**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES, FD-1, IAMAW, AFL-CIO, et al. | ) ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | )   Civ. A. No. 18-cv-1261 |
| | ) |
| DONALD J. TRUMP, et al. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 56 of the Federal Rules of Civil Procedure, Plaintiffs NATIONAL FEDERATION OF FEDERAL EMPLOYEES, FD-1, IAMAW, AFL-CIO; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS; SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO; NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, FEDERAL EDUCATION ASSOCIATION, INC.; METAL TRADES DEPARTMENT, AFL-CIO; INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, AFL-CIO & CLC; NATIONAL WEATHER SERVICE EMPLOYEES ORGANIZATION; PATENT OFFICE PROFESSIONAL ASSOCIATION; NATIONAL LABOR RELATIONS BOARD UNION; NATIONAL LABOR RELATIONS BOARD PROFESSIONAL ASSOCIATION; and MARINE ENGINEERS' BENEFICIAL ASSOCIATION, DISTRICT NO. 1 PCD, AFL-CIO ("Plaintiffs" or "Plaintiff Unions") file this motion for summary judgment for the reasons set forth in the attached memorandum.

1

Plaintiff Unions move the Court to enter judgement declaring that Exec. Order 13,836, 13,837, and 13,839 are unlawful and permanently enjoin Defendant President Trump or his subordinates, including Defendants Pon and OPM, from enforcing Exec. Orders 13,836, 13,837, and 13,839.

**Dated: June 25, 2018**                                     Respectfully Submitted,


                                                 /s/ Jefferson D. Friday
                                                 Jefferson D. Friday (application for
                                                    readmission pending)
                                                 General Counsel
                                                 D.C. Bar No. 358253


                                                 /s/ Renee L. Mantone
                                                 Renee L. Mantone (application for admission
                                                    pending)
                                                 Assistant General Counsel
                                                 D.C. Bar No. 1045053


                                                 /s/ Suzanne Summerlin
                                                 Suzanne Summerlin*
                                                 Assistant General Counsel
                                                 D.C. Bar No. 1044859
                                                 * Lead Counsel

                                                 National Federation of Federal Employees,
                                                    FD-1, IAMAW, AFL-CIO
                                                 1225 New York Avenue, N.W., Suite 450
                                                 Washington, D.C. 20005
                                                 Phone: (202) 216-4420
                                                 Fax:    (202) 898-1861
                                                 Email: jfriday@nffe.org
                                                 Email: rcatalano@nffe.org
                                                 Email: ssummerlin@nffe.org

                                                 Attorneys for Plaintiff NFFE

/s/ Mark Schneider

Mark Schneider
General Counsel
D.C. Bar No. 385989
International Association of Aerospace
  Workers, AFL-CIO
9000 Machinists Place,
Upper Marlboro, MD 20772

Attorney for Plaintiff IAM


/s/ Sarah E. Suszczyk

Sarah E. Suszczyk (pro hac vice application
  pending)
Deputy General Counsel


/s/ Robert J. Shore

Robert J. Shore
Assistant General Counsel
D.C. Bar No. 999552

National Association of Government
  Employees, Inc.
1020 North Fairfax, Suite 200
Alexandria, VA 22314
Phone: (703) 519-0300
Fax:    (703) 519-0311
Email: ssuszczyk@nage.org
Email: rshore@nage.org

Attorneys for Plaintiff NAGE


/s/ Bradley Raymond

Bradley Raymond, Of Counsel
General Counsel
D.C. Bar No. 952184
International Brotherhood of Teamsters
Tel: 202-624-6847

Attorney for Plaintiff Teamsters



 /s/ Keith R. Bolek

Keith R. Bolek
D.C. Bar No. 463129
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C. 20015
Phone: (202) 362-0041
Fax:    (202) 362-2640
Email: kbolek@odonoghuelaw.com

Attorney for Plaintiff Metal Trades
Department, AFL-CIO



 /s/ Richard J. Hirn

Richard J. Hirn
Attorney at Law
D.C. Bar No. 291849
5335 Wisconsin Ave N.W., Suite 440
Washington, D.C. 20015
Phone: (202) 274-1812
Email: richard@hirnlaw.com

Attorney for Plaintiffs FEA/NEA, NWSEO
and POPA

## CERTIFICATE OF SERVICE

I certify that, on June 25, 2018, I electronically filed the foregoing document with the Clerk of

the Court for the United States District Court for the District of Columbia through the CM/ECF

system. I further certify that service was accomplished pursuant to the Court's electronic filing

procedures.


  /s/ Suzanne Summerlin
Suzanne Summerlin
D.C. Bar No. 1044859
Phone: (202) 216-4420
Email: ssummerlin@nffe.org

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES, FD-1, IAMAW, AFL-CIO, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. A. No. 18-cv-1261 |
| DONALD J. TRUMP, et al. | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

On Behalf of Plaintiff Unions,

*/s/ Suzanne Summerlin*

Suzanne Summerlin
D.C. Bar No. 1044859
Assistant General Counsel
**National Federation of Federal**
**Employees, FD-1, IAMAW, AFL-CIO**
1225 New York Avenue, N.W., Suite 450
Washington, D.C. 20005
Phone: (202) 216-4420
Fax:    (202) 898-1861
Email: ssummerlin@nffe.org

**Dated: June 25, 2018**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ...............................................................................................1

II.     STATEMENT OF THE CASE..............................................................................1

        a.      The Civil Service Reform Act and the Federal Service Labor-Management
                Relations Statute ....................................................................................1

                1.      The Federal Service Labor-Management Relations Statute .............2

                        i.      *The Duty to Bargain*.............................................................2

                        ii.     *Official Time* ......................................................................3

                        iii.    *Grievance Procedures* ..........................................................4

                        iv.     *The Federal Labor Relations Authority, and the Authority to Administer
                                the FSLMR Statute* ...............................................................5

                2.      Performance Evaluation Procedures .................................................6

        b.      The Executive Orders .............................................................................7

                1.      Executive Order 13, 836 ................................................................7

                2.      Executive Order 13, 837 ................................................................8

                3.      Executive Order 13, 839 ..............................................................11

III.    THE SUMMARY JUDGMENT STANDARD.......................................................12

IV.     THE STANDARD OF REVIEW .......................................................................13

V.      ARGUMENT ...................................................................................................14

        a.      Summary Judgment Should be Granted Because the President
                Lacks Authority to Issue the Executive Orders .......................................14

        b.      The Executive Orders are also Invalid Because Multiple Provisions Conflict with
                the FSLMR Statute ...............................................................................21
                1.      The Executive Orders Impermissibly Restrict the Scope of Bargaining
                        Mandated by Congress in the FSLMR Statute ...............................22

2. Executive Order No. 13,837 is an Improper Attempt to Legislate Different Requirements For Use of Official Time Under 5 U.S.C. § 7131 than Congress Proscribed ................................................................................................27

3. Exec. Order No. 13,837 Plainly Violates Both 5 U.S.C. § 7211 and 5 U.S.C. § 7102.....................................................................................................................31

4. Exec. Order No. 13,836 Impermissibly Rewrites the Collective Bargaining Scheme Created by Congress Through the FSLMR Statute...........................33

VI.  CONCLUSION.................................................................................................................34

## TABLE OF AUTHORITIES

Cases                                                                        Pages

*Am. Fed'n of Gov't Employees, AFL-CIO, Council of Locals No. 214 v.
Fed. Labor Rel. Auth.*, 798 F.2d 1525 (D.C. Cir. 1986) ..................................... 17, 29

*Am. Fed'n of Gov't Employees, Locals 225, 1504, & 3723, AFL-CIO v.
Fed. Labor Rel. Auth.*, 712 F.2d 640 (D.C. Cir. 1983) ................................................ 24

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986) .......................................... 12, 13

*Bldg. & Constr. Trades Dep't v. Allbaugh*, 172 F.Supp.2d 138 (D.D.C. 2001),
*rev'd. on other grounds*, 295 F.3d 28 (D.C. Cir. 2002) ............................................. 20

*Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964) ................ 27

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Rel. Auth.*,
464 U.S. 89 (1983) ................................................................... 16, 17, 20, 26

*Bush v. Lucas*, 462 U.S. 367 (1983) ........................................................... 32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................ 13

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (1996) ................................... 13, 15, 21

*Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993) ................................................ 12

*Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840 (D.C. Cir. 2001) ............................. 13

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ............................................ 12

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .......................................... 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................... 12

*Mexichem Flour, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017) .................................. 18

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ...................... 14

*Nat'l Fed'n of Fed. Employees, Local 1167 v. Fed. Labor Rel. Auth.*,
681 F.2d 886 (D.C. Cir. 1982) ................................................................ 19

*NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006).............................................. 26

*Old Dominion Branch No. 496, National Ass'n of Letter Carriers, AFL-CIO
v. Austin*, 418 U.S. 264 (1974)............................................................... 16

*Overseas Educ. Ass'n, Inc. v. Fed. Labor Rel. Auth.*, 876 F.2d 960 (D.C. Cir. 1989) ............... 16

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................. 27

*United States v. R.I. Dep't of Corr.*, 81 F. Supp. 3d 182, 188 (D.R.I. 2015) ............................ 21

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ................................................... 13

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................... 13, 14, 20, 21

<u>Statutes and Regulations</u>

5 U.S.C. § 301 ............................................................................................. 9, 11, 15

5 U.S.C. § 1104 ................................................................................................... 11

5 U.S.C. § 3301 ............................................................................................. 11, 15

5 U.S.C. § 4302 ............................................................................................. 6, 7, 24

5 U.S.C. § 7101 ............................................................................................... 2, 17

5 U.S.C. § 7102 ....................................................................................... 2, 28, 31, 32

5 U.S.C. § 7103 ........................................................................................ 3, 6, 7, 17

5 U.S.C. § 7104 ...................................................................................... 5, 6, 16, 20

5 U.S.C. § 7105 ................................................................................. 5, 6, 17, 18, 22

5 U.S.C. § 7106 ................................................................................... 3, 7, 8, 24, 33

5 U.S.C. § 7114 ......................................................................... 2, 3, 5, 23, 30, 33

5 U.S.C. § 7117 ....................................................................................... 3, 7, 10, 22

5 U.S.C. § 7119 ................................................................................................... 2, 6

5 U.S.C. § 7120 ....................................................................................................... 6

5 U.S.C. § 7121 ............................................................................ 4, 5, 11, 22, 26, 29

5 U.S.C. § 7131 ...................................................................................... 3, 4, 9, 18, 26-32

5 U.S.C. § 7134 ................................................................................... 6, 18, 23, 27

5 U.S.C. § 7211 ..................................................................................... 30, 32

5 U.S.C. § 7301 ............................................................................ 9, 11, 15, 16

18 U.S.C § 1913 ........................................................................... 10, 28, 31

5 C.F.R. Part 2424 ......................................................................................... 18

Administrative Decisions

*AFGE Local 12 and the U.S. Department of Labor*, 60 F.L.R.A. 533 (2004) ...................... 24, 33

*AFGE, Local 1760 and Social Security Administration, Northeastern
Program Service Center Activity*, 22 F.L.R.A. 195 (1986) ......................................... 24

*Department of Defense, Montana Air National Guard, Great Falls, MT and ACT*,
00 FSIP 35 (2000) ......................................................................................... 23

*Military Entrance Processing Station, Los Angeles and AFGE Local 2866*,
25 F.L.R.A. 685 (1987) .................................................................................. 25

*NFFE Local 1827 and Catherine Bratton*, 49 F.L.R.A. 738 (1994) .......................... 30

*NFFE Local 1214 and U.S. Department of the Army Headquarters, U.S. Army
Training Center and Fort Jackson, Fort Jackson, SC*, 51 F.L.R.A. 1362 (1996) ...................... 24

*NTEU v. Internal Revenue Service*, 27 F.L.R.A. 132 (1987) ...................................... 23

*NTEU v. U.S. Department of Commerce, Patent and Trademark Office*,
52 F.L.R.A. 1265 (1997) ................................................................................. 29

*Patent Office Prof'l Ass'n Union and Patent and Trademark Office,
Department of Commerce*, 29 F.L.R.A. 1389 (1987) ................................................. 29

*U.S. Department of Army, Corps of Engineers, Memphis District and
NFFE, Local 259*, 52 F.L.R.A. 920 (1997) ......................................................... 28, 31

*U.S. Geological Survey, Caribbean District Office San Juan, Puerto Rico and
AFGE Local 1503*, 53 F.L.R.A. 1006 (1997) ........................................................ 33

Secondary Materials and Miscellaneous

124 Cong. Rec. H 8466 (daily ed. Aug. 11, 1978) ................................................... 19

124 Cong. Rec. H 8467 (daily ed. Aug. 11, 1978) ................................................... 19

124 Cong. Rec. H 9637 (daily ed. Sept. 13, 1978) ...................................................... 19

124 Cong. Rec. H 9638 (daily ed. Sept. 13, 1978) ...................................................... 30

124 Cong. Rec. H 9639 (daily ed. Sept. 13, 1978) ...................................................... 20

Application of 18 U.S.C. 1913 to "Grass Roots" Lobbying by Union
Representatives, 29 Op. O.L.C. 181 (2005).......................................................... 28, 31

H. Manley Case, *Project on the Merit Systems Protection Board: The
Civil Service Reform Act of 1978*, 29 HOW. L.J. 283 (1986) ...................................... 31

Joseph E. Slater, *The Court Does Not Know 'What a Labor Union Is':
How State Structures and Judicial (MIS)Constructions Deformed Public
Sector Labor Law*, 79 OR. L. REV. 981 (2000) ............................................................ 31

I. **INTRODUCTION**

On May 25, 2018 Defendant, President Donald J. Trump issued three executive orders (the "Executive Orders") which seek to regulate aspects of collective bargaining, union representation and employee performance within the Executive Branch. Exec. Order 13,836, 83 Fed. Reg. 25,329 (Jun. 1, 2018); Exec. Order 12,837, 83 Fed. Reg. 25,335 (Jun. 1, 2018); *and* Exec. Order 12,839, 83 Fed. Reg. 25, 25343 (Jun. 1, 2018).

Movants are 13 labor organizations ("Plaintiff Unions") representing approximately 300,000 federal employees across the United States and working abroad. Plaintiff Unions have filed this action to challenge Defendant Trump's issuance of the Executive Orders. The Executive Orders were issued without authority from the U.S. Constitution or the Congress. Further, the Executive Orders impermissibly seek to legislate in an area already covered by statute, in a way that conflicts with statute and/or the Constitution. Therefore, Plaintiff Unions move for summary judgment on all counts of their complaint, and respectfully request this Court issue a declaratory judgment and permanent injunction halting implementation of the Executive Orders.

II. **STATEMENT OF THE CASE**

a. **The Civil Service Reform Act and the Federal Service Labor-Management Relations Statute**

Prior to 1978, the right of a federal employee to join a union and to bargain collectively with a department or agency in the Executive Branch was set forth in executive orders issued by President John F. Kennedy (Exec. Ord. No. 10,988, 27 Fed. Reg. 551 (Jan. 17, 1962)) and President Richard M. Nixon (Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 29, 1969)). These executive orders established a limited right for federal employees to join labor organizations and bargain collectively with their employer. For more than two decades, executive orders were a part of the governing legal framework for labor-management relations in the Executive Branch.

1

This framework was displaced in 1978, when Congress passed the Civil Service Reform Act ("CSRA"). Signed into law by President Carter, the CSRA is a comprehensive statute that addresses nearly all aspects of employment within the Executive Branch.

### 1.    The Federal Service Labor-Management Relations Statute

One of the cornerstones of the CSRA is the Federal Service Labor-Management Relations Statute ("FSLMR Statute" or "Statute"). *See* 5 U.S.C. §§ 7101, *et seq.* In the FSLMR Statute, Congress codified its finding that the existence of labor organizations, like the Plaintiff Unions, and collective bargaining on behalf of federal employees, is in the public interest. 5 U.S.C. § 7101. Thus, the FSLMR Statute reaffirmed federal employees' rights to form unions and, through those unions, to bargain collectively over conditions of employment. 5 U.S.C. §§ 7101(a)(1); 7102.

### i.    The Duty to Bargain

The FSLMR Statute refines the "representation rights and duties" of both labor organizations and executive agencies. This includes the duty to bargain, which provides as follows:

> Any agency and any exclusive bargaining representative in any appropriate unit in the agency, through appropriate representatives, shall meet and negotiate in good faith for the purpose of arriving at a collective bargaining agreement. In addition, the agency and the exclusive representative may determine appropriate techniques, consistent with the provisions of section 7119 of this title [which address impasses], to assist in any negotiation.

5 U.S.C. § 7114(a)(4).  The Statute further enumerates certain aspects of the duty to bargain, that are binding upon both employers and unions. These aspects include, but are not limited to, the obligation "to approach the negotiations with a sincere resolve to reach a collective bargaining agreement;" "to be represented at the negotiations by duly authorized representatives prepared to discuss and negotiate on any condition of employment;" and "to meet at reasonable times and convenient places as frequently as may be necessary, and, to avoid unnecessary delay."  5 U.S.C. §§ 7114(b)(1), (2) & (3).  Once the parties reach an agreement, they are required to execute a

written document embodying the agreed-upon terms and "to take such steps as are necessary to implement such agreement." 5 U.S.C. § 7114(b)(5).

The FSLMR Statute further defines the conditions of employment over which the parties may bargain collectively. 5 U.S.C. § 7103(a)(14). The statute defines the phrase "conditions of employment" to include "personnel policies, practices and matters whether established by rule, regulation or otherwise, affecting working conditions," with the exception of such policies, practices or matters relating to political activities, classification of any position and "to the extent any such matters are specifically provided by statute." *Id.* While the Statute does specifically provide certain management rights to employers, 5 U.S.C. §7106(a), it permits collective bargaining between labor organizations and executive agencies:

> (1)     at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project or tour of duty, or on the technology, methods, and means of performing work;

> (2)     procedures which management officials of the agency will observe in exercising authority under this section; or

> (3)     appropriate arrangements for employees adversely affected by the exercise of any authority under this section [5 U.S.C. § 7106] by such management officials.

5 U.S.C. §§ 7106(b)(1)-(3). The duty to bargain in good faith applies to all subjects of bargaining which are not inconsistent with federal law, or a government-wide rule or regulation. *See* 5 U.S.C. § 7117(a)(1).

### ii.     *Official Time*

To ensure that a labor organization can fulfill its legal obligation of the duty to bargain, the FSLMR Statute authorizes "official time" to employees who represent their union in contract negotiations. 5 U.S.C. § 7131(a). The Statute provides that any such employee "shall be authorized official time for such purposes, including attendance at impasse proceeding, during the time the

employee otherwise would be in a duty status." *Id.* The only limitation is that "[t]he number of employees for whom official time is authorized under this subsection shall not exceed the number of individuals designated as representing the agency for such purposes." *Id.*

The FSLMR Statute contains other provisions governing official time. For example, it expressly identifies activities that are prohibited on official time, such as those matters "relating to internal union business of a labor organization (including the solicitation of membership, elections of labor organization officials, and collection of dues)." 5 U.S.C. § 7131(b). The Statute also provides that, except as provided in preceding subsections, "any employee representing an exclusive representative or … in connection with any other matter covered by this chapter, any employee in an appropriate unit represented by an exclusive representative shall be granted official time in any amount the agency and the exclusive bargaining representative involved agree to be reasonable, necessary and in the public interest." 5 U.S.C. § 7131(d). The reference to Chapter is Chapter 71, which includes provisions that govern, *inter alia*, grievance and arbitration procedures. *See* 5 U.S.C. § 7121.

### iii.    *Grievance Procedures*

Section 7121(a) of the FSLMR Statute provides that any collective bargaining agreement must provide for procedures to settle grievances, including arbitrability questions. 5 U.S.C. § 7121(a)(1). With certain exceptions, these "procedures shall be the exclusive administrative procedure for resolving grievances which fall within its coverage." *Id.* The Statute specifically provides that any negotiated grievance procedure shall be "fair and simple," as well as provide for "expeditious processing…." 5 U.S.C. §§ 7121(b)(1)(A), (B).  It also requires a grievance procedure "assure an exclusive representative the right, in its own behalf or on behalf of any employee represented by the exclusive representative, to present and process grievances" and "provide that

4

any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency." 5 U.S.C. §§ 7121(C)(i)-(iii). Thus, the grievance procedure must provide the union with the right to represent any employee in the bargaining unit. The reason is that the labor organization has a duty, whether in handling grievances or negotiating collective bargaining agreements, to represent "the interests of all employees in the unit … without discrimination and without regard to labor organization membership." 5 U.S.C. § 7114(a)(1).

> iv.     *The Federal Labor Relations Authority, and the Authority to Administer the FSLMR Statute*

Not only does the FSLMR Statute contain detailed provisions governing collective bargaining, official time and grievance procedures, but it also established the Federal Labor Relations Authority ("FLRA") to administer and enforce those provisions, as well as the remainder of the Statute. 5 U.S.C. §§ 7104, 7015. The FLRA consists of three members (no more than two from the same political party). 5 U.S.C. § 7104(a). FLRA members are appointed for five year terms by the President, by and with the advice and consent of the Senate. 5 U.S.C. §§ 7104(b), 7104(c).

The FSLMR Statute establishes the powers and duties of the FLRA. 5 U.S.C. § 7105. Section 7105 of the Statute provides that it is the FLRA that "shall provide leadership in establishing policies and guidance relating to matters under this chapter [Chapter 71], and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter." 5 U.S.C. § 7105(a)(1). This section further enumerates the powers of the FLRA, which it will exercise "to the extent provided in this chapter and in accordance with regulations prescribed …" by that agency. 5 U.S.C. § 7105(a)(2). The FLRA can "prescribe criteria and resolve issues relating to determining "compelling need" for agency rules or regulations, and "resolve issues relating to the

duty to bargain in good faith."  5 U.S.C. §§ 7105(a)(2)(D), 7105(a)(2)(E). The FLRA also has the

power "to take such other actions as are necessary and appropriate to effectively administer the

provisions of this chapter. 5 U.S.C. § 7105(a)(2)(I).

> With respect to the regulations, the Statute further provides, in relevant part, that:

> The Authority [*i.e.*, the FLRA], the General Counsel [of the FLRA], the Federal
> Mediation and Conciliation Service, the Assistant Secretary of Labor Management
> Relations, and the [Federal Service Impasses] Panel shall each prescribe rules and
> regulations to carry out the provisions of this chapter to each of them, respectively.

5 U.S.C. § 7134.[1] The FSLMR Statute does not grant the authority to issue regulations to any other

agency, such as the Office of Personnel Management ("OPM") or the President.

Rather, the Statute provides the President with the authority to issue executive orders in

two specific areas. First, the President may exclude an agency or subdivision from the coverage of

the FSLMR Statute if it "has as a primary function intelligence, counterintelligence, investigative

or national security work." 5 U.S.C. § 7103(b)(1). Second, the President may issue an executive

order suspending the statute's provisions "with respect to any agency, installation, or activity

located outside the 50 States and the District of Columbia, if the President determines the

suspension is necessary in the interest of national security." 5 U.S.C. § 7103(b)(2).

### 2.   *The Performance Evaluation Procedures*

Another significant aspect of the Civil Service Reform Act ("CSRA") involves the

processes for the evaluation of employee performance. *See* 5 U.S.C. § 4302. The CSRA directs

agencies to develop one or more "performance appraisal systems" that "(1) provide for periodic

appraisals of job performance of employees; (2) encourage employee participation in establishing

performance standards; and (3) use the results of performance appraisals as the basis for training,

---

[1] The provisions addressing entities or offices other than the FLRA may be found in 5 U.S.C. 7104(f) (General Counsel of the FLRA), 5 U.S.C. § 7119(a) (Federal Mediation and Conciliation Service, 5 U.S.C. § 7119(c) (Federal Service Impasses Panel) 5 U.S.C. § 7120 (Assistant Secretary for Labor Management Relations).

rewarding, reassigning, promoting, reducing in grade, retaining and removing employees." 5 U.S.C. §§ 4302(a)(1)-(3). The CSRA further provides that, "[u]nder regulations which the Office of Personnel Management shall prescribe, each performance appraisal system shall provide for … reassigning, reducing in grade or removing employees who continue to have unacceptable performance, *but only after an opportunity to demonstrate acceptable performance*." 5 U.S.C. § 4302(c)(6) (emphasis added).

The italicized language above is commonly known as a "performance improvement period" or "PIP." The CSRA does not define the length of a PIP, either in 5 U.S.C. § 4302 above, or as a management right in 5 U.S.C. § 7106(a). Therefore, the length of a PIP is a matter for collective bargaining under the FSLMR Statute. 5 U.S.C. §§ 7103(a)(12). As noted above, agencies must bargain with unions over conditions of employment to the extent that such proposals are not inconsistent with law, government-wide regulation, or rights that are served by statute to management. 5 U.S.C. §§ 7103(a)(12), 7103(a)(14), 7106(a), 7117(a)(1).

b.    **The Executive Orders**

For nearly 40 years, the extensive statutory framework established by the CSRA and the FSLMR Statute has governed collective bargaining, labor-management relations and many other aspects of the employment relationship within departments and agencies of the Executive Branch.

On May 25, 2018, President Trump issued Executive Orders which overlap with the provisions of the CSRA and the FSLMR Statute. *See supra*, Sec. II(a). The provisions at-issue in each Executive Order are addressed herein.

1.    *Executive Order No. 13,836*

Executive Order No. 13,836, 83 Fed. Reg. 25329 (Jun. 1, 2018), is entitled "Developing Efficient, Effective and Cost-Reducing Approaches to Federal Sector Collective Bargaining."

Although President Trump purports to issue the Executive Order "[b]y the authority vested in [him] as President by the Constitution and the laws of the United States of America," the President does not specifically identify what provision of the Constitution or what law would provide him with the authority. Exec. Order No. 13,836, 83 Fed. Reg. at 25329.

The Executive Order contains substantive provisions that affect collective bargaining with labor organizations, which is otherwise governed by the FSLMR Statute, including:

(a)      Section 5(a), 83 Fed. Reg. at 25331, which states that between four to six months "should ordinarily be considered [a] reasonable" period of time to negotiate a collective bargaining agreement (also referred to as a "term agreement");

(b)      Section 5(e), *id.* at 25332, requires agencies to insist upon the exchange of written proposals during negotiations, as well as directs agencies to "at the soonest opportunity," to eliminate "any requirements for a bargaining approach other than the exchange of written proposals," such as an interest-based bargaining process where the parties at the bargaining table jointly develop contract provisions through dialogue in their effort to resolve workplace issues; and

(c)      Section 6, *id.*, prohibits the heads of Federal agencies from bargaining "over the substance of subjects set forth in section 7106(b)(1) of Title 5, United States Code", and further directs that such heads "shall instruct subordinate officials that they may not negotiate over those same subjects."

## 2.     *Executive Order No. 13,837*

Executive Order No. 13,837, 83 Fed. Reg. 25335 (Jun. 1, 2018), is entitled "Ensuring Transparency, Accountability and Efficiency in Taxpayer-Funded Union Time Use." President

Trump purports to issue the Executive Order "[b]y the authority vested in [him] as President by the Constitution and the laws of the United States…." *Id.*, 83 Fed. Reg. at 25335.

The President identifies two such laws: 3 U.S.C. § 301 and 5 U.S.C. § 7301. The former statute provides that the President "is authorized to designate or empower the head of any department or agency in the executive branch," or any official who is appointed and confirmed by the Senate, "to perform without approval, ratification or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification or other action of the President…." 5 U.S.C. § 301. The latter statute provides, "[t]he President may prescribe regulations for the conduct of employees in the executive branch." 5 U.S.C. § 7301.

Rather than address the functions of the President or the conduct of employees in the executive branch, Executive Order No. 13,837 addresses the amount and use of "taxpayer-funded union time," which is an ideologically laden label for "official time,"[2] by employees who are acting as representatives of their labor organization.  These provisions include the following:

(a)     Section 3, 83 Fed. Reg. at 25336, declares that collective bargaining agreements providing more than one (1) hour of official time per bargaining unit employee should, "taking into account the size of the bargaining unit and the amount of [official] time to be granted under sections 7131(a) and 7131(c) of Title 5, United States Code, ordinarily not be considered reasonable, necessary or in the public interests …" for the purpose of 5 U.S.C. § 7131(d);

---

[2] Rather than indulge the ideologies underlying the Executive Order, the Plaintiffs will refer to the matter at issue by its rightful name, official time, as provided in statute.  5 U.S.C. § 7131.

(b)      Section 4(a)(i), *id.* at 25337, prohibits union representatives from using official time to lobby Congress for improvements in working conditions;

(c)      Section 4(a)(ii), *id.*, prohibits employees as union representatives from spending more than one-quarter of their time carrying out representational activities;

(d)      Section 4(a)(iii), *id.*, prohibits union representatives from using government facilities or resources without charge when they are performing the representation obligations imposed upon them by the FSLMR Statute;

(e)      Section 4(a)(iv), *id.*, prohibits union representatives from being reimbursed for travel expenses when engaged in collective bargaining;

(f)      Section 4(a)(v), *id.*, prohibits union representatives from using official time when they are processing grievances on behalf of individuals other than themselves;

(g)      Section 4(b), *id.*, establishes a pre-authorization requirement for each use of official time;

(h)      Section 4(c), *id.* at 25,337-25,338, directs the OPM's Director to issue regulations concerning the use of official time, despite the absence of any such authority under the FSLMR Statute;

(i)      Section 5(a), *id.* at 25,338, subjects union representatives to discipline for what the President deems to be improper use of official time;

(j)      Section 5(c), *id.* at 25,338, states that official time to lobby Congress is a violation of 18 U.S.C. § 1913; and

(k)      Section 8(b), *id.* at 25,340, directs Federal Agencies to reopen existing collective bargaining agreements to obtain compliance with the Executive Order or,

alternatively, to terminate unilaterally the provisions of existing agreements that conflict with the order.

### 3.   *Executive Order 13,839*

Executive Order No. 13,839, 83 Fed. Reg. 25335 (Jun. 1, 2018), is entitled "Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles." The President purports to issue this Executive Order "by the authority vested in [him] as President by the Constitution and the laws of the United States of America," specifically referring to three such statutes: 5 U.S.C. § 1104(a)(1); 5 U.S.C. § 3301; and 5 U.S.C. § 7301. The first statute provides that the President may delegate his authority for personnel management functions to the OPM Director. 5 U.S.C. § 1104(a)(1). The second statute addresses the President's ability to issue regulations relating to the civil service. 5 U.S.C. § 3301.  The third statute, as noted above, provides, "[t]he President may prescribe regulations for the conduct of employees in the executive branch." 5 U.S.C. § 7301.

The following provisions of the Executive Order involve matters that overlap with the FSLMR Statute:

(a)     Section 3, 83 Fed. Reg. at 25,334, directs agencies to exclude grievances from negotiated grievance and arbitration procedures, despite the fact that the FSLMR Statute provides employees with the right to choose between the grievance procedure and the Merit System Protection Board, 5 U.S.C. §§ 7121(d) & (e);

(b)     Section 4(a), *id.*, excludes from the grievance procedure disputes over employee performance ratings, incentive pay, cash awards, quality step increases, and recruitment, retention and relocation payments;

      (c)      Section 4(b)(iii), *id.*, precludes unions from negotiating "just cause" standards for discipline that include progressive discipline;

      (d)      Section 4(c), *id.* at 25,345, which prohibits unions from negotiating over the length of performance improvement periods or PIPs; and

      (e)      Section 7, *id.*at 25,345-25,346, directs the OPM Director to issue regulations implementing the exclusions from the grievance and arbitration procedure, as well as removing the above noted matters from negotiation.

President Trump had no authority to issue the Executive Orders under the U.S. Constitution or statute. Further, the Executive Orders conflict with the provisions of the CSRA and the FSLMR Statute – undermining the statutory scheme established by Congress nearly four decades ago when it decided to specifically legislate federal labor-management relations, overriding executive orders issued by previous U.S. Presidents. Therefore, the Plaintiff Unions now seek summary judgment to enjoin the Executive Orders from taking effect.

## III.    <u>THE SUMMARY JUDGMENT STANDARD</u>

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions, affidavits, or declarations show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

Mere allegations are not sufficient to defeat a summary judgment motion. *Anderson*, 477 U.S. at 247.  To preclude summary judgment, a nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Doe v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993).

Thus, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials, but be supported by affidavits, declarations, and other competent evidence. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (holding that to defeat a motion for summary judgment, a part must present "more than a scintilla of evidence to support his claims"). Federal Rule of Civil Procedure 56 and Local Rule 7.1(h) each place the burden upon Defendants to designate specific facts showing that there is a genuine issue of fact for resolution at a trial. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990); *Celotex*, 477 U.S. at 324.

If the nonmoving party's evidence is "not significantly probative" or "merely colorable," the Court may still grant the motion for summary judgment. *Anderson*, 477 U.S. at 249-50.

## IV.   THE STANDARD OF REVIEW

Executive orders are unquestionably subject to judicial review. "[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The United States Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952).

In this action, the Plaintiff Unions are seeking non-statutory *ultra vires* review of the action by the President to issue the Executive Orders. *See Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1328 (1996). "The responsibility of determining the limits of statutory grants of authority is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id*. at 1324; *see also Youngstown Sheet & Tube* 343 U.S. at 589 ("The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times."); *and Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) ("It is

beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action."). Therefore, the Congress and U.S. Constitution have vested in this Court the sole power to review the actions of the President and to determine if the Executive Orders at-issue are lawful.

## V.   ARGUMENT

As provided *infra* in Section V.a., summary judgment should issue in this matter because the President lacks authority to issue Executive Order Nos. 13,836, 13,837, and 13,839, as neither statute nor the Constitution grants him with such authority. In enacting the FSMLR Statute, Congress explicitly removed from the President the authority to regulate Federal sector collective bargaining through executive orders. Consequently, the President did not have legal authority, either through statute or the Constitution, to issue the three Executive Orders of May 25. Similarly, OPM is not one of the agencies to which Congress delegated the authority to issue regulations implementing the FSLMR Statute and therefore it lacks legal authority to issue the regulations which the President directed in the three Executive Orders.

In the alternative, even if the Court finds the President had authority, several sections of the three Executive Orders conflict with the FSLMR Statute. *See infra,* Section V.b.

### a.   Summary Judgment Should be Granted Because the President Lacks Authority to Issue the Executive Orders

It is "a statement of black letter law" that 'the President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999), *quoting Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Accordingly, a reviewing court must enjoin the enforcement of an executive order that is either issued without legal authority, or which is in conflict with an act of Congress. *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 189 (holding that the parties'

failure to point to any "colorable source for the President's authority" meant that portion of the Executive Order directing removal of Native Americans was invalid); *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1327-30 (D.C. Cir. 1996) (finding that an executive order disqualifying federal contractors who hire permanent striker replacements conflicts with National Labor Relations Act).

The Plaintiff Unions will demonstrate that the Executive Orders were issued without authority from the Congress or the U.S. Constitution, and further, the Executive Orders violate Congress' statutory scheme to regulate federal labor-management relations.

In the preambles to Exec. Order No. 13,837 and Exec. Order No. 13,839, the President cites the Constitution as his authority to issue the orders, as well as 5 U.S.C. § 7301.  Section 7301 states: "The President may prescribe regulations for the conduct of employees in the executive branch."

Exec. Order No. 13,839 additionally cites 5 U.S.C. § 3301, authorizing the President "to prescribe such regulations for the admission of individuals into the civil service" and to "ascertain the fitness of applicants." Of significance, the President cites a grant of authority which speaks to hiring of federal employees, yet nothing in that executive order addresses hiring.

Finally, the President cites no specific statutory authority in the preamble of Exec. Order No. 13,836 ("Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining").

The President's interpretation of the grant of power in Section 7301 is inaccurate. The President cites this authority without consideration for the fact that the Executive Orders impermissibly overwrite and intrude into the statutory scheme proscribed by Congress when it

passed the FSLMR Statute in 1978. *See* Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute ["SOF"] ¶ 20-25.

Before the passage of the FSLMR Statute, federal employees enjoyed a limited right to collectively bargain with the government through a series of executive orders issued by President Kennedy (Exec. Order No. 10,988, 27 Fed. Reg. 551 (Jan. 17, 1962)) and by President Nixon (Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 29, 1969)).

In 1974, prior to the passage of the FSLMR Statute, the Supreme Court wrote in a footnote to a case involving unions and defamation claims, that "Executive Order [No. 11,491] finds express statutory authorization in 5 U.S.C. § 7301, which provides that '[t]he President may prescribe regulations for the conduct of employees in the executive branch.'" *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273, n.5 (1974).

However, Congress wrested the power to regulate federal labor-management relations away from the Executive branch with the passage of the FSLMR Statute, "a comprehensive effort by Congress to balance the interest of the Government in efficient operation with the interest of employees in decisions affecting them." *Overseas Educ. Ass'n, Inc. v. FLRA*., 876 F.2d 960, 961 (D.C. Cir. 1989). As discussed below, both the text and legislative history of the FSLMR Statute establish that Congress explicitly divested the President of authority to regulate federal sector collective bargaining through executive orders, except in two discrete instances.

Congress, through the FSLMR Statute created the Federal Labor Relations Authority ("FLRA"), an independent, bipartisan agency, to regulate federal sector labor relations. 5 U.S.C. § 7104; *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 92 (1983).  In so doing it "entrusted the FLRA with the primary responsibility for administering and interpreting the

FSLMR. The FLRA was intended to develop specialized expertise in the field of federal labor relations and to use this expertise to give content to the Statute's principles and goals." *Am. Fed'n of Gov't Employees, AFL-CIO, Council of Locals No. 214 v. FLRA*, 798 F.2d 1525, 1528 (D.C. Cir. 1986).

Specifically, Congress granted the FLRA, and not the President or OPM, the authority to "provide leadership in establishing policies and guidance relating to matters under this chapter, and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter." 5 U.S.C. § 7105(a)(1); *Bureau of Alcohol, Tobacco and Firearms*, 464 U.S. at 92.

The Executive Orders attempt to supplant the FLRA's role. For example, in noting that the FSLMR Statute authorizes official time, Section 1 of Exec. Order No. 13,837 states that "[t]he Congress, however, has also instructed the executive branch to interpret the law in a manner consistent with the requirements of an effective and efficient government." *See* 5 U.S.C. § 7101(b). This is not correct: Congress granted only the FLRA, an independent agency, the authority to interpret the Statute, not "the executive branch."

Congress explicitly limited the President's authority to issue executive orders under the FSLMR Statute to two specific, narrow areas involving national security. 5 U.S.C. § 7103(b).[3] The Executive Orders plainly do not fall within either of these exceptions.

The President directs the Office of Personnel Management ("OPM") to execute these unlawful orders in further contravention of Congressional authority and the FSLMR Statute. In §

---

[3] "(1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that— (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security." 5 U.S.C. § 7103(b).

4 of Exec. Order No. 13,837 the President instructed the OPM Director to promulgate regulations limiting the use of official time authorized by § 7131 of the FSLMR Statute. Similarly, in Section 7 of Exec. Order No. 13,839 the President instructed the OPM Director to issue regulations limiting the scope of negotiated grievance procedures in collective bargaining agreements by removing from them disputes over removals, performance ratings, incentive pay, awards, within grade step increases and recruitment, retention and relocation benefits.  "The agency must have statutory authority for the regulations it wants to issue." *Mexichem Fluor, Inc. v. Envtl. Prot. Agency*, 866 F.3d 451, 460 (D.C. Cir. 2017). However, OPM is not one of the agencies which Congress authorized to issue regulations under the FSLMR Statute:

> The Authority, the General Counsel, the Federal Mediation and Conciliation Service, the Assistant Secretary of Labor for Labor Management Relations, and the Panel shall each prescribe rules and regulations to carry out the provisions of this chapter applicable to each of them, respectively. Provisions of subchapter II of chapter 5 of this title shall be applicable to the issuance, revision, or repeal of any such rule or regulation.

5 U.S.C. § 7134.

Furthermore, in § 7105(a)(2)(E), Congress granted the FLRA, not the President nor OPM, the power and duty to "resolve issues relating to the duty to bargain in good faith under section 7117(c) of this title," through "negotiability appeals," which is the statutory process for determining what issues or proposals may be negotiated into federal sector collective bargaining agreements. *See* 5 C.F.R. Part 2424.

The legislative history of the FSLMR Statute strongly supports that the President plainly lacks authority to issue executive orders implementing or affecting the statute (beyond the narrow exceptions listed above). Representative Clay, who chaired the Subcommittee on Civil Service and who was a major proponent of the FSLMR Statute, explained:

> During 1977, the Subcommittee on Civil Service which I chair conducted exhaustive public hearings on labor-management relations— receiving testimony from over 40 witnesses in the course of 5 days of public hearings. Testimony was overwhelmingly in support of the thrust of the committee's legislation because the existing program was susceptible to the whims of an incumbent President, limited in its scope, management-oriented, and lacking in the opportunity for judicial review of decisions of the Federal Labor Relations Council.

124 Cong. Rec. H 8466 (daily ed. Aug. 11, 1978). Representative Ford, another of the bill's

sponsors, explained that the purpose of the FSLMR Statute was to replace a labor relations scheme

dependent on executive orders:

> Collective bargaining is not new to the Federal Government. Under Executive orders, 58 percent of the work force has been organized into exclusive bargaining units, and agreements have been negotiated covering 89 percent of those organized. Though the Civil Service Commission tells us that the Federal labor movement can be traced back to the 19th century, the modern era began in 1962, when Executive Order 10988 was issued. Since that time, there have been several changes in the order. However, the basic thrust and intent remains the same. The system as it now exists still contains the inherent shortcomings that come from being created, governed, and administered by management alone. To continue to tinker with the Executive order system is to delay the obvious: What is now needed in the Federal Government is a labor-relations program based upon legislation.

124 Cong. Rec H 8467 (daily ed. Aug. 11, 1978). The House eventually adopted a compromise

bill fashioned by Representative Udall, which was the basis for what was ultimately enacted after

conference with the Senate. *National Federation of Federal Employees, Local 1167 v. F.L.R.A.*,

681 F.2d 886, 890 n.5, (D.C. Cir 1982). In urging the enactment of the Udall compromise,

Representative Clay explained that:

> The Udall substitute provides for: A statutory Federal labor-management program which cannot be universally altered by any President.

124 Cong. Rec. H 9637 (daily ed. Sept 13, 1978). Representative Derwinski also explained that

the Udall substitute amendment (and the statute as a whole) was intended prohibit the President

from unilaterally altering the federal sector labor relations program through executive orders:

> . . . is simply the administration's proposal for a flexible but orderly codification of the Executive orders which have successfully governed Federal labor-management relations since 1962. Four Presidents, two of each party, have managed to work

> with the guide-lines embodied in this substitute, and now their successor has offered
> to codify the system into statutes which cannot, like Executive orders, be revoked
> by the White House at will.

124 Cong. Rec. H 9639 (daily ed. Sept 13, 1978).

In sum, the President does not have authority under the Constitution to issue these executive orders because they go beyond providing "guidance and supervision to his subordinates" or "direct[ing] Executive Branch officials in the implementation of statutory authority." *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32-22 (D.C. Cir. 2002).

First, the President has only limited supervisory authority over the FLRA– which is an independent agency. The Authority members serve a fixed term and "may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b).

Second, the Executive Orders alter the rights of third parties – the plaintiffs and other federal employee unions, and federal employees while acting as representatives of their unions, and not as employees of their agencies.[4]

The Executive Orders are akin to President Truman's executive order at issue in *Youngstown Sheet & Tube Co. v. Sawyer* – in which the President sought to interject himself into a labor dispute between steel mill owners and their employees' unions. Like President Truman, President Trump is attempting to legislate in a sphere in which Congress has already legislated:

> The preamble of the order itself, like that of many statutes, sets out reasons why the
> President believes certain policies should be adopted, proclaims these policies as
> rules of conduct to be followed, and again, like a statute, authorizes a government
> official to promulgate additional rules and regulations consistent with the policy
> proclaimed and needed to carry that policy into execution. The power of Congress
> to adopt such public policies as those proclaimed by the order is beyond question.
> . . .   It can make laws regulating the relationships between employers and
> employees, prescribing rules designed to settle labor disputes, and fixing wages and

---

[4] The Supreme Court has rejected the view that that employees engaged in collective bargaining are acting in their "official capacity," "on the job," or in a "duty status." *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 105

> working conditions in certain fields of our economy. The Constitution did not subject this law-making power of Congress to presidential or military supervision or control.

*Youngstown Sheet & Tube*, 343 U.S. at 588. In his concurrence, Justice Douglas anticipated the precise type of Presidential action the Court proscribed in *Youngstown Sheet & Tube*. Justice Douglas stated that if unchecked, a President may someday use executive orders to unilaterally undermine unions' collective bargaining rights:

> Today a kindly President uses the seizure power to effect a wage increase and to keep the steel furnaces in production. **Yet tomorrow another President might use the same power to prevent a wage increase, to curb trade unionists, to regiment labor as oppressively as industry thinks it has been regimented by this seizure**.

*Youngstown Sheet & Tube*, 343 U.S. at 633 (emphasis added).

Today, Justice Douglas' extraordinarily prescient warning that a President could use the executive powers to attempt to break federal sector unions has come to fruition. However, because the President's cited claims of authority to issue the Executive Orders are either non-existent or are facially invalid as inapplicable, no such authority exists. Without authority, the Executive Orders are illegal and summary judgment should be granted for the Plaintiff Unions.

b. **The Three Executive Orders Are Also Invalid Because Multiple Provisions Conflict with the FSLMR Statute.**

Even if the Court finds that the President retains authority to issue executive orders regulating the relations between the federal government and its employee unions, the Court must still set aside those executive orders if their terms conflict with the FSLMR Statute. *Chamber of Commerce v. Reich*, 74 F.3d at 1332-34; *United States v. Rhode Island Department of Corrections*, 81 F.Supp.3d 182, 188 (D.R.I. 2015). As the Plaintiff Unions will demonstrate in this section of this memorandum, multiple sections of the Executive Orders conflict with both the text of the

FSLMR Statute and with the FSLMR Statute as interpreted by the FLRA and the courts, and on one issue, with the Opinions of the Attorney General as well.

### *1. The Executive Orders Impermissibly Restrict the Scope of Bargaining Mandated by Congress in the FSLMR Statute*

The Executive Orders operate together to severely and impermissibly restrict the scope of bargaining established in the FSLMR Statute. SOF ¶ 26-75. In drafting the FSLMR Statue Congress specifically mandated a broad scope grievance procedure to enable maximum problem resolution, excluding only a few matters while allowing the parties to negotiate additional exclusions where warranted. 5 U.S.C. § 7121.[5]

The Executive Orders operate to take many critical subjects off the collective bargaining table in direct contravention of 5 U.S.C. § 7121. These major additional exclusions are found in Sections 3, 4(a), 4(b)(iii), 4(c), and 7 of Exec. Order No. 13,839 and Sections 4(a)(iii) and 4(a)(iv) of Exec. Order No. 13,837. In addition, by removing important areas of collective bargaining from the process, the Executive Orders impermissibly interfere with the FLRA's statutory role in determining what is negotiable and the obligation of the parties to bargain over negotiable matters good faith. *See* 5 U.S.C. §§ 7105, 7117.

Section 7 of Exec. Order No. 13,839 directs the OPM director to issue regulations implementing these exclusions from the grievance and arbitration procedures, and removing these matters from negotiation, despite the fact that OPM is not one of the agencies which Congress authorized to issue regulations governing the "Standard for Negotiating Grievance Procedures," or other aspects of the implementation of the FSLMR Statute. *See* 5 U.S.C. § 7134. The Executive

---

[5] The five exceptions are found in 5 U.S.C. § 7121(c). Congress provided that the grievance procedure "shall not apply" to: "(1) any claimed violation of subchapter III of chapter 73 of this title (relating to prohibited political activities; (2) retirement, life insurance, or health insurance; (3) a suspension or removal under section 7532 of this title; (4) any examination, certification, or appointment; or (5) the classification of any position which does not result in the reduction in grade or pay of an employee."

Orders are not mere collective bargaining guidance, as the government is already effectuating these Executive Orders, specifically Section 7, and taking these matters off the bargaining table. For example, the Department of Defense, Defense Civilian Personnel Advisory Service ("DCPAS") has already deemed provisions in recently signed NFFE bargaining agreements with the Department of Defense ("DoD") to be illegal because they permit grievances over matters proscribed in the Executive Orders, and are otherwise in accord with the FSMLR Statute.[6] SOF ¶29, 31.

Section 4(a) of Exec. Order No. 13,839 unilaterally excludes from the negotiated grievance and arbitration procedures disputes over employee performance ratings, incentive pay, cash awards, quality step increases, and recruitment, retention and relocation payments. However, Congress did not exclude these matters from what may be grieved under negotiated grievance procedures. Additionally, the FLRA has held that agencies must obtain agreement from the union to exclude additional subjects. *See DoD, Montana Air National Guard, Great Falls, MT and ACT*, 00 FSIP 35 (2000) (finding that performance ratings/evaluations are not subjects that are required by law to be excluded from the scope of the negotiated grievance and arbitration procedures); *see also NTEU v. Internal Revenue Service*, 27 F.L.R.A. 132, 135 (1987) (finding that proposals requiring employees to participate in making recommendations regarding performance awards do not affect management's rights and are negotiable). Moreover, the Court of Appeals for the D.C. Circuit has provided that where the parties reach impasse over the scope of the negotiated grievance procedure, the Federal Service Impasses Panel must impose a broad scope grievance procedure unless the party seeking to narrow the scope can persuade it to do otherwise. *Am. Fed'n*

---

[6] DCPAS is charged with conducting agency-head review pursuant to 5 U.S.C. § 7114 for legal compliance for all of DoD, covering hundreds of individual bargaining units and collective bargaining relationships and some 400,000 federal employees. SOF ¶ 30.

*of Gov't Employees, Locals 225, 1504, & 3723, AFL-CIO v. Fed. Labor Relations Auth.*, 712 F.2d 640, 649 (D.C. Cir. 1983).

Section 4(b)(iii) precludes unions from negotiating "just cause" standards for discipline, which includes progressive discipline as a key element. This is contrary to the FLRA's finding that proposals conditioning disciplinary action on adherence to the standard of cause, such as "efficiency of the service" or "just cause" are negotiable. *See NFFE, Local 1214 and U.S. Department of the Army Headquarters, U.S. Army Training Center and Fort Jackson, Fort Jackson*, SC, 51 F.L.R.A. 1362 (1996) (finding that such provisions are tailored to apply to employees who are adversely affected by managements right to discipline under 5 U.S.C. § 7106(a)(2)(A) and are designed to prevent arbitrary and capricious decisioning making); *See also American Federation of Government Employees, Local 1760 and Social Security Administration, Northeastern Program Service Center Activity*, 22 F.L.R.A. 195 (1986).

Section 4(c) precludes unions from negotiating over the length of the performance improvement period for employees whose performance is deemed substandard, when the FLRA has held that the length of performance improvement periods is a mandatory subject of negotiation. *See Patent Office Prof'l Ass'n Union*, 29 F.L.R.A. 1389, 1403 (1987) *petition for review denied*, 973 F.2d 1485 (D.C. Cir. 1989) (hereinafter *POPA*) (finding the length of the improvement period for an employee to demonstrate acceptable performance to be negotiable and that such proposals do not interfere with management rights under section 7106(a)(1)). Limiting the opportunity period to 30 days is contrary to 5 U.S.C. § 4302(c)(6), which does not set a time limit but rather provides that employees are given "an opportunity to demonstrate acceptable performance."

In fact, the Plaintiff Union's bargaining units have historically bargained over the length of time for opportunity periods, also known as PIPs. For example, NFFE Local 1998 has negotiated

a performance improvement period of 45 to 90 calendar days, as found in Article 23 of its current contract. SOF ¶ 5. Congress delegated the authority to determine the scope of bargaining for opportunity periods to the FLRA and as such the President is outside of his authority. *See POPA*, *supra*.

Section 4(a)(iii) of Exec. Order No. 13,837 prohibits union representatives from using government facilities or resources without charge when they carry out the representation obligations imposed upon them by the FSMLR Statute. It is well settled that access to or use of agency facilities by unions is fully negotiable; once granted, access may not be changed absent negotiations. *Military Entrance Processing Station, Los Angeles and AFGE Local 2866*, 25 F.L.R.A. 685 (1987).  However, section 4(a)(iii) purports to require labor organizations to pay for its use of government property, such as "office or meeting space, reserved parking spaces, phones, computers, and computer systems." Agencies are using 4(a)(iii) to attempt to induce payment for the use facilities and services, as evinced by negotiations currently taking place between NFFE Local 1998 and Passport Services. After the issuance of the Executive Orders, Passport Services retracted proposals it had already made concerning the use of agency facilities by the union. SOF ¶ 37-39. The Chief Labor Management Negotiator for Passport Services notified NFFE Local 1998 that the withdrawal of its proposals was due to the issuance of the Executive Orders. SOF ¶37. The new proposals adversely affect the Union, as they require NFFE Local 1998 to pay for office space based on the proportion of square footage used and for the use of cabinet space, bulletin boards, phones, computers, and computer office equipment for any type of union business. SOF ¶ 37, 74.

Section 4(a)(iv) of Exec. Order No. 13,837 prohibits union representatives from being reimbursed for their travel expenses when engaged in collective bargaining when the United States Supreme Court has held that the issue is negotiable. *See Bureau of Alcohol, Tobacco & Firearms*

*v. Fed. Labor Relations Auth.*, 464 U.S. 89, 107 n. 17 (1983) ("Unions may presumably negotiate for such payments in collective bargaining as they do in the private sector.").[7]

The Executive Orders, as currently implemented in much of the government through DCPAS and other agencies, are already operating as a major executive and regulatory re-write of the FSLMR Statute. As such, the Orders fall squarely within this Court's ruling, upheld by the D.C. Circuit in *NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006). In that case, the D.C. Circuit permanently enjoined the Department of Homeland Security from issuing regulations, similar to these Orders, because they excessively interfered with the collective bargaining system created by Congress in the FSLMR Statute. *Id.* at 865. As such, the Executive Orders are a regulatory overreach and summary judgment should be granted in favor of the Plaintiff Unions.

---

[7] Additionally, Section 3 of Exec. Order No. 13,839, "Standard for Negotiating Grievance Procedures," directs agencies to endeavor to exclude grievances over removals from negotiated grievance and arbitration procedures. Congress clearly envisioned, however, that such grievances would be subject to arbitration when it included provisions in § 7121(e) and (f) that allow employees to choose to use either the grievance and arbitration procedures, or an appeal to the Merit System Protection Board, to contest their removals, and to obtain judicial review of those arbitration decisions.

### 2. Executive Order No. 13,37 is an Improper Attempt to Legislate Different Requirements For Use of Official Time Under 5 U.S.C. § 7131 than Congress Prescribed [8]

Congress, through the FSLMR Statute, established a statutory right for employees to use official time for certain representational activities. *See* 5 U.S.C. § 7131. The FSLMR Statute provides that "any employee representing an exclusive representative," or "in connection with any other matter covered by an exclusive representative, shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest." 5 U.S.C. § 7131(d). Moreover, Congress extended official time to any employee representing the union or by any bargaining unit employee "in connection with any other matter covered by [the Act]," and only explicitly excluded official time for duties related to the union's "internal business." 5 U.S.C. § 7131(d). Therefore, Sections 3, 4(a)(i), 4(a)(ii), 4(a)(iv), 4(a)(v), 4(b), and 4(c) of Exec. Order No. 13,837 plainly conflict with 5 U.S.C. § 7131. Giving effect to those conflicting requirements set forth in those sections would override Congress's legislative authority.

---

[8] The Plaintiff Unions hereby incorporate all arguments raised by Plaintiffs American Federation of Government Employees, *et al*. ("AFGE"), and National Treasury Employees Union ("NTEU") relating to the conflict between Executive Order No. 13,837 and 5 U.S.C. § 7131.

Plaintiff Unions also hereby incorporate all arguments raised by Plaintiff AFGE relating to Executive Order No. 13,837 and the First Amendment of the U.S. Constitution. Exec. Order No. 13,837 prohibits representatives of a labor organization from using official time to "prepare or pursue grievances (including arbitration of grievances) brought against an agency" pursuant to a collective bargaining agreement, yet provides an exception for employees working on their own behalf.

In treating unions and their representatives differently from individual employees, Section 4(a)(v) of Executive Order 13,837 is in violation of the First Amendment as it encroaches upon Plaintiffs' right to take collective action to pursue interests of their members. The Supreme Court has found that the First Amendment protects workers and allows them to come together for the purpose of advising one another in asserting rights Congress bestowed upon them. *Brotherhood of R.R. Trainmen v. Virginia ex re. Va. State Bar*, 377 U.S. 1, 5 (1964). Moreover, the government may only interfere with such rights where there is a compelling state interest. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

Section 4(c) of Exec. Order No. 13,837 directs the OPM director to issue regulations governing the use of official time under the FSLMR Statute despite the fact that OPM is not one of the agencies which Congress authorized to issue regulations implementing the Statute. *See* 5 U.S.C. § 7134.

Section 3 unilaterally determines that only one hour (or less) of official time per bargaining unit member in the aggregate is "reasonable, necessary, and in the public interest." However, the FSLMR Statute provides that the amount of official time that is reasonable, necessary and in the public interest should be jointly agreed to by federal agencies and their unions. *See* 5 U.S.C. § 7131(d). Plaintiff NFFE's Local 1998 has seen the effects of this order, where Passport Services withdrew its proposals on official time and set forth the one hour per bargaining unit temporal limit on official time, citing the Executive Orders as its authority to do so. SOF ¶36.

Section 4(a)(i) prohibits federal union representatives from using official time to lobby Congress for improvements in working conditions, a practice which the FLRA and multiple Opinions of the Attorney General have ruled is permissible. It is well settled that §§ 7102 and 7131(d) together give express authorization under 19 U.S.C. § 1913 or union representatives to "lobby members of Congress on representational issues." *U.S. Department of Army, Corps of Engineers and NFFE, Local 259*, 52 F.L.R.A. 920 (1997); *see also* Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying by Union Representatives, 29 Op. O.L.C. 179, 181 (2005). Here, direct lobbying fulfills the union's right "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the view of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities" guaranteed by Section 7102(1).

Section 4(a)(ii) prohibits union representatives from spending more than one quarter of their time carrying out representation activities, even though the Circuit Court of Appeals for the District of Columbia has ruled that Congress intended for union representatives to be able to negotiate full-time release from their duties in order to fulfill the union's obligations under the FSLMR Statute. The Court has reasoned that "the FLRA's generalized concern to protect the ability of agencies to carry out their mission cannot displace a specific congressional provision providing for the negotiability of official time proposals… ." *Am. Fed'n of Gov't Employees, AFL-CIO, Council of Locals No. 214 v. Fed. Labor Relations Auth.*, 798 F.2d 1525, 1530 (D.C. Cir. 1986). The D.C. Circuit also found that "the FLRA's suggestion that its interpretation is necessary to protect the ability of agencies to function effectively also ignores the express language of section 7131(d). *Id*. In that section, Congress has provided that the agency and the union together should determine the amount of official time "reasonable, necessary, and in the public interest." Agencies, such as Passport Services, are currently using Section 4(a)(ii) in negotiations to enforce the limitation of 25 percent of an employee's paid time for official time and are ignoring the standard of what might be "reasonable, necessary, and in the public interest" as set forth by Congress. SOF ¶33-60.

Section 4(b) unilaterally establishes a pre-authorization requirement for each use of official time, when the process for using official time is a subject to negotiations under the FSLMR Statute. In *NTEU and U.S. Department of Commerce, Patent and Trademark Office*, the FLRA interpreted section 7131(d) to mean that management cannot unilaterally determine the amount or have unilateral control over the scheduling of official time. 52 F.L.R.A. 1265, 1284 (1997). Of concern to the FLRA was that if negotiations were not allowed over the scheduling of official time, management could control when that time could be used and would effectively dictate the union's

choice of representative. *Id*. at 1286. In effect, Section 4(b) would ultimately contravene the FLRA's concerns over the negotiability of official time and the Union's right to determine its representatives and have a sufficient opportunity to perform representational activities.

Section 4(a)(v) prohibits union representatives from using official time, requiring them to take leave, when they are carrying out their duty to process and settle grievances without discrimination that is imposed upon them by the FSLMR Statute. Section 4(a)(v) provides that employees "may not" use official time "to prepare or pursue grievances (including arbitration of grievances) brought against an agency under procedures negotiated pursuant to section 7121 of title 5, United States Code, except where such use is otherwise authorized by law or regulation." This section directly contradicts 5 U.S.C. § 7131, which expressly provides for union representatives to use official time in such instances where the contract between the union and agency allows. Moreover, the union has a fiduciary and legal obligation to its bargaining unit employees, both members and non-members. 5 U.S.C. § 7114. This obligation is shown by the heavy burden placed on unions through the duty of fair representation, which is why official time is used to process grievances. SOF ¶ 39. As provided by Civil Service Subcommittee Chairman Clay:

> Section 7132(b) of the Udall compromise bars the use, of official time for conducting the internal business of a labor organization. The section also lists three such activities reflecting our intention that "internal business" be strictly construed to apply only to those activities regarding the structure and institution of the labor organization. Activities that involve labor-management contacts are not included in this section. Nor is preparation for such activities, such as grievances, bargaining, unfair labor practice proceedings, included within this section. Title V imposes heavy responsibilities on labor organizations and on agency management. These organizations should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities.

124 Cong. Rec. H 9638 (daily ed. Sept 13, 1978).

Should the union breach this duty, the union is faced with financial liability if grievances are not timely processed or processed at all. *National Federation of Federal Employees, Local 1827 and Catherine Bratton*, 49 F.L.R.A. 738, 748-50 (1994) (finding that if employees are denied benefits because of the union's actions, the FLRA may order the union to make employees whole for any money lost). Ultimately, President Trump is attempting to amend the Statute by treating grievance processing as if it is prohibited union business.

### 3. Exec. Order No. 13,837 Plainly Violates Both 5 U.S.C. § 7211 and 5 U.S.C. § 7102

Section 4(a)(i) of Exec. Order No. 13,837 prohibits federal union representatives from using official time to lobby Congress for improvements in working conditions, a practice which the FLRA and multiple Opinions of the Attorney General have ruled is permitted by statute. It is well settled that §§ 7102 and 7131(d) together give express authorization under 19 U.S.C. § 1913 or union representatives to "lobby members of Congress on representational issues." *See U.S. Department of Army, Corps of Engineers and NFFE, Local 259*, 52 F.L.R.A. 920 (1997); *see also* Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying by Union Representatives, 29 Op. O.L.C. 179, 181 (2005). Here, direct lobbying fulfills the union's right "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the view of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities" guaranteed by Section 7102(1). Exec. Order No. 13,837 plainly seeks to make it more difficult for federal employees who serve as representatives of labor organizations to present views to Congress on matters related to the working conditions that cannot be addressed at the bargaining table.

Moreover, when U.S. Presidents have, in the past, attempted to silence federal employees and their labor unions, the Congress has stepped in. In 1912, Congress passed the Lloyd-La Follette

Act ("LLA") in response to "gag orders" issued by Presidents Taft and Roosevelt. In enacting the LLA, Congress weighed the competing policy considerations and concluded that efficient management of Government operations did not preclude the extension of free speech rights to Government employees. *Bush v. Lucas*, 462 U.S. 367, 383-84 (1983); *see also* Manley Case, H., PROJECT ON THE MERIT SYSTEMS PROTECTION BOARD: THE CIVIL SERVICE REFORM ACT OF 1978, 29 How. L.J. 283, 289-90 (1986); and Slater, J., THE COURT DOES NOT KNOW 'WHAT A LABOR UNION IS': HOW STATE STRUCTURES AND JUDICIAL (MIS)CONSTRUCTIONS DEFORMED PUBLIC SECTOR LABOR LAW, 79 Or. L. Rev 981, 1022-1024 (Winter, 2000), n. 213.

The passage of the CSRA strengthened and reinforced the rights contained in the LLA. *See* 5 U.S.C. § 7211 and § 7102 ("Each employee shall have the right to form, join, or assist any labor organization… ."). Yet, the President has issued an executive order with respect to what executive branch employees can and cannot do, stating: "Employees may not engage in lobbying activities during paid time, except in their official capacities as an employee." Section 4, Exec. Order 13,387. The plain language of the Exec. Order 13,387 makes this prohibition immediately operative. Since negotiated official time under 5 U.S.C. § 7131(d) allows for employees to meet with members of Congress during normal business hours, the President is plainly attempting to interfere with federal employees from using that time to petition and to furnish information to Congress.

This Executive Order will have immediate harm since it is aimed at chilling the activities that employees would otherwise engage in under the respective collective bargaining agreements. *See* SOF ¶ 53-59.

Exec. Order No. 13,837 issued by President Trump has the same intended effect as the executive order issued by President Taft. The President is seeking to place barriers in order to interfere with the ability of federal employees, through their labor organizations, to express their

views to members of Congress. This is a clear violation of both 5 U.S.C. § 7211 and 5 U.S.C. § 7102 and the President's attempt to legislate a new rule must be enjoined.

### 4. Exec. Order No. 13,836 Impermissibly Rewrites the Collective Bargaining Scheme Created by Congress Through the FSLMR Statute

Exec. Order No. 13,836, entitled "Developing Efficient, Effective and Cost-Reducing Approaches to Federal Sector Collective Bargaining" runs afoul of the statutorily promulgated and carefully constructed FSLMR collective bargaining in several ways. Specifically at issue are sections 5(a), 5(e), and 6.

Section 5(a) arbitrarily determines how long bargaining should last when Congress has granted the FLRA the authority to decide whether the parties have fulfilled their duty to bargain in good faith in a diligent manner. It is the FLRA that is to decide whether the parties are negotiating in good faith by "meet[ing] at reasonable times and convenient places as frequently as may be necessary, and to avoid unnecessary delays;" 5 U.S.C. § 7114(b)(3). While Section 5 states that between four and six months "should ordinarily be considered [a] reasonable" amount of time to negotiate a term agreement, the determination of whether the parties have fulfilled their duty to bargain in good faith in a diligent manner as required by the statute is for the FLRA to make in the context of adjudicating unfair labor practice charges. *U.S. Geological Survey, Caribbean District Office, San Juan, Puerto Rico and AFGE Local 1503*, 53 F.L.R.A. 1006 (1997). One year is generally considered by the courts, the NLRB and the FLRA as a reasonable period of time to bargain an initial contract. *Id*. at 1020.

Section 5(e) instructs agencies to require the exchange of written proposals during bargaining. This is a matter to be mutually agreed to during bargaining over ground rules, and will preclude an interest-based bargaining process where the parties at the bargaining table jointly develop contract provisions through dialogue and in an effort to mutually resolve workplace issues.

*See American Federation of Government Employees, Local 12 and the U.S. Department of Labor*, 60 F.L.R.A. 533 (2004) (finding the Union's request for advance substantive written proposals to constitute a ground rule and therefore was a mandatory subject of bargaining).

Section 6 orders Federal agencies not to negotiate over "permissive" matters, although the FSLMR Statute gives authority to Federal agencies to elect to do so. *See* 5 U.S.C. § 7106(b)(1).

## VI.   <u>CONCLUSION</u>

Wherefore, for the reasons cited above, Plaintiff Unions respectfully request summary judgment in their favor, a declaration that the Executive Orders are unlawful, an order enjoining the Defendants from effectuating the Executive Orders, and attorneys' fees and costs.