**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al*., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Consolidated Case No. 18-cv-1261 (KBJ) |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al*., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**BRIEF FOR AMICI CURIAE REPRESENTATIVES ELIJAH E. CUMMINGS, PETER T. KING, WILLIAM (BILL) CLAY, SR., AND JIM LEACH IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Adina H. Rosenbaum
D.C. Bar. No. 490928
Adam R. Pulver
D.C. Bar No. 1020475
Public Citizen Litigation Group
1600 20th St. NW
Washington, DC 20009
202-588-1000

Attorneys for Amici Curiae

July 2, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF AMICI CURIAE ............................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.    The Official Time Executive Order Is Contrary to the Federal Service Labor-Management Relations Statute, Which Provides for Bargaining Over Official Time. ................................................................................................................................. 4

II.    The Removal Procedures Executive Order Is Contrary to the Federal Service Labor-Management Relations Statute, Which Leaves No Room for the President to Unilaterally Exclude Certain Disputes from Negotiated Grievance Procedures. ........................................................................................... 10

CONCLUSION ........................................................................................................................ 13

# TABLE OF AUTHORITIES

## CASES

*American Federation of Government Employees v. Federal Labor Relations Authority*,
    798 F.2d 1525 (D.C. Cir. 1986)..................................................................................7, 8

*American Federation of Government Employees v. Secretary of Air Force*,
    716 F.3d 633 (D.C. Cir. 2013)........................................................................................12

*Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority,*
    464 U.S. 89 (1983)..................................................................................................2, 4, 5

*National Treasury Employees Union v. Chertoff,*
    452 F.3d 839 (D.C. Cir. 2006).........................................................................................4

*National Treasury Employees Union & United States Department of Commerce Patent &*
    *Trademark Office,*
    52 F.L.R.A. 1265 (1997)...................................................................................................9

*In re United Mine Workers of America International Union*,
    190 F.3d 545 (D.C. Cir. 1999).........................................................................................4

*United States Department of the Army Corps of Engineers & National Federation of*
    *Federal Employees Local 259,*
    52 F.L.R.A. 920 (1997)....................................................................................................7

## STATUTES

Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101, *et seq.*,............................1
    5 U.S.C. § 7101(a) .............................................................................................2, 9, 10
    5 U.S.C. § 7101(a)(1)(C) ........................................................................................12
    5 U.S.C. § 7102(1) ....................................................................................................7
    5 U.S.C. § 7102(2) ..................................................................................................12
    5 U.S.C. § 7103(a)(9)..................................................................................11, 12, 13
    5 U.S.C. § 7117........................................................................................................12
    5 U.S.C. § 7121..........................................................................................................3
    5 U.S.C. § 7121(a)(1)..................................................................................10, 11, 12
    5 U.S.C. § 7121(a)(2)..................................................................................10, 11, 12
    5 U.S.C. § 7121(b)(1)(C)(iii) ..................................................................................11
    5 U.S.C. § 7121(c) ......................................................................................10, 11, 13
    5 U.S.C. § 7131..........................................................................................................3
    5 U.S.C. § 7131(a) .....................................................................................................5
    5 U.S.C. § 7131(c) .....................................................................................................5
    5 U.S.C. § 7131(d) ...................................................................................3, 5, 6, 7, 8

# OTHER AUTHORITIES

124 Cong. Rec. 25,613 (1978) ...........................................................................2

124 Cong. Rec. 29,186 (1978) ...........................................................................2

124 Cong. Rec. 29,187 (1978) ...........................................................................2

124 Cong. Rec. 29,188 (1978) ....................................................................3, 5, 9

124 Cong. Rec. 33,389 (1978) .........................................................................11

124 Cong. Rec. 38,717 (1978) ...........................................................................6

124 Cong. Rec. 38,718 (1978) ...........................................................................2

Executive Order 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971) .......................5

Executive Order 13,837, 83 Fed. Reg. 25,335 (May 25, 2018).........................3
    Executive Order 13,837 § 4(a)(i) ................................................................7
    Executive Order 13,837 § 4(a)(i)(ii) ...........................................................7
    Executive Order 13,837 § 4(a)(v) ...............................................................7
    Executive Order 13,837 § 4(b).....................................................................8

Executive Order 13,839, 83 Fed. Reg. 25,343 (May 25, 2018).........................3
    Executive Order 13,839 § 4(a) ..............................................................10, 12

H.R. 986, 105th Cong. (1997)............................................................................6

H.R. 1364, 115th Cong. (2017)..........................................................................6

H.R. Rep. No. 95-1403 (1978)........................................................................2, 6

President Transmitting Draft Civil Service Reform Legislation,
    H. R. Doc. No. 95-299 (1978) ....................................................................10

Statement of Jimmy Carter on Signing S. 2640 Into Law,
    14 Weekly Comp. Pres. Doc. 1765 (Oct. 13, 1978) ....................................2

**INTEREST OF AMICI CURIAE**

Amici curiae Elijah E. Cummings, Peter T. King, William (Bill) Clay, Sr., and Jim Leach are a bipartisan group of current and former members of the United States Congress who are committed to a merit-based, non-partisan, effective federal workforce. These members believe that collective bargaining, the right to representation, and procedures to resolve workplace disputes fairly are vital to such a workforce. Representative Clay and Representative Leach were members of the House of Representatives when Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. § 7101, *et seq.*, in 1978, and served on the House Committee on Post Office and Civil Service, which had jurisdiction over the legislation. Representative Cummings and Representative King are current members of the House of Representatives. Representative Cummings is the Ranking Member of the House Committee on Oversight and Government Reform.

As former members of Congress who helped establish the current federal labor-management relations system, and as current members of Congress working for good governance, amici have a strong interest in the proper interpretation and implementation of the FSLMRS. In issuing Executive Orders 13,837 and 13,839, the President purported to unilaterally restrict federal employees' ability to be granted official time. He also purported to unilaterally exclude major categories of disputes from statutorily-mandated grievance procedures. Amici believe that these Executive Orders conflict with the FSLMRS's framework for labor-management relations in the federal government. Amici are filing this brief to explain that the Executive Orders are contrary to the FSLMRS, which provides civil servants a right to bargain over official time and provides that mandatory grievance procedures will cover all matters except those specifically listed in the statute unless unions and management bargain otherwise.

1

## ARGUMENT

Congress enacted the FSLMRS as Title VII of the Civil Service Reform Act of 1978, "a comprehensive revision of the laws governing the rights and obligations of civil servants." *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 91 (1983) (*BATF*). The FSLMRS established "the first statutory scheme governing labor relations between federal agencies and their employees." *Id*. Before the FSLMRS, "labor-management relations in the federal sector were governed" by a program established by executive order, *id.*, which was "management-oriented" and "susceptible to the whims of an incumbent President." 124 Cong. Rec. 25,613 (1978) (remarks of Rep. Clay). The FSLMRS "move[d] Federal labor relations from Executive Order to statute," *Statement of Jimmy Carter on Signing S. 2640 Into Law*, 14 Weekly Comp. Pres. Doc. 1765 (Oct. 13, 1978), and created a "statutory Federal labor-management program which cannot be universally altered by any president," 124 Cong. Rec. 29,186 (1978) (remarks of Rep. Clay), one that provides "employees and their representatives rights that they ha[d] not enjoyed under the Executive order." 124 Cong. Rec. 38,718 (1978) (remarks of Rep. Ford); *see* H.R. Rep. No. 95-1403, at 5 (1978) ("Under the existing system of labor-management relations in the executive branch, the President, by Executive order, has complete authority to establish the labor-management program. Title VII establishes a new program and provides for greater employee and employee organization participation.").

Congress enacted the FSLMRS based on the recognition that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a); *see* 124 Cong. Rec. 29,187 (1978) (remarks of Rep. Clay) (explaining that the statute was intended to "encourage both management and labor to engage in the kind of relationship that, in the private sector, has fostered the single most productive economy in the world"). Accordingly, the statute

2

removes agency discretion over many terms and conditions of employment, requiring them instead to be the subject of negotiations between the parties. Recognizing the importance of the activities governed by the statute, and the "heavy responsibilities" involved, 124 Cong. Rec. 29,188 (1978) (remarks of Rep. Clay), Congress provided federal employees with "official time"—paid time during the work day for employees to engage in activities related to labor-management relations—that is expressly authorized by the statute for some activities and is to be granted based on agreement in bargaining for others. 5 U.S.C. § 7131. Congress also required collective bargaining agreements to include grievance procedures for resolving complaints by employees, labor organizations, and agencies, and it directed that those procedures cover a broad range of complaints, excluding only those specifically listed in the statute or agreed to be excluded in bargaining. *Id*. § 7121.

Through Executive Order 13,837, entitled "Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use" (the Official Time Executive Order), 83 Fed. Reg. 25,335 (May 25, 2018), and Executive Order 13,839, entitled "Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles" (the Removal Procedures Executive Order), 83 Fed. Reg. 25,343 (May 25, 2018), the President seeks to alter the statutory scheme for federal labor-management relations established by Congress in the FSLMRS. This brief focuses on two specific areas in which the Executive Orders are contrary to the FSLMRS. First, although the FSLMRS provides that federal employees engaging in matters covered by the statute "shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest," 5 U.S.C. § 7131(d), the Official Time Executive Order purports to unilaterally limit the amount of official time that employees may receive and the matters for which they may use official time, along

with the way official time is authorized. Second, although the FSLMRS requires collective bargaining agreements to include grievance procedures covering all disputes except those excluded by statute or those the parties have agreed to exclude, the Removal Procedures Executive Order purports to unilaterally exclude certain disputes from grievance procedures.

In enacting the FSLMRS, including the provisions on official time and grievance procedures, "Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime." *BATF*, 464 U.S. at 107. The President's new Executive Orders seek to do the opposite, overriding the collective-bargaining process established by Congress. "Needless to say, the President is without authority to set aside congressional legislation by executive order[.]" *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). The Executive Orders are contrary to the FSLMRS, and the challenged provisions should be enjoined.

I.   **The Official Time Executive Order Is Contrary to the Federal Service Labor-Management Relations Statute, Which Provides for Bargaining Over Official Time.**

Under the FSLMRS, the scope, amount, and use of official time provided to union representatives are the subject of good-faith bargaining. By unilaterally prohibiting the use of official time for certain activities, capping the amount of official time that civil servants may be authorized, and decreeing the way official time will be authorized, the Official Time Executive Order is incompatible with the statutory scheme Congress adopted. *See Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 860 (D.C. Cir. 2006) ("The right to negotiate collective bargaining agreements that are equally binding on both parties is of little moment if the parties have virtually nothing to negotiate over.").

4

In enacting the FSLMRS, Congress paid particular attention to the issue of official time, which allows employees to be paid for time spent engaging in labor-management activities during the working day. The executive order regime that preceded the FSLMRS had provided that employees could not use official time when negotiating an agreement, except if the parties agreed to another arrangement, and even then the arrangement could provide official time only for up to 40 hours or one-half the time spent in negotiations during regular working hours. *See* Exec. Order 11,616, § 11, 36 Fed. Reg. 17,319, 17,321 (Aug. 28, 1971). Congress concluded, however, "that union negotiators 'should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities.'" *BATF*, 464 U.S. at 102 (quoting 124 Cong. Rec. 29,188 (1978) (remarks of Rep. Clay)). Accordingly, in the FSLMRS, Congress rejected the Executive Order's limitations and expanded the official time available to employees.

The FSLMRS addresses official time in two ways. First, it explicitly provides employees with official time when "representing an exclusive representative in the negotiation of a collective bargaining agreement," 5 U.S.C. § 7131(a), limited to the same number of employees that management sends to the negotiation, and "in any phase of proceedings" before the Federal Labor Relations Authority (FLRA), if the FLRA so determines, *id*. § 7131(c). Second, in addition to the official time mandated in sections 7131(a) and (c), the statute provides that "any employee representing an exclusive representative," or "any employee in an appropriate unit represented by an exclusive representative," "shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest," for time spent "in connection with any … matter covered by this chapter," except for activities relating to internal union business. *Id*. § 7131(d). In this way, Congress made

"all other matters concerning official time for unit employees engaged in labor-management relations activity subject to negotiation between the agency and the exclusively recognized labor organization involved." H.R. Rep. No. 95-1403, at 59. As a member of the conference committee explained, the statute makes clear that "neither defining 'internal business' nor agreeing to grant official time for non-internal business was a matter of agency discretion. Instead, the granting of official time is subject to negotiations between the parties." 124 Cong. Rec. 38,717 (1978) (remarks of Rep. Ford).

In the years since the FSLMRS was enacted, some members of Congress have introduced bills that would have limited the permissible scope of official time under 5 U.S.C. § 7131(d). In 1997, for example, a bill introduced in the House of Representatives would have limited official time to certain activities related to grievances and meetings with management officials requested or approved by the agency, and would have limited official time for any employee to no more than fifty percent of the employee's paid time. *See* H.R. 986, 105th Cong. (1997). Similarly, in 2017, a bill introduced in the House of Representatives would have prohibited granting an employee official time for purposes of engaging in any political activity, including lobbying activity. *See* H.R. 1364, 115th Cong. (2017). Congress has not passed any of these bills. Instead, Congress has maintained the framework established in the FSLMRS, under which the amount of official time received under section 7131(d), and the matters for which it can be used, are subject to negotiation and agreement between the parties.

The Official Time Executive Order conflicts with the bargaining-based framework for official time established by Congress in section 7131(d). While Congress intended both the amount of official time available to civil servants and the activities on which it could be spent to be a subject of negotiation, and ultimately the product of agreement, the Executive Order

unilaterally decrees that employees will not be able to receive official time for certain labor-management activities, and it unilaterally places caps on the amount of official time available to employees. For example, it declares that employees "may not engage in lobbying activities during paid time, except in their official capacities as an employee," and may not use official time "to prepare or pursue grievances (including arbitration of grievances)" brought on behalf of labor organizations or other employees. Exec. Order 13,837 §§ 4(a)(i) & (a)(v), 83 Fed. Reg. at 25,337. And it limits official time to one-quarter of paid time, allowing employees to exceed that cap only for the purposes described in sections 7131(a) and (c), and providing that any time spent over that cap for such purposes will be counted against the following year's time. *Id*. § 4(a)(ii).

These unilaterally imposed prohibitions are incompatible with section 7131(d), which committed the determination of the amount and scope of official time to be granted to "the agency and the union together." *Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth*., 798 F.2d 1525, 1530 (D.C. Cir. 1986) (*AFGE v. FLRA*); *see also id*. (describing section 7131(d) as a "specific congressional provision providing for the negotiability of official time proposals"). For example, the FSLMRS explicitly gives employees representing labor organizations the right to present the organization's views to Congress. 5 U.S.C. § 7102(1). Lobbying Congress on representational matters is thus a "matter covered by" the FSLMRS. Section 7131(d) provides that, "in connection with any … matter covered" by the statute, employees "shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest." *Id*. § 7131(d). These provisions together make clear that the parties may agree that official time will be granted to employees to engage in representational lobbying purposes. *See U.S. Dep't of the Army Corps of Eng'rs & Nat'l Fed'n of*

*Fed. Employees Local 259*, 52 F.L.R.A. 920, 933 (1997). And the statute envisions that the parties will engage in good-faith bargaining over the amount of official time that will be granted for lobbying purposes. *See generally AFGE v. FLRA*, 798 F.2d at 1530. In contrast, the Executive Order provides that official time may never be granted for lobbying activities, and attempts to dictate, without negotiation, that no such time shall be allowed.

Similarly, in contrast to the Executive Order, which limits official time to 25 percent of working time, allowing employees to exceed 25 percent official time only for the mandatory official time provided in sections 7131(a) and (c), the statute contains no cap on the time that can be spent on official time. It allows the parties to agree to grant larger amounts of official time and provides that the amount of official time granted under section 7131(d) will be set through agreement of the parties. Under the Executive Order, however, parties may not agree to grant larger amounts of official time, and there is no ability to negotiate over that cap. Moreover, the Executive Order provides that any official time authorized in excess of the cap for section 7131(a) and (c) purposes will be counted against the following year. Accordingly, employees who are authorized official time for activities covered by those provisions, as required by the statute, may end up barred from receiving official time under section 7131(d) the following year, despite section 7131(d)'s requirement that employees "be granted" official time in an amount agreed upon by the agency and union. 5 U.S.C. § 7131(d).

In addition to its restrictions on the scope and amount of official time, the Executive Order conflicts with section 7131(d)'s bargaining-based approach to official time by forbidding employees to use official time without receiving advance written authorization from their agency, except in circumstances to be determined by the Office of Personnel Management and the agency. Exec. Order 13,837 § 4(b), 83 Fed. Reg. at 25,337. Recognizing that, "[b]y using the

term 'shall' [in section 7131(d)] and thereby making the grant of official time mandatory, …

Congress intended for representatives of labor organizations to be able to use and schedule that

time in a meaningful way," the Federal Labor Relations Authority has determined that the

"scheduling of official time … must be determined bilaterally." *Nat'l Treasury Employees Union*

*& U.S. Dep't of Commerce Patent & Trademark Office*, 52 F.L.R.A. 1265, 1284 (1997); *see also*

*id.* at 1287 (explaining that "the scheduling of official time" includes "the ability to use official

time without advance scheduling or permission from the supervisor"). In contrast, the Executive

Order unilaterally imposes a hurdle to obtaining official time.

The Executive Order's prohibitions on the use of official time threaten not only the

parties' ability to negotiate over official time, but also the larger federal labor-management

relations scheme established in the FSLMRS. As Representative Clay explained in discussing the

reasons for granting official time, the FSLMRS "imposes heavy responsibilities on labor

organizations and on agency management." 124 Cong. Rec. 29,188 (1978) (remarks of Rep.

Clay). Official time helps labor organizations and their representatives to fulfill these

responsibilities, enabling employees to engage in labor-management activities during the day

without having to take leave. The Executive Order's unilateral limits on official time will

discourage employees from exercising the labor rights provided to them by Congress, will reduce

employees' availability to engage in representational activities, and will impede labor

organizations' ability to perform their duties under the statute.

In enacting the FSLMRS, Congress found that "statutory protection of the right of

employees to organize, bargain collectively, and participate through labor organizations of their

own choosing in decisions which affect them … safeguards the public interest." 5 U.S.C.

§ 7101(a). Protection of these rights "contributes to the effective conduct of public business" and

"facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." *Id*. The ability to bargain over official time for non-internal business, when that official time has not been mandatorily granted, is one of the tools Congress gave federal employees to help ensure that their statutory rights are protected and effective. The President's attempts to deprive employees of their right to negotiate over this time should be rejected.

## II.     The Removal Procedures Executive Order Is Contrary to the Federal Service Labor-Management Relations Statute, Which Leaves No Room for the President to Unilaterally Exclude Certain Disputes from Negotiated Grievance Procedures.

The grievance provisions of the FSLMRS are clear. The law requires that collective bargaining agreements contain grievance procedures for resolving employment-related complaints and that these procedures be the exclusive means of resolving such complaints. 5 U.S.C. § 7121(a)(1). The statute contains two exceptions to the grievance procedures: (1) when parties to a collective bargaining agreement *agree* to exclude a matter from the grievance procedures, *id.* § 7121(a)(2), and (2) when a complaint concerns one of five specific matters listed in the statute, *id.* § 7121(c). The Removal Procedures Executive Order purports to exclude from grievance procedures disputes concerning performance ratings and certain forms of compensation. Exec. Order No. 13,839 § 4(a), 83 Fed. Reg. at 25,344. Because these disputes are not among the five specifically excluded by Congress, however, neither the President nor an agency official may exclude them unilaterally.

From its inception, the FSLMRS aimed to "permit the establishment through collective bargaining of grievance and arbitration systems … [to] largely displace the multiple appeals systems … unanimously perceived as too costly, too cumbersome and ineffective." Message from the President Transmitting Draft Civil Service Reform Legislation, H.R Doc. No. 95-299,

10

at 4 (1978). To achieve a "responsible and balanced system," Congress enacted a law that authorizes "employees … to set up procedures for adjudicating their grievances," 124 Cong. Rec. 33,389 (1978) (statement of Sen. Sasser), with binding arbitration as a backstop, *see* 5 U.S.C. § 7121(b)(1)(C)(iii).

The FSLMRS provides that "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability," and that, except for certain matters as to which employees may elect between administrative remedies, such "procedures shall be the exclusive administrative procedures for resolving" covered disputes. 5 U.S.C. § 7121(a)(1). Congress ensured that grievance procedures covered a broad range of subjects, as reflected by several statutory provisions. First, "grievance" is broadly defined. *See id.* § 7103(a)(9). The term includes, among other things, "any complaint … by any employee concerning any matter relating to the employment of the employee," and "any complaint … by any labor organization concerning any matter relating to the employment of any employee." *Id.* Second, Congress enumerated five exceptions to the requirement that complaints be subject to grievance procedures. *Id.* § 7121(c). The exceptions are for grievances concerning:

> (1) any claimed violation of subchapter III of chapter 73 of this title (relating to prohibited political activities);
> (2) retirement, life insurance, or health insurance;
> (3) a suspension or removal under section 7532 of this title [concerning national security];
> (4) any examination, certification, or appointment; or
> (5) the classification of any position which does not result in the reduction in grade or pay of an employee.

*Id.*

Absent a statutory exception, Congress provided only one way for a matter to be excluded from the grievance procedures' coverage: by agreement of the parties. The FSLMRS states that "[a]ny collective bargaining agreement may exclude any matter from the application

11

of the grievance procedures which are provided for in the agreement." *Id.* § 7121(a)(2). That is, parties, through collective bargaining, may *agree* to exclude certain matters from negotiated grievance procedures. This provision is consistent with the remainder of the FSLMRS, which promotes mutual agreement through collective bargaining, *see, e.g.*, *id.* §§ 7102(2), 7117, and with the legislative findings underpinning the FSLMRS, including the finding that the right to bargain collectively "facilitates and encourages the amicable settlements of disputes between employees and their employers," *id.* § 7101(a)(1)(C).

The structure of section 7121—a directive that collective bargaining agreements contain grievance procedures that "shall be the exclusive administrative procedures for resolving grievances" unless a collective bargaining agreement provides otherwise, followed by an enumeration of specific exceptions—makes plain the statutory scheme enacted by Congress. A matter must either fall within a statutory exception, be excluded by agreement of the parties, or be subject to negotiated grievance procedures. *See Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 637 (D.C. Cir. 2013) ("Unless a specific statutory or contract exception applies, [the grievance] procedure is 'the exclusive administrative procedure[] for resolving grievances which fall within its coverage.'" (quoting 5 U.S.C. § 7121(a)(1))).

The Removal Procedures Executive Order attempts to create a fourth category of grievances: those exempt from mandatory grievance procedures by presidential fiat. The order states: "[T]o the extent consistent with law, no agency shall: (a) subject to grievance procedures or binding arbitration disputes concerning: (i) the assignment of ratings of record; or (ii) the award of any form of incentive pay, including cash awards; quality step increases; or recruitment, retention, or relocation payments." Exec. Order 13,839 § 4(a), 83 Fed. Reg. at 25,344. Such disputes are plainly "grievances" within the statutory definition. *See* 5 U.S.C.

§ 7103(a)(9). They do not fall within any of the limited exceptions to the negotiated grievance requirement of the FSLMRS. *See id.* § 7121(c). Thus, they may not be excluded from grievance procedures unless parties agree, through collective bargaining, to do so. The statute does not permit the President to unilaterally prevent employees from grieving these matters according to the terms of their collective bargaining agreements.

## CONCLUSION

The plaintiffs' motions for summary judgment should be granted.

Dated: July 2, 2018                               Respectfully submitted,

                                                  /s/ Adina H. Rosenbaum
                                                  Adina H. Rosenbaum
                                                  D.C. Bar. No. 490928
                                                  Adam R. Pulver
                                                  D.C. Bar No. 1020475
                                                  Public Citizen Litigation Group
                                                  1600 20th St. NW
                                                  Washington, DC 20009
                                                  202-588-1000

                                                  Counsel for Amici Curiae