**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, <br><br> Plaintiff, <br><br> v. <br><br> DONALD J. TRUMP, *et al*., <br><br> Defendants. | Consolidated Case No. 1:18-cv-01261-KBJ <br><br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES, FD-1, IAMAW, AFL-CIO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al*., <br><br> Defendants. | |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al*., <br><br> Defendants. | |

NATIONAL TREASURY
EMPLOYEES UNION,

               Plaintiff,

       v.

DONALD J. TRUMP, *et al*.,

               Defendants.

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

I.     THE PRESIDENT'S AUTHORITY TO CONTROL THE CONDUCT OF
FEDERAL EMPLOYEES ................................................................. 4

II.    THE FEDERAL SERVICE LABOR–MANAGEMENT RELATIONS STATUTE ......... 5

    A.  General Statutory Framework ....................................................... 5

    B.  Employees' Use of Official Time ................................................. 8

    C.  Negotiated Grievance Procedures ............................................... 9

    D.  Removal of Employees for Unacceptable Performance............... 9

III.    THE PRESIDENT'S MAY 25, 2018 EXECUTIVE ORDERS ....................... 10

    A.  Executive Order No. 13,836, Developing Efficient, Effective, and
Cost-Reducing Approaches to Federal Sector Collective Bargaining
(Collective Bargaining Order)..................................................... 10

    B.  Executive Order No. 13,837, Ensuring Transparency, Accountability, and
Efficiency in Taxpayer-Funded Union Time Use (Official Time Order) ................. 11

    C.  Executive Order No. 13,839, Promoting Accountability and Streamlining
Removal Procedures Consistent With Merit System Principles
(Removal Procedures Order)........................................................ 13

LEGAL STANDARD........................................................................................... 14

ARGUMENT ..................................................................................................... 15

I.    PLAINTIFFS' CLAIMS FALL OUTSIDE THIS COURT'S JURISDICTION.............. 15

    A.  Congress Already Foreclosed Plaintiffs' Attempt to Bypass the Statute's
Exclusive Review Scheme by Filing Suit in District Court. ..................................... 16

        1.    The Statute establishes a scheme of exclusive review by the FLRA,
subject to judicial review in the courts of appeals. ................................... 18

        2.    Plaintiffs' claims are precisely the type that Congress intended be
reviewed by the FLRA and, if necessary, by a court of appeals............... 20

B.   Prudential Ripeness Concerns Counsel Against Hearing Plaintiffs' Claims. .......... 22

II.   PLAINTIFFS' CLAIMS LACK MERIT......................................................................... 26

A.   Congress Made Clear That Certain Subjects Could be Made Exempt from
Collective Bargaining Negotiations by the Issuance of Government-Wide Rules. .. 26

B.   None of the Challenged Provisions of the Orders Conflicts With the Statute. ......... 28

1.   The Collective Bargaining Order is not in conflict with the Statute......... 28

a.   Section 5(a)'s "ordinarily reasonable" time periods for
negotiating ground rules and term CBAs do not conflict with
the Statute................................................................................... 29

b.   Section 5(c) provides guidance to agencies that is consistent
with 5 U.S.C. § 7114(b). .............................................................. 30

c.   Section 5(e) is not in conflict with any provision of the Statute... 31

d.   Section 6 is consistent with Congress's express determination
that certain matters may be negotiated only "[a]t the election
of the agency." ............................................................................ 32

2.   The Official Time Order is not in conflict with the Statute...................... 33

a.   Section 3 of the Official Time Order does not conflict with the
Statute. ........................................................................................ 34

b.   Section 4 of the Official Time Order does not conflict with the
Statute. ........................................................................................ 36

i.   Sections 4(a)(i)-(v) and 4(b) are Government-wide
rules that preclude agencies from bargaining over
contrary proposals. ......................................................... 36

ii.   Section 4(a)(i) does not violate 5 U.S.C. §§ 7102(1)
or 7211, or otherwise conflict with the Statute. ............... 38

iii.   Section 4(a)(ii) does not conflict with the language
of or intent underlying 5 U.S.C. § 7131........................... 39

iv.   Sections 4(a)(iii), 4(a)(iv), and 4(b) do not conflict
with the Statute. .............................................................. 41

        v.     Section 4(a)(v) does not force unions to violate 5 U.S.C. § 7114, or otherwise conflict with the Statute. ............................................................ 42

        vi.    Section 4(c) does not conflict with the Statute because Congress gave OPM broad authority to administer civil service regulations. ................................ 43

   3.    The Removal Procedures Order is entirely consistent with the Statute. .................................................................................. 44

      a.    Sections 3 and 4(a) of the Removal Procedures Order are not in conflict with the Statute. .......................................... 45

        i.     Section 4(a) is a Government-wide rule that precludes agencies from including certain disputes in negotiated grievance procedures, and is also consistent with Congress's express decision to allow any matter to be excluded from such procedures. ...................................................... 45

        ii.    Section 3 is not a binding directive to agencies and, even if it were, is consistent with Congress's intent to allow certain matters to be excluded from negotiated grievance procedures...................................... 47

      b.    Section 4(b)(iii) of the Removal Procedures Order does not conflict with the Statute or impermissibly restrict the scope of bargaining. .................................................................. 48

      c.    Section 4(c) of the Removal Procedures Order does not conflict with 5 U.S.C. § 4302(c)(6). ............................................. 50

      d.    Sections 2(a) and 2(b) do not impose binding requirements but instead announce principles of federal employee Accountability, which create no conflict with statutory provisions.................................................................. 51

C.  The Executive Orders Do Not "Cumulatively" Violate the Collective Bargaining Scheme.................................................................................. 54

D.  Plaintiffs' Claims Under the Take Care Clause and the Separation of Powers Doctrine Are Baseless. ............................................................................ 58

E.  Section 4(a)(v) of the Official Time Order Does Not Infringe Plaintiffs' First Amendment Right to Free Association. .................................................... 60

iii

1.      Section 4(a)(v) does not infringe Plaintiffs' right to free association.............................................................................................. 61

2.      Even if the First Amendment were implicated, Section 4(a)(v) passes constitutional muster...................................................................... 63

III.    THIS COURT HAS NO JURISDICTION TO GRANT PLAINTIFFS' REQUESTED RELIEF.............................................................................. 64

CONCLUSION..................................................................................................... 67

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967).............................................................................................. 23

*AFGE v. FLRA*,
   798 F.2d 1525 (D.C. Cir. 1986)....................................................................... 40, 51

*AFGE v. Loy*,
   367 F.3d 932 (D.C. Cir. 2004)............................................................ 17, 19, 20, 22

*AFGE, AFL-CIO, Local 2441 v. FLRA*,
   864 F.2d 178 (D.C. Cir. 1988)............................................................................ 32

*AFGE, Locals 225, 1504, & 3723, AFL-CIO v. FLRA*,
   712 F.2d 640 (D.C. Cir. 1983)............................................................................ 46

*Am. Petroleum Inst. v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012)............................................................... 23, 24, 26

*Arch Coal, Inc. v. Acosta*,
   888 F.3d 493 (D.C. Cir. 2018)....................................................................... 17, 20

*Ass'n of Civilian Technicians v. FLRA*,
   269 F.3d 1119 (D.C. Cir. 2001)........................................................................ 8, 9

*Ass'n of Civiliam Technicians v. FLRA*,
   283 F.3d 339 (D.C. Cir. 2002)............................................................................ 20

*Ass'n for Women in Sci. v. Califano*,
   566 F.2d 339 (D.C. Cir. 1977)............................................................................ 59

*Autor v. Pritzker*,
   740 F.3d 176 (D.C. Cir. 2014)............................................................................ 63

*Baker v. Carr*,
   369 U.S. 186 (1962)............................................................................................ 60

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002).................................................................... 2, 4, 59

*Boy Scouts of America v. Dale*,
   530 U.S. 640 (2000)............................................................................................ 62

*Brook v. Corrado*,
    999 F.2d 523 (Fed. Cir. 1993) ................................................................................ 54

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
    464 U.S. 89 (1983) ................................................................................... *passim*

*Bush v. Lucas*,
    462 U.S. 367 (1983) ............................................................................................ 38

*Campaign for Accountability v. DOJ*,
    278 F. Supp. 3d 303 (D.D.C. 2017) ................................................................... 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................ 15

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008) ........................................................................... 65

*Council of Prison Locals v. Brewer*,
    735 F.2d 1497 (D.C. Cir. 1984) ........................................................................... 8

*Dalton v. Spencer*,
    511 U.S. 462 (1994) ............................................................................. 3, 57, 58

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
    85 F. Supp. 3d 250 (D.D.C. 2015) ..................................................................... 25

*Dep't of Veterans Affairs v. FLRA*,
    9 F.3d 123 (D.C. Cir. 1993) ............................................................................... 46

*El Dia v. Hernandez Colon*,
    963 F.2d 488 (1st Cir. 1992) ....................................................................... 23, 24

*Elgin v. Dep't of the Treasury*,
    567 U.S. 1 (2012) ............................................................................................... 22

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................................ 64

*FLRA v. Aberdeen Proving Ground*,
    485 U.S. 409 (1988) .............................................................................................. 6

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................. 58, 65, 66

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................................................ 19

*HHS v. FLRA*,
　844 F.2d 1087 (4th Cir. 1988) (en banc) ................................................................ 7, 20, 27

*Ind. Air National Guard v. FLRA*,
　712 F.2d 1187 (7th Cir. 1983) ................................................................................... 7

*IRS v. FLRA*,
　494 U.S. 922 (1990) .................................................................................... 26, 27, 55

*IRS v. FLRA*,
　996 F.2d 1246 (D.C. Cir. 1993) ........................................................................ *passim*

*Jarkesy v. SEC*,
　803 F.3d 15 (D.C. Cir. 2015) ..................................................................................... 16

*John Glenn Presidential Comm., Inc. v. FEC*,
　822 F.2d 1097 (D.C. Cir. 1987) ................................................................................ 63

*Karahalios v. NFFE, Local,1263*,
　489 U.S. 527 (1989) .................................................................................... 17, 18, 19

*Keeffe v. Library of Cong.*,
　588 F. Supp. 778 (D.D.C. 1984) *aff'd in part, rev'd in part*,
　777 F.2d 1573 (D.C. Cir. 1985) ................................................................................ 46

*Konigsberg v. State Bar of Cal.*,
　366 U.S. 36 (1961) .................................................................................................... 63

*Local 1498, AFGE v. AFGE, AFL/CIO*,
　522 F.2d 486 (3d Cir. 1975) ....................................................................................... 5

*Lovitsky v. Trump*,
　No. 17-cv-00450, 2018 WL 1730278 (D.D.C. Apr. 10, 2018) .................................. 66

*Lovshin v. Dep't of the Navy*,
　767 F.2d 826 (Fed. Cir. 1985) .......................................................................... 52, 53

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992) .................................................................................................. 60

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*,
　485 U.S. 360 (1988) .................................................................................... 62, 63, 64

*Manhattan-Bronx Postal Union v. Gronouski*,
　350 F.2d 451 (D.C. Cir. 1965) ............................................................................... 4, 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) .................................................................................................. 15

*Meyer v. Bush*,
981 F.2d 1288 (D.C. Cir. 1993) ........................................................................................ 27

*Mississippi v. Johnson*,
71 U.S. 475 (1867) ........................................................................................ 3, 60, 65, 66

*Mori v. Dep't of the Navy*,
731 F. Supp. 2d 43 (D.D.C. 2010) ........................................................................................ 15

*Myers v. United States*,
272 U.S. (4 Wall.) 52 (1926) ........................................................................................ 4, 59

*NAACP v. Alabama ex. Rel. Patterson*,
357 U.S. 449 (1958) ........................................................................................ 62

*Nat'l Ass'n of Gov't Emps., Inc. v. FLRA*,
179 F.3d 946 (D.C. Cir. 1999) ........................................................................................ 33

*Nat'l Ass'n of Gov't Emps., Local R5-136 v. FLRA*,
363 F.3d 468 (D.C. Cir. 2004) ........................................................................................ 32

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
851 F.2d 1424 (D.C. Cir. 1988) ........................................................................................ 25

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ........................................................................................ 66

*NFFE v. FLRA*,
789 F.2d 944 (D.C. Cir. 1986) ........................................................................................ 7

*NFFE, Local 1319 v. Dep't of the Interior*,
526 U.S. 86 (1999) ........................................................................................ 17, 57

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ........................................................................................ 66

*Nixon v. United States*,
506 U.S. 224 (1993) ........................................................................................ 60

*NTEU v. Bush*,
891 F.2d 99 (5th Cir. 1989) ........................................................................................ 61

*NTEU v. Chertoff*,
452 F.3d 839 (D.C. Cir. 2006) ........................................................................................ 55, 56, 57

*NTEU v. FLRA*,
712 F.2d 669 (D.C. Cir. 1983) ........................................................................................ 7

*NTEU v. FLRA*,
   721 F.2d 1402 (D.C. Cir. 1983) ...................................................................... 42, 43

*NTEU v. FLRA*,
   745 F.3d 1219 (D.C. Cir. 2014) .............................................................................. 19

*NTEU v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ................................................................ 223, 25, 26

*Ohio Bureau of Emp. Servs. v. Hodory*,
   431 U.S. 471 (1977) ................................................................................................ 64

*Old Dominion Branch, Nat'l Ass'n of Letter Carriers, Local 4965, AFL-CIO  v. Austin*,
   418 U.S. 264 (1974) ............................................................................................ 2, 59

*OPM v. FLRA*,
   864 F.2d 165 (D.C. Cir. 1988) .......................................................................... 27, 28

*Overseas Educ. Ass'n v. FLRA*,
   876 F.2d 960 (D.C. Cir. 1989) .......................................................................... 20, 45

*Pro-Football, Inc. v. Harjo*,
   284 F. Supp. 2d 96 (D.D.C. 2003) .................................................................... 14, 15

*Regan v. Taxation with Representation of Wash.*,
   461 U.S. 540 (1983) .......................................................................................... 62,  63

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ................................................................................................ 62

*Rosell v. Wood*,
   No. Civ. A. 01-1355 RCL, 2002 WL 32396260 (D.D.C. Mar. 27, 2002)
   *aff'd,*  63 F. App'x 519 (D.C. Cir. 2003) .............................................................. 46

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985) .......................................................................... 65, 66

*Sierra Club v. Envtl. Prot. Agency*,
   873 F.3d 946 (D.C. Cir. 2017) ................................................................................ 52

*Social Sec. Admin. v. FLRA*,
   956 F.2d 1280 (4th Cir. 1992) .................................................................................. 7

*Steadman v. Governor, U.S. Soldiers' & Airmen's Home*,
   918 F.2d 963 (D.C. Cir. 1990) ................................................................................ 22

*Suzal v. Dir., U.S. Info. Agency*,
   32 F.3d 574 (D.C. Cir. 1994) ............................................................................ 45, 46

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ........................................................................ 65, 66

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ........................................................................................ 16, 22

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................................... 61

*U.S. Customs Serv. v. FLRA,*
    43 F.3d 682 (D.C. Cir. 1994) ........................................................................ 45, 46

*U.S. Customs Serv. v. FLRA,*
    854 F.2d 1414 (D.C. Cir. 1988) ............................................................................ 49

*U.S. Dep't of Navy v. FLRA,*
    665 F.3d 1339 (D.C. Cir. 2012) ............................................................................ 18

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ............................................................................................... 61

*Williams v. IRS,*
    919 F.2d 745 (D.C. Cir. 1990) ........................................................................ 63, 64

*Wood v. AFGE,*
    255 F. Supp. 3d 190 (D.D.C. 2017) ...................................................................... 65

*Zingg v. Dep't of the Treasury, IRS,*
    388 F.3d 839 (Fed. Cir. 2004) ............................................................................... 54

## ADMINISTRATIVE CASES

*AFGE v. Dep't of Hous. & Urban Dev.,*
    43 F.L.R.A. 1405 (1992) ........................................................................................ 21

*AFGE Local 1426 & U.S. Dep't of the Army, Fort Sheridan, IL,*
    45 F.L.R.A. 867 (1992) .......................................................................................... 49

*AFGE Local 3732 & U.S. Dep't of Transp., U.S. Merch. Marine Acad.,*
    *Kings Point, NY,*
    39 F.L.R.A. 187 (1991) ..................................................................................... 49, 50

*Dep't of Def., Def. Contract Audit Agency Cent. Region & AFGE, Local 3529,*
    37 F.L.R.A. 1218 (1990) ........................................................................................ 27

*Dep't of the Interior, Wash., D.C. & U.S. Geological Survey, Reston, Va. v. NFFE,*
    52 F.L.R.A. 475 (1996) .......................................................................................... 21

*Douglas v. Veterans Administration*,
   5 M.S.P.R. 280 (1981) ........................................................................... 52

*In re Dep't of Def., Mont. Air Nat'l Guard, Great Falls, Mont. & Ass'n of Civilian Technicians*,
   Case No. 00 FSIP 35 (Apr. 18, 2000) .................................................... 46

*Int'l Bhd of Elec. Workers v. Dep't of the Interior*,
   25 F.L.R.A. 201 (1987)........................................................................... 38

*Lee v. EPA*,
   115 M.S.P.R. 533 (2010) ....................................................................... 50

*Melnick v. HUD.*,
   42 M.S.P.R. 93 (1989*), aff'd*, 899 F.2d 1228 (Fed. Cir.1990)................. 50

*NFFE, Local 15 and U.S. Dep't of the Army*,
   30 F.L.R.A. 1046 (1988)......................................................................... 37

*NFFE, Local 1214 & U.S. Dept. of the Army Headquarters, U.S. Army Training Ctr. & Fort Jackson, Fort Jackson, SC*,
   51 F.L.R.A. 1362 (1996)......................................................................... 49

*NFFE, Local 1655 v. Dep't,of Def.*,
   49 F.L.R.A. 874 (1994)..................................................................... 21, 27

*NFFE, Local 2015 and U.S. Dep't of Interior Nat'l Park Serv.*,
   41 F.L.R.A. 1158 (1991)......................................................................... 37

*NTEU v. Dep't of the Treasury*,
   42 F.L.R.A. 377 (1991).......................................................................... 21

*Patent Office Prof'l Ass'n Union v. Patent & Trademark Office Dep't of Commerce*,
   29 F.L.R.A. 1389 (1987)......................................................................... 51

*Towne v. Dep't of Air Force*,
   No. SF-0432-11-0591-I-2, 2013 WL 5781296 (M.S.P.B. Oct. 28, 2013) ............... 50

*U.S. Dep't of the Army Corp of Eng'rs, Memphis Dist., Memphis, Tenn. and NFFE*,
   52 F.L.R.A. 920 (1997)........................................................................... 39

*Wood v. Dep't of the Navy*,
   27 M.S.P.R. 659 (1985) ......................................................................... 51

## **CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I .......................................................................................... 58

U.S. Const. art. II ......................................................................................................... 4

U.S. Const. art. II §1 ................................................................................................. 4, 59

U.S. Const. art. II §3 ......................................................................................... 2, 3, 58, 60

U.S. Const. art. III ....................................................................................................... 33

U.S. Const. amend. I .................................................................................................. 4, 64

**STATUTES**

3 U.S.C. § 301 ............................................................................................................. 44

5 U.S.C. § 105 ............................................................................................................. 28

5 U.S.C. § 1103 ........................................................................................................... 44

5 U.S.C. § 1104 ........................................................................................................... 44

5 U.S.C. § 3301 ........................................................................................................... 59

5 U.S.C. § 4302 ........................................................................................................ 9, 50

5 U.S.C. § 4303 ............................................................................................................. 9

5 U.S.C. § 4304 ........................................................................................................... 10

5 U.S.C. § 7101 *et seq.*............................................................................................... 1, 5

5 U.S.C. § 7101 ............................................................................................................. 6

5 U.S.C. § 7102 ........................................................................................................ 5, 38

5 U.S.C. § 7103 ...................................................................................................... 9, 28, 47

5 U.S.C. § 7105 ....................................................................................................... *passim*

5 U.S.C. § 7106 ....................................................................................................... *passim*

5 U.S.C. § 7114 ....................................................................................................... *passim*

5 U.S.C. § 7116 ...................................................................................................... 7, 19

5 U.S.C. § 7117 ............................................................................................... *passim*

5 U.S.C. § 7118 ...................................................................................... 7, 18, 31

5 U.S.C. § 7119 .................................................................................................. 7

5 U.S.C. § 7121 ............................................................................................... *passim*

5 U.S.C. § 7122 ................................................................................................ 18

5 U.S.C. § 7123 ................................................................................. 8, 17, 18, 19

5 U.S.C. § 7131 ............................................................................................... *passim*

5 U.S.C. § 7132 ................................................................................................ 19

5 U.S.C. § 7134 ........................................................................................ 43, 44

5 U.S.C. § 7301 ............................................................................................... *passim*

5 U.S.C. § 9701 ................................................................................................ 55

18 U.S.C. § 1913 .............................................................................................. 39

Civil Service Reform Act of 1978,
   Pub. L. No. 95–454, 92 Stat. 111 ................................................................ 5

H.R. Rep. No. 95-1403 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723 ......................................... 6

H. R. Conf. Rep. No. 95-1717 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2860 ............................ 27

**FEDERAL RULES**

Fed. R. Civ. P. 12 .............................................................................................. 65

Fed. R. Civ. P. 56 .............................................................................................. 14

**FEDERAL REGULATIONS**

5 C.F.R. § 430.210 ............................................................................................ 10

5 C.F.R. § 432.103 .............................................................................................. 9

5 C.F.R. § 432.104 ........................................................................................ 9, 50

**EXECUTIVE ORDERS**

Executive Order No. 10,988, 3 C.F.R. 521 (1959-1963) ........................................................ 5, 35

Executive Order No. 11,491, 3 C.F.R. 861 (1966-1970) ........................................................ 5, 35

Executive Order No. 11,616, 3 C.F.R. 605 (1971-1975) ............................................................ 35

Executive Order No. 11,636, 3 C.F.R. 634 (1971-1975) .............................................................. 5

Executive Order No. 11,838, 3 C.F.R. 957 (1971-1975) .............................................................. 5

Executive Order No. 12,564, 51 Fed. Reg. 32,889 (Sept. 15, 1986) ........................................... 27

Executive Order No. 12,871, 58 Fed. Reg. 52,201 (Oct. 1, 2013) ........................................ 33, 34

Executive Order No. 13,836, 83 Fed. Reg. 25,239 (June 1, 2018) ...................................... *passim*

Executive Order No. 13,837, 83 Fed. Reg. 25,335 (June 1, 2018) ...................................... *passim*

Executive Order No. 13,839, 83 Fed. Reg. 25,343 (June 1, 2018) ...................................... *passim*

## OTHER AUTHORITIES

Application of 18 U.S.C. § 1913 to Grass Roots Lobbying by Union Representatives,
29 Op. O.L.C. 179 (2005) ...................................................................................................... 39

## **<u>INTRODUCTION</u>**

On May 25, 2018, the President issued three Executive Orders designed to promote more efficient and effective approaches to federal-sector collective bargaining and labor-management relations.  Among other things, these Orders seek to eliminate unnecessary burdens and delays in the collective bargaining process between agencies and unions, to ensure that federal employees spend the clear majority of their paid time working on behalf of the public, and to promote accountability in the federal workforce by streamlining agency efforts to remove employees whose performance falls below acceptable standards.  All of these measures are to be implemented within the framework established by the Federal Service Labor–Management Relations Statute, 5 U.S.C. § 7101 *et seq.* (the Statute), which governs federal-sector collective bargaining.  While passage of the Statute in 1978 replaced the previous system of federal labor relations governed solely by Executive Order, Congress continued to acknowledge a substantial Executive Branch role to play in defining the scope of collective bargaining across the federal government and in setting consistent negotiating policy for employing agencies.

Plaintiffs in these four consolidated cases, a collection of federal employee unions, challenge numerous provisions of the Orders under overlapping statutory and constitutional legal theories.  None of their challenges has merit.

As a threshold matter, Plaintiffs' claims fall outside the Court's jurisdiction for two independent reasons.  First, in enacting the Statute, Congress designated the Federal Labor Relations Authority (FLRA) and the courts of appeals—not the district courts—as the proper forums to adjudicate claims of the sort Plaintiffs advance here.  Because Congress intended that these challenges be channeled through this dedicated review mechanism, culminating in judicial review in a court of appeals, this Court lacks jurisdiction to hear these consolidated cases.

Second, even if the Court concludes that it may hear Plaintiffs' claims, these claims are not prudentially ripe. As the Orders make plain, numerous provisions that Plaintiffs challenge are to be implemented only pursuant to notice-and-comment rulemaking by the Office of Personnel Management (OPM). Those rulemakings have not yet been proposed, let alone concluded. Other provisions of the Orders contemplate negotiations between individual agencies and unions that have not been concluded, much less commenced in many cases. Only when such regulations become final or negotiations culminate in FLRA decisions reviewable in the court of appeals would the issues implicated by Plaintiffs' claims be fit for judicial review.

In all events, Plaintiffs' claims cannot survive on their merits. Contrary to Plaintiffs' insistence that the orders are an unlawful exercise of Presidential power, they fall well within the President's authority. As the Supreme Court and D.C. Circuit have held, the President has ample statutory authority to "establish a labor-management relations system for federal employment," *Old Dominion Branch, Nat'l Ass'n of Letter Carriers, Local 4965, AFL-CIO v. Austin*, 418 U.S. 264, 273-74 and 273 n.5 (1974)—a power far greater than the measures challenged here—and likewise possesses authority to supervise and guide federal agencies and officials in their execution of federal laws, including the Statute, *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). In directing his subordinates to exercise their discretion consistent with statutory authority and to advance the efficient functioning of the civil service, the President is carrying out his constitutional responsibilities, not violating them as Plaintiffs contend.

Plaintiffs' attempts to dress up their core assertions of *ultra vires* Executive action as violations of the separation-of-powers doctrine and the Take Care Clause also must be dismissed. Plaintiffs' separation-of-powers claim fails at the outset because it does no more than recycle their statutory conflict claims and the Supreme Court has squarely rejected the proposition "that

whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Dalton v. Spencer*, 511 U.S. 462, 471 (1994). Their Take Care Clause claims are similarly foreclosed by the Supreme Court's recognition that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867), and therefore not a proper subject of judicial intervention.

Even if these claims were justiciable, they would fail for the same reason that Plaintiffs' claims of *ultra vires* Executive action do: there is no conflict with the Statute. The challenged provisions of the Orders are wholly consistent with what Congress contemplated when it created the modern federal collective bargaining regime. Critically, section 7117(a)(1) of the Statute "permits the government to pull a subject out of the bargaining process by issuing a government-wide rule that creates a regime inconsistent with bargaining." *IRS v. FLRA*, 996 F.2d 1246, 1250 (D.C. Cir. 1993). This section alone, unmentioned by Plaintiffs, disposes of a large part of their case. Many of the provisions that Plaintiffs challenge are rules that § 7117(a)(1) envisions the Executive Branch might create to advance certain Government-wide interests and thereby limit the scope of collective bargaining. When the President does as he has here—set uniform, Government-wide rules on certain topics that preclude agencies from entertaining inconsistent proposals during negotiations—there can be no conflict with the duty to bargain. And for those challenged provisions that are not Government-wide rules, the President has done no more than set goals for agencies to achieve in collective bargaining negotiations, none of which are contrary to the Statute. Plaintiffs' suggestion that the President may not establish policy objectives for his subordinates to meet lacks any basis.

Plaintiffs' remaining claim—that the Government's decision not to pay employees for pursuing third-party grievances against their employing agencies violates their First Amendment right to free association—is baseless.  The challenged provision imposes no restriction on the right of a union or its members to pursue a third-party grievance and in fact encourages agencies to grant leave to employees for that purpose.  In any event, a decision not to subsidize the exercise of a First Amendment right does not amount to an infringement of that right.

Finally, were Plaintiffs to prevail on any of their claims, the remedy they seek is not permissible.  The President's official, non-ministerial conduct may not be enjoined, nor is it appropriate to enter declaratory relief against him.  Meanwhile, insofar as Plaintiffs seek to enjoin OPM and its Director, that request is premature since OPM has not yet begun the rulemaking process to which Plaintiffs object.

For all of these reasons, Plaintiffs' Motions for Summary Judgment should be denied, and summary judgment entered for Defendants on all of Plaintiffs' claims.

## **BACKGROUND**

### I.   **THE PRESIDENT'S AUTHORITY TO CONTROL THE CONDUCT OF FEDERAL EMPLOYEES**

Article II of the Constitution provides that "[the executive Power shall be vested in a President of the United States of America."  U.S. Const., Art. II, § 1, cl. 1.  This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Bldg. & Const. Trades Dep't, AFL-CIO*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment."  *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).  Congress has further recognized this aspect of

Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Prior to Congress's enactment of the Statute, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees" by Executive Order.  *See, e.g.*, *Local 1498, AFGE* v. *AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975).  "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 452 (D.C. Cir. 1965).  Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962.  Exec. Order No. 10,988, 3 C.F.R. 521 (1959–1963); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91-92 (1983) ("*BATF*").   In doing so, he recognized that labor relations are closely linked to "the efficient administration of the Government" and the "effective conduct of public business."  *See* Exec. Order No. 10,988. Multiple Presidents subsequently amended that Order.  *See* Exec. Order No. 11491, 3 C.F.R. 861 (1966–1970), as amended by Exec. Orders Nos. 11616, 11636, and 11838, 3 C.F.R. 605, 634 (1971–1975) and 3 C.F.R. 957 (1971–1975).

## II.    THE FEDERAL SERVICE LABOR–MANAGEMENT RELATIONS STATUTE

### A.    General Statutory Framework

Against this backdrop, Congress in 1978 passed the Federal Service Labor–Management Relations Statute, 5 U.S.C. § 7101 *et seq.*  The Statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95–454, 92 Stat. 111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *BATF*, 464 U.S. at 91. The Statute establishes the right of federal employees to organize, select an exclusive representative, and engage in collective bargaining about a circumscribed range of topics.  5 U.S.C.

§ 7102.  It also requires the management officials of federal agencies to meet and bargain in good faith with the employees' chosen union for the purpose "of arriving at a collective bargaining agreement."  5 U.S.C. § 7114(a)(4).

These directives are subject to a variety of limitations, however.  As the Supreme Court has noted, Congress "[r]ecogniz[ed] 'the special requirements and needs of the Government,'" and the Statute therefore "exempts certain matters from the duty to negotiate."  *FLRA v. Aberdeen Proving Ground*, 485 U.S. 409, 410 (1988) (per curiam) (quoting 5 U.S.C. § 7101(b)).  Section 7117(a)(1), for instance, precludes an agency from bargaining over proposals that are "inconsistent with any Federal law or any Government-wide rule or regulation," and over "matters which are the subject of . . . a Government-wide rule or regulation."  5 U.S.C. § 7117(a)(1).  And the Statute does not disturb the President's express statutory authority to prescribe such Government-wide rules for the conduct of employees in the Executive Branch, *id.* at § 7301, or for the admission of individuals into the civil service, *id.* at § 3301.  Moreover, section 7106(a) provides that "nothing in this chapter shall affect the authority of any management official of any agency" with respect to certain enumerated "management rights."  *See* H.R. Rep. No. 95-1403 (1978), *reprinted in* U.S.C.C.A.N. 2723 (Section 7106 "place[s] limits on the number of subjects about which agency management may bargain with a labor organization.").  Finally, the Statute itself makes clear that "[e]xcept as otherwise expressly provided," none of its provisions should be construed to "limit, curtail, abolish, or terminate any function of, or authority available to, the President which the President had immediately before" the Statute's effective date.  Pub. L. 95-454, § 804, 92 Stat. 111.

For any negotiability disputes that arise in the course of the bargaining process, the Statute provides a dedicated mechanism for their resolution.  If management officials decline to negotiate

over a union's bargaining proposal, maintaining "that the duty to bargain in good faith does not extend to [such] matter," 5 U.S.C. § 7117(c)(1), the union may file a negotiability appeal with the FLRA.  *See id.* §§ 7105(a)(2)(E), 7117(c).  The FLRA then "expedites proceedings" and, "at the earliest practicable date," decides whether the union's proposal is subject to the bargaining obligation.  *Id.* § 7117(c)(6); *see BATF*, 464 U.S. at 93.  A union or agency may also seek to resolve a dispute over whether there is a duty to bargain over a particular proposal by filing an unfair labor practice charge.  *See* 5 U.S.C. § 7116(a)(5), (b)(5).  Under §§ 7105(a)(2)(G) and 7118(a)(6), the FLRA has jurisdiction to consider charges of unfair labor practices.

Apart from disputes over negotiability and unfair labor practice charges, if a union and an agency reach an impasse in their negotiations, including after a determination by the FLRA that a union's proposal is subject to the bargaining obligation, either party may seek resolution of the substantive disagreements from the Federal Service Impasses Panel (the Panel).  *See id.* § 7119(b)(1); *see also Social Sec. Admin. v. FLRA,* 956 F.2d 1280, 1287 (4th Cir. 1992).  The Panel may "take whatever action is necessary and not inconsistent with [the Statute] to resolve the impasse," 5 U.S.C. § 7119(c)(5)(B)(iii), such as adopting a compromise position or imposing either party's proposal on the counterparty.  *Id.* § 7119(c)(5)(C); *see, e.g.*, *NFFE v. FLRA*, 789 F.2d 944, 945 (D.C. Cir. 1986); *NTEU v. FLRA*, 712 F.2d 669, 671 n.5 (D.C. Cir. 1983).  "Thus, it is possible that a proposal held negotiable by the FLRA may be imposed on the parties by the Federal Service Impasses Panel in the event the agency and the union do not ultimately agree." *Ind. Air National Guard v. FLRA*, 712 F.2d 1187, 1189 n.1 (7th Cir. 1983); *accord HHS v. FLRA*, 844 F.2d 1087, 1089 (4th Cir. 1988) (en banc).  If either party fails to comply with any final action ordered by the Panel, such action constitutes an unfair labor practice, for which the other party

may seek redress at the FLRA.  *See Council of Prison Locals v. Brewer*, 735 F.2d 1497, 1500 (D.C. Cir. 1984).

The FLRA's final orders, including orders resolving negotiability disputes and unfair labor practice charges, such as those resulting from failure to comply with final action ordered by the Panel, are, with few exceptions, subject to judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts business or in the United States Court of Appeals for the District of Columbia."  5 U.S.C. § 7123(a).

### B.      Employees' Use of Official Time

Congress mandated the authorization of paid "official time" for certain enumerated activities of employees and prohibited it for certain others.  First, any employee representing a union "in the negotiation of a collective bargaining agreement" shall be authorized official time. 5 U.S.C. § 7131(a).  Second, Congress authorized the FLRA to determine whether to authorize official time for an employee "participating for, or on behalf of a [union] in any phase of proceedings before the [FLRA]."  *Id.* § 7131(c).  Finally, Congress provided that any employee's activities "relating to the internal business of a [union]" are ineligible for official time and must instead be performed when the employee is in a non-duty status.  *Id.* § 7131(b).

For other activities, when representing a union or in connection with any other matter covered by the Statute, an employee "shall be granted official time in any amount the agency and the [union] agree to be reasonable, necessary, and in the public interest."  5 U.S.C. § 7131(d). Thus, Congress left to agencies and unions in individual negotiation settings to determine the specific activities for which official time may be authorized, so long as consistent with other laws and regulations.  *See Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1119, 1120 (D.C. Cir. 2001).

### C.  Negotiated Grievance Procedures

The Statute requires that all federal collective bargaining agreements (CBAs) "shall provide procedures for the settlement of grievances, including questions of arbitrability." 5 U.S.C. § 7121(a)(1). While "grievances" is broadly defined in § 7103(a)(9),[1] a CBA may "exclude any matter from the application of the grievance procedures which are provided for in the agreement." *Id.* § 7121(a)(2). With certain exceptions not pertinent here, these negotiated grievance procedures "shall be the exclusive procedures for resolving grievances." *Id.* § 7121(a)(1).

### D.  Removal of Employees for Unacceptable Performance

Subject to provision of 30 days' advance written notice and the employee's right to counsel and to respond, an agency may "remove an employee for unacceptable performance." 5 U.S.C. § 4303(a). To facilitate various personnel actions, including removals of employees for unacceptable performance, Congress has required each federal agency to develop a performance appraisal system. *Id.* § 4302(a). A performance appraisal system must provide for, among other things, "removing employees who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance." *Id.* § 4302(c)(6). OPM regulations provide that, if "an employee's performance is determined to be unacceptable in one or more critical elements," "the agency shall afford the employee a reasonable opportunity to demonstrate acceptable performance, commensurate with the duties and responsibilities of the employee's position." 5 C.F.R. § 432.104; *see also id.* § 432.103(d) (defining an opportunity to demonstrate acceptable performance as "a reasonable chance for the employee . . . to demonstrate acceptable

---

[1] "Grievances," as defined in § 7103(a)(9), include complaints by employees and unions "concerning any matter relating to the employment" of an employee, 5 U.S.C. § 7103(a)(9)(A), (B), complaints concerning the effect, interpretation, or alleged breach of the collective bargaining agreement, *id.* § 7103(a)(9)(C)(i), and "any complaint . . . by any employee labor organization, or agency concerning . . . any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment," *id.* § 7103(a)(9)(C)(ii).

performance in the critical element(s) at issue"). An agency's performance appraisal system is subject to review and approval by OPM. *See* 5 U.S.C. § 4304(b)(1); 5 C.F.R. § 430.210.

## III.   THE PRESIDENT'S MAY 25, 2018 EXECUTIVE ORDERS

On May 25, 2018, the President signed three Executive Orders addressing labor relations in the federal sector. To fulfill the President's objective of a more effective and efficient Government, these Orders direct agencies subject to the Statute to adopt particular positions in collective bargaining negotiations, prescribe certain rules of employee conduct, and impose certain requirements on agencies, all subject to existing law, including the Statute, and any CBAs in effect when the Orders were issued.

### A.   Executive Order No. 13,836, Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining (Collective Bargaining Order)

Executive Order No. 13,836 (the Collective Bargaining Order) is designed "to assist executive departments and agencies . . . in developing efficient, effective, and cost-reducing collective bargaining agreements." Exec. Order No. 13,836, 83 Fed. Reg. 25,239 (June 1, 2018). The Order requires that federal agencies make efforts to secure CBAs that satisfy this and other objectives. Sections 5 and 6 of this Order are relevant here.

Generally, Section 5 establishes certain "temporal objectives" for agencies in negotiating grounds rules and term CBAs—generally, 6 weeks or less for ground rules and between 4 and 6 months for a term CBA should "ordinarily be considered reasonable." Collective Bargaining Order, Sec. 5(a). When such negotiations last longer than a reasonable period, Section 5(a) directs agencies to consider seeking the assistance of the Federal Mediation and Conciliation Service or the Panel. Section 5(e) calls for agencies, during negotiations, to request the exchange of written proposals to facilitate resolution of any negotiability issues that may arise. If an agency's existing

10

agreements require something other than exchange of written proposals, Section 5(e) directs the agency to take steps to eliminate such requirements.

Section 6 directs heads of agencies subject to the Statute not to negotiate over the subjects set forth in 5 U.S.C. § 7106(b)(1).  That statutory provision, labeled "Management rights," allows—but does not require—an agency to negotiate "on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work."  5 U.S.C. § 7106(b)(1).  In effect, Section 6 constitutes a binding directive across federal agencies involved in collective bargaining not to exercise their statutory discretion to negotiate over the subjects listed in § 7106(b)(1).

The Collective Bargaining Order expressly provides that it "shall be implemented consistent with applicable law" and that it shall not "abrogate any CBA in effect on the date of [the] order."  Collective Bargaining Order, Sec. 9(b), (c).

**B.      Executive Order No. 13,837, Ensuring Transparency, Accountability, and Efficiency in Taxpayer-Funded Union Time Use (Official Time Order)**

Executive Order No. 13,837 (the "Official Time Order") reflects the President's policy decision to "eliminate[] unnecessary, inefficient, or unreasonable expenditures" and "ensure that taxpayer-funded union time is used efficiently and authorized in amounts that are reasonable, necessary, and in the public interest."[2]  Exec. Order No. 13,837, 83 Fed. Reg. 25,335 (June 1, 2018).  The Order states that federal employees should spend the clear majority of their duty hours on agency business; that agencies should not pay, unless required by law, for unions' expenses; that any unrestricted grants of official time should be eliminated to the extent consistent with the

---

[2] Executive Order No. 13,837 uses the term "taxpayer-funded union time" synonymously with "official time," as defined in the Statute.  Official Time Order, Sec. 2(i).  For simplicity and to reduce any potential confusion, this Memorandum uses the statutory term "official time."

Statute; and that use of official time should be pre-authorized and monitored by agencies to ensure usage only for authorized purposes.   Aside from challenges to the definitional provisions for "taxpayer-funded union time" and "union time rate," Plaintiffs primarily challenge Sections 3 and 4 of the Official Time Order.

Section 3 provides guidance to agencies in negotiating official time grants under § 7131(d) of the Statute, while acknowledging that employees are entitled to official time for certain activities pursuant to §§ 7131(a) and (c).   In essence, Section 3 instructs agencies that a bargaining unit's union time rate[3] exceeding one hour is presumptively not "reasonable, necessary, and in the public interest," and directs agencies to commit the effort "to strive for a negotiated union time rate of [one] hour or less."   Official Time Order, Sec. 3(a).   But the Order also permits agencies to authorize official time that would result in a union time rate exceeding one hour.   *Id.*, Sec. 3(b).  In such cases, the agency head must simply report the agreement to the President and "explain why such expenditures are reasonable, necessary, and in the public interest."   *Id.*

Section 4(a) consists of a set of five Government-wide rules that restrict employees' use of paid time and Government property.   These rules, which apply only to conduct taken while on official duty, prohibit employees from engaging in lobbying activities during paid time except in their official capacities as employees, set a cap on the amount of paid time employees may spend performing non-agency business (while ensuring employees can claim paid time for activities under §§ 7131(a) and (c)), disallow certain free or discounted use of Government property or resources by employees acting on behalf of a union, and prohibit employees from using official time to prepare or pursue grievances on behalf of third parties under negotiated grievance procedures.

---

[3] The "union time rate" is defined as the total number of hours in a fiscal year that employees in a bargaining unit use for official time, divided by the number of employees in the bargaining unit.   Official Time Order, Sec. 2(j).

To administer the requirements of Section 4, the Order obligates OPM to "examine whether existing regulations are consistent with the rules set forth in this section." *Id.*, Sec. 4(c)(i). If not, OPM is to propose, as soon as practicable, new regulations "to clarify and assist agencies in implementing these rules." *Id.* Further, each agency head is to ensure compliance with Section 4's requirements "to the extent consistent with applicable law and existing collective bargaining agreements." *Id.*, Sec. 4(c)(ii). If an agency's existing regulations, policies, and practices are not consistent with Section 4's requirements, the agency head "shall take all appropriate steps consistent with applicable law to bring them into compliance . . . as soon as practicable." *Id.*

The Official Time Order expressly provides that it "shall be implemented consistent with applicable law" and that it shall not "abrogate any collective bargaining agreement in effect on the date of [the] order." *Id.*, Sec. 9(a), (d). The Order also directs each agency to "consult with employee labor representatives about the implementation of [the] order." *Id.*, Sec. 8(b).

### C.   Executive Order No. 13,839, Promoting Accountability and Streamlining Removal Procedures Consistent With Merit System Principles (Removal Procedures Order)

Executive Order No. 13,839 (the Removal Procedures Order) rests on the conclusion that a "[f]ailure to address unacceptable performance and misconduct undermines morale, burdens good performers with subpar colleagues, and inhibits the ability of executive agencies . . . to accomplish their missions." Exec. Order No. 13,839, Sec. 1, 83 Fed. Reg. 25,343 (June 1, 2018). That position is supported by the Federal Employee Viewpoint Survey's finding "that less than one-third of Federal employees believe that the Government deals with poor performers effectively." *Id.* The Order thus includes measures to "advance[] the ability of supervisors in agencies to promote civil servant accountability consistent with merit system principles while simultaneously recognizing employees' procedural rights and protections." *Id.* Plaintiffs challenge Sections 2, 3, and 4 of the Order.

Section 2 articulates a set of principles regarding federal employee accountability, including that agency supervisors "should not be required to use progressive discipline," that "disciplinary action should be calibrated to the specific facts and circumstances of each individual employee's situation," and that "agencies are not prohibited from removing an employee simply because they did not remove a different employee for comparable conduct." *Id.*, Sec. 2(a)-(c).

Section 3 encourages agencies, whenever reasonable, to exclude from negotiated grievance procedures disputes concerning employee removals for misconduct or unacceptable performance.

Section 4(a) directs agencies, to the extent consistent with applicable law, to exclude from their negotiated grievance or binding arbitration procedures any disputes concerning either the assignment of ratings of record or the award of any form of incentive pay. Section 4(c) provides that agencies may generally not afford an employee facing possible removal a period of greater than thirty days to demonstrate acceptable performance, but includes an exception to this directive "when the agency determines in its sole and exclusive discretion that a longer period is necessary to provide sufficient time to evaluate an employee's performance."

The Removal Procedures Order expressly provides that it "shall be implemented consistent with applicable law" and that it shall not "abrogate any collective bargaining agreement in effect on the date of [the] order." *Id.*, Sec. 8(b), (c).

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*,

284 F. Supp. 2d 96, 112 (D.D.C. 2003) (citation omitted). Rather, the dispute must regard a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation." *Id.* That is determined by "look[ing] to the substantive law on which each claim rests." *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010) (citation omitted). The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112.

"In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Mori*, 731 F. Supp. 2d at 46 (citation omitted). Summary judgment may also be granted in favor of the movant where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), such as through "the absence of evidence proffered by the opposing party," *Mori*, 731 F. Supp. 2d at 46 (citing *Celotex*, 477 U.S. at 322). In opposing summary judgment, "the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial." *Pro-Football*, 284 F. Supp. 2d at 113. "[M]etaphysical doubt as to the material facts" does not suffice. *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS FALL OUTSIDE THIS COURT'S JURISDICTION.

Plaintiffs' claims fall outside this Court's jurisdiction for two independent reasons. First, in the Statute, Congress established a dedicated statutory review scheme for disputes over the scope and manner of collective bargaining, including an opportunity for judicial review in a court of appeals. A plaintiff may not bypass that scheme by seeking instead to obtain review in district

court.  Second, Plaintiffs' claims are not prudentially ripe because they will not be fit for judicial review until subsequent action has occurred, including forthcoming rulemaking proceedings by OPM, any necessary revisions to agency policies, and developments in individual negotiating settings.  For either of these reasons, Plaintiffs' claims should be dismissed for lack of jurisdiction and summary judgment entered for Defendants.

### A.   Congress Already Foreclosed Plaintiffs' Attempt to Bypass the Statute's Exclusive Review Scheme by Filing Suit in District Court.

Plaintiffs cannot proceed in this Court because Congress did not provide for district courts to review the type of claims that Plaintiffs have asserted.  Instead, in the Statute, Congress established a detailed, exclusive review mechanism for such claims:  They must be addressed first by the FLRA, which possesses specialized expertise in the relevant area, followed, if necessary, by judicial review in the courts of appeals.  Under Supreme Court precedent, Plaintiffs may not bypass this dedicated review scheme by proceeding to sue directly in district court.

When a statute expressly provides for judicial review following review by an administrative review body, "it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies."  *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (quoting *Jarkesy v. SEC*, 803 F.3d 15, 15 (D.C. Cir. 2015) (internal quotation marks omitted)).  Therefore, when a plaintiff's claim can be "meaningfully addressed in the Court of Appeals" under an exclusive statutory review scheme established by Congress, a district court lacks jurisdiction. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 201 (1994).  "Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is fairly discernible in the statutory scheme, and (ii) the

litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *Arch Coal*, 888 F.3d at 498.

Here, Congress intended for the claims asserted by Plaintiffs to be heard in the first instance by the FLRA, to which Congress delegated "rulemaking, adjudicatory, and policymaking powers" under the Statute. *NFFE, Local 1319 v. Dep't of the Interior*, 526 U.S. 86, 87 (1999). As the Supreme Court has held, "the congressional scheme . . . leave[s] the enforcement of union and agency duties under the [Statute] to the General Counsel and the FLRA and . . . confine[s] the courts to the role given them under the [Statute]." *Karahalios v. NFFE, Local 1263*, 489 U.S. 527, 536–37 (1989) (implied right of action alleging violation of duty of fair representation could not be brought in district court). The FLRA's powers granted by Congress include, *inter alia*, the power to "resolve issues relating to the duty to bargain," 5 U.S.C. § 7105(a)(2)(E), and the power to resolve disputes about whether the duty to bargain in good faith extends to a particular matter, *id.* §§ 7105(a)(2)(D), 7117(c).

In other words, Congress created and specifically empowered the FLRA to resolve just the type of disputes concerning negotiability that Plaintiffs attempt to lay before this Court. And if Plaintiffs are dissatisfied by the outcome before the FLRA, they retain a right to judicial review in the courts of appeals. *See* 5 U.S.C. § 7123. Because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review through these consolidated actions. *AFGE v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (quoting *Karahalios*, 489 U.S. at 533).

### 1. *The Statute establishes a scheme of exclusive review by the FLRA, subject to judicial review in the courts of appeals.*

As to the first *Thunder Basin* factor, Congress had made an exclusive scheme of review "fairly discernible" in the Statute.   Enforcement of union and agency duties under the Statute is left, in the first instance, to the FLRA, subject to judicial review in the courts of appeals. *Karahalios*, 489 U.S. at 536-37.   To that end, Congress directed that the FLRA "shall provide leadership in establishing policies and guidance relative to matters under [the Statute]."  5 U.S.C. § 7105(a)(1).  Among other duties, the FLRA shall "resolve[] issues relating to the duty to bargain in good faith under section 7117(c)," and "conduct hearings and resolve complaints of unfair labor practice under section 7118."  *Id.* § 7105(a)(2)(E), (G).  Thus, if a union alleges that an agency is improperly refusing to bargain on a particular matter—what Plaintiffs here allege will happen under the Orders—it "may appeal the allegation to the [FLRA]," which "shall expedite proceedings" and issue a written decision "at the earliest practicable date."  *Id.* § 7117(c)(1), (6).

Similarly, if an agency is charged with an unfair labor practice, the FLRA's General Counsel investigates and, if warranted, files a complaint against the agency.  Following a hearing, the FLRA (or its designee) issues a written decision, which may include an order to the agency to cease and desist from the alleged unfair labor practice or to renegotiate a CBA, with retroactive effect, in accordance with the FLRA's directive.  *Id.* § 7118(a)(1), (2), (6)-(7).  A union may also invoke the arbitration process to pursue an unfair labor practice charge with the FLRA.  *See* 5 U.S.C. § 7122(a); *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1344 (D.C. Cir. 2012).

With two limited exceptions, "[a]ny person aggrieved by any final order of the [FLRA]" may seek judicial review of the order in the Court of Appeals for the D.C. Circuit or in the court

of appeals where the aggrieved person resides.  *Id.* § 7123(a).[4]  The Statute makes no provision for any type of judicial review in federal district court.  Indeed, the only two mentions of federal district courts in the Statute are to further the FLRA's ability to resolve disputes.  *See id.* § 7123 (allowing the FLRA to petition a district court for "appropriate temporary relief" after charging an unfair labor practice); *id.* § 7132 (providing that a district court may issue an order requiring compliance with a subpoena issued by the FLRA, the General Counsel, or the Panel).

The FLRA's function is "to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act."  *BATF*, 464 U.S. at 97.  Congress created the FLRA "to enforce the duties imposed on agencies and unions by [the Statute]" and it provided such an "administrative remedy" in lieu of "a parallel remedy in a federal district court."  *Karahalios*, 489 U.S. at 532–33.  As a general matter, "when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems," as it has done here, "those procedures are to be exclusive."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (citation omitted).

Thus, when a matter is within the FLRA's authority to decide, as are Plaintiffs' claims here, "[judicial r]eview may be had, but it must be in the court of appeals and it may occur only after the claim has been presented to and finally decided by the FLRA."  *Loy*, 367 F.3d at 936.  For this reason, the D.C. Circuit has previously rejected a union plaintiff's attempt to file suit directly in district court when the union could obtain judicial review as Congress set forth in the Statute.  As the D.C. Circuit in that case held, although § 7123 of the Statute prevents a union from suing in

---

[4] The Statute provides unions with a right to judicial review in a court of appeals when an FLRA order reviewing an arbitral award "involves an unfair labor practice."  5 U.S.C. § 7123(a)(1).  The D.C. Circuit has accordingly held that a court of appeals "has jurisdiction to review a final order of the [FLRA] when an unfair labor practice under 5 U.S.C. § 7116 is either an explicit ground for, or necessarily implicated by, the [FLRA]'s decision."  *NTEU v. FLRA*, 745 F.3d 1219, 1222 (D.C. Cir. 2014) (quotation and alteration omitted).

district court to challenge a bargaining unit determination, the union "remains free to obtain *indirect* judicial review by refusing to bargain, drawing an unfair labor practice charge, and appealing that charge to the Authority and then to a court of appeals."  *Ass'n of Civilian Technicians v. FLRA*, 283 F.3d 339, 342 (D.C. Cir. 2002).  And the fact that the courts of appeals have been given jurisdiction only *after* the FLRA has undertaken a decision does not mean that Plaintiffs can circumvent the channeling scheme Congress designed by pursuing their claims in district court rather than before the FLRA.  "The district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA."  *Loy*, 367 F.3d at 935.

> **2.      Plaintiffs' claims are precisely the type that Congress intended be reviewed by the FLRA and, if necessary, by a court of appeals.**

As to the second *Thunder Basin* factor, Plaintiffs' claims are just the type Congress intended to be reviewed within the Statute's structure.  A claim will "fall outside of the scope of a special statutory scheme" in only three narrow circumstances: "when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim is wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency."  *Arch Coal*, 888 F.3d at 500.  None of those circumstances exists here.

The first and third circumstances can be quickly dispatched.  The first (no meaningful judicial review) is plainly absent, since the Statute expressly provides for judicial review of an FLRA order in a court of appeals.  There can be no plausible contention that such review would not be "meaningful," as circuit courts routinely grapple with questions of negotiability and Government-wide rules.  *See, e.g.*, *IRS*, 996 F.2d 1246, 1249–53 (D.C. Cir. 1993); *Overseas Educ. Ass'n v. FLRA*, 876 F.2d 960, 962 (D.C. Cir. 1989); *HHS*, 844 F.2d at 1089–90.  Nor could the third circumstance (lack of agency expertise) plausibly apply because, as the Supreme Court has observed, the FLRA possesses "specialized expertise in its field of labor relations" and enjoys

"considerable deference when it exercises its special function of applying the general provisions of the [Statute] to the complexities of federal labor relations." *BATF*, 464 U.S. at 97 (citation omitted).

That leaves only the second circumstance—claims wholly collateral to the Statute's review scheme. But Plaintiffs' claims fall squarely within the purview of the FLRA's broad scope of review authority. Nearly all of Plaintiffs' claims are premised on alleged conflicts between provisions of the Executive Orders and provisions of the Statute that, according to Plaintiffs, mandate a duty to bargain on certain topics. Such negotiability claims are precisely the type of dispute that the FLRA is empowered to consider and routinely decides. *See* 5 U.S.C. § 7105(a)(2)(E); *see, e.g.*, *Dep't of the Interior, Wash., D.C. & U.S. Geological Survey, Reston, Va. v. NFFE*, 52 F.L.R.A. 475, 476 (1996); *NTEU v. Dep't of the Treasury*, 42 F.L.R.A. 377, 378 (1991). Indeed, the FLRA has specifically addressed negotiability disputes centering on whether bargaining proposals are consistent with an Executive Order's provisions. *See NFFE, Local 1655 v. Dep't of Def.*, 49 F.L.R.A. 874, 888-90 (1994); *AFGE v. Dep't of Hous. & Urban Dev.*, 43 F.L.R.A. 1405, 1410 (1992). If not raised as negotiability disputes, Plaintiffs' claims are also not collateral to the Statute because they can be brought to the FLRA (and, if necessary, to a court of appeals) as an unfair labor practice committed by an agency. Plaintiffs broadly contend that pursuant to the Orders, agencies are now bound to take negotiating positions contrary to the Statute, and under § 7116(a)(8), any such "fail[ure] or refus[al] to comply with any provision of [the Statute]" would amount to an unfair labor practice. Plaintiffs' claims are not "collateral" to the Statute, but are well within the scope of disputes which Congress committed to a dedicated review mechanism.

21

The constitutional claims that certain Plaintiffs seek to press fall equally within the jurisdiction of the FLRA, subject to review in the court of appeals, and they may not be brought directly in this court. That Plaintiffs have chosen not to "present [their] constitutional claims to the [FLRA] is no reason for allowing [them] to litigate those claims in the district court." *Loy*, 367 F.3d at 936. "To hold otherwise would be to excuse non-compliance with the requirement that one must exhaust administrative remedies on the basis that the party failed to comply." *Id.* (reversing for lack of jurisdiction district court's consideration of union's constitutional claims not presented to the FLRA). As the D.C. Circuit has explained, "when a constitutional claim is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter, a plaintiff must first pursue the administrative machinery." *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990).

At bottom, Plaintiffs challenge the validity of Executive Order provisions removing certain subjects from the collective bargaining process and affecting the manner of bargaining between agencies and unions. The Statute channels such disputes to the FLRA under its exclusive review scheme, whether the dispute is framed in constitutional terms or otherwise. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 12–13 (2012). Even if the FLRA were incapable of addressing constitutional questions (which is not the case), district court jurisdiction would still be precluded so long as such "constitutional questions" "can be meaningfully addressed in the Court of Appeals." *Thunder Basin*, 510 U.S. at 215. Because the Statute "does not foreclose all judicial review of [Plaintiffs'] constitutional claims, but merely directs that judicial review shall occur in the" courts of appeals, this Court lacks jurisdiction to hear them. *Elgin*, 567 U.S. at 10.

### B.   Prudential Ripeness Concerns Counsel Against Hearing Plaintiffs' Claims.

Even if review of Plaintiffs' claims were not statutorily precluded, the Court should decline to consider these claims because they are not prudentially ripe. The prudential ripeness doctrine

"exists to prevent the courts from wasting [their] resources by prematurely entangling [themselves] in abstract disagreements, and, where, as here, other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized." *NTEU v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996).   In determining whether a claim is prudentially ripe, courts consider two factors: (1) "the 'fitness of the issues for judicial decision;'" and (2) "the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).   The "fitness" of the issues "depends on whether [the issues are] purely legal, whether consideration of the issues would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (internal quotations omitted).   Assuming the issues are not fit for judicial review, "any hardship" caused by the deferral of consideration must be "immediate and significant," given the "institutional interests" at play.   *Id.* at 389.

Section 4 of the Official Time Order and each challenged provision of the Removal Procedures Order present issues that are not currently fit for judicial review because these sections contemplate future action by OPM and each affected agency.   When a challenged executive order is "merely a precursor to the later formulation of actual regulations," the "policies that underscore the ripeness doctrine militate strongly against granting discretionary (declaratory) relief," and that is true here.   *El Dia v. Hernandez Colon*, 963 F.2d 488, 496 (1st Cir. 1992).   Section 4 of the Official Time Order became effective 45 days after the date the Order was issued, *i.e.*, on July 9, 2018.   During the 45-day period, Section 4(c)(i) instructs OPM to "examine whether existing regulations are consistent with the rules set forth in this section."   If OPM finds that existing regulation are not consistent, it must "propose for notice and public comment, as soon as practicable, appropriate regulations to clarify and assist agencies in implementing these rules,

consistent with applicable law." Although the requirements of Section 4 went into effect on July 9, 2018, only when OPM has finalized its regulations to "administer[] th[ose] requirements of this section" might there be a sufficiently final agency action fit for judicial review. Official Time Order, Sec. 4(c)(i).

Similarly, Section 7 of the Removal Procedures Order directs OPM to examine existing regulations and, "as soon as practicable," to "propose for notice and public comment appropriate regulations to effectuate" Sections 2 through 6 of the Order. Simultaneously, agency heads are ordered to revise their policies in areas where new OPM regulations are not required. Removal Procedures Order, Sec. (7)(b)(i). Section 7 further instructs agency heads, after OPM issues final regulations, to "further revise" their "discipline and unacceptable performance policies" to "conform" to any new regulations. *Id.* Plaintiffs' challenges to the Removal Procedures Order itself are premature given the OPM and agency administrative action that has yet to occur. *See El Dia*, 963 F.2d at 496.

Judicial review is inappropriate at least until these administrative processes are complete. In proposing new regulations for comment, OPM is directed to clarify the rules, specifically considering the interplay of the Orders with "applicable law." *See* Official Time Order, Section 4(c). When it does so, Plaintiffs will have an opportunity to air their concerns about the Orders directly to OPM through the notice-and-comment process, and OPM will have an opportunity to "apply its expertise," and "solidify or simplify the factual context" before any determination of the legality of the provisions at issue. *See Am. Petroleum Inst.*, 683 F.3d at 387. And, even if Plaintiffs fail to "persuade the agency, permitting the administrative process to reach its end" allows "for more intelligent resolution of any remaining claims and avoid[s] inefficient and unnecessary piecemeal review." *Id.*; *see also Campaign for Accountability v. DOJ*, 278 F. Supp. 3d 303, 318–

19 (D.D.C. 2017) (A prudential ripeness defect "occurs, generally speaking, when the alleged *wrong* is insufficiently concrete—as a *factual* matter—to be capable of legal evaluation. . . ."). That "the broad legal theory advanced" by Plaintiffs may not significantly change over time does not prevent the application of the prudential ripeness doctrine. *See NTEU*, 101 F.3d at 1431. The prudential ripeness doctrine exists for courts to avoid "'entangling [them]selves in abstract disagreements over administrative policy'" regardless of whether the legal argument underlying Plaintiffs' claim will evolve. *See Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 270 (D.D.C. 2015) (quoting *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1428 (D.C. Cir. 1988)).

Section 3 of the Official Time Order and the Collective Bargaining Order also present issues that are unfit for judicial review at this time. Both Section 3 of the Official Time Order and the Collective Bargaining Order set goals for the outcome of agencies' negotiations and advise agencies on policy considerations while bargaining with individual unions. While the Orders intend for agencies to strive to meet these aspirational objectives, their provisions leave room for negotiation, in at least one case contemplating that the agency may end up before the Panel at impasse. *See* Official Time Order, Sec. 3(b)(ii). The Orders moreover expressly direct agencies to fulfill their statutory obligation to bargain in good faith while striving to meet the Orders' directives. *See* Collective Bargaining Order, Secs. 5(a)-(b), (d), 7(b); Official Time Order, Sec. 3(a). As the factual outcome of these negotiations is sure to vary by agency and bargaining unit, disputes arising from these provisions should be channeled through the FLRA and, if necessary, decided upon a complete factual record before the D.C. Circuit. In their current abstract form, the issues are unripe.

Further, given the "institutional interests" at play, Plaintiffs have not identified sufficiently "immediate and significant" hardships that would be caused by deferring consideration of their claims and thus justify review at this point.  *See Am. Petroleum Inst.*, 683 F.3d at 389 (citation omitted).  Though many provisions of the Orders have immediate effect in the absence of a current CBA with conflicting terms, OPM and other agencies must be given an opportunity to implement the terms of the Orders consistent with their expertise and applicable law and in the course of negotiations.  That Congress has created avenues for review of both administrative rulemaking proceedings and federal labor disputes only confirms that judicial review is premature.  *See NTEU*, 101 F.3d at 1432.  Until such time as OPM issues regulations implementing these challenged sections of the Orders or agency-specific disputes have been channeled through the FLRA (and the Panel, if necessary), Plaintiffs claims are prudentially unripe.

## II.     PLAINTIFFS' CLAIMS LACK MERIT.

Even if this Court concludes that it has jurisdiction to hear Plaintiffs' claims, it should dismiss them on the merits and grant summary judgment to Defendants.

### A.     Congress Made Clear That Certain Subjects Could be Made Exempt from Collective Bargaining Negotiations by the Issuance of Government-Wide Rules.

Plaintiffs' claims that the challenged provisions are *ultra vires* executive action contrary to the Statute are baseless.  Many provisions of the challenged Orders are properly considered "government-wide rules or regulations" that permissibly remove subjects from the scope of collective bargaining, as contemplated by Congress.  5 U.S.C. § 7117(a)(1).  In light of the unique statutory scheme, wherein the duty to bargain includes an obligation for federal agencies to proceed to binding arbitration in cases of disagreement, Congress reserved for the Government the right to create "government-wide rules or regulations," thereby exempting matters from that duty. *See IRS*, 996 F.2d at 1247; *see also IRS v. FLRA*, 494 U.S. 922, 935 n.3 (1990) (Brennan, J.,

dissenting) ("The function of § 7117(a)(1) appears to be to insulate from the bargaining process union efforts to change anything that has already been settled by those with authority over the agency — *e. g.*, Congress, *the President*, or OMB." (emphasis added)).  In doing so, Congress provided the Executive with the discretion to "pull a subject out of the bargaining process by issuing a government-wide rule that creates a regime inconsistent with bargaining." *IRS*, 996 F.2d at 1250; *see also IRS*, 494 U.S. at 938 (Stevens, J. dissenting) (The duty to bargain "does not extend to matters which are the subject of such a regulation."); *Dep't of Def., Def. Contract Audit Agency Cent. Region & AFGE, Local 3529*, 37 F.L.R.A. 1218, 1228 (1990) ("[U]nder section 7117 of the Statute, Government-wide [rules and] regulations bar the negotiation of, and agreement on, union proposals that conflict with them.").

Rather than creating conflict with the Statute, as Plaintiffs suggest, these portions of the challenged Orders constitute a lawful exercise of the authority delegated to the Executive by Congress to promote "governmental efficiency and merit objectives of the statute." *OPM v. FLRA*, 864 F.2d 165, 169 (D.C. Cir. 1988).  They also constitute a lawful exercise of his authority, expressly recognized by Congress, "to prescribe regulations for the conduct of employees in the executive branch." 5 U.S.C. § 7301.  Under § 7117(a)(1), these portions of the challenged Orders are "Government-wide rules or regulations" that remove certain subjects from the collective bargaining process.[5]  Congress intended that the term "Government-wide rules or regulations" be construed broadly to include "official declarations of policy" that are "binding on officials and agencies to which they apply," as well as rules and regulations promulgated after notice and

---

[5] Although Defendants here maintain that the challenged provisions are properly characterized as Government-wide rules, provisions of an Executive Order may also be considered "Federal law" within the meaning of § 7117(a)(1). *See, e.g., NFFE, Local 1655 v. Dep't of Def.*, 49 F.L.R.A. at 888–90 ("The Authority has determined that Executive Order 12,564 constitutes a '"law,"' within the meaning of section 7117(a)(1) of the Statute."); *see also Meyer v. Bush*, 981 F.2d 1288, 1302 n. 6 (D.C. Cir. 1993) ("An executive order is, for many purposes, a form of presidential 'law.'").

comment. *HHS*, 844 F.2d at 1099 (quoting H. R. Conf. Rep. No. 95-1717 at 158 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2860, 2892).  Section 6 of the Collective Bargaining Order, Sections 4(a) and 4(b) of the Official Time Order, and Section 4 of the Removal Procedures Order easily meet this standard.  By their terms, each of these provisions is binding across the Federal Government and apply to all agencies subject to the Statute.  *See, e.g.*, Collective Bargaining Order, Sec. 6 (referring to heads of agencies "subject to the provisions of chapter 71 of title 5"); Official Time Order, Sec. 2(a) (defining "agency" as defined in 5 U.S.C. § 7103(a)(3)); Removal Procedures Order, Sec. 1 (defining "agencies" as defined in 5 U.S.C. § 105).  Each challenged provision is also "generally applicable throughout the federal government." *IRS*, 996 F.2d at 1250 n. 5.  Most importantly, and as explained in more detail below, each of these provisions lawfully removes something from the scope of collective bargaining.  *See infra* Part II.B.

To be sure, the Executive may not use its statutory authority to issue Government-wide rules or regulations to create additional rights not present in the Statute.  *See OPM v. FLRA*, 864 F.2d at 169-71.  The Executive may, however, "direct[] the exercise" of its authority in a "*specific* way, so that *particular* subjects or appropriate arrangements are identified as inappropriate topics of bargaining." *IRS*, 996 F.2d at 1251 (quoting *OPM*, 864 F.2d at 171).  As explained below, the challenged provisions create no conflict with the statutory scheme.  Instead, they "restrict" the discretion of agencies to exercise "rights already granted." *IRS*, 996 F.2d at 1251.

### B.      None of the Challenged Provisions of the Orders Conflicts With the Statute.

Plaintiffs' claims that individual provisions of the Orders are in "conflict" with the Statute are all meritless.  Repeatedly, Plaintiffs either misread the provision at issue, misconstrue the Statute, or refuse to acknowledge the effect of a Government-wide rule.  These claims of *ultra vires* Executive action should be dismissed and judgment on those claims granted to Defendants.

### 1.    *The Collective Bargaining Order is not in conflict with the Statute.*

Plaintiffs challenge four sections of the Collective Bargaining Order.  Section 4(a) encourages, but does not require, agencies to meet specified timetables in their collective bargaining negotiations.  Section 5(c), meanwhile, merely restates the Statute's parameters for when an unfair labor practice may be charged.  Although Section 5(e) provides that agencies should *request* the exchange of written proposals during negotiations, nothing in that provision allows agencies to unilaterally *impose* such an exchange as an exclusive requirement, as Plaintiffs allege.  Finally, Section 6 directs agencies not to negotiate matters that Congress reserved to them as management rights, wholly consistent with the Statue's express allowance that such matters may be negotiated only "at the election of the agency."  None of these challenged provisions conflicts with the Statute.

#### a.    Section 5(a)'s "ordinarily reasonable" time periods for negotiating ground rules and term CBAs do not conflict with the Statute.

Section 5(a) of the Collective Bargaining Order provides agencies with direction on what time periods "should ordinarily be considered reasonable" for negotiating ground rules (up to six weeks) and a term CBA (between four and six months).  Plaintiffs maintain (NFFE Mot. 33, ECF No. 26) that this guidance to agencies deprives the FLRA of its authority to decide whether the parties are negotiating in good faith through an unfair labor practice charge.  But nothing in Section 5(a) precludes a union from bringing an unfair labor practice charge to the FLRA alleging that an agency has prematurely terminated negotiations.  The FLRA's authority has not been diminished.

Plaintiffs also misread Section 5(a) when they state that it requires agencies to submit to mediation or the Panel any bargaining over ground rules that exceeds six weeks or any term CBA negotiation that exceeds four to six months.  AFSCME Mot. 24, ECF No. 27.  The final sentence

of Section 5(a) applies only to disputes over ground rules that have not been resolved "after a reasonable period" and does not expressly refer to or incorporate the six-week period previously noted.  Also contrary to Plaintiffs' view, there is no mention of advancing disputes over substantive CBA negotiations in the same manner as disputes over ground rules.  Moreover, the reference to a "reasonable period" is deliberately flexible: while agencies have been notified that a six-week period "should ordinarily be considered reasonable," nothing in Section 5(a) precludes them from negotiating for a longer period before advancing to mediation or the Panel.  Plaintiffs' claim (AFSCME Mot. 24) that Section 5(a) "sets uniform rules for all agency timelines" and ignores the "specific context" of any particular negotiating session is belied by the text of the provision, which designates the time periods as "objectives," rather than hard-and-fast rules, and stresses agencies' "obligation to bargain in good faith."  Plaintiffs' reading of Section 5(a) would require agencies and unions to protract their disputes for an *unreasonable* period, which is hardly a viable solution.

Finally, Plaintiffs' invocation of §§ 7114(b)(1) and (b)(3) *supports* the rationale underlying Section 5(a).  While §§ 7114(b)(1) and (b)(3) direct unions and agencies to meet "as frequently as may be necessary," nothing in Section 5(a) speaks to the *frequency* of negotiation meetings.  Section 5(a) instead speaks to the overall *duration* of negotiations over a period, regardless of their frequency within that period.  More importantly, sections 7114(b)(1) and (b)(3) specifically direct the parties "to avoid unnecessary delays," which is the same policy goal that animates Section 5(a).  Collective Bargaining Order, Sec. 5(a) (directing agencies to "minimize delay" and "set reasonable time limits for good-faith negotiations").  The Statute establishes no minimum time period during which negotiations, whether productive or not, must continue.

**b.      Section 5(c) provides guidance to agencies that is consistent with 5 U.S.C. § 7114(b).**

Section 5(c)—challenged by AFSCME—instructs agencies to consider filing an unfair labor practice complaint when confronted with a union negotiating in bad faith.  It further instructs agencies to consider proposing new contract terms or agency policies if the union does not offer counter proposals in a timely manner.  In essence, Section 5(c) restates as a policy instruction to agencies what Congress provided in 5 U.S.C. § 7114(b).  It is therefore consistent with the Statute.

In challenging Section 5(c), AFSCME advances an interpretation wholly untethered to that provision's text.  AFSCME speculates that agencies will "presume bad faith on the part of a union" and contends that Section 5(c) mandates them to "engage in bad faith bargaining."  AFSCME Mot. 23.  But Section 5(c) merely restates as a policy instruction to agencies what Congress provided in §§ 7114(b) and 7118—that if the union violates its duty to negotiate in good faith, agencies should *consider* filing an unfair labor practice complaint or *consider* proposing new contract terms or policy changes.  Nothing in Section 5(c) *requires* agencies to take these actions.  Indeed, there is nothing contemplated by Section 5(c) that is not already permitted by the Statute, and AFSCME has not contended otherwise.  Plaintiffs' argument that Section 5(c) will mandate bad-faith bargaining is further undermined when considered against Section 5(d), which provides that agencies shall continue to "negotiate in good faith" even after filing an unfair labor practice complaint.

At bottom, Plaintiffs' speculation about possible developments in hypothetical future negotiations is not based on any requirement of Section 5(c), and simply underscores why such disputes should be channeled through the FLRA in the first instance.  *See supra* Part I.A.

c.      **Section 5(e) is not in conflict with any provision of the Statute.**

Section 5(e) reflects the President's policy conclusion that written proposals "facilitate resolution of negotiability issues and assess the likely effect of specific proposals on agency operations and management rights."  It therefore directs agencies to "request" of unions that the parties exchange written proposals during negotiations.

Plaintiffs' challenge to Section 5(c) rests on a misunderstanding of its terms.  Nothing in Section 5(e) authorizes agencies to unilaterally impose the exchange of written proposals as the exclusive method of negotiation (NFFE Mot. 33) or requires agencies "to remove all bargaining approaches other than the exchange of written proposals."  AFSCME Mot. 24.  Instead, it directs agencies, at the soonest available opportunity, to take steps to eliminate any requirement that an agency use a technique *other than* exchange of written proposals.  Thus, if currently effective requirements *prevent* an agency from taking the approach that the President has directed, the agency is instructed to take steps to change that requirement.  Plaintiffs cannot seek to invalidate Section 5(e) by advancing an interpretation at odds with its text.

Finally, the suggestion (AFSCME Mot. 24–25) that Section 5(e) silently bans agencies from meeting with unions is baseless.  There is nothing in the Collective Bargaining Order that precludes agency and union representatives from meeting face-to-face, and Plaintiffs point to none.

d.      **Section 6 is consistent with Congress's express determination that certain matters may be negotiated only "[a]t the election of the agency."**

Section 6 is a Government-wide rule that prohibits agencies from negotiating "over the substance of the subjects" set forth in 5 U.S.C. § 7106(b)(1).  As Plaintiffs rightly concede, section 7106(b)(1) "permits an agency to refrain from negotiating its statutory 'management rights.'" AFSCME Mot. 25; *see, e.g.*, *Nat'l Ass'n of Gov't Employees, Local R5-136 v. FLRA*, 363 F.3d 468, 471 (D.C. Cir. 2004) ("As to these decisions [concerning subjects set forth in § 7106(b)(1)],

the agency is permitted *but not required* to negotiate with the labor organization." (quoting *AFGE, AFL-CIO, Local 2441 v. FLRA*, 864 F.2d 178, 180 (D.C. Cir. 1988)) (emphasis added)).  Section 6 merely restates agencies' statutorily-conferred right to "refrain from negotiating," and it is therefore entirely consistent with Congress's determination that the enumerated subjects may only be negotiated "at the election of the agency."  5 U.S.C. § 7106(b)(1).  This language—which Plaintiffs fail to acknowledge—is fatal to Plaintiffs' argument.

The D.C. Circuit took no issue with a prior Executive Order that *mandated* agencies to negotiate over the subjects set forth in § 7106(b)(1).  *See Nat'l Ass'n of Gov't Employees, Inc. v. FLRA*, 179 F.3d 946, 951 (D.C. Cir. 1999) (concluding that Executive Order No. 12,871 "reaffirm[s] the President's authority to insure his control and supervision over the Executive Branch" by issuing an order to his subordinates) (quotation and alterations omitted)).  By the same logic, given Congress's reservation of the election to agencies, an Executive Order that *prohibits* agencies from such negotiation is an equally valid exercise of Presidential authority.

### 2.    *The Official Time Order is not in conflict with the Statute.*

The challenged provisions of the Official Time Order—Sections 3 and 4—broadly aim to promote "an effective and efficient government," Official Time Order, Sec. 1, by setting forth goals for bargaining under 5 U.S.C. § 7131(d) and prescribing rules of conduct that remove certain subjects from the scope of official-time negotiations.  Nothing in these provisions conflicts with the Statute.[6]

---

[6] Though Plaintiffs also attempt to challenge definitions of terms contained in the Executive Order (*see* AFGE Mot. 14–15), the use of such terms does not impose an injury on Plaintiffs sufficient to establish Article III standing.  The use of these terms is limited to the "purposes of this order," and the terms have no independent effect.  *See* Official Time Order, Sec. 2.  Section 2(i), which defines "taxpayer-funded union time," specifically incorporates the definition of official time contained in the Statute and adds no other criteria to the statutory definition.  And, assuming any challenge to a definition contained in an executive order could confer standing on a plaintiff, Plaintiffs' challenge to the definition of "union time rate," Section 2(j), is coextensive with their challenge to Section 3, which sets an aspirational union time rate that agencies should strive to meet in negotiations.

### a.      Section 3 of the Official Time Order does not conflict with the Statute.

Section 3 is consistent with both the language of and the intent underlying 5 U.S.C. § 7131(d).  In crafting the official time portion of the Statute, Congress specifically provided that employees may spend unlimited official time on "the negotiation of a collective bargaining agreement" and, when the FLRA allows, on "any phase of proceedings before the [FLRA]."  5 U.S.C. §§ 7131(a), (c).  Congress left the decision to the unions and the agencies, however, as to how much official time "shall be granted" for other activities, provided only that the activities are covered under the Statute and that the agreement is "reasonable, necessary, and in the public interest."  *Id.* § 7131(d).  Section 3 expressly preserves the statutory obligation to grant official time under §§ 7131(a) and (c).  *See* Official Time Order, Sec. 3(c) ("Nothing in this section shall be construed to prohibit any agency from authorizing taxpayer-funded union time as required under sections 7131(a) and 7131(c) of title 5, United States Code.").  Instead, Section 3 of the Official Time Order merely provides guidance to agencies as to how they should approach negotiations under § 7131(d), just as a union president may provide a directive to his or her officers in preparing for collective bargaining negotiations.

Plaintiffs correctly point out that § 7131(d) contemplates bargaining over the amount of negotiated official time.  And, despite Plaintiffs' arguments to the contrary, so does Section 3.  Section 3 provides guidance on what amount of official time should "ordinarily be considered reasonable" under § 7131(d), specifically contemplating that agencies will need to consider some additional factors in making this determination, such as "the size of the bargaining unit."  Official Time Order, Sec. 3(a).  Tellingly, Section 3 requires agencies to "commit the time and resources necessary to *strive* for a *negotiated* union time rate of 1 hour or less" while, at the same time, fulfilling "their obligation to bargain in good faith."  *Id.* (emphasis added).  If the President had

intended for Section 3 to give unilateral authority to agencies to determine what is reasonable under § 7131(d), he would not have included such language contemplating negotiations and reminding agencies of their statutory obligation to bargain in good faith.

Nor does anything in Section 3 run afoul of Congress' intent in drafting § 7131(d).  Prior to the passage of the Statute, the system of Executive Orders governing federal labor relations limited a union to negotiating with agencies "to obtain official time for employee representatives, up to a maximum of either 40 hours, or 50% of the total time spent in bargaining."  *BATF*, 464 U.S. at 101; Exec. Order No. 11,616, 3 C.F.R. 861 (1966-1970).  Rather than adopting an earlier Senate version of the legislation, which would have codified these restrictions on official time, Congress enacted § 7131 as presently in force, with unlimited official time for collective bargaining and some activities before the FLRA, and the joint discretion to negotiate the allowance of official time for other activities covered under the Statute.  *See BATF*, 464 U.S. at 102; *see also* 5 U.S.C. § 7131(d).  Indeed, Congress was presumably aware of the long history of the President's regulating the use of official time through Executive Order, and declined to alter his authority in that regard.  *See, e.g.* Exec. Order. 10,988, 3 C.F.R. 521, 524-25 (1959-1963); Exec. Order. No. 11,491, 3 C.F.R. 861-62, 863-74 (1966-1970); Exec. Order No. 11,616, 3 C.F.R. 861 (1966-1970). In particular, as the Supreme Court has noted, nothing in the Act "suggest[s] that Congress intended employee representatives to be treated as though they were 'on the job' for all purposes." *BATF*, 464 U.S. at 104.  Section 3 is consistent with the statutory scheme enacted by Congress; it does not limit the amount of official time available for §§ 7131(a) and (c) activities, and only guides agencies in their negotiations over other circumstances where it is appropriate to consider employee representatives "on the job."

Acknowledging that agencies may, at times, be unable to meet the goal outlined in Section 3, the Official Time Order sets forth a procedure for agencies to inform the President, through the Director of OPM, when that is the case.  Official Time Order, Sec. 3(b).  When necessary, an agency is required to "explain why such expenditures are reasonable, necessary, and in the public interest, describe the benefit (if any) the public will receive . . . and identify the total cost."  *Id.*, Sec. 3(b)(i).  But, in contrast to Plaintiffs' unfounded suggestion that the agencies would be "taken to the woodshed" for making such a report (NTEU Mot. 17, ECF No. 29), the Order provides no consequence whatsoever for so reporting, reinforcing the aspirational nature of Section 3's goal to negotiate for a reasonable amount of official time for certain activities.

### b.      Section 4 of the Official Time Order does not conflict with the Statute.

#### i.      *Sections 4(a)(i)-(v) and 4(b) are Government-wide rules that preclude agencies from bargaining over contrary proposals.*

Sections 4(a)(i)-(v) and Section 4(b) are all Government-wide rules as contemplated by § 7117(a)(1).  Each of these provisions prescribes a uniform rule for employee conduct, applicable across the entire Government, which entirely removes contrary proposals from the scope of collective bargaining.  Congress specifically allowed the type of action being challenged here in § 7117(a)(1), and § 7301 further authorizes the President to regulate the conduct of federal employees in this manner.  Despite this express authority, Plaintiffs argue that, because they have historically bargained over topics covered by these provisions, the Government-wide rules are contrary to the Statute.  Plaintiffs note that the text of the Statute, which states that employees "*shall* be granted official time" upon agreement by the agency and the union, contemplates bargaining over the amount of time to be official under § 7131(d).  But the duty to bargain under § 7131(d) is limited by § 7117, providing that the Executive may remove issues from the scope of

bargaining.  Moreover, the parties may continue to bargain over a variety of other activities that should (or should not) be permitted as official time.  Thus, Plaintiffs' claim of "conflict" falls flat.

Plaintiffs' reading of the Statute would also render § 7117(a)(1) superfluous.  That section "is cast in absolute terms—there is no obligation to bargain over any proposal inconsistent with a government-wide regulation."  *IRS*, 996 F.2d at 1252.  That the FLRA, in cases not involving Government-wide rules, has previously found the subjects of Section 4 to be negotiable or even mandatory subjects of bargaining is no longer relevant in light of the President's creation of Government-wide rules on these subjects.  Section 7131(d) allows unions and agencies to bargain over the extent to which official time shall be granted with respect to "any . . . matter covered by [the Statute]."  If the Executive's right to issue Government-wide rules is limited to subjects unregulated by the Statute, it would have no effect at all.  *See, e.g.*, *NFFE, Local 2015 and U.S. Dep't of the Interior Nat'l Park Serv.*, 41 F.L.R.A. 1158, 1185–86 (1991) (concluding that a drug-testing regime established following President Reagan's Drug-Free Workplace Executive Order appropriately overrode the agency's duty to bargain over official time for a private drug test); *NFFE, Local 15 and U.S. Dep't of the Army*, 30 F.L.R.A. 1046, 1070–71 (1988) (finding union proposals non-negotiable because they conflicted with President Reagan's Drug-Free Workplace Executive Order).

In *IRS*, the D.C. Circuit rejected an argument analogous to Plaintiffs' reasoning here. There, the court considered an Office of Management and Budget Circular that imposed a Government-wide rule specifically precluding grievances related to the regulation, and that the FLRA had found contrary to the Statute.  996 F.2d at 1251–52.  The FLRA read the Statute to confer a right to grieve over Government-wide regulations, reasoning that "the statutory right to grieve over a claimed violation of a rule may not be cut off by the rule itself, even if the rule, by

its very terms, purports to prohibit grievances." *Id.* at 1251. The D.C. Circuit overturned the FLRA's decision, characterizing its reasoning as "circular." *Id.* at 1252. The court explained that the FLRA's reliance on the statutory right to grieve failed "to recognize that the statute itself, in Section 7117(a), provides the *exemption* from the duty to bargain." *Id.* (emphasis added). Thus, it held, to avoid reading Section 7117(a) out of the statute, "general right[s]" contained in the statute cannot be "read to trump that explicit exception." *Id.* Similarly, here, Plaintiffs' generalized reliance on the right to bargain over certain proposed grants of official time does not supersede the Executive's right to prescribe Government-wide rules that remove discrete issues from the scope of bargaining. *See id.*; *see also Int'l Bhd. of Elec. Workers v. Dep't of the Interior*, 25 F.L.R.A. 201, 201–03 (1987) (finding that reduction-in-force procedures, which the union argued had historically been a mandatory subject for bargaining, were not negotiable, as they conflicted with a Government-wide regulation).

### ii. Section 4(a)(i) does not violate 5 U.S.C. §§ 7102(1) or 7211, or otherwise conflict with the Statute.

Section 4(a)(i) provides that employees may not engage in lobbying activities—apart from in their official capacities—on paid time, not that employees are prohibited from lobbying at all. As Plaintiffs note, 5 U.S.C. § 7102(1) gives employees the right "to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities." The Statute further prohibits agencies from "interfer[ing]" with or "den[ying]" employees this right. But the Official Time Order does no such thing. Section 4(a)(i) simply provides that employees may not engage in lobbying activities while being paid by the Government on an active duty status. Thus, Plaintiffs' reliance on the discussion in *Bush v. Lucas*, concerning Executive Orders issued by Presidents Taft and Roosevelt that "forbade federal employees to communicate directly with Congress without the permission of their

supervisors," has no application here.  462 U.S. 367, 382–83 (1983).  Nothing in this Order limits employees' ability to petition their representatives, so long as they do not do so while on paid time, official or otherwise, or to lobby in the course of discharging their official duties as government employees (such as in an agency Office of Legislative Affairs).

Plaintiffs' reliance on the Office of Legal Counsel's Opinion "Application of 18 U.S.C. § 1913 to 'Grass Roots' Lobbying by Union Representatives" and the FLRA's decision in *U.S. Dep't of the Army Corp of Eng'rs, Memphis Dist., Memphis, Tenn. and NFFE*, 52 F.L.R.A. 920 (1997) is also misplaced.  Both the OLC Opinion and the FLRA decision addressed the question of whether agreements under § 7131(d) to allow lobbying on official time are separately prohibited by 18 U.S.C. § 1913.  *See* Application of 18 U.S.C. § 1913 to 'Grass Roots' Lobbying by Union Representatives, 29 Op. O.L.C. 179, 180–82 (2005); 52 F.L.R.A. 920 at 933.  Neither OLC nor the FLRA, however, concluded that § 7131(d) requires bargaining over lobbying on official time in a manner inconsistent with a Government-wide rule providing to the contrary.

<blockquote>

iii.        ***Section 4(a)(ii) does not conflict with the language of or intent underlying 5 U.S.C. § 7131.***

</blockquote>

Section 4(a)(ii)(1) provides that employees generally "shall spend at least three-quarters of their paid time . . . performing agency business or attending necessary training."  Nonetheless, employees who have already "spent one-quarter of their paid time [on union business] may continue to use taxpayer-funded union time in that fiscal year" for activities covered by §§ 7131(a) and (c), which establish categories of official time that agencies must grant regardless of the outcome of collective bargaining negotiations provided for in § 7131(d).  Official Time Order, Sec. 4(a)(ii)(2).  This additional §§ 7131(a) and (c) time "shall count toward[s]" the amount of official time available to conduct union business under § 7131(d) in future years.  *Id.*, Sec. 4(a)(ii)(3).  In effect, therefore, Section 4(a)(ii) permits individuals to spend unlimited amounts of

their paid time on §§ 7131(a) and (c) activities, but individuals who choose to do so limit their ability to spend time on non-agency business, such as official time pursuant to § 7131(d) in future years.

Take, for example, an individual who had already spent 25% of his paid time on union business.  He may choose to take advantage of the Order's exception and spend an additional 10% (or more) of his paid time on §§ 7131(a) and (c) activities.  The following year, however, he would be permitted to spend only 15% of his paid time—rather than the 25% otherwise allotted—on non-agency business that does not fall under §§ 7131(a) or (c).  But that person may spend unlimited amounts of his paid time on §§ 7131(a) and (c) activities—either in the next year or in any subsequent fiscal year.

For the same reasons that Section 3 is consistent with the Statute, discussed in Part II.B.1.a, *supra*, Section 4(a)(ii) does not violate Congress's intent to allow unlimited grants of official time for purposes specified in §§ 7131(a) and (c).  It has no effect on certain employee representatives' ability to spend, hypothetically, up to 100% of their time on collective bargaining or certain activities before the FLRA.  Instead, it limits the amount of paid time that an agency can agree to grant to particular individuals for other non-agency business.  The reason for this requirement is obvious: Federal employees have been hired to perform specific tasks based on specific qualifications and expertise.  When these employees are shifted to other tasks—to perform union business, for example—other employees who may or may not have the same qualifications and expertise will have to fill in, and the employees who have been shifted to other business may fall out of practice with handling their official job duties.  The President was well within his authority to conclude that this inefficient practice should cease.  *See* 5 U.S.C. §§ 7117(a)(1), 7301.  That some unions were able to previously negotiate over proposals for employees to devote 100% of

their paid time to any official time activity, *see, e.g.*, *AFGE v. FLRA*, 798 F.2d 1525 (D.C. Cir. 1986), has nothing to do with whether unions can now prevent the President from issuing a Government-wide rule to require federal employees to spend at least three-quarters of their paid time on official duties.  Rather, that some agencies previously agreed to the unlimited funding of union activities as official time under § 7131(d) is precisely one of the inefficiencies that the Official Time Order seeks to prevent.

> iv.     ***Sections 4(a)(iii), 4(a)(iv), and 4(b) do not conflict with the Statute.***

Section 4(a)(iii) prohibits employees from receiving the "free or discounted" use of Government property or resources for union business unless the use is "generally available" for other employees acting on behalf of "non-Federal organizations."  Section 4(a)(iv) provides that "[e]mployees may not be permitted reimbursement for expenses incurred performing non-agency business, unless required by law or regulation."  Section 4(b) provides that employees must obtain "advance written authorization from their agency" before using official time, "except where obtaining prior approval is deemed impracticable under regulations or guidance adopted" by OPM. None of these provisions limits Plaintiffs' or their members' ability to conduct union business outside of the office or to engage in collective bargaining.  In fact, Plaintiffs fail to identify any specific statutory conflict with these provisions.[7]  Instead, they rely on their general argument that, because access to agency resources, travel reimbursements, and the scheduling of official time have previously been negotiated, a Government wide-rule prohibiting negotiation on these issues is unlawful.  But that is precisely the point of the Executive's authority to issue Government-wide rules or regulations: to remove certain discrete topics from the scope of bargaining where other

---

[7] Indeed, in *BATF*, the Supreme Court held that the provision of expenses for travel related to collective bargaining was not mandated under § 7131(a), but instead negotiable under § 7131(d).  464 U.S. at 106–07.

overarching policy prerogatives take precedence. And these provisions do not limit Plaintiffs' ability to exercise their statutory rights; they only limit the extent to which the Government will subsidize such activities or allow it to interfere with agency work.

<p align="center">v.       <strong><em>Section 4(a)(v) does not force unions to violate 5 U.S.C. § 7114, or otherwise conflict with the Statute.</em></strong></p>

Section 4(a)(v) prohibits employees from using official time to prepare or pursue grievances unless they are brought on the employee's own behalf, the employee is appearing as a witness in a grievance proceeding, or an employee is challenging an adverse personnel action taken against the employee in retaliation for engaging in federally protected whistleblower activity. Nothing in Section 4(a)(v), however, prohibits unions from providing representation to federal employees by union employees working on union time, or federal union representatives from preparing grievances outside of their time on active duty, and nothing prohibits individuals from accessing grievance procedures. Indeed, Section 4(a)(v) explicitly carves out official time used by individuals preparing their own grievances.

Despite these carve-outs, Plaintiffs allege that, by prohibiting union representatives from preparing grievances for individuals other than themselves on official time, the unions will be forced to violate their duty of fair representation. But unions are still able to discharge this duty adequately—they simply, at least as a general matter, may no longer be subsidized by the Government in doing so. Plaintiffs' argument also misunderstands that duty. The duty of fair representation, rooted in 5 U.S.C. § 7114(a)(1), requires the union to "represent[] the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership." The duty "does not establish an objective standard of 'adequate representation' that the union must meet as a minimum, and that, once met, the union may use as a basis upon which to discriminate between members and nonmembers." *NTEU v. FLRA*, 721

F.2d 1402, 1406 (D.C. Cir. 1983).  Instead, "a union may adopt virtually *any* non-arbitrary standard for providing representation of individual employees, so long as the standard adopted is applied in a nondiscriminatory manner with respect to all unit employees, *i.e.*, members and nonmembers alike." *Id.* (emphasis in original).  Here, Section 4(a)(v) generally prohibits employees from taking official time to prepare grievances for individuals other than themselves, thereby precluding any possibility of discrimination between union members and nonmembers.

Thus, unless Plaintiffs' employee representatives, in their discretion, intend to use their non-duty time solely to prepare grievances for a subset of their bargaining unit (which would be a choice independent of any effect from Section 4(a)(v)), no violation of the duty of fair representation will result.  Nor will Plaintiffs' rights to be present at formal discussions with or investigations of employees that they represent be affected.  *See* 5 U.S.C. § 7114(b).  Section 4(a)(v) only applies to the conduct of employees on official time, and does not prevent Plaintiffs from exercising their rights under § 7114.

<div align="center">

vi.     ***Section 4(c) does not conflict with the Statute because Congress gave OPM broad authority to administer civil service regulations.***

</div>

Section 4(c) states that the requirements of Section 4 "shall become effective 45 days from the date" of the Executive Order and that OPM "shall be responsible for administering the requirements of this section."  Section 4(c) also directs OPM to "examine whether existing regulations are consistent with the rules set forth in this section" and if not, to "propose for notice and public comment, as soon as practicable, appropriate regulations to clarify and assist agencies in implementing these rules, consistent with applicable law."  Plaintiffs challenge Section 4(c) by arguing that OPM lacks authority to issue regulations implementing the Official Time Order.

Plaintiffs' challenge to OPM's authority to issue regulations that it has not issued is plainly not ripe for judicial review.  *See supra* Part I.B.  But in any case, OPM has ample authority to issue

<div align="center">43</div>

regulations to implement the Official Time Order.  Congress granted OPM broad authority to "execut[e], administer[], and enforc[e] . . . the civil service rules and regulations of the President and the Office and the laws governing the civil service" as well as to "aid[] the President . . . in preparing such civil service rules as the President prescribes."  5 U.S.C. § 1103(a)(5), (7).  And nothing in the Statute contradicts this authority.  Plaintiffs' reliance on 5 U.S.C. § 7134, which provides that "the [FLRA], the General Counsel, the Federal Mediation and Conciliation Service, the Assistant Secretary of Labor for Labor Management Relations, and the Panel shall each prescribe rules and regulations to carry out the provisions of this chapter applicable to each of them," is misplaced.  Section 7134 only requires the enumerated entities to prescribe rules *applicable* to them.  It does not prevent OPM, which possesses independent statutory authority, from promulgating regulations as requested by the President in his role of overseeing the conduct of the civil workforce under 5 U.S.C. § 7301.   This argument, moreover, wholly ignores that Congress has authorized the President to delegate to the OPM Director the authority to issue Government-wide rules.  *See* 5 U.S.C. § 1104(a)(1), (b)(3); *id.* § 301; *see also IRS*, 996 F.2d at 1250 (finding that an OMB Circular may constitute a Government-wide rule).

### 3. *The Removal Procedures Order is entirely consistent with the Statute.*

Plaintiffs challenge parts of Sections 2, 3, and 4 of the Removal Procedures Order.  These provisions aim to "hold[] Federal employees accountable for performance and conduct," Removal Procedures Order, Sec. 1, by setting forth guiding management principles and standards for negotiating grievance procedures, removing certain disputes from negotiated grievance procedures, and setting a presumptive standard for a reasonable performance improvement period.  Because there is no conflict between these provisions and the Statute, Plaintiffs' claims lack merit.

     **a.**     **Sections 3 and 4(a) of the Removal Procedures Order are not in conflict with the Statute.**

          **i.**     *Section 4(a) is a Government-wide rule that precludes agencies from including certain disputes in negotiated grievance procedures, and is also consistent with Congress's express decision to allow any matter to be excluded from such procedures.*

Section 4(a) directs agencies to exclude two discrete types of disputes—performance ratings and incentive pay awards—from negotiated grievance procedures contained in CBAs. Plaintiffs contend that this provision conflicts with the Statute. The D.C. Circuit has flatly rejected this argument, explaining that "agencies are under no obligation to make any particular matters 'grievable.'" *Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574, 585 (D.C. Cir. 1994); *see* 5 U.S.C. § 7121(a)(2) ("Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement."). Moreover, Plaintiffs' argument ignores the fact that Section 4(a) itself is a Government-wide rule. Accordingly, whether performance ratings and incentive pay awards should be included in grievance procedures under Section 4(a) is not a matter to which the duty to bargain extends.

An agency's refusal to negotiate over matters subject to a Government-wide rule is not "bad faith bargaining" by agencies (AFSCME Mot. 14); rather, it is the result envisioned by Congress in § 7117(a)(1). *See Overseas Educ. Ass'n, Inc.*, 876 F.2d at 962 n.7 ("Section 7117 forecloses bargaining where it would be inconsistent with some other applicable law."). Plaintiffs' assertion that performance ratings and incentive pay awards are "mandatory subjects of bargaining" runs counter to what Congress provided in § 7117(a)(1) and to the express permission Congress extended in § 7121(a)(1), to exclude certain matters from negotiated grievance procedures. Other than performance ratings and incentive pay awards, the negotiability of a variety

of disputes remains unaffected by Section 4(a).  The claim that Section 4(a) will "preclude bargaining altogether" (NTEU Mot. 21), is both speculative and overstated.

Section 4(a) is also consistent with what the D.C. Circuit has long held—that a broad range of matters *may* be the subject of a negotiated grievance procedure "unless the parties' collective bargaining agreement specifically limits the scope of grievances."  *U.S. Customs Serv. v. FLRA*, 43 F.3d 682, 689 (D.C. Cir. 1994) (citing 5 U.S.C. § 7121(a)(2)); *AFGE, Locals 225, 1504, & 3723, AFL-CIO v. FLRA*, 712 F.2d 640, 649 (D.C. Cir. 1983) (holding that § 7121(a)(2) "permits the parties to negotiate limited scope agreements in the course of bargaining").  Congress did not mandate a fixed and uniform set of grievances to be included in negotiated grievance procedures, as Plaintiffs repeatedly suggest.  *See U.S. Customs Serv.*, 43 F.3d at 684 (citing § 7121(a)(2) and explaining that "[p]arties are not required to adopt a grievance procedure coextensive with the Statute's provision").[8]

The FLRA and Panel decisions on which Plaintiffs rely (NFFE Mot. 23) did not involve a Government-wide rule prohibiting agencies from subjecting certain matters to negotiated grievance procedures.  Indeed, in one of those cited decisions, *In re Dep't of Def., Mont. Air Nat'l Guard, Great Falls, Mont. and Ass'n of Civilian Technicians*, Case No. 00 FSIP 35, at *4 (Apr. 18, 2000), the Panel indicated that the outcome would have been different if the type of dispute at

---

[8] *See also Dep't of Veterans Affairs v. FLRA*, 9 F.3d 123, 130 (D.C. Cir. 1993) ("[T]he scope of the grievance procedures may also be negotiated."); *Suzal*, 32 F.3d at 581 (noting that parties "may 'exclude any matter' from the negotiated procedure's coverage"); *AFGE, Locals 225, 1504, & 3723, AFL-CIO v. FLRA*, 712 F.2d 640, 642 (D.C. Cir. 1983) ("A collectively bargained agreement that excludes from the grievance procedure only the five subjects specified in section 7121(c) is termed a 'broad scope' agreement; one that excludes other subjects as well is called a 'limited scope' agreement."); *Keeffe v. Library of Cong.*, 588 F. Supp. 778, 781 (D.D.C. 1984), *aff'd in part, rev'd in part*, 777 F.2d 1573 (D.C. Cir. 1985) ("While this negotiated grievance procedure often covers all potential grievances, of importance here is that the CSRA permits a union and a federal agency to exclude certain matters from the negotiated grievance procedure and to establish some alternate mechanism for resolution of those matters. § 7121(a)(2)."); *Rosell v. Wood*, No. CIV.A. 01-1355 RCL, 2002 WL 32396260, at *4 (D.D.C. Mar. 27, 2002), *aff'd*, 63 F. App'x 519 (D.C. Cir. 2003) ("[C]ollective bargaining agreements may specifically exclude certain categories of grievances from their procedures.")

issue were "required, by law, to be excluded from the scope of negotiated grievance/arbitration procedures."  When a Government-wide rule is involved, and certainly where it precludes certain matters from being grieved, as Section 4(a) does, the Statute "exempts from bargaining any proposal inconsistent with such a [rule]."  *IRS*, 996 F.2d at 1251.  Indeed, the D.C. Circuit has previously rejected the very arguments Plaintiffs raise here.  To permit employees to grieve matters expressly excluded by Government-wide rule "would be to destroy the exemption from bargaining" and thereby deprive the Government of § 7117(a)(1)'s "meaningful protection," particularly "when the government-wide [rule] specifically precludes grievances."  *Id.* at 1252 (explaining that § 7117(a)'s "exemption from bargaining could be largely negated if employees retain an independent right to grieve violations of a government-wide rule").

Section 4(a) is entirely consistent with Congress's design that certain matters could be excluded from negotiated grievance procedures.  Plaintiffs' claim that the provision "plainly conflicts" with the Statute is meritless.  NTEU Mot. 22.  Only if Congress had *mandated* that these two types of disputes be *included* in negotiated grievance procedures would Section 4(a) create any conflict with the Statute.  Because Congress did not, Plaintiffs' claims of conflict fail.[9]

      **ii.**      ***Section 3 is not a binding directive to agencies and, even if it were, is consistent with Congress's intent to allow certain matters to be excluded from negotiated grievance procedures.***

Plaintiff NTEU contends that Section 3, concerning employee removals, is invalid for essentially the same reasons as Section 4(a).  NTEU Mot. 27-28  But unlike Section 4(a), Section

---

[9] That § 7103(a)(9) defines "grievance" broadly is not dispositive, as Plaintiffs contend.  Other provisions of § 7121 make clear that it is not mandatory for an agency to subject every conceivable employment matter other than those expressly excluded by Congress in § 7121(c), to a grievance procedure.  For example, § 7121(d) refers to the rights of an employee affected by a prohibited personnel practice "which also falls under the coverage of the negotiated grievance procedure."  Had Congress intended to establish conclusively that all matters (other than those set forth in § 7121(c)) are subject to every agency's negotiated grievance procedure, as NTEU contends, the quoted language from § 7121(d) would not have been necessary.

3 is not a binding directive requiring agencies to exclude removals from negotiated grievance procedures. Instead, Section 3 sets a "goal" for agencies during negotiations to "endeavor" to exclude employee removals from negotiated grievance procedures. Section 3 expressly contemplates that this goal may not be met. *See* Removal Procedures Order, Sec. 3 (requiring agency head to explain to the President, through the OPM Director, any "fail[ure] to achieve this goal"). Clearly, the President knows how to issue a binding directive to agencies to exclude certain matters from negotiated grievance procedures, since Section 4(a) of the same Order does just that. The hortatory language of Section 3 and its express contemplation of a contrary outcome are fatal to NTEU's argument.[10] Consistent with Congress's express allowance in § 7121(a)(2) that certain matters be excluded from negotiated grievance procedures, Section 3 does no more than give direction to agency negotiators on which particular grievances they should seek to exclude.

> **b.      Section 4(b)(iii) of the Removal Procedures Order does not conflict with the Statute or impermissibly restrict the scope of bargaining.**

Section 4(b)(iii) is a Government-wide rule that precludes agencies from making agreements that would require them to engage in "progressive discipline" before deciding to remove an employee. Section 4(b)(iii) reflects the President's determination that any proposal to require progressive discipline should be "pull[ed] . . . out of the bargaining process." *IRS*, 996 F.2d at 1250. Congress contemplated the exercise of such authority in § 7117(a), and there is thus no "impermissible restriction" on the scope of bargaining. NFFE Mot. 22.

---

[10] NTEU's argument that Congress intended, without exception, for employee removals to be included in negotiated grievance procedures misreads 5 U.S.C. § 7121(e). That section permits an employee to elect a remedy only for "[m]atters covered under sections 4303 and 7512 of this title *which also fall within the coverage* of the negotiated grievance procedure." 5 U.S.C. § 7121(e)(1) (emphasis added). Plainly, if the matter does not "fall within the coverage of the negotiated grievance procedure," there is no election for the employee to make. In any event, had Congress intended to mandate inclusion of removals in negotiated grievance procedures, it would not have done so in such roundabout fashion.

Even if the decision to forego progressive discipline had not been removed from the scope of the duty to bargain under § 7117(a), no provision of the Statute mandates the use of progressive discipline prior to removing an employee.  Plaintiffs' claim of "conflict" thus fails at the outset. Congress expressly reserved as a management right the "authority of any management official of any agency . . . to . . . remove . . . or take other disciplinary action against [employees in the agency]."  5 U.S.C. § 7106(a)(2).  And § 7106(b)(2) does not independently require agencies to bargain over progressive-discipline proposals to be used when agencies take any disciplinary action, as Plaintiffs contend.  AFSCME Mot. 14.  Rather, that argument is contradicted by D.C. Circuit precedent.  *See U.S. Customs Serv. v. FLRA*, 854 F.2d 1414, 1420 (D.C. Cir. 1988) (noting that FLRA decisions and "the decisions of this court establish that a proposal to postpone agency action can directly interfere with management rights" and collecting cases).

Plaintiff NFFE further mischaracterizes Section 4(b)(iii) as "preclud[ing] unions from negotiating 'just cause' standards for discipline" when the provision erects no such bar, and wrongly relies on FLRA decisions considering "just cause" proposals—as opposed to the "progressive discipline" proposals that Section 4(b)(iii) actually addresses.  NFFE Mot. 24. Moreover, in the very decision on which NFFE relies, the FLRA expressly stated that a mandatory "progressive discipline[]" system would "excessively interfere with management's right to discipline."  *See NFFE, Local 1214 & U.S. Dep't of the Army Headquarters, U.S. Army Training Ctr. & Fort Jackson, Fort Jackson, SC*, 51 F.L.R.A. 1362, 1366 (1996) (citing *AFGE Local 1426 and U.S. Dep't of the Army, Fort Sheridan, IL*, 45 F.L.R.A. 867, 875 (1992); *AFGE Local 3732 and U.S. Dep't of Transportation, U.S. Merch. Marine Acad., Kings Point, NY*, 39 F.L.R.A. 187, 199 (1991)).  As the FLRA has previously explained, "[r]estrictions on an agency's ability to choose the specific penalty to impose in disciplinary actions directly interfere with management's

right to discipline employees under section 7106(a)(2)(A) of the Statute." *Merchant Marine Acad.*, 39 F.L.R.A. at 198.

> ### c. Section 4(c) of the Removal Procedures Order does not conflict with 5 U.S.C. § 4302(c)(6).

Section 4(c) is a Government-wide rule that generally requires agencies to set a presumptive 30-day limit on an employee's opportunity to demonstrate acceptable performance. It contains an exception to the general rule, however, when the agency in its discretion determines that a period longer than thirty days "is necessary to provide sufficient time to evaluate an employee's performance." Plaintiffs' claim of a conflict between Section 4(c) and 5 U.S.C. § 4302(c)(6) is unfounded.

Neither § 4302(c)(6) nor any other provision establishes any minimum duration that an agency must afford an employee to improve performance, let alone any minimum period in excess of thirty days. Nor did OPM do so when, pursuant to that provision, it promulgated the currently applicable regulation. *See* 5 C.F.R. § 432.104 ("[T]he agency shall afford the employee a reasonable opportunity to demonstrate acceptable performance, commensurate with the duties and responsibilities of the employee's position.").[11] Plaintiffs cite no statutory provision that precludes the President from directing agencies to set a presumptive limit on improvement periods in the course of their labor negotiations. Indeed, § 7106 confirms that nothing in the Statute affects the authority of management to "layoff," "suspend," "remove," "reduce in pay grade," or "take other disciplinary action" against an employee. 5 U.S.C. § 7106(a)(2)(A). Plaintiffs' allegation of a "conflict" thus draws no support from the text of the statute or the regulation.[12]

---

[11] Section 7(a) of the Removal Procedures Order directs OPM, as it may deem necessary, to issue new proposed regulations to effectuate Section 4(c)'s presumptive 30-day limit on improvement periods.

[12] Notably, a 30-day period has previously been found of sufficient duration for an employee to demonstrate acceptable performance. *See Towne v. Dep't of Air Force*, No. SF-0432-11-0591-I-2, 2013 WL 5781296 (M.S.P.B. Oct. 28,

Equally meritless is Plaintiffs' contention that the duration of a performance improvement period is a "mandatory subject of negotiation."  NFFE Mot. 24.  Because the President has issued a Government-wide rule directing agencies to impose a 30-day limit on improvement periods (except when the agency determines a longer period is warranted), agencies may properly refuse to negotiate on that issue.  *See AFGE*, 798 F.2d at 1530 n.6; *IRS*, 996 F.2d at 1249–50.  That the FLRA, in a decision not involving a Government-wide rule, has found the duration of an improvement period negotiable is therefore of no consequence to the analysis.  *See Patent Office Prof'l Ass'n Union & Patent & Trademark Office Dep't of Commerce*, 29 F.L.R.A. 1389, 1402–04 (1987).  Even if that decision were applicable here, the FLRA took care to note that the "length of the 'reasonable time' to demonstrate acceptable performance . . . is left to agency discretion."  *Id.* at 1403.  While Section 4(c) establishes a presumptive limit on improvement periods, it also expressly contemplates that an agency may exercise such discretion to extend that period when it determines that a period longer than thirty days is necessary to evaluate the employee's performance.  Plaintiffs' claim of a statutory conflict is baseless.

> **d.      Sections 2(a) and 2(b) do not impose binding requirements but instead announce principles of federal employee accountability, which create no conflict with statutory provisions.**

Section 2(a) sets forth the preferred policy that agencies "limit opportunit[ies] to demonstrate acceptable performance" to "the amount of time that provides sufficient opportunity" to do so.  Section 2(b) declares that management "should not be required" to use progressive discipline, but should have the opportunity to tailor a penalty "to the facts and circumstances" of particular instances of misconduct.  Plaintiff NTEU claims that Sections 2(a) and 2(b) conflict with

---

2013); *Lee v. EPA*, 115 M.S.P.R. 533 (2010), ¶ 33; *Melnick v. HUD*, 42 M.S.P.R. 93, 101 (1989), *aff'd*, 899 F.2d 1228 (Fed. Cir. 1990) (Table); *Wood v. Dep't of the Navy*, 27 M.S.P.R. 659, 662–63 (1985).

statutory provisions governing employee removals.  NTEU Mot. 24-27.  Sections 2(a) and 2(b) are not mandatory directives imposing requirements on agencies or federal employees, but instead articulate two of the President's "principles for accountability" for the federal workforce. Plaintiffs' claims of statutory conflict founder at the outset.  In contrast to other portions of the Orders that constitute Government-wide rules, Sections 2(a) and 2(b) are merely general policy statements.  Because such policy statements do not carry the force of law, they cannot "conflict" with the Statute in a manner that could form the basis of a valid claim.  *Cf., e.g.*, *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) ("Policy statements are binding on neither the public nor the agency, and the agency retains the discretion and the authority to change its position . . . in any specific case." (citation omitted)).

The Order itself recognizes that these Sections do not on their own impose any requirements.  Instead, the Order in Section 7 directs OPM to propose regulations, to the extent necessary, "to effectuate the principles set forth in Section 2 of this order" and directs agencies to conform their policies to these principles.  By contrast, Section 7 requires OPM and agencies to effectuate the "requirements" of other Sections of the Order, including 3, 4, 5, and 6.  If any judicial review might be sought for a challenge to the policies embodied in Sections 2(b) and 2(c), it is not through NTEU's premature policy dispute with these provisions, but through a challenge to any forthcoming changes to OPM regulations or agency policies.  *See supra* Part I.B.  NTEU's argument that these Sections undercut particular factors set forth in the MSPB's decision in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, is also premature; whether an agency has properly considered any of the *Douglas* factors in deciding to remove an employee, or is even required to, is a question the MSPB should answer in the context of a specific removal case.[13]

---

[13] The factors set forth in *Douglas* apply only to disciplinary actions pursuant to Chapter 75 of Title 5, and not to those taken under Chapter 43.  *See Lovshin v. Dep't of the Navy*, 767 F.2d 826, 835 (Fed. Cir. 1985).  Thus, Plaintiffs' claim

Even if these Sections were proper subjects of judicial review, NTEU's arguments lack merit.  Although NTEU submits that Sections 2(a) and 2(b) conflict with Congress's removal scheme, it identifies no statutory provision that generates this alleged problem.  Instead, NTEU's actual argument is not that these Sections conflict with any statute, but that they "undercut" certain aspects of the MSPB's ruling in *Douglas*.  NTEU Mot. 26.  This claim of inconsistency with *Douglas* is belied by a close reading of the six specific *Douglas* factors which NTEU invokes.  *Id.*

Consideration of whether an offense was "frequently repeated" (*Douglas* factor 1) and of the employee's "past disciplinary record" (*Douglas* factor 3) are not "undercut," but are instead expressly contemplated, by the Removal Procedures Order, which expects agencies to consider "not only similar past misconduct" of the disciplined employee, but also "all past misconduct," and furthermore makes clear that agencies should consider "an employee's disciplinary record." Removal Procedures Order, Sec. 2(e).  MSPB's dictate in *Douglas* that agencies consider the consistency of a disciplinary penalty with those imposed on other employees or set forth in any "applicable agency table of penalties" (*Douglas* factors 6, 7) is also not at odds with the Order. Section 2(c) simply states the truism that "disciplinary action should be calibrated to the specific facts and circumstances of each individual employee's situation."  Removal Procedures Order, Sec. 2(c).  And while Section 2(c) does call for individualized assessments of appropriate penalties, it merely states that agencies should not be *bound* to conform their penalties to how different employees have been treated historically, and hardly *mandates* that agencies vary from prior disciplinary practice, as NTEU's argument implies.  *Id.*, Sec. 2(a) (stating that that agency officials "should not be *required* to use progressive discipline" (emphasis added)), Sec. 2(b) (stating that discipline handed down to one employee "does *not necessarily* justify similar discipline of a

---

of a conflict with *Douglas* does not extend to the substantial set of disciplinary actions that an agency may take pursuant to Chapter 43.

different employee at a different time" (emphases added)).  Indeed, Section 2(c) explicitly advises that "agencies should consider appropriate comparators as they evaluate potential disciplinary actions."  *Id.*, Sec. 2(c).  Similarly, nothing in the Order precludes agencies from considering an employee's rehabilitation potential (*Douglas* factor 10) or the deterrent value of alternative sanctions (*Douglas* factor 12), and NTEU points to nothing.  NTEU's contention that the Removal Procedures Order "undercuts" these *Douglas* factors is baseless.

NTEU's statutory conflict argument, such as it is, also ignores that the MSPB leaves to agencies the discretionary determination of which of the *Douglas* factors are relevant in a particular misconduct case.  "The determination of which *Douglas* factors apply in a particular case and the weight to be given the relevant factors lies primarily within the *agency's broad discretion to determine the appropriate penalty for a particular case*."  *Zingg v. Dep't of the Treasury, IRS*, 388 F.3d 839, 844 (Fed. Cir. 2004) (emphasis added); *Brook v. Corrado*, 999 F.2d 523, 528 (Fed. Cir. 1993).  NTEU's contention that the *Douglas* factors are to be uniformly imposed as rigid requirements in every misconduct case does not survive close scrutiny.

Finally, even assuming there is any conflict between the policy stated in Sections 2(a) and 2(b) and *Douglas*, NTEU offers no authority for the proposition that the President's policy preferences must conform to MSPB precedent.  NTEU's implicit argument that the President must be enjoined merely from stating his policy differences with the MPSB is baseless.

### C.    The Executive Orders Do Not "Cumulatively" Violate the Collective Bargaining Scheme.

In addition to challenging the individual provisions detailed above, Plaintiffs contend that the Executive Orders, "taken together," "are aimed at ending collective bargaining as we know it." NTEU Mot. 30.  This argument cannot be squared with the absence of any conflict between the challenged Executive Order provisions and the Statute.  Nor can it be reconciled with Congress's

express contemplation that the scope of bargaining could be restricted by the President's issuance of Government-wide rules.  That the President's policy choices about how best to guide the conduct of employees of the Executive branch do not align with Plaintiffs' own policy preferences is not a proper basis for seeking judicial review.  Given that Congress, in § 7117(a)(1), sought to "insulate from the bargaining process" any matter already settled by the Executive, and that Plaintiffs have identified no actual conflict with the Statute, the Executive Orders are wholly consistent with the congressional scheme.  *IRS v. FLRA*, 494 U.S. at 935 n.3 (Brennan, J., dissenting).  Contrary to Plaintiffs' claim, there is no "cumulative" violation of collective bargaining in the abstract.

Plaintiffs' argument relies principally on *NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), a case that involved a legal framework entirely distinct from the Statute.  In *NTEU*, the D.C. Circuit considered the human resources management system ("HR system") that the newly-formed Department of Homeland Security had created pursuant to the Homeland Security Act of 2002, 5 U.S.C. § 9701 (the "HSA").  Although the HSA did not mention the Statute, it did require the HR system to "ensure that employees may . . . bargain collectively."  5 U.S.C. § 9701(b)(4).  The D.C. Circuit held that DHS's HR system failed to meet this requirement.  *NTEU*, 452 F.3d at 844.  But that HR system was created from whole cloth; in particular, it was different in at least four respects from the directives to agencies within the existing framework of the Statute that Plaintiffs challenge here.

First, the HR system gave DHS the "right to unilaterally abrogate lawfully negotiated and executed agreements."  *Id.* at 844, 848 ("Taken together, these regulations subordinate all collective bargaining agreements to the prerogatives of management.").  No similar attempt has

been made here, nor could it have been, given the specific review mechanism that Congress established for negotiated agreements in § 7114(c).

Second, DHS's HR system allowed bargaining only over "employee-specific terms affecting discipline, discharge and promotion," *id.* at 861, thus leaving the parties with "virtually nothing to negotiate over," *id.* at 860.  The HR system also would have "empower[ed] DHS to take *any matter* off the bargaining table *at any time*," whenever DHS deemed it necessary to carry out its mission.  *Id.* at 862 (emphasis added).  By contrast, the effect of the Executive Orders challenged here is to remove, *ex ante*, certain discrete subjects from the scope of bargaining—a result the Statute expressly permits and the D.C. Circuit has endorsed—while also urging (but not requiring) agencies to meet several specified policy objectives during negotiations.  On its face, meanwhile, each of the Orders repeatedly states that its provisions are to be implemented consistent with applicable law and subject to the duty to bargain in good faith that is the hallmark of the Statute.  That all of this is achieved within the framework Congress established for federal sector collective bargaining sets this case apart from *Chertoff*, where DHS had committed "a flagrant departure from the norms of 'collective bargaining' underlying [the Statute]."  *Id.* (noting the "striking disparity" between DHS's HR system and the framework of the Statute).

Third, the DHS HR system did not "have the advantage of an impasses panel" to resolve negotiation stalemates, including potentially imposing conditions on the agency.  *Id.* at 864.  This omission differs starkly from the context of the present case, where resort to the Panel, as well as to the FLRA for additional disputes, remains expressly contemplated on the face of the Orders.

Fourth, the DHS HR system sought "to conscript FLRA into reviewing a narrowly defined area of cases under an intensely deferential standard of review."  *Id.* at 866.  Under that system, the FLRA would have been reduced to "guard[ing] against substantial adjudicative failures" by an

initial reviewing board within DHS.  *Id.*  The Executive Orders here do not purport to intrude into the FLRA's domain, let alone to do so in ways that indiscriminately favor agencies over unions. Rather, the FLRA is to retain all of its "rulemaking, adjudicatory, and policymaking powers" under the Statute.  *NFFE v. Dep't of the Interior*, 526 U.S. at 98.

Therefore, even assuming any applicable force from the holding of *NTEU v. Chertoff*, which is based on the *sui generis* provisions of the Homeland Security Act and not the broadly applicable provisions of the Statute, the HR system struck down by the D.C. Circuit bears no resemblance to the collective bargaining regime that continues to exist under the President's Executive Orders.  DHS's HR system, as the D.C. Circuit put it, "does not even give an illusion of collective bargaining."  *NTEU*, 452 F.3d at 858.  By contrast, the design of the Executive Orders is to implement, subject to applicable limitations, a specific approach to the existing collective bargaining scheme established by the Statute, *i.e.*, one in pursuit of an "effective and efficient Government."  Collective Bargaining Order, Sec. 1(b).  Plaintiffs' reliance on *Chertoff* cannot sustain their claim of a "cumulative" violation of collective bargaining.

Plaintiffs' "cumulative" violation theory ignores not only § 7117(a) of the Statute and the President's authority to exempt certain subjects from bargaining, but also the Orders' repeated directives that agencies must continue to meet their statutory duty to bargain in good faith.  At bottom, Plaintiffs' argument appears to be that they simply dislike the actions the President has taken—but that is no basis for this Court to invalidate an Executive Order that does not conflict with the Statute.

**D.     Plaintiffs' Claims Under the Take Care Clause and the Separation of Powers Doctrine Are Baseless.**

Under a variety of doctrinal frameworks, Plaintiffs also contend that the President lacked authority to issue the Executive Orders they challenge.  These claims, whether asserted as a separation-of-powers claim or as a violation of the Take Care Clause, are meritless.

As an initial matter, these constitutional claims are simply dressed-up allegations that mirror Plaintiffs' contentions that the Executive Orders are *ultra vires* because they conflict with the Statute.  But Plaintiffs cannot independently proceed with these claims merely by repackaging them in constitutional guise.  *See, e.g.*, *Dalton*, 511 U.S. at 471  (rejecting argument "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine").  Plaintiffs cannot transform what is otherwise a straightforward claim of statutory conflict into a constitutional one merely by alleging that the President's failure to comply with the Statute encroaches on the Legislative Branch's Article I powers or amounts to a violation of his constitutional responsibilities under Article II, Section 3.  *See id.* at 474 ("The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.").  Indeed, "if every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* [*v. Massachusetts*, 505 U.S. 788 (1992)], permitting review of presidential acts for constitutionality] would be broadened beyond recognition."  *Id.*

In any event, Plaintiffs' arguments that the President lacks authority to issue the Executive Orders are baseless.  Congress has expressly recognized the President's authority to "prescribe regulations for the conduct of employees in the executive branch."  5 U.S.C. § 7301.  The Supreme Court had "no difficulty" concluding that this provision empowers the President to issue an

58

Executive Order that "establish[es] a labor-management relations system for federal employment." *Nat'l Ass'n of Letter Carriers*, 418 U.S. at 273 n.5; *see also Ass'n for Women in Sci. v. Califano,* 566 F.2d 339, 344 (D.C. Cir. 1977) (concluding that Executive Order prescribing standards of ethical conduct for federal employees "has a distinct statutory foundation [under § 7301]; indeed, it is to be accorded the force and effect of a statute").  The Executive Order that preceded enactment of the Statute governed all aspects of federal sector labor-management relations and was thus considerably more expansive than the individual provisions of the Orders at issue here.  Yet the court upheld the lawfulness of this Executive Order, acknowledging the broad scope of executive authority conferred by § 7301.  If § 7301 conferred sufficient basis to sustain an Executive Order that created a standalone federal labor relations regime, it certainly supports the lesser executive action taken within an existing congressional scheme at issue here.[14]

Far from exceeding his constitutional authority, the Orders carry out the President's responsibilities under Article II, Section 1, which provides that the "executive Power shall be vested in a President of the United States of America."  That power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government."  *Bldg. & Const. Trades Dep't, AFL-CIO*, 295 F.3d at 32 (quoting *Myers,* 272 U.S. at 164).  In addition, Article II, Section 3, provides that the President "shall take Care that the Laws be faithfully executed," and the "faithful execution of the laws enacted by the Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates."  *Bldg. & Const. Trades Dept.*, 295 F.3d at 32.  The Executive Orders are "an exercise of the President's supervisory authority over the Executive Branch."  *Id.*

---

[14] The Removal Procedures Order is also authorized under 5 U.S.C. § 3301, *inter alia*, which provides that the President may "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service."

at 33. Plaintiffs thus have things exactly backwards in contending that the President exceeded his constitutional authority. Indeed, it is Plaintiffs' extreme positions—such as their assertion that the President cannot even tell his subordinates how to allocate their "time and resources" to achieve particular "goal[s]" in bargaining (NTEU Mot. 27)—that would raise constitutional concerns.

Finally, Plaintiffs' attempted claim under the Take Care Clause cannot proceed in this Court because there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department" and "a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). As the Court has explained, "[v]ery different is the duty of the President in the exercise of the power to see that the laws are faithfully executed . . . . The duty thus imposed on the President is in no just sense ministerial. It is purely executive and political." *Mississippi*, 71 U.S. at 499. "An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.'" *Id.*; *see also, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed"). Plaintiffs' Take Care Clause claim must be dismissed.

## E.   Section 4(a)(v) of the Official Time Order Does Not Infringe Plaintiffs' First Amendment Right to Free Association.

Plaintiffs allege that Section 4(a)(v) of the Official Time Order violates their First Amendment right to free association. In a series of speculations, Plaintiffs contend that the unavailability of official time for pursuing third-party grievances will reduce their ability to represent their members, which in turn will discourage employees from associating with them, all in violation of the First Amendment. AFGE Mot. 12; AFSCME Mot. 29–30.

As a threshold matter, Plaintiffs have failed to make the necessary showing to succeed on a facial challenge to the constitutionality of an executive order. "A facial challenge to an executive order, like a facial challenge to legislation, 'is, of course, the most difficult challenge to mount successfully, since the challenge must establish that no set of circumstances exists under which the Act would be valid.'" *NTEU v. Bush*, 891 F.2d 99, 100 (5th Cir. 1989) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987); *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 5 (1982) ("A facial challenge, in this context, means a claim that the law is invalid *in toto* —and therefore incapable of any valid application." (internal quotation omitted)). As discussed previously, Section 4(a)(v) is subject to future clarifying regulations by OPM, and is thus not ripe for judicial review. *See supra*, Part I.B. For similar reasons, Plaintiffs have not shown—and cannot show—that there are no possible circumstances under which Section 4(a)(v) would be valid. Thus, Plaintiffs' facial challenge fails.

But even setting aside the conjectural nature of this alleged constitutional harm, Section 4(a)(v) in no way prohibits unions from engaging in representational efforts, and therefore does not infringe the right of unions or their members to associate. Instead, it merely provides that union representatives shall not be paid a Government salary while pursuing grievance proceedings on behalf of third parties. Plaintiffs muster no authority for their claim that the First Amendment requires the Government to subsidize their associational efforts in this regard, and the Supreme Court has held directly to the contrary.

### 1. *Section 4(a)(v) does not infringe Plaintiffs' right to free association.*

Plaintiffs' First Amendment claim hinges on the premise that Section 4(a)(v) works an actual infringement of their members' right to associate. It does not. Instead, Section 4(a)(v) has no effect on union members' ability to associate; it merely reflects the President's determination

that the cost to unions for one particular form of union business—pursuing grievances on behalf of third parties—should not be borne by the taxpayer.

Section 4(a)(v) imposes no direct effect on Plaintiffs' right to free association because it does not compel them to accept members who would compromise their message, meddle in their internal affairs, or expose them to reprisals. *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *NAACP v. Alabama ex. Rel. Patterson*, 357 U.S. 449 (1958).   Nor does it impose any indirect burden on that right.   "It does not 'order' [employees] not to associate together for the purpose of [pursuing grievances], or for any other purpose, and it does not 'prevent' them from associating together or burden their ability to do so in any significant manner."   *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of America*, 485 U.S. 360, 366 (1988).   Indeed, Plaintiffs and their members remain free to pursue third-party grievances without restriction, and the Order expressly contemplates that employees would be granted leave for that purpose.   *See* Official Time Order, Sec. 4(e).

The sole effect of Section 4(a)(v) is that the Government will not in future collective bargaining agreements agree to subsidize this particular form of union business through the provision of official time to union representatives.   That decision does not rise to the level of a First Amendment infringement.   *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983) ("Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." (quotation omitted)).

In fact, the Supreme Court has rejected the erroneous supposition underlying Plaintiffs' entire First Amendment argument—*i.e.*, that the Government's decision not to pay for unions'

pursuit of third-party grievances works a constitutional deprivation.   To the contrary, even assuming that employees "and their union would be much better off if [official time] were available [to pursue third-party grievances], [the unions'] right of association does not require the Government to furnish funds to maximize the exercise of that right." *Lyng*, 485 U.S. at 368; *see also Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) ("when the government appropriates public funds to establish a program, its decision not to [use program funds to] subsidize the exercise of a fundamental right does not infringe the right" (citation and alterations omitted)); *John Glenn Presidential Comm., Inc. v. FEC*, 822 F.2d 1097, 1100 (D.C. Cir. 1987) (same).

### 2. *Even if the First Amendment were implicated, Section 4(a)(v) passes constitutional muster.*

Even if Section 4(a)(v) posed some cognizable burden on Plaintiffs' right to free association, the regulation passes muster under the standard articulated in *Williams v. IRS*, 919 F.2d 745 (D.C. Cir. 1990).   "It is well settled that the government may limit the exercise of a citizen's first amendment rights where government regulations are aimed to address legitimate concerns and not designed to control or limit the exercise of first amendment freedoms."   *Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50–51 (1961)).   While the right to free association is considered a fundamental interest, the Government's "decision not to subsidize the exercise of a fundamental right does not infringe [that] right, and thus is not subject to strict scrutiny."   *Regan*, 461 U.S. at 549.   Thus, Plaintiffs' contention that strict scrutiny analysis is required (AFSCME Mot. 29–30) is incorrect.

Although Plaintiffs mischaracterize the Government's interest as mere "administrative convenience" (AFSCME Mot. 31), Section 4(a)(v) is plainly "aimed to address legitimate concerns."   *Williams*, 919 F.2d at 746.   In fact, the Order expressly identifies an interest in maintaining "[a]n effective and efficient government" by "keep[ing] careful track of how it spends

the taxpayers' money and eliminat[ing] unnecessary, inefficient, or unreasonable expenditures." Official Time Order, Sec. 1.  To advance this policy, the Order directs executive branch employees to "spend their duty hours performing the work of the Federal Government and serving the public." *Id*.[15]  "The fiscal integrity of Government programs, and the Government as a whole, 'is a legitimate concern of the State.'"  *Lyng* 485 U.S. at 373 (quoting *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 493 (1977)).

Section 4(a)(v) is also "not designed to control or limit the exercise of first amendment freedoms."  *Williams*, 919 F.2d at 746.  As discussed above, the Order carefully preserves the right of unions to pursue third-party grievances on their own time, *see* Official Time Order, Sec. 4(e), and affects only whether they will be paid for that specific activity out of public funds.  Were it designed to "control or limit" Plaintiffs' free association, the Order would have sought to go further than merely discontinuing a public subsidy for this particular activity.  The face of the Order further makes clear that its intent is to ensure efficient allocation of resources, and not to interfere in any way with Plaintiffs' associational activities in pursuing grievances.[16]

Accordingly, even if the Court concludes that Section 4(a)(v) poses some burden on Plaintiffs' associational rights, the provision passes constitutional muster.  Plaintiffs' First Amendment claim should be dismissed and summary judgment granted in favor of Defendants.

## III.    THIS COURT HAS NO JURISDICTION TO GRANT PLAINTIFFS' REQUESTED RELIEF.

Though Plaintiffs name OPM and Director Pon as Defendants in these cases, Plaintiffs make no allegations of unlawful conduct by OPM.  Because Plaintiffs have failed to state any

---

[15] Plaintiffs' repeated insistence that the Order states no government interest is thus flatly wrong.  AFGE Mot. 11.  Section 4(a) itself offers a justification to "ensure that Federal resources are used effectively and efficiently and in a manner consistent with . . . the public interest."  Official Time Order, Sec. 4(a).

[16] Plaintiffs' claim to strict scrutiny similarly hinges on the flawed proposition that Section 4(a)(v) works a "significant impairment of First Amendment rights."  AFSCME Mot. 30 (quoting *Elrod v. Burns*, 427 U.S. 347, 362 (1976)).

claim for relief against OPM or Director Pon, their dismissal is appropriate. *See* Fed. R. Civ. P. 12(b)(6); *Wood v. AFGE*, 255 F. Supp. 3d 190, 199 (D.D.C. 2017) (dismissing defendant when there were "no allegations tying him" to the remaining claims).  If Plaintiffs argue OPM is properly a defendant because of future conduct, such an argument only highlights the premature nature of these actions. *See* supra Part I.B.

With only the President remaining as a Defendant, this Court lacks jurisdiction to grant Plaintiffs' requested relief enjoining the President from enforcing his Executive Orders and declaring the President's Orders unlawful. *See* NTEU, 18-cv-01348, ECF No. 21, Am. Compl. at 41–42, Relief Requested; NFFE, 18-cv-01395, ECF No.1, Compl. at 27–28, Request for Relief, AFSCME, 18-cv-01444, ECF No. 1, Compl. at 22–23, Relief Requested; AFGE, ECF No. 9, Am. Compl. at 20, Relief Requested.  Courts have no jurisdiction "to enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 803 (quoting *Mississippi*, 71 U.S. at 501).  The reasons underlying this principle are "painfully obvious." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  "[T]he President . . .  is a coequal branch of government, and for the President 'to be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.* (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

With respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction," *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985)), because "it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-Espinoza*, 770 F.2d at 208 n.8.  Therefore, "similar considerations

regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan*, 100 F.3d at 976 n.1; *Lovitsky v. Trump*, No. 17-cv-00450, 2018 WL 1730278 at \*5 n.5 (D.D.C. Apr. 10, 2018); *see also Sanchez-Espinoza*, 770 F.2d at 208 n.8 (The "equivalence of [the] effect" of injunctive and declaratory relief directed at Executive branch officials "dictates an equivalence of criteria for issuance."). "It is incompatible with [the President's] constitutional position that he can be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827–28 (Scalia, J., concurring in part and concurring in the judgment). The President's immunity from such judicial relief is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)).

Following *Franklin*, the D.C. Circuit determined that "declaratory relief" against the President for his non-ministerial conduct "is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). This is because "a court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Id.* at 1012 (emphasis added) (citing *Mississippi*, 71 U.S. at 499); *see also Lovitsky*, 2018 WL 1730278 at \*7 (recognizing same).

Here, Plaintiffs have limited their allegations to supposed wrongdoings on the part of the President. *See e.g.*, AFSCME Compl. ¶¶ 94-97 (alleging that the President has failed to take care that the laws be faithfully executed). In such circumstances, this Court has no authority to direct the President in his exercise of his executive authority or to enter declaratory judgment against him.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motions for Summary Judgment should be denied, Defendants' Motion for Summary Judgment should be granted, and Judgment should be entered for Defendants.


Dated: July 16, 2018                        Respectfully submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General

                                            JENNIFER D. RICKETTS
                                            Director, Federal Programs Branch

                                            CHRISTOPHER HALL
                                            Assistant Branch Director


                                            */s/ Rachael Westmoreland*
                                            RACHAEL WESTMORELAND
                                            (GA Bar #539498)

                                            */s/ M. Andrew Zee*
                                            M. ANDREW ZEE
                                            (CA Bar #272510)

                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., N.W.
                                            Washington, DC  20530
                                            Tel.:  (202) 514-1280
                                            Fax:  (202) 616-8460
                                            Email: rachael.westmoreland@usdoj.gov

                                            *Counsel for Defendants*