**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| | ) Consolidated Case No. 18-CV-1261 (KBJ) |
| DONALD J. TRUMP, in his official capacity as President of the United States, | ) ) ) |
| Defendant. | ) ) ) |

**BRIEF FOR AMICUS CURIAE TOM WOLF, GOVERNOR OF PENNSYLVANIA IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

MARK GISLER
D.C. Bar No. 474628
JEAN-MARC FAVREAU
D.C. Bar No. 473235
*Counsel of Record for Amicus Curiae Tom Wolf,
Governor of Pennsylvania*
Peer, Gan & Gisler LLP
1730 Rhode Island Avenue, NW
Suite 715
Washington, DC 20037

DENISE J. SMYLER
General Counsel
Office of the Governor
Commonwealth of Pennsylvania
225 Main Capitol Building
Harrisburg, PA 17120
*Counsel for Tom Wolf, Governor of Pennsylvania*

DANIEL T. BRIER
Myers, Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
*Counsel for Tom Wolf, Governor of Pennsylvania*

July 20, 2018

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION AND STATEMENT OF INTEREST
OF THE AMICUS CURIAE ................................................................................. 1

   A.  The Commonwealth of Pennsylvania Has an Interest in Preserving
      Federal Employees' First Amendment and Collective Bargaining Rights ..................... 1

ARGUMENT ..................................................................................................... 4

   A.  The Executive Order Harms the Commonwealth of Pennsylvania's
      Citizens By Infringing Upon Their First Amendment Rights ................................... 4

      1.  The First Amendment Guarantees Individuals' Right to
         Expressive Association Through Labor Unions ................................................. 4

      2.  The Executive Order Strips Federal Government Workers in
         the Commonwealth of Their Right to Expressive Association
         by Imposing Restrictions on Their Right to Choose to Support
         Others Who Advocate on Their Behalf ........................................................... 5

      3.  The Executive Order Imposes "Self-Service" Grievance
         Representation and Infringes Upon Federal Employees'
         Right to Select Union Representatives to Advocate
         on Their Behalf ........................................................................................... 7

   B.  The Executive Order Destabilizes the Grievance-Arbitration
      Process and Labor Relations and Runs Counter to the President's
      Stated Interest in Government Efficiency ........................................................... 11

      1.  The commonwealth Believes the Pre-Executive Order
         Is Efficient and Beneficial to its Citizens ....................................................... 11

      2.  The Long-Standing Labor Law Structure Promotes
         Labor Peace and Efficiency ......................................................................... 14

      3.  Executive Order 13,837 is a Blatant Anti-Union,
         Anti-Employee Order ................................................................................... 15

CONCLUSION ................................................................................................... 16

## TABLE OF AUTHORITIES

### CASES

Page

*Bates v. City of Little Rock,*
    361 U.S. 516 (1960) ........................................................................................................ 6

*Brotherhood of R.R. Trainmen v. Virginia ex rel. VA State Bar,*
    377 U.S. 1 (1964) ................................................................................................... 4, 8, 11

*Connick v. Myers,*
    461 U.S. 138 (1983) ...................................................................................................... 12

*Hague v. C.I.O.,*
    307 U.S. 496 (1939) ........................................................................................................ 4

*Janus v. AFSCME,*
    585 U.S. ___ (2018) ................................................................................................... 6, 15

*Labov v. Lally,*
    809 F.2d 220 (3d Cir. 1987) ........................................................................................... 4

*NAACP V. Button,*
    371 U.S. 415 (1963) ...................................................................................................... 11

*Pap's A.M. v. City of Erie,*
    812 A.2d 591 (Pa. 2002) ................................................................................................. 5

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ...................................................................................................... 12

*Reed v. Reed,*
    401 U.S. 71 (1971) .......................................................................................................... 8

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ........................................................................................................ 4

*Thomas v. Collins,*
    323 U.S. 516, 534 (1945) ......................................................................................... 4, 11

## STATUTES

Federal Service Labor Relations Statute
    5 U.S.C. § 7101(a) ............................................................................... 14, 15
    5 U.S.C. § 7101(a)(1).................................................................................. 7
    5 U.S.C. § 7102........................................................................................... 7


National Labor Relations Act (1935)
    29 U.S.C. § 151 ......................................................................................... 14

Pennsylvania Constitution
    Article 1, § 1 ............................................................................................. 13
    Article 1, § 20 ........................................................................................... 13

Pennsylvania Labor Relations Act
    43 P.S. § 211.2 .......................................................................................... 13
    43 P.S. § 211.2(a)........................................................................................ 2
    43 P.S. § 211.2(b).................................................................................. 2, 14
    43 P.S. § 211.2(c)...................................................................................... 3, 9

Public Employees Relations Act
    43 P.S.§ 1101.101 ...................................................................... 3, 9, 13, 14

U.S. Constitution
    First Amendment ................................................................................ *passim*

## OTHER AUTHORITIES

Michael Ash and Jean Ann Seago, *The Effect of Registered Nurses'*
    *Unions on Heart-Attack Mortality,*
    57 Indus. & Lab. Rel. Rev. 422 (2004)......................................................... 12

Bureau of Labor Statistics, *Economic News Release: Table 5,*
    https://www.bls.gov/news.release/union2.t05.htm#union_a05.f.2 ................................. 3

Lydia DePillis, *Here's What Happened to Teachers After Wisconsin*
    *Gutted its Unions,* CNN Money, November 17, 2017,
    *available at* https://money.cnn.com/2017/11/17/news/economy/
    wisconsin-act-10-teachers/index.html .......................................................... 14

Caitlin Emma, *Teachers Are Going to Strike in Trump's America*
    Politico Magazine, April 12, 2018.......................................................... 13-14

Executive Order 13,837, 83 Fed. Reg. 25335............................................... *passim*
    Executive Order 13,837 § 1 ...................................................................... 6, 9

Executive Order 13,837 § 3 ......................................................................... 6
Executive Order 13,837 § 4(a)(ii).............................................................. 6
Executive Order 13,837 § 4(a)(v).............................................................. 6
Executive Order 13,837 § 4(a)(iii)............................................................. 6

OPM, *Major Work Locations of the Executive Branch Fiscal Year 2017*
 (February, 2018) ...................................................................................... 1

Pennsylvannia Governor's Comm'n to Revise the Pub. Emp. Law,
 *Report and Recommendations*  (1968).......................................................... 14

Pennsylvania Workforce Statistics, *2018 State Government Workforce Statistics*,
 *available at* http://www.oabis.state.pa.us/SGWS/2018/SGWS_MAIN.html.................. 3

Lisa Rein, *Trump's Fight with Federal Employee Unions*
 *Gets Real on Monday*
 The Washington Post, July 8, 2018 ............................................................. 15

David Ziskind, David, One Thousand Strikes of Government Employees,
 (Columbia University Press 1940)................................................................ 14

## INTRODUCTION AND STATEMENT OF INTEREST
## OF THE AMICUS CURIAE

Governor Wolf submits this brief as *Amicus* in support of the plaintiffs in this litigation. This brief will first discuss Pennsylvania's interests in this litigation and then turn to how Executive Order No. 13,837 harms Pennsylvania workers and the Commonwealth.

A.  The Commonwealth of Pennsylvania Has an Interest in Preserving Federal Employees' First Amendment and Collective Bargaining Rights

According to the Office of Personnel Management ("OPM"), in fiscal year 2017, over 62,000 individuals worked for the federal government in the Commonwealth of Pennsylvania.[1] OPM, *Major Work Locations of the Executive Branch Fiscal Year 2017* (February 2018).[2] These hard-working Pennsylvanians function as public servants throughout the Commonwealth for various essential federal agencies including the Department of Veterans Affairs, the Federal Bureau of Prisons, the Social Security Administration, Internal Revenue Service, Immigration and Customs Enforcement, and others. Thus, thousands of the Commonwealth's citizens provide services to the most vulnerable Pennsylvanians and serve agencies that aid in securing us as citizens.

The impact of these federal workers goes far beyond the critical services that they provide to Pennsylvanians.  Indeed, they contribute to the Commonwealth financially by paying taxes to the Commonwealth, counties, municipalities, and school districts, and they purchase goods and services throughout Pennsylvania.  In sum, not only do these

---

[1] Plaintiff AFGE represents approximately 40,000 employees in the Commonwealth.

[2] *Available at* https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/major-work-locations-of-the-executive-branch.pdf.

federal workers provide essential services to many of Pennsylvania's other 12 million citizens, but they also are an integral component of our economy and society.

Federal workers in Pennsylvania share many attributes with the Commonwealth's private and public workforce—both work hard, provide essential services, and contribute significantly to our overall safety and wellbeing.  Therefore, the Commonwealth has a special interest in protecting the rights and privileges of all its workers.

Pennsylvania has long recognized the importance of collective bargaining rights for private workers.  As far back as 1937, Pennsylvania made clear that "individual employe[e]s do not possess full freedom of association or actual liberty of contract" and that "[e]mployers in many instances … have superior economic power in bargaining with employe[e]s." Pennsylvania Labor Relations Act ("PLRA") 43 P.S. § 211.2(a). Because of this, our Commonwealth concluded that the "growing inequality of bargaining power substantially and adversely affects the general welfare of the State by creating variations and instability in competitive wage rates and working conditions within and between industries, and by depressing the purchasing power of wage earners." *Id*. Further:

> Experience has proved that protection by law of the right of employe[e]s to organize and bargain collectively removes certain recognized sources of industrial strife and unrest, encourages practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours or other working conditions, and tends to restore equality of bargaining power between employers and employe[e]s.

*Id.* § 211.2(b).  And, in an exercise of the legitimate police power the Commonwealth – to protect the public welfare, prosperity, health, and peace of the people of Pennsylvania – declared:

> [T]he public policy of the State [is] to encourage the practice and procedure of collective bargaining and to protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection, free from the interference, restraint or coercion of their employers.

*Id.* § 211.2(c).

And for decades, Pennsylvania has recognized the rights of its public employees to organize and collectively bargain.  Pennsylvania's Public Employe Relations Act ("PERA") acknowledges that it is the "public policy of this Commonwealth" to "promote orderly and constructive relationships between all public employers and their employe[e]." 43 P.S. § 1101.101. Public employees have the right to organize and freely choose their representatives. Meanwhile, public employers must negotiate and bargain with employee organizations representing public employees and must also enter into written agreements evidencing the result of this bargaining. *Id.* This, the Commonwealth has declared, will best accomplish the harmonious relationship between employer and employee. Because of this, in Pennsylvania, 81% of the Commonwealth's own workforce (58,926 out of 72,560) is covered by collective bargaining agreements. Pennsylvania Workforce Statistics, *2018 State Government Workforce Statistics*.[3]

These laws have led to labor peace in the Commonwealth.  Terms and conditions of employment have improved and employees have been able to secure competitive wages and freely exercise important associational, expressive, and collective bargaining

---

[3] *Available at* http://www.oabis.state.pa.us/SGWS/2018/SGWS_MAIN.html. In total, in 2017, labor unions represented approximately 723,000 workers in Pennsylvania. Bureau of Labor Statistics, *Economic News Release: Table 5*, https://www.bls.gov/news.release/union2.t05.htm#union_a05.f.2.

rights. However, as discussed below, Executive Order 13,837 will undermine this harmony in the Commonwealth's federal workforce, which will have serious repercussions for the rest of its citizenry.

## ARGUMENT

### A. The Executive Order Harms the Commonwealth of Pennsylvania's Citizens By Infringing Upon Their First Amendment Rights

1. <u>The First Amendment Guarantees Individuals' Right to Expressive Association Through Labor Unions</u>

The First Amendment of the United States Constitution protects individuals' right to assemble, and preserves their right to join with fellow workers to advocate for collective interests. *Brotherhood of R.R. Trainmen v. Virginia ex rel. VA State Bar*, 377 U.S. 1, 5 (1964), *rehearing denied*, 377 U.S. 960. *See also*, *Thomas v. Collins*, 323 U.S. 516, 534 (1945); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.").[4] The Commonwealth has long cherished and defended these principles and, as discussed herein, has a strong interest in protecting these fundamental rights for all of its citizens, including unions and their bargaining unit members. *See*, PA Const. art. 1, §§ 7, 20; *see also, Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002) (stating that Article 1,

---

[4] In a case arising out of the Commonwealth, the Third Circuit recognized that public employees have a vital First Amendment right of association that extends to collective action: "Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." *Labov v. Lalley*, 809 F.2d 220, 222-23 (3d Cir. 1987) (*citing*, *Hague v. C.I.O.*, 307 U.S. 496 (1939)).

Section 7 of the Pennsylvania Constitution "provides protection for freedom of expression that is broader than the federal constitutional guarantee.").

Executive Order 13,837 ("EO 13,837") violates these First Amendment rights, and impairs the rights of both those federal employees who work in the Commonwealth and state and municipal employees. For decades, these employees have worked under a system that respects their First Amendment rights. Meanwhile, their government and agency employers have received the benefit of labor peace as a result of these constitutional guarantees, and the Commonwealth's citizens have benefited from the consistent services provided by organized employees within those federal and state agencies. As discussed below, EO 13,837 undermines these important and fundamental rights, and damages the interests of the Commonwealth, its public servants, and its citizens.

   2.   <u>The Executive Order Strips Federal Government Workers in the Commonwealth of Their Right to Expressive Association by Imposing Restrictions on Their Right to Choose to Support Others Who Advocate on Their Behalf</u>

EO 13,837 immediately strips the right to free association from thousands of Pennsylvanians who work for the federal government as part of a union bargaining unit. Specifically, it restricts their rights to join unions, bargaining collectively, and, significantly, to use their chosen exclusive representatives in a meaningful and effective manner. EO 13,837 accomplishes these things in several insidious ways, each of which acts to dismantle the unions' ability to provide meaningful representation to their members and to restrict employees' ability to exercise their free speech and assert their associational rights. *Cf. Bates v. City of Little Rock*, 361 U.S. 516 (1960) (Constitutional

rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference.").[5]

First, EO 13,837 imposes arbitrary restrictions on the amount of work time that employee representatives[6] can devote to representational activities (EO 13,837 §§ 1, 4(ii)) and how much those representatives can earn for that time. *Id.* § 3. Second, it also outrightly prohibits employee representatives from using official time to handle grievances for bargaining unit members – one of the most important responsibilities of such representatives. *Id.* § 4(a)(v). Finally, the EO does away with unions' ability to negotiate with federal agencies for the use of government property, including office and meeting spaces, parking spaces and equipment such as phones and computers to carry out their representational responsibilities. *Id.* § 4(a)(iii). These limitations certainly undermine the viability and effectiveness of federal employee unions and, consequently,

---

[5] The Executive Order further infringes upon employees' speech and associational rights by restricting collective bargaining subjects and the union's ability to represent its members. Given the Supreme Court's recent decision in *Janus v. AFSCME*, 585 U.S. ____ (2018), which held that public employee speech through collective bargaining "is of overwhelming public concern," *id.* at 31, the government's attempts to restrict that speech through this Executive Order violates the First Amendment. If a bargaining unit member who does not want to pay dues to support the union has important First Amendment rights to refrain from supporting such important public union speech, then it must also be the case that unions and their supportive bargaining unit members have equally important First Amendment speech and associational rights in the bargaining and labor relations arena. Accordingly, the Executive Order's restrictions on the important speech and associational rights of employees who support the union as well as those of their union representatives violates *Janus* by discriminating against labor speech intended to exercise collective bargaining rights.

[6] The term "employee representative", as used herein, refers to federal employees who serve, part-time, as union stewards and typically have the requisite training and knowledge to deal with grievances, engage in collective bargaining, advise employees, and interpret collective bargaining agreements.

impact Pennsylvanians in the federal sector who would otherwise exercise their First Amendment rights to associate with and speak through their unions.

For decades, before the President issued EO 13,837, unions and agencies bargained about official time and related issues on an equal playing field – one that permitted open speech, advocacy, discussion, and consideration of each party's interests. Indeed, the Federal Service Labor Management Relations Statute ("FSLMRS") mandates that such discussion and consideration occur, and those functions are consistent with federal employees' fundamental right to speak on labor issues with a unified voice, and through their choice of representative. 5 U.S.C. §§ 7101(a)(1), 7102. Yet, in direct contravention of the FSLMRS' mandate and those rights, the President through this Executive Order, unilaterally wrested those issues out of the hands of employee representatives and deliberately censored those who were previously free to bargain with their agency counterparts. Importantly, the those employee advocates most restricted by the EO are those who are in the best position to establish work rules and resolve labor issues in the manner most reasonable, necessary, and in the public interest.

3. The Executive Order Imposes "Self-Service" Grievance Representation and Infringes Upon Federal Employees' Right to Select Union Representatives to Advocate on Their Behalf

Employees' right to expressive association through union membership means more than simply being a part of a collective group; it means that the group must have the freedom to choose those individuals – union stewards, officers, or other representatives – who have the requisite knowledge, training, and expertise to effectively represent and advise them and to actually level the playing field against the potential superior bargaining power of employers. *See*, *Bhd. of R.R. Trainmen*, 377 U.S. at 6 ("[t]he right of

members to consult with each other in a fraternal organization necessarily includes the right to select a spokesman from their number who could be expected to give the wisest counsel."). But here, EO 13,837 intentionally and effectively undercuts federal employees' ability to have effective representation through their unions.  It intrudes upon the free association and free speech rights of federal employees and is a direct attack on employees, union stewards and the union apparatus that supports their representational work within the Commonwealth of Pennsylvania.

By denying official time to employee-representatives to work on grievance-related activities and limiting their time and pay for other representational purposes, and by excluding employees who represent *themselves* from these same constraints, the EO forces unions out of their representational role and thrusts employees into a role serving as their own advocates. This shift to an "every employee for herself" system destroys a principal representational function of unions and depletes the value of collective representation that the employees specifically sought when they organized and joined their unions, putting their faith and union dues into a collective organization and elected representatives to bargain on their behalf.  In this way, the EO declares a preference for "self-service" and against representation by official employee representatives.[7] This feature of the EO strips federal employees of the First Amendment protections that extend to employees' rights to confer with experienced representatives who are best

---

[7] The President has offered no rationale for discriminating between employees and employee-representatives, as there is no reason to believe that granting official time for employee representatives to handle grievances would be any less efficient than doing so for employees handling their won grievances. *Cf. Reed v. Reed*, 401 U.S. 71, 76 (1971). If anything, trained union representatives are *more* efficient, requiring less time and, therefore, fewer government resources.

positioned to provide advice to and advocate for those employees. It also runs counter to the collective bargaining rights deemed so important to the Commonwealth and its citizenry. Among the Pennsylvania Labor Relations Act's many strong pronouncements in support of the freedom of association, the Commonwealth specifically protected the right to "designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 43 P.S. § 211.2(c); *See also*, 43 P.S. § 1101.101.

In direct contrast to these principles of free speech and association, EO 13,837 all but compels federal employees to handle their own grievances, which in turn, generates a drastic representational imbalance. If they wish to challenge a work rule or disciplinary decision or to otherwise exercise their contractual rights, employees must contend against managers, labor relations specialists, and lawyers who outrank them and are trained *and paid* by the agencies. In this way, EO 13,837 dramatically tilts the playing field that collective bargaining rights in the federal sector were meant to equalize. Individual employees will necessarily be less effective in representing themselves in the grievance-arbitration process. Conversely, employee representatives receive training, understand their collective bargaining agreements, interpret those contracts consistently, and provide effective advocacy. Thus, when those employee representatives face obstacles to representing employees such as those imposed by EO 13,837, the employee representatives' ability to bargain and advocate for their members is impaired and those employees' right to collective expression and action is rendered meaningless.

EO 13,837 creates a new anti-employee representative scheme that not only weakens advocacy for individual employee grievants, but also undermines effective labor

relations by promoting a "free for all" approach to union and management efforts to consistently apply their collective bargaining agreements. Collective bargaining agreements, like laws, often contain ambiguities, but knowledgeable union and management representatives often work out resulting issues through discussion, negotiation, and grievances. Untrained employees, on the other hand, will necessarily apply and interpret contractual provisions inconsistently. This will further upset labor peace and stability by creating a chaotic approach to enforcing and applying the rules that govern federal employees' terms and working conditions. It will ultimately destroy the functioning and stable grievance arbitration system that federal workers and the beneficiaries of their services have come to rely upon for decades.

EO 13,837 further undermines stable labor relations and effective union representation by eliminating access to employer facilities and equipment. Without the ability to negotiate for office space or other necessary accommodations, where are employees supposed to meet with their union representatives? And where are employee representatives supposed to do their union work so critical to helping their members? Will they be expected to meet and work in rented space elsewhere in town, or at their own workspaces, or at home? Taking away office and meeting space and the reasonable use of government equipment and resources is petty and deliberately undermines the efficiency and effectiveness of unions.

Ultimately, all of EO 13,837's limitations on federal employees' ability to join together and select advocates who can effectively speak on their behalf constitute violations of those employees' First Amendment rights. *See*, *Bhd. of R.R. Trainmen,* 377 U.S. at 6-8; *See also*, *NAACP v. Button*, 371 U.S. 415, 429 (1963) ("the First Amendment

also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion."); *Thomas v. Collins*, 323 U.S. 516, 536-37 (1945). Indeed, the right to expressive association is meaningless if such an important right cannot be exercised effectively.

### B. The Executive Order Destabilizes the Grievance-Arbitration Process and Labor Relations and Runs Counter to the President's Stated Interest in Government Efficiency

EO 13,837 purportedly seeks to advance the government's interest in addressing and promoting federal agencies' "efficiency". EO 13,837 § 1. Yet the Order does exactly the opposite. Indeed, limiting employees' ability to obtain effective representation through unions, as this EO does, weakens labor relations that have been shown to *improve* efficiency. For example, employers and employees most efficiently resolve workplace disputes through effective grievance-arbitration procedures, and strong labor-management relationships help the parties creatively solve problems and foster environments that encourage new ideas.  However, if allowed to stand, EO 13,837 will undermine federal employees' ability to be represented by unions that engage in effective, cooperative, interest-based collective bargaining designed for "win-win" outcomes. This will necessarily destabilize the labor relations that have worked for federal employees and, as a result, will damage those agencies' ability to provide efficient, effective, consistent service to those citizens who rely upon them.

1. <u>The Commonwealth Believes the Pre-Executive Order System is Efficient and Beneficial to its Citizens</u>

Intrusions on the rights of employees to freely associate and bargain, such as those imposed by EO 13,837 are not only impermissible, but functionally unwise.  The Commonwealth has long understood that functioning grievance-arbitration systems,

which result from stable collective-bargaining relationships, serve several purposes that benefit workers *and their employers*. For one, such systems increase morale and foster better working environments and peaceful working relationships between employees and management – benefits that the Supreme Court has recognized as important interests for government employers in the First Amendment context. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) ("[P]ertinent considerations" for First Amendment balancing include "harmony among coworkers" and "close working relationships for which personal loyalty and confidence are necessary."); *Connick v. Myers*, 461 U.S. 138, 151 (1983) ("'[I]t is important to the efficient and successful operation of [government] for [employees] to maintain close working relationships with their superiors.'"). Additionally, strong grievance-arbitration systems and stable labor relationships ensure that employees who have concerns about inefficiencies in agency operations can raise those concerns freely. Cf. Michael Ash & Jean Ann Seago, *The Effect of Registered Nurses' Unions on Heart-Attack Mortality*, 57 Indus. & Lab. Rel. Rev. 422, 425 (2004) (arguing that union grievance procedures, by providing "protection from arbitrary dismissal or punishment," may "encourage nurses to speak up in ways that improve patient outcomes but might be considered insubordinate and, hence, career-jeopardizing without union protections.").

The benefits of good labor relations also accrue to the Commonwealth and all of its citizens who rely upon services performed by federal employees and are better served when those employees work in environments where they are free to air their grievances and ideas. Indeed, the Commonwealth maintains a significant interest in ensuring that federal agencies that provide services to its residents – from veterans' and health care

benefits to national security – are well run with strong employee protections and peaceful labor relations.  *See, e.g.*, 43 P.S. § 1101.101; 43 P.S. § 211.2.

Functioning grievance arbitration systems and stable labor relations foster relationships that lead to *improvements* in agency efficiency, as the Commonwealth and its employees have experienced first-hand.  For example, since 1988, the Commonwealth and several unions representing its employees, including AFSCME, the state's largest employee union, negotiated an "Accelerated Grievance Process" that helped to clear an enormous backlog of pending grievances. As a result of this process – which the Commonwealth and the unions have continued to improve over the years – the vast majority of the grievances are heard and resolved much more quickly than through the old grievance process. Such a concerted association of employees protected the public fisc against the large back pay awards that can accumulate during backlogged grievance proceedings, and benefited *all* of Pennsylvania's citizens.  President Trump's EO effectively precludes such cooperation at the federal level.

Moreover, by destabilizing labor relations, EO 13,837 creates inefficiencies by increasing conflict between workers and management, fomenting job dissatisfaction, and dramatically increasing the risk of job actions such as strikes, slowdowns, and sick outs. The wave of collective action sparked by public school teachers in several states across the country exemplify the type of havoc that bubbles up when labor relations break down and workers feel like they do not have a voice. *See, e.g.*, Caitlin Emma, *Teachers Are Going on Strike in Trump's America*, Politico Magazine, April 12, 2018; *See also*, Lydia

13

DePillis, *Here's What Happened to Teachers After Wisconsin Gutted its Unions*, CNN Money, November 17, 2017.[8]

> 2. <u>The Long-Standing Labor Law Structure Promotes Labor Peace and Efficiency</u>

The very concerns about labor peace discussed above served as the impetus and foundation for labor law in the United States from Congressional enactment of the National Labor Relations Act in 1935 to the development of public sector labor laws in the Federal sector, the Commonwealth, and beyond. *See, e.g.,* 29 U.S.C. § 151; 5 U.S.C. § 7101(a); 43 P.S. § 211.2(b)("Experience has proved that protection by law of the right of employees to organize and bargain collectively removes certain recognized sources of industrial strife and unrest…"); 43 P.S. § 1101.101; Pa. Governor's Comm'n to Revise the Pub. Emp. Law, *Report and Recommendations* 6 (1968) (concluding that the "inability" of public employees to "bargain collectively has … led to more friction and strikes than any other single cause."); *See also*, David Ziskind, One Thousand Strikes of Government Employees 187 (Columbia University Press 1940).

Even the FSLMRS itself states:

> (a)   The Congress finds that—
>
> (1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them–
>
> > (A) safeguards the public interest,

---

[8] *Available at* https://money.cnn.com/2017/11/17/news/economy/wisconsin-act-10-teachers/index.html, (last visited July 17, 2018)

> (B) contributes to the effective conduct of
> public business, and
>
> (C) facilitates and encourages the amicable
> settlements of disputes between employees
> and their employers involving conditions of
> employment;

5 U.S.C. § 7101(a). In contravention of these findings, EO 13,837 takes us one step back

toward the industrial strife of the past.

   3.   <u>Executive Order 13,837 is a Blatant Anti-Union, Anti-Employee Order</u>

     The President's stated interest of increased efficiency in EO 13,837 deliberately

ignores the value of full collective bargaining rights that this Commonwealth and this

country have recognized for decades. EO 13,837 has nothing to do with promoting

efficiency. Rather, it blatantly attempts — in the vein of *Janus v. AFSCME*, Slip Op. No.

16-1466 (2018), and in the wake of numerous other Trump administration actions that

weaken and destroy public employee unions — to undermine the ability of labor unions

to effectively represent employees. *See e.g.* Rein, Lisa, *Trump's Fight with Federal

Employee Unions Gets Real on Monday*, The Washington Post, July 8, 2018 ("Trump's

executive orders represent a broadening of the get-tough initiatives that have played out

in individual agencies since he took office."). Ultimately, it renders the speech and

advocacy that employees should be free to collectively assert powerless. The

Commonwealth, which has learned the value of effective, collective representation

through its own experiences with public sector unions, urges this Court not to let that

happen. The constitutional rights of public employees – and all citizens – to assemble and

express themselves collectively and the public good that flows from those rights are

simply too important to brush away with the stroke of a pen.

## CONCLUSION

For the foregoing reasons, Governor Wolf respectfully requests that the Court grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

/s/ Mark Gisler
/s/ Jean-Marc Favreau

MARK GISLER
D.C. Bar No. 474628
JEAN-MARC FAVREAU
D.C. Bar No. 473235
*Counsel of Record for Amicus Curiae Tom Wolf, Governor of Pennsylvania*
Peer, Gan & Gisler LLP
1730 Rhode Island Avenue, NW
Suite 715
Washington, DC 20037

DENISE J. SMYLER
General Counsel
Office of the Governor
Commonwealth of Pennsylvania
225 Main Capitol Building
Harrisburg, PA 17120
*Counsel for Tom Wolf, Governor of Pennsylvania*

DANIEL T. BRIER
Myers, Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
*Counsel for Tom Wolf, Governor of Pennsylvania*