**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION<br>1750 H Street, N.W.<br>Washington, D.C.  20006 | )<br>)<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>) |
| DONALD J. TRUMP,<br>President of the United States,<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20035, | )<br>)<br>)<br>) |
| and | )<br>) |
| JEFF T.H. PON,<br>Director of the Office of Personnel Management<br>1900 E Street, N.W.<br>Washington, D.C.  20415 | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

No. 1:18-cv-01348-KBJ,
consolidated with,
  No. 1:18-cv-01261-KBJ

---

**PLAINTIFF NTEU'S CONSOLIDATED OPPOSITION TO DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

GREGORY O'DUDEN
General Counsel
D.C. Bar No. 254862

LARRY J. ADKINS
Deputy General Counsel
D.C. Bar No. 425653

JULIE M. WILSON
Deputy General Counsel
D.C. Bar No. 482946

PARAS N. SHAH
Assistant Counsel
D.C. Bar No. 983881

July 20, 2018

ALLISON C. GILES
Assistant Counsel
D.C. Bar No. 439705

JESSICA HORNE
Assistant Counsel
D.C. Bar No. 1029732
NATIONAL TREASURY EMPLOYEES UNION
1750 H Street, N.W.
Washington, D.C.  20006
Tel:  (202) 572-5500
Fax:  (202) 572-5645
Email:  greg.oduden@nteu.org
Email:  larry.adkins@nteu.org
Email:  julie.wilson@nteu.org
Email:  paras.shah@nteu.org
Email:  allie.giles@nteu.org
Email:  jessica.horne@nteu.org

## TABLE OF CONTENTS

Page:

Introduction ............................................................................................................................1

Argument ................................................................................................................................2

I.    This Court Has Jurisdiction Over NTEU's Challenge to the Validity of the May 2018 Executive Orders ..........................................................................................................2

    A.  This Court Has Previously Held That It Has Jurisdiction Over Challenges to Federal Employment Policies or Regulations ..........................................................3

    B.  The FLRA Lacks Jurisdiction Over Challenges to Executive Orders ....................5

    C.  The Government Cites No Authority For Its Argument that the FLRA Can Decide the Legality of an Executive Order. ..........................................................6

    D.  FLRA Has No Expertise in Interpreting Executive Orders ....................................7

    E.  In Appeals From the FLRA, Appellate Courts Cannot Consider Any Matter Not Decided Below. ..............................................................................................8

II.    NTEU's Challenge to The May 2018 Executive Orders Is Ripe ....................................8

    A.  The Purely Legal Issues Presented Are Fit for Judicial Resolution ......................9

    B.  This Dispute is Ripe, Even if OPM Later Issues Regulations. ...............................9

    C.  This Matter Is Ripe Even if NTEU and Agencies Continue to Negotiate Over Some Employment-Related Matters. ......................................................................11

    D.  This Matter Is Ripe Because NTEU and Its Members Are Suffering Hardship from the Implementation of these Executive Orders .............................................13

III.    The Challenged EO Provisions Conflict with Congress's Collective Bargaining and Personnel Scheme ..........................................................................................................14

    A.  Under NTEU v. Chertoff, the Executive Branch Cannot Eviscerate Congress's Collective Bargaining Scheme. ..........................................................................14

**B. Section 7117(a)(1) Does Not Give the President Authority to Alter Congress's Collective Bargaining Scheme.** ........................................................15

**C. The Challenged EO Provisions Are in Conflict with the Act** ................................19

   **1. Section 6 of Collective Bargaining EO** ................................................19

   **2. Sections 3 and 4 of the Official Time EO** ..........................................20

      **Section 3** ................................................................................20

      **Section 4(a)(i)** .......................................................................21

      **Section 4(a)(ii)** ......................................................................22

      **Section 4(a)(iii)** .....................................................................22

      **Section 4(a)(v)** .......................................................................22

   **3. Removal Procedures EO** .......................................................................23

      **Section 4(a)** ...........................................................................23

      **Section 3** ................................................................................24

      **Section 4(c)** ............................................................................25

      **Sections 2(b) and (2(c)** ........................................................25

   **4. Cumulative Effect of the Three Executive Orders** ................................27

**IV. This Court Has the Authority to Grant the Relief Sought Against the Defendants.** ........................................................................................27

**Conclusion** ........................................................................................35

## TABLE OF AUTHORITIES

Page:

**Cases:**

**13th Regional Corp. v. Dep't of the Interior**, 654 F.2d 758 (D.C. Cir. 1980) ........................31

**AFGE and HUD**, 43 F.L.R.A. 1405 (1992)..............................................................................6

**AFGE v. Nicholson**, 475 F.3d 341 (D.C. Cir. 2007)..............................................................4, 6

**AFGE v. Nicholson**, 404 F. Supp.2d 14 (D.D.C. 2005) ...........................................................6

**AFGE v. Loy**, 367 F.3d 932 (D.C. Cir. 2004) ....................................................................... 4-6

**AFGE v. Pierce**, 697 F.2d 303 (D.C. Cir. 1982)......................................................................4

**AFGE Local 32 and OPM**, 51 F.L.R.A. 491 (1995)................................................................6

**AFGE, AFL-CIO, Nat'l Council of Grain Inspection Locals v. FLRA,**
   794 F.2d 1013 (5th Cir 1986) ...........................................................................................5, 8

**Appalachian Power Co. v. EPA**, 208 F.3d 1015 (D.C. Cir. 2000) ...............................10, 21, 24

**Beatty v. Washington Metro. Area Transit Auth.**, 860 F.2d 1117 (D.C. Cir. 1988) .............30

**Bernal v. Fainter**, 467 U.S. 216 (1984).................................................................................16

**Bureau of Alcohol, Tobacco, & Firearms v. FLRA,**
   464 U.S. 89 (1983)...............................................................................................................7

**Chamber of Commerce v. Reich**, 74 F.3d 1322 (D.C. Cir. 1996)...........................................17

**Citizens for Responsibility & Ethics in Wash. v. Trump**, 302 F. Supp. 3d 127
   (D.D.C. 2018) ....................................................................................................................32

**Clinton v. City of New York**, 524 U.S. 417 (1998).................................................................33

**Department of Treasury, IRS v. FLRA**, 996 F.2d 1246 (D.C. Cir. 1991) ........................ 15-18

**Douglas v. VA**, 5 M.S.P.R. 280 (1981) ............................................................................ 25-27

**Edison Elec. Inst. v. EPA**, 996 F.2d 326 (D.C. Cir. 1993)..................................................9, 13

**El Dia v. Colon**, 963 F.2d 488 (1st Cir. 1992)........................................................................11

Elgin v. Department of the Treasury, 567 U.S. 1 (2012)....................................... 7

Fidelity Television, Inc. v. FCC, 502 F.2d 443 (D.C. Cir. 1974) .........................21

Fort Bragg Ass'n of Educators, NEA and Dep't of the Army, Fort Bragg Schools,
  31 F.L.R.A. 70 (1988) ..............................................................................6, 8

Franklin v. Massachusetts, 505 U.S. 788 (1992) ...................................... 28-32

General Elec. Co. v. EPA, 290 F.3d 377 (D.C. Circ. 2002) .......................... 10-11, 24

Lee v. EPA, 115 M.S.P.R. 533 (2010) ...............................................................25

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)......................................26

Mississippi v. Johnson, 71 U.S. 475 (1867)............................................... 29-30

National Association of Government Employees v. FLRA, 179 F.3d 946
  (D.C. Cir. 1999) ....................................................................................8, 20

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272
  (D.C. Cir. 2005) ........................................................................................10

Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng'rs, 440 F.3d 459
  (D.C. Cir. 2006) ......................................................................................9, 26

Newdow v. Roberts, 603 F.3d 1002 (D.C. Cir. 2010) .....................................32

NFFE, Local 1655 and DOD, 49 F.L.R.A. 874 (1994)......................................6

Nixon v. Sirica, 487 F.2d 700 (D.C. Cir. 1973) ..............................................28

NTEU v. Chertoff, 385 F. Supp. 2d 1 (D.D.C. 2005)................................... 4-5,7

*NTEU v. Chertoff, 452 F.3d 839 (D.C. Cir. 2006)....................1-2, 5, 12, 14, 17, 20, 23-24, 27

NTEU v. Devine, 577 F. Supp. 738 (D.D.C. 1983),
  aff'd, 733 F.2d 114 (D.C. Cir. 1984) ...................................................3, 5

NTEU v. Devine, 733 F.2d 114 (D.C. Cir. 1984)........................................ 3-5, 7

NTEU v. Horner, 869 F.2d 571 (Fed. Cir. 1989) ............................................4

NTEU v. Horner, 854 F.2d 490 (D.C. Cir. 1988)............................................4

NTEU v. Nixon, 492 F.2d 587 (D.C. Cir. 1974) .......................................27-28. 32-33

**NTEU v. Reagan**, 663 F.2d 239 (D.C. Cir. 1981)..............................................................33

**NTEU v. Von Raab**, 649 F. Supp. 380 (E.D. La. 1986),
  **aff'd in part, vacated in part on other grounds**, 488 U.S. 886 (1988)......................4

**NTEU and Dep't of Treasury, IRS**, 60 F.L.R.A. 782 (2005) ........................................ 5

**OPM v. FLRA**, 864 F.2d. 165 (D.C. Cir. 1988) .................................................... 17-19

**Spirit of Sage Council v. Kempthorne**, 511 F. Supp. 2d 31 (D.D.C. 2007) ...................... 12-13

**Spokeo, Inc. v. Robins**, 136 S.Ct. 1540 (2016) .....................................................26

**Swan v. Clinton**, 100 F.3d 973 (D.C. Cir. 1996). .............................................. 29-34

**U.S. Dep't of Air Force v. FLRA**, 952 F.2d 446 (D.C. Cir. 1991) ...........................5, 8

**U.S. Dep't of Justice, Fed Bureau of Prisons and AFGE, Council 33**
  **68 F.L.R.A. 932 (2015)**....................................................................... 5-6

**U.S. Postal Service v. Gregory**, 534 U.S. 1 (2001) ................................................27

**XP Vehicles, Inc. v. DOE**, 118 F. Supp. 3d 38 (D.D.C. 2015).....................................13

**Statutes:**

5 U.S.C. § 1204........................................................................................27

5 U.S.C. § 4302(c)(6) ................................................................................25

5 U.S.C. § 7106(b)(1) ......................................................................... 11, 19-20

5 U.S.C. § 7106(b)(3) ................................................................................18

5 U.S.C. § 7117(a)(1) ...................................................................... 2, 14-19, 23, 27

5 U.S.C. § 7123(c) .....................................................................................8

5 U.S.C. § 7131.................................................................................20, 23

5 U.S.C. § 7131(d)...............................................................................18, 22

5 U.S.C. § 7513.................................................................................7, 27

5 U.S.C. § 7701........................................................................................27

**Regulations**:

5 C.F.R. § 432.104 ......................................................................................25

**Miscellaneous**:

Executive Order No. 13836, Developing Efficient, Effective, and Cost-Reducing
 Approaches to Federal Sector Collective Bargaining......................................................passim

Executive Order No. 13837, Ensuring Transparency, Accountability, and Efficiency in
 Taxpayer-Funded Union Time Use....................................................................passim

Executive Order No. 13839, Promoting Accountability and Streamlining Removal
 Procedures Consistent With Merit System Principles......................................passim

OPM, Guidance for Implementation of Executive Order 13836 (July 5, 2018),
 https://chcoc.gov/content/guidance-implementation-executive-order-13836-developing-
 efficient-effective-and-cost ..................................................................................10, 12

OPM, Guidance for Implementation of Executive Order 13837 (July 5, 2018),
 https://chcoc.gov/content/guidance-implementation-executive-order-13837---ensuring-
 transparency-accountability-and ..............................................................................10

OPM, Guidance for Implementation of Executive Order 13839 (July 5, 2018),
 https://chcoc.gov/content/guidance-implementation-executive-order-13839-promoting-
 accountability-and-streamlining ........................................................................10, 26

S. Rep. No. 95-969 at 28, reprinted in 1978 U.S.C.C.A.N. 2750.............................................27

## **INTRODUCTION**

Congress spent many months crafting the detailed federal personnel and labor relations scheme in the Civil Service Reform Act (Act) and Title VII of that Act, which is the Federal Service Labor-Management Relations Statute (Statute).  The government's brief boils down to the remarkable assertion that the President, with a stroke of a pen, can eviscerate the core elements of Congress's carefully designed 40-year old statutory framework.[1]  That view is untenable.  The President cannot direct his subordinates to take action contrary to statute.  As NTEU showed in its initial brief, the challenged provisions of the executive orders bar or limit agencies from negotiating over matters that Congress specifically intended to be subject to negotiations.  They also take aim at statutes establishing the processes by which employees may be sanctioned for misconduct or unacceptable performance.[2]  And agencies, acting at the President's direction, are already taking bargaining positions that are consistent with the challenged EO provisions but in plain conflict with the federal statute.

In arguing that the EOs are legal, the government tries to distinguish and minimize the import of NTEU v. Chertoff, 452 F.3d 839 (D.C. Cir. 2006).  There, in a unanimous opinion, the D.C. Circuit held that the government may not take so many matters off the negotiating table such that the concept of collective bargaining is rendered "meaningless."  Id. at 861.  Doing so flies in the face of the statutory "mutual obligation" of the employer and the labor organization to pursue an agreement regarding appropriate conditions of employment.  Id. at 854.  Just as it was wrong for the regulations at issue in NTEU v. Chertoff to take certain topics off the bargaining table, it is wrong for the executive orders challenged here to impose pre-determined, inflexible

---

[1] The government has filed a consolidated opposition to NTEU's and other unions' Motions for Summary Judgment and a Cross-Motion for Summary Judgment (Gov't Br.).

[2] See NTEU Memorandum in Support of Motion for Summary Judgment (ECF No. 29) at 13-34 (NTEU Br.).

bargaining positions.  <u>NTEU v. Chertoff</u> must inform any analysis of executive branch changes to the federal collective bargaining scheme.

The government relies heavily and repeatedly on 5 U.S.C. § 7117(a)(1), arguing that this provision gives the President authority to alter fundamentally the federal labor relations and personnel scheme.  As NTEU demonstrates, the government's argument is flawed.  Section 7117(a)(1) does not shield an illegal EO from review by this Court.  Nothing in that provision, or in the cases cited by the government, suggests that a Government-wide regulation, regardless of its validity, can be used to exempt matters from bargaining.

For the reasons explained below and its opening brief, NTEU's Motion for Summary Judgment should be granted, and the defendants' Cross-Motion for Summary Judgment should be denied.

## **ARGUMENT**

### **I.       This Court Has Jurisdiction Over NTEU's Challenge to the Validity of the May 2018 Executive Orders.**

The government argues that this Court lacks jurisdiction to consider NTEU's challenge to the May 25, 2018 Executive Orders.  The government asserts that NTEU must proceed, instead, through the statutory unfair labor practice scheme established by the Act by filing actions on an agency-by-agency basis with the Federal Labor Relations Authority (FLRA).  Gov't Br. at 16-22. The government thus argues that the FLRA provides the "exclusive review mechanism" for the type of claims that NTEU has asserted.  Gov't Br. at 16.

The government's preemption argument fails to come to grips with NTEU's argument, and it is contrary to the law in this Circuit.  NTEU challenges the legality of the provisions of the EOs, not their implementation.  The D.C. Circuit has held that the Act does not preclude a court action to enjoin broad, unlawful executive action, such as the EOs issued here.  Indeed, a court

challenge is the only route by which NTEU can obtain the relief that it seeks.  As explained

below, the FLRA lacks any authority to assess the legality of these EOs and enjoin them, which

only an Article III court may do.

###### A.   This Court Has Previously Held That It Has Jurisdiction Over Challenges to Federal Employment Policies or Regulations.

The government has previously and unsuccessfully made the argument that judicial review

of any matter related in any way to federal employment is precluded by the Act.  In NTEU v.

Devine, NTEU sued to enjoin regulations issued by the Office of Personnel Management (OPM),

arguing that those regulations were contrary to federal statute.  See 577 F. Supp. 738 (D.D.C.

1983), aff'd, 733 F.2d 114 (D.C. Cir. 1984).  The government asserted that the matter was

outside of the court's jurisdiction because NTEU's claim "must be processed only as provided

for in the exclusive scheme established by the Civil Service Reform Act," such as contesting

actions appeals before the Merit Systems Protection Board (MSPB) or filing charges with the

FLRA.  577 F. Supp. at 745.  The district court rejected the government's argument.  The court

held that such a rulemaking challenge "is not the typical sort of labor altercation between a

federal employee and his federal employer" that the Act covers, and allowed NTEU's suit to

proceed.  Id.

The D.C. Circuit affirmed, calling the government's preclusion argument "meritless."

733 F.2d at 117 n.8.  As the Devine Court explained:

> It is one thing to say that when a statute provides a detailed scheme of administrative
> protection for defined employment rights, less significant employment rights of the same
> sort are implicitly excluded and cannot form the basis for relief directly through the
> courts. Cf. Carducci v. Regan, 230 U.S. App. D.C. 80, 714 F.2d 171 (D.C. Cir. 1983). It
> is quite different to suggest . . . that a detailed scheme of administrative adjudication
> impliedly precludes pre-enforcement judicial review of rules.

Id.

The basic principle enunciated in NTEU v. Devine is reflected in the long list of suits entertained by federal courts in which federal sector unions challenged agency regulations or government policies of general application on the grounds that they were inconsistent with federal statute or the Constitution.  See, e.g., AFGE v. Nicholson, 475 F.3d 341, 348-50 (D.C. Cir. 2007) (district court had jurisdiction to hear union's challenge to whether an agency's decision regarding premium pay unlawfully conflicted with statute); NTEU v. Horner, 869 F.2d 571, 574-77 (Fed. Cir. 1989) (upholding union challenge to regulation governing pay increases for employees paid special salary rates); NTEU v. Horner, 854 F.2d 490, 495-96 (D.C. Cir. 1988) (district court properly found that it had jurisdiction to consider challenge to OPM rule excepting certain jobs from competitive service); AFGE v. Pierce, 697 F.2d 303, 304-08 (D.C. Cir. 1982) (court of appeals considered challenge to a planned reduction-in-force); NTEU v. Von Raab, 649 F. Supp. 380, 384-85 (E.D. La. 1986) (rejecting claim that the MSPB and FLRA framework precludes judicial review of challenge to drug-testing program), aff'd in part, vacated in part on other grounds, 488 U.S. 886 (1988).

Indeed, in NTEU v. Chertoff, the government unsuccessfully raised the same preclusion argument at the district court level that it raises here.  See NTEU v. Chertoff, 385 F. Supp. 2d 1 (D.D.C. 2005).  There, the government argued, relying on AFGE v. Loy, 367 F.3d 932 (D.C. Cir. 2004), that the district court lacked jurisdiction to consider NTEU's argument that new Department of Homeland Security (DHS) regulations violated the civil service laws.  385 F. Supp. 2d at 22.  The government similarly asserted that the union's claims should be presented in the first instance to the FLRA.  Id.

4

The district court summarily rejected the government's argument.  Concluding that NTEU and the other unions could challenge the new regulations in court, Judge Collyer explained:

> A preenforcement challenge to new regulations "is not the typical sort of labor altercation between a federal employee and his federal employer" to which the exclusive administrative review processes of the Civil Service Reform Act ("CSRA") apply. NTEU v. Devine, 577 F. Supp. at 745. The D.C. Circuit agreed that exclusive FLRA review for "defined employment rights" is "quite different" from "pre-enforcement judicial review of rules." NTEU v. Devine, 733 F.2d 114, 117 n. 8 (D.C. Cir. 1984).

Id. at 23.  The government chose not to raise this issue on appeal.  See generally 452 F.3d 839 (D.C. Cir. 2006).

## B.  The FLRA Lacks Jurisdiction Over Challenges to Executive Orders.

As in NTEU v. Chertoff, the government relies on Loy to support its jurisdictional claim. Gov't Br. at 17, 19-20.  And for the same reasons, that case is inapposite.  Loy involved, at bottom, bargaining unit eligibility.  367 F.3d at 935.  The court held "the district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA."  Id.

Here, however, the FLRA has no jurisdiction—exclusive or otherwise—over NTEU's challenge to the validity of the EOs.  The FLRA itself has repeatedly stated that it cannot enjoin or declare invalid a government regulation or policy.  "It is long and well-established that the Authority does not have the power to assess whether an OPM regulation is invalid." NTEU and Dep't of Treasury, IRS, 60 F.L.R.A. 782, 783 (2005).  See also U.S. Dep't of Air Force v. FLRA, 952 F.2d 446, 452 (D.C. Cir. 1991) ("[T]he Authority concedes that it has no power to adjudicate the validity of the OPM regulations."); AFGE, AFL-CIO, Nat'l Council of Grain Inspection Locals v. FLRA., 794 F.2d 1013, 1015 (5th Cir. 1986) ("The FLRA responds to [petitioner's] argument by contending that the FLRA has no power to assess the lawfulness or validity of another federal agency's government-wide regulation."); U.S. Dep't of Justice, Fed.

5

Bureau of Prisons and AFGE, Council 33, 68 F.L.R.A. 932, 941 (2015) (FLRA cannot consider

union's argument that a regulation is invalid); AFGE Local 32 and OPM, 51 F.L.R.A. 491, 496

n.9 (1995) ("[I]nsofar as the argument suggests that the Authority should invalidate OPM's

regulations, such action is beyond our jurisdiction."); Ft. Bragg Ass'n of Educ., NEA and Dep't

of Army, 31 F.L.R.A. 70, 71 (1988) (FLRA lacks authority to consider whether executive order

on drug testing is illegal).

In fact, the D.C. Circuit considered Loy in evaluating a union's challenge to the legality

of a decision by the Secretary of Veterans Affairs affecting nurses' premium pay.  AFGE v.

Nicholson, 475 F.3d 341 (D.C. Cir. 2007).  The district court had held that it lacked jurisdiction

because it considered the matter to be an unfair labor practice dispute that should have been

brought before the FLRA.  404 F. Supp. 2d 14, 22 (D.D.C. 2005).  The D.C. Circuit reversed,

however, because what was really at issue was the legality of the Secretary's decision, and "the

legality of the disputed § 7422 decision is expressly outside the FLRA's purview."  475 F.3d at

348.  The D.C. Circuit held that "the Union is presumptively entitled to judicial review of its

claim" and "Loy does not provide a basis for the district court dismissing this case for lack of

jurisdiction."  Id.

### C.      The Government Cites No Authority For Its Argument That the FLRA Can Decide the Legality of an Executive Order.

In its brief, the government cites FLRA case law involving whether a provision is

negotiable, but notably no case establishing that the FLRA can entertain and resolve a challenge

to the legality of an EO.  For example, both NFFE, Local 1655 and DOD, 49 F.L.R.A. 874, 888-

90 (1994) and AFGE and HUD, 43 F.L.R.A. 1405, 1410 (1992), cited at Gov't Br. at 21,

involved whether disciplinary proposals for employees with substance abuse problems conflicted

with an executive order on that same topic.  Neither case involved—as NTEU's suit here does—a challenge to whether the EO itself was valid.

Elgin v. Department of the Treasury, 567 U.S. 1 (2012), does not help the government. See Gov't Br. at 22.  Elgin held that a district court did not have jurisdiction over individual challenges to removals from federal employment because the Act specifically provides for review of adverse actions by the MSPB.  567 U.S. at 8, 23.  Elgin does not govern here, however, for the same reason that the courts in NTEU v. Devine and NTEU v. Chertoff rejected the government's preclusion arguments.  Elgin involved the typical sort of labor altercation between a federal employee and his federal employer—namely, a removal—for which an administrative review scheme is specifically set forth in Section 7513 of the Act.  As the courts in NTEU v. Devine and NTEU v. Chertoff observed, exclusive administrative review for such "defined employment rights" is "quite different" from the "pre-enforcement judicial review of rules" that NTEU seeks.  NTEU v. Chertoff, 385 F. Supp. 2d at 23 (quoting NTEU v. Devine, 733 F.2d at 117 n.8).  No provision of the Act specifically provides that exclusive review of a pre-enforcement challenge to the validity of a Government-wide rule or regulation rests with the FLRA.

### D.     **FLRA Has No Expertise in Interpreting Executive Orders.**

The government also suggests that because the FLRA has expertise in labor-management relations, its review scheme is entitled to deference.  Gov't Br. at 20-21.  The Supreme Court has recognized that the FLRA possesses "specialized expertise in its field of labor relations."  Bureau of Alcohol, Tobacco, & Firearms v. FLRA, 464 U.S. 89, 107 (1983).  But this case does not involve a labor management dispute.  It involves a challenge to executive orders.  Indeed, the D.C. Circuit has explicitly found that the FLRA has no expertise in, and is not entitled to any

deference regarding the interpretation of, executive orders.  Nat'l Ass'n of Gov't Emps. v. FLRA, 179 F.3d 946, 950 (D.C. Cir. 1999) (reviewing FLRA's determination about an unfair labor practice *de novo* and giving no deference to the Authority's interpretation of an executive order).

### E.      In Appeals From the FLRA, Appellate Courts Cannot Consider Any Matter Not Decided Below.

The government suggests that NTEU could eventually get the judicial review it seeks if it proceeded to the FLRA, and then appealed any adverse ruling to a court of appeals.  Gov't Br. at 17.  But the government does not explain how the court of appeals could resolve an issue of the legality of an EO if the lower administrative body (here, the FLRA) cannot.

The Statute gives appellate courts limited jurisdiction over FLRA decisions.  5 U.S.C. § 7123(c).  Appellate courts can only consider "the question determined" by the FLRA, and "[n]o objection that has not been urged before the Authority, or its designee, shall be considered by the court."  Id.  As explained above, the FLRA cannot consider the question of whether an EO is lawful.  See U.S. Dep't of Air Force v. FLRA, 952 F.2d 446, 452 (D.C. Cir. 1991) ("the Authority concedes that it has no power to adjudicate the validity of the OPM regulations); AFGE, AFL-CIO, Nat'l Council of Grain Inspection Locals v. FLRA., 794 F.2d 1013, 1015 (5th Cir. 1986) ("The FLRA responds to [petitioner's] argument by contending that the FLRA has no power to assess the lawfulness or validity of another federal agency's government-wide regulation."); Ft. Bragg Ass'n of Educ., NEA and Dep't of Army, 31 F.L.R.A. 70, 71 (1988) (FLRA lacks authority to consider whether executive order on drug testing is illegal). Therefore, NTEU can only get the relief it seeks by proceeding with this district court action.

## II.     NTEU's Challenge to the May 2018 Executive Orders Is Ripe.

Ripeness involves evaluating (1) the fitness of the issues for judicial decision and the (2) hardship to the parties of withholding court consideration.  Edison Elec. Inst. v. EPA, 996 F.2d 326, 334 (D.C. Cir. 1993).  If the first prong is satisfied, there is no need to consider the second. Id. at 334.  This is a facial challenge to the executive orders' legality.  No further action is required.  As such, NTEU's challenge to these Presidential directives, which NTEU showed in its opening brief agencies are already implementing, is clearly ripe.  In fact, the harm to the bargaining process has already occurred.

### A.     The Purely Legal Issues Presented Are Fit for Judicial Resolution.

This Circuit has repeatedly held that "a purely legal claim in the context of a facial challenge . . . is presumptively reviewable."  Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng., 440 F.3d 459, 464 (D.C. Cir. 2006).  The government itself states that this case "is purely a matter of law."  Gov't Statement of Material Facts at 1.  Accordingly, NTEU's legal claims alleging conflicts between the EOs and federal statute are presumptively reviewable.

### B.     This Dispute is Ripe, Even if OPM Later Issues Regulations.

The government argues that because some (but not all) of the challenged provisions contemplate that OPM will issue guidance and regulations, NTEU's challenge to those specific provisions is not ripe until and unless OPM takes that action.  Gov't Br. at 23 (arguing that Section 4 of Official Time EO and the Removal Procedures EO contemplate that OPM will issue regulations).  Yet, no OPM action was required to activate the EOs.  The EOs, by their plain terms, went into effect on July 9, 2018.  Agencies have already taken concrete steps to implement them.  NTEU Facts ¶¶ 13-21, 28-29, 39-43, 54-55, 64, 69-74.  It is plain that these agencies are not awaiting OPM regulations.  While OPM may eventually issue regulations that

may also be contrary to law, before this Court NTEU challenges the EOs on their face and as

they are currently being implemented.

Moreover, the government—oddly—does not mention that OPM has, in fact, already

issued guidance on the three Executive Orders on July 5, 2018.[3]  As explained above, ripeness

does not depend on OPM action, but if it did—as the government argues—that action has now

occurred.

This Circuit has routinely found a matter to be ripe where an agency issues guidance,

even if there is the possibility that the agency might revise its position in the future.  In General

Electric Co. v. EPA, 290 F.3d 377, 378 (D.C. Cir. 2002), the company challenged issuance of an

internal EPA "PCB Risk Assessment Review Guidance Document." Notwithstanding that the

agency document was literally labeled as "guidance," the D.C. Circuit found the challenge ripe.

Id. at 379-81.  The fact that the agency might revise its position in the future did not defeat

ripeness.  Id.  Indeed, the D.C. Circuit concluded, if the "possibility . . . [or] probability . . . of

future revision in fact could make agency action non-final as a matter of law, then it would be

hard to imagine when any agency rule . . . would ever be final as a matter of law."  Id.   See also

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1282 (D.C. Cir.

2005) (challenge to permits issued by the Corps was ripe even though the permits' "applicability

to a given activity remains within the Corps' discretion"); Appalachian Power Co. v. EPA, 208

F.3d 1015, 1023 (D.C. Cir. 2000) (agency document labeled "guidance" was still final as the

---

[3] See NTEU Supplemental Statement of Material Facts As to Which There is No Genuine Issue ¶¶ 1-3, noting the
issuance of OPM, Guidance for Implementation of Executive Order 13836 (July 5, 2018),
https://chcoc.gov/content/guidance-implementation-executive-order-13836-developing-efficient-effective-and-cost);
OPM, Guidance for Implementation of Executive Order 13837 (July 5, 2018), https://chcoc.gov/content/guidance-
implementation-executive-order-13837---ensuring-transparency-accountability-and; and OPM, Guidance for
Implementation of Executive Order 13839 (July 5, 2018), https://chcoc.gov/content/guidance-implementation-
executive-order-13839-promoting-accountability-and-streamlining.

document reflected "a settled agency position," and the agency expected states to fall in line with it).

El Dia, Inc. v. Hernandez Colon, 963 F.2d 488 (1st Cir. 1992), does not aid the government's ripeness argument.  See Gov't Br. at 23.  In that case, an Executive Order issued by the Puerto Rican governor had some objectionable "whereas" clauses; the order did not, however, actually affect "plaintiffs' rights, duties, or obligations" in any way.  963 F.2d at 496.  Those rights would not be affected until later agency action.  The First Circuit accordingly found the challenge was not yet ripe.  Id.  Here, in contrast, NTEU's rights and obligations under the collective bargaining established by Congress have already been affected by agency action.  NTEU Facts ¶¶ 13-21, 28-29, 39-43, 54-55, 64, 69-74.

In sum, this matter is ripe because the EOs have already gone into effect, agencies are actively implementing them, and OPM has issued guidance.  Under General Electric Co. v. EPA and other cases from this circuit, the fact that OPM may eventually issue regulations on some (but not all) of the challenged EO provisions does not alter the fact that there is an active legal dispute ripe for judicial resolution.

### C.  This Matter Is Ripe Even if NTEU and Agencies Continue to Negotiate Over Some Employment-Related Matters.

The government asserts that any challenge to either Section 3 of the Official Time EO, or to the Collective Bargaining EO, is not ripe because these provisions only "set goals for the outcome of agencies' negotiations[.]" Gov't Br. at 25.

NTEU challenges only one section of the Collective Bargaining EO:  Section 6.  See NTEU Am. Compl., Count 6.  That section flatly states that "[t]he heads of agencies…may not negotiate over the substance of the subjects set forth in section 7106(b)(1) of title 5…and shall instruct subordinate officials that they may not negotiate over those same subjects."  Collective

Bargaining EO, Section 6 (emphasis added).  OPM in its July 5 guidance reiterates this mandatory language.  OPM Guidance for Implementation of Executive Order 13836 (July 5, 2018), https://chcoc.gov/content/guidance-implementation-executive-order-13836-developing-efficient-effective-and-cost.

This language does not "set goals" for negotiations—it prohibits agencies from entering into any negotiations over these permissive subjects at all.  NTEU's challenge to this mandatory directive is ripe because no further action needs to happen for it to take effect. Although the government discusses other sections in its ripeness argument, it fails to cite Section 6 of the Collective Bargaining Order or offer any explanation as to why a challenge to it might not be ripe.  See Gov't Br. at 25 (discussing Sections 5(a)-(b), (d) and 7(b) of this EO).

The government also argues that a challenge to Section 3 of the Official Time EO, which limits agencies' ability to negotiate official time beyond a one-hour rate, is not ripe because it only "sets goals" for negotiations and the factual outcome of negotiations might vary.  Gov't Br. at 25.  The government made the same kind of argument in NTEU v. Chertoff, and the D.C. Circuit called it "specious."  452 F.3d at 854.  In NTEU v. Chertoff, the government argued that the dispute was not ripe because DHS might not ever choose to implement a contract with which the union disagreed.  Id.  The D.C. Circuit explained that "whether DHS ever chooses to displace the outcome of collective bargaining is irrelevant to the ripeness inquiry, since the Unions cite a threat to the process of collective bargaining."  Id. (emphases in original).

As in NTEU v. Chertoff, here, NTEU's claim is that the collective bargaining process has already been impaired in a way that is ripe for judicial resolution because the President has directed his agencies to take items off the table and, thus, has altered the collective bargaining process.  See id.  See also Spirit of Sage Council v. Kempthorne, 511 F. Supp. 2d 31, 38-40

(D.D.C. 2007) (following <u>NTEU v. Chertoff</u> and holding that facial challenge to agency rules as inconsistent with Endangered Species Act was ripe because the rules affect agency action, and environmental organizations and others need not wait until a specific permit decision is made).

> **D.     This Matter Is Ripe Because NTEU and Its Members Are Suffering Hardship from the Implementation of these Executive Orders.**

Lastly, the government argues that NTEU has not satisfied the "hardship" prong of the ripeness test.  The government does not dispute that NTEU has standing in this matter, and thus has necessarily been injured by these executive orders.  The government's hardship argument, therefore, is at odds with its implicit concession that NTEU has been harmed.

In any event, if an issue is fit for judicial decision, a court need not consider the hardship to the parties.  <u>Edison Elec. Inst. v. United States</u>, 996 F.2d 326, 334 (D.C. Cir. 1993).  NTEU does, however, satisfy the hardship prong.  Multiple agencies have announced that they intend to renegotiate collective bargaining agreements and have submitted bargaining proposals that bear no resemblance to many years of past negotiating; these proposals aim to harm NTEU's representation of its employees, in accord with the executive orders.  <u>See</u> NTEU Facts ¶¶ 13-21, 28-29, 39-43, 54-55, 64, 70-74 (discussing HHS, SSA and OCC proposals to eliminate multiple articles in the contracts).

The ripeness doctrine is designed to prevent "premature adjudication" of "abstract disagreements."  <u>XP Vehicles, Inc. v. DOE</u>, 118 F. Supp. 3d 38, 39 (D.D.C. 2015).  There is nothing premature or abstract about NTEU's claims or about the harm being inflicted on NTEU and its members.  Delaying adjudication of NTEU's purely legal claims would ensure that the current harm that NTEU and its members are experiencing will continue.  In sum, this dispute is ripe for judicial resolution.

III.    **The Challenged EO Provisions Conflict with Congress's Collective Bargaining and Personnel Scheme**

Turning to the merits, at bottom, the government argues that the President can take an unlimited number of conditions of employment—including those that Congress expressly intended to be part of federal sector bargaining—out of the bargaining process by unilateral directive.  The government's argument fails for multiple reasons.  Specifically, the government ignores the plain import of <u>NTEU v. Chertoff</u>; it misinterprets the reach of 5 U.S.C. § 7117(a)(1); and its specific arguments that some EO provisions are merely directives or are consistent with statute do not survive scrutiny.

A.    **Under <u>NTEU v. Chertoff</u>, the Executive Branch Cannot Eviscerate Congress's Collective Bargaining Scheme.**

Late in the government's brief, it acknowledges <u>NTEU v. Chertoff</u> but strives to distinguish it.  Gov't Br. at 55-56.  As NTEU has previously explained, that case is highly instructive.  That it involved different facts does not alter its central holding about what collective bargaining in the federal sector <u>must</u> entail.  <u>See</u> NTEU Br. at 11-13.

In that case, the DHS promulgated regulations establishing a new human resources system.  Although it gave DHS broad discretion to create rules, Congress expressly required that system to "ensure that employees . . . may bargain collectively."  452 F.3d at 857.  In analyzing whether the new system met this requirement, the D.C. Circuit studied Chapter 71 of Title 5 (the Statute) as the touchstone for what collective bargaining must mean.  <u>Id.</u> at 844.  The DHS system specifically took multiple conditions of employment, including formerly permissive areas of bargaining, off the table entirely—just as the EOs do here.  <u>Id.</u> at 862.  The D.C. Circuit held that this was contrary to what collective bargaining means and was not permissible.  <u>Id.</u>  If the executive branch "enjoys unlimited discretion to define the 'metes and bounds' of collective

bargaining . . . it can whittle the scope of bargaining so drastically as to render collective bargaining meaningless." Id. at 861.

The government argues that the DHS system was different because it did not have an impasse panel and sought to change the FLRA's jurisdiction.  But these factors were not central to the Court's holding.  The D.C. Circuit concluded that "we find the limited scope of bargaining under the proposed HR system violates the Act, and on this point we reverse the District Court." Id. at 861.  The Court made this holding before it noted that the DHS system lacked an impasse panel and tinkered with FLRA jurisdiction.  Id. at 864-66.  Indeed, if anything, this dispute is more compelling than the one presented in NTEU v. Chertoff.  The statute at issue in NTEU v. Chertoff at least explicitly gave DHS the authority to develop its own system of labor relations, so long as employees could "bargain collectively."  Id. at 845.  Here, Congress has not granted the President permission to create an entirely new system of labor relations or to make wholesale changes to the Act.

**B.      Section 7117(a)(1) Does Not Give the President Authority to Alter Congress's Collective Bargaining Scheme.**

Section 7117(a)(1) of Title 5 is an exception to the general duty to bargain.  It provides that the duty to bargain does not extend to matters that are the subject of a Government-wide rule or regulation.  Id.  The government argues that Section 7117(a)(1) permits EOs to remove multiple matters from the scope of collective bargaining, relying particularly on Department of Treasury, IRS v. FLRA, 996 F.2d 1246 (D.C. Cir. 1991) (IRS).  Gov't Br. at 26-28.   It defies logic, however, that Congress enacted such a detailed collective bargaining scheme, but then intended to allow the President to eviscerate it by excepting one subject after another from the duty to bargain through Section 7117(a)(1).  Congress could not have designed a comprehensive statutory regime, yet reserved to the President the right to render the Act nugatory.  As goes the

familiar canon of statutory construction, an exception must be narrowly construed; otherwise the exception will swallow the rule. See, e.g., Bernal v. Fainter, 467 U.S. 216, 222 n.7 (1984).

IRS does not support the rule-swallowing interpretation of the Section 7117(a)(1) exception that the government advocates.  In IRS, the court considered the negotiability of a union proposal that would have permitted grievances to be filed over the IRS's compliance with OMB Circular A-76.[4]   Finding the Circular to be a Government-wide regulation, the court relied on section 7117(a)(1) to conclude that the proposal was not negotiable.  996 F.2d at 1252.  In so holding, the court narrowly decided that, because the Circular precluded bargaining over its implementation, and, in fact, expressly prohibited grievances concerning alleged violations of the Circular's provisions, the agency could not be required "to bargain over grievance procedures directed at [the Circular's] implementation."  Id.  As discussed more fully below, the court's rational conclusion lends no support to the government's position here.

**1**.    As a threshold matter, counsel for NTEU are unaware of any case, and the government cites none, in which, pursuant to Section 7117(a)(1), an invalid Government-wide regulation provided the basis to exclude a matter from bargaining.  Such an outcome makes no sense.  The government's § 7117(a)(1) argument thus wrongly presumes the validity of the underlying EOs (see Gov't Br. at 27, characterizing the EOs as the "lawful exercise of the authority delegated to the Executive"), which is the issue squarely before this Court.

The circumstances in this case are materially different from those present in IRS.  NTEU has shown in its opening brief (pages 13-34) that numerous provisions of the EOs are contrary to statute.  No such contentions were at issue in IRS, where the union sought only to hold IRS to compliance with the Circular.  To the contrary, the court recognized that the Circular was valid

---

[4]   The Circular established general policies governing federal agency decisions to contract out government work.

16

because it did "not purport to expand on management rights recognized in the statute; rather it restricts rights already granted."  996 F.2d at 1251.

With the validity of the Circular not in dispute, the <u>IRS</u> court concluded that the Circular qualified as a Government-wide regulation under section 7117(a)(1), which allows the government "to pull a subject out of the bargaining process."  <u>Id.</u> at 1250.  It did not, however, rule that any Government-wide regulation, <u>regardless of its validity</u>, enables the government to exempt a topic from the bargaining process.  Indeed, even the government recognizes, as it must, that Section 7117(a)(1) is not without boundaries, saying "the Executive may not use its statutory authority to issue Government-wide rules or regulations to create additional rights not present in the Statute."  Gov't Br. at 28 (relying on <u>OPM v. FLRA</u>, 864 F.2d. 165, 169-71 (D.C. Cir. 1988)).

Accordingly, <u>IRS</u> does not shield the challenged provisions from this Court's review of their legality.  Once the Court finds the EO provisions to be contrary to statute, they cannot stand.  <u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322 (D.C. Cir. 1996).  Nothing in <u>IRS</u> requires a different outcome.

**2.**  Even if the Court finds that, when viewed individually, one or more of the challenged provisions conform to the statutes that NTEU has identified, the provisions are invalid for another reason.  That is, collectively, they assault and undermine the collective bargaining regime established by the Act.  <u>See</u> NTEU Br. at 30-34.  The government cites no authority for the proposition that, pursuant to his authority under section 7117(a)(1), the President may dismantle the core provisions of the statutory scheme that Congress so carefully crafted.  To the contrary, as NTEU made clear in its initial brief, the D.C. Circuit in <u>NTEU v. Chertoff</u> soundly

rejected Executive efforts to create, via regulation, a labor-management system that "[shrunk] the scope of bargaining well below what Chapter 71 provides." 452 F.3d at 862.

The D.C. Circuit has "recognized some important limitations on the government's ability to diminish the scope of bargaining through government-wide regulations." IRS, 996 F.2d at 1251. The court is loath to "grant to management the protection that it was unable to secure from Congress" (OPM, 864 F.2d at 168) or allow management to "develop[ ] new management powers not granted by the Act." IRS, 996 F.2d at 1251. Permitting the President to modify the Act's statutory scheme through implementation of these EOs would do just that. Section 4(c) of the Removal Procedures EO, for example, gives management a right not granted by the Act to determine, in its "sole and exclusive discretion," whether a PIP period longer than 30 days is appropriate—a determination that, under the Act, is subject to bargaining.

The D.C. Circuit in OPM further explained that Section 7117(a)(1) does not permit a Government-wide regulation to prevent bargaining over a whole category (i.e., appropriate arrangements for employees adversely affected by the exercise of enumerated management rights) that Congress expressly subjected to bargaining under Section 7106(b)(3). OPM, 864 F.2d at 167. The OPM regulation at issue, the Court observed, would "read section 7106(b)(3) out of the statute." Id. The Court compared the regulation to a hypothetical one that, in the Court's view, was obviously outside the agency's power to issue: "No bargaining can occur over appropriate arrangements, even where section 7106(b)(3) would otherwise apply." Id. at 168. "Congress intended that section 7106(b)(3) would play a vital role in federal labor-management relations," the Court observed, and OPM could not "nullify" that role through a Government-wide regulation. Id.

The EOs here run afoul of the limitations on Government-wide regulations recognized in OPM.  For instance, Sections 4(a)(i), 4(a)(ii), and 4(a)(v) of the Official Time EO effectively read Section 7131(d), which requires bargaining over official time for purposes other than negotiating collective bargaining agreements or proceedings before the FLRA, out of the statute. To be sure, the Official Time EO does not include a provision like the hypothetical regulation posed by the Court in OPM, 864 F.2d at 16—that is, the Official Time EO does not provide that "no bargaining can occur over official time under section 7131(d)."  But by capping the amount of official time that can be allotted to an employee at 25% and rendering nonnegotiable official time for the key purposes for which it is used, such as handling grievances, the EOs accomplish the same goal.  There is no practical difference between death by a thousand cuts and death by a stab to the heart.  The President can inflict neither upon legislation duly enacted by Congress.

### C.    The Challenged EO Provisions Are in Conflict with the Act.

In addition to citing Section 7117(a)(1), the government makes specific arguments, discussed below, regarding each of the challenged EO provisions (although it conflates different challenges brought by different unions).  Its arguments are unavailing.

####    1.   Section 6 of Collective Bargaining EO.

NTEU challenges Section 6 of the Collective Bargaining EO, which bars agencies from negotiating over the substance of "permissive" subjects set forth in 5 U.S.C. § 7106(b)(1).  The government does not dispute that this is a mandate to agencies.  Gov't Br. at 32 ("Section 6 . . . prohibits agencies from negotiating . . ." over § 7106(b)(1) subjects).  Instead, the government argues that NTEU's challenge must fail because these are, by definition, permissive matters; therefore, any agency may refrain from bargaining over them.  Gov't Br. at 32-33.  The government misses the point.  By removing all permissive topics from the table, agencies are

deprived of exercising their statutory discretion to bargain.  They never get to make the choice as to whether to refrain from bargaining.

The government does not acknowledge that <u>NTEU v. Chertoff</u> addressed this specific point.  There, the D.C. Circuit rejected DHS's similar attempt to take all permissive subjects of bargaining off the table.  452 F.3d at 860-64.  As Judge Edwards explained, by making Section 7106(b)(1)'s "permissive" subjects completely "off limits," the agency's regulation in that case would have operated to "shrink[] the scope of bargaining well below what Chapter 71 provides." <u>Id.</u> at 862.  It would do so in a way that, more generally, was a "flagrant departure from the norms of 'collective bargaining.'"  <u>Id.</u>  Similarly here, in dictating to employer-agencies that they are completely barred from ever bargaining over "permissive" subjects, the President seeks to establish a one-sided "bargaining" regime that plainly contravenes what Congress intended in the Statute.   For the same reasons as in <u>NTEU v. Chertoff</u>, Section 6 of the Collective Bargaining EO, which takes all permissive subjects off the table, is a "flagrant departure" from collective bargaining norms and must be invalidated. [5]

**2.**   <u>Section 3 and 4 of the Official Time EO.</u>

NTEU challenges Sections 3, 4(a)(i), 4(a)(ii), 4(a)(iii), and 4(a)(v) of the Official Time EO.

<u>Section 3</u>. Section 3 of the Official Time EO instructs agencies not to agree to official time in excess of one hour per bargaining unit employee per year.  The government argues that this explicit cap does not conflict with Section 7131.  The government acknowledges, however,

---

[5]  The government cites <u>National Association of Government Employees v. FLRA</u>, 179 F.3d 946, 950 950 (D.C. Cir. 1999) as support for its argument.  Gov't Br. at 33.  That case involved an Executive Order which directed agencies to negotiate over section 7106(b)(1) subjects, but did not involve (unlike here) a challenge to the validity of the EO itself.

that "Congress left the decision to the unions and agencies . . . as to how much official time

'shall be granted.'"  Gov't Br. at 34.  This is absolutely true.  Congress meant for agencies and

unions to negotiate over appropriate amounts of official time.  As in the case of permissive

subjects, by establishing a limitation on agency discretion, no meaningful negotiations can take

place – a violation of the Act.

The government also suggests that Section 3 is "guidance," rather than a mandate to

agencies.  Gov't Br. at 34-35.  Section 3 says agencies should "strive" to negotiate this one-hour

rate, but in the same breath requires agencies to "commit the time and resources necessary" to

achieve this.  If agencies fail to meet this cap, the agency head (not a designee) must report to the

President within 15 days and justify his or her deviation from this order.  This requirement that

the heads of agencies must report to the President within an extremely short timeframe

underscores the mandatory nature of Section 3.

Just because the government prefers to label this EO provision as "guidance" does not

make it so.  Courts have seen though such labels.  In <u>Appalachian Power Co. v. EPA</u>, 208 F.3d at

1023, the Court described an agency document misleadingly labeled as "guidance" as reading

"like a ukase" because "[i]t commands, it requires, it orders, it dictates."  <u>Accord</u> <u>Fidelity</u>

<u>Television, Inc. v. FCC</u>, 502 F.2d 443, 448 (D.C. Cir. 1974) (undertaking "a realistic assessment

of the nature and effect" of the government action for purposes of determining reviewability).

Agencies certainly understand that the Official Time provisions are directives, not mere

suggested guidance.  Indeed, they have rushed to carry out the President's commands.  <u>See</u>

NTEU Facts ¶¶ 18, 28 (HHS proposed substantial changes to Official Time articles, including a

ban on any official time under 7131(d)); NTEU Facts ¶ 13 (SSA proposes to revise Official Time

article, among others).

21

Section 4(a)(i).  Section 4(a)(i) bars official time for lobbying.  The statute contemplated that agencies and unions negotiate over using official time for petitioning Congress.  Because the statute contemplates such negotiations and Section 4(a)(i) bars them, there is a simple and obvious statutory conflict.  The government does not address NTEU's argument, focusing instead on whether other legal authorities give employees the right to petition Congress.  Gov't Br. at 38-39.  Because the government does not address or refute NTEU's argument that a <u>bar</u> on official time for lobbying conflicts plainly with a statute that does <u>not bar</u> official time for lobbying, NTEU's challenge to Section 4(a)(i) should be sustained.

Section 4(a)(ii).  For Section 4(a)(ii), the government argues that the 25% cap on official time spent on activities under 5 U.S.C. § 7131(d) (that is, time spent on activities other than collective bargaining and FLRA proceedings) is not contrary to statute.  To support this claim, the government makes a completely irrelevant and baseless <u>policy</u> argument.  According to the government, the supposed problem with current negotiated amounts of official time is that "the employees who have been shifted to other business may fall out of practice with handling their official job duties."  Gov't Br. at 40.

The government offers no support for this policy argument, which certainly does not appear in the language of the EO.   The government does not explain why its musings on how official time is used or affects agency assignments of work should matter to this Court.   As NTEU showed in its initial brief, under the Statute, agencies and unions should negotiate over amounts of official time; there is no cap.  Section 4(a)(ii) establishes a cap.  For this reason, Section 4(a)(ii) conflicts with the statute and cannot stand.

Section 4(a)(iii).   Section 4(a)(iii) limits unions' access to discounted government property or resources.  Under the current statutory scheme, unions routinely bargain for such

discounted use, which is a critical union tool that helps unions serve their employees. See NTEU Br. at 18-20. Section 4(a)(iii) takes this matter completely off the negotiating table. As NTEU explained, by upending the current balance of collective bargaining, this EO provision is impermissible for the reasons explained in NTEU v. Chertoff (see supra, p. 12).

Section 4(a)(v). Section 4(a)(v) prohibits employees from using official time "to prepare or pursue grievances (including arbitration of grievances) brought against an Agency...." As NTEU has explained, by restricting union access to official time, this provision flatly conflicts with Section 7131 of Title 5. Section 7131 expressly allows employee union representatives to use official time during the grievance-arbitration process, whenever authorized by contract between the employee's exclusive representative and the employing agency. NTEU Br. at 14-15. That is, the Act allows agencies and unions to negotiate whether official time may be used for grievances. Section 4(a)(v) prohibits this. Accordingly, Section 4(a)(v) is inconsistent with the statute.

**3.** Removal Procedures EO.

NTEU challenges Sections 2(b) 2(c), 3, 4(a) and 4(c) of the Removal Procedures EO. In its response, the government relies on Section 7117(a)(1), which NTEU has addressed above (pages 15-19). Govt Br. at 44. NTEU addresses the government's additional arguments in the order presented by the government.

Section 4(a). Section 4(a) precludes removal disputes about performance ratings and incentive pay awards from negotiated grievances procedures. It bars bargaining altogether on these two topics, and the government acknowledges that this section is a "binding directive." Gov't Br. at 48. Yet, as NTEU showed, the Act permits bargaining on these topics. NTEU Br. at 20-22. Congress meant for this and other topics to be part of a fair give-and-take process

which is the definition of collective bargaining process.   Removing topics from that process, as the D.C. Circuit explained in <u>NTEU v. Chertoff</u>, impermissibly upends Congress' collective bargaining framework.   For this reason, section 4(a) conflicts with the statute.

<u>Section 3</u>.   Section 3 concerns excluding removals from negotiated grievance procedures. The government argues that this section only sets a "goal" for negotiations, and its "hortatory language" cannot conflict with the statute.   Gov't Br. at 48.   As NTEU explained above in conjunction with another EO section (page 21), just because the government called something "guidance" does not make it so.   Courts have routinely seen through such labelling and concluded that agency "guidance" can and does have consequences.   <u>See</u> <u>General Elec. Co. v. EPA</u>, 290 F.3d 377, 378 (D.C. Circ. 2002) (EPA risk assessment review labeled "guidance" was subject to challenge); <u>Appalachian Power Co. v. EPA</u>, 208 F.3d at 1023 (agency document labeled "guidance" was still final, in part because the agency expected states to fall in line with it).

In this case, Section 3's "endeavor" language is coupled with an admonition that agencies "<u>shall</u> commit the time and resources necessary to achieve this goal[.]"   Removal Procedures EO, Section 3 (emphasis added).   And if agencies fail in this effort, the agency head "shall" provide an explanation to the President.   <u>Id.</u>   Taken together, section 3 constitutes a command to federal agencies to exclude removals from the negotiated grievance process.   And in fact, agencies are acting to exclude removals from collective bargaining agreements.   <u>See</u> NTEU Facts ¶¶ 41-42. The government has not pointed to a single agency that has taken a bargaining position at odds with this EO provision, or any of the challenged EO provisions, illustrating that agencies do not consider these provisions mere "hortatory language."

Section 4(c).  Section 4(c) requires agencies to set a 30-day limit on employees'
opportunity to demonstrate unacceptable performance.  Gov't Br. at 50.  The government points
out that 5 U.S.C. § 4302(c)(6) does not establish a specific time limit, and argues, therefore, that
there can be no conflict with the statute.  This is too facile.  Section 4302(c)(6) specifically
provides that employees who have unacceptable performance must be given "an opportunity to
demonstrate acceptable performance."  A reasonable opportunity period "is a substantive right
and a necessary prerequisite to all chapter 43 actions."  Lee v. EPA, 115 M.S.P.R. 533, 551
(2010).  Government regulations also specify that this opportunity must be "reasonable."  5
C.F.R. § 432.104.  Agencies and unions negotiate over what is reasonable, which can vary
depending on the affected employees' duties and responsibilities, the performance deficiencies
involved, and the amount of time which would be sufficient to enable employees to improve.
See Lee, 115 M.S.P.R. at 551.

The government's argument that the President can impose a per se 30-day limit conflicts
with this scheme because it predetermines what improvement period is reasonable.  It is
therefore invalid.  NTEU Br. at 22-24.  Indeed, there is no limiting principle to the government's
theory that a limit on PIPs must be allowed since the statute does not specify a timeframe.  Under
this theory, the President could presumably demand that agencies only agree to one-day PIPs.
This would clearly not allow any sort of "reasonable opportunity" for employees to demonstrate
improved performance.  By giving agencies "sole and exclusive discretion" to allow longer PIPs,
the EO purports to immunize agency decisions regarding PIP lengths from MSPB review.  This,
too, is contrary to the statutory scheme.

Sections 2(b) and 2(c).  Sections 2(b) and 2(c) involve Douglas factors.  Section 2(b)
states that supervisors "should not be required to use progressive discipline," and Section 2(c)

states that agencies "are not prohibited from removing an employee simply because they did not remove a different employee for comparable conduct."   As NTEU explained, the MSPB ruled in Douglas v. VA, 5 M.S.P.R. 280 (1981), that when disciplining employees, agencies should, when relevant, consider factors such as whether progressive discipline is appropriate, and how comparably situated employees were disciplined.  NTEU Br. at 10, 25.

The government asserts Sections 2(b) and 2(c) are "merely general policy," and cannot therefore conflict with the statute.  Gov't Br. at 52.  The government omits to mention that OPM issued guidance to all federal agencies on July 5, 2018 (well before the government's brief was filed) explaining that Section 2(b) is mandatory.  OPM states that "consideration of progressive discipline is not required or permitted when administering disciplinary action[.]"  OPM, Guidance for Implementation of Executive Order 13839 (July 5, 2018), https://chcoc.gov/content/guidance-implementation-executive-order-13839-promoting-accountability-and-streamlining (emphasis added).

The government next argues that any challenge to Sections 2(b) and 2(c) is premature because NTEU should wait until the matter comes up in a specific MSPB case.  Gov't Br. at 52. That argument has no merit.  Courts have recognized that where, as here, individuals enjoy certain protected rights, the invasion of those rights can create standing.  See generally Lujan v. Defenders of Wildlife, 504 U.S. 555, 578 (1992); Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1549 (2016).  And, as noted above, purely legal claims in the context of a facial challenge are presumptively reviewable.  Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng'rs, 440 F.3d 459, 464 (D.C. Cir. 2006).  NTEU's challenge, therefore, is not premature.

Finally, the government argues that because Sections 2(b) and 2(c) are not specifically enshrined in statute, there can be no impermissible statutory conflict.  The

government's argument fails to appreciate that the MSPB's role is grounded in statute.  5 U.S.C. §§ 1204, 7513, 7701.  Congress intended that "the Merit Systems Protection Board will be independent of the direction and control of the President."  S. Rep. No. 95-969 at 28, reprinted in 1978 U.S.C.C.A.N. at 2750.  In exercising this Congressionally mandated function, the MSPB concluded that appropriate discipline of federal employees under Chapter 71 entails consideration of relevant Douglas factors when relevant.  Those factors are "settled," U.S. Postal Service v. Gregory, 534 U.S. 1, 5, (2001), and have been enshrined in thousands of court and administrative decisions.  See NTEU Br. at 25-26.  For the President to remove these factors from agency consideration is inconsistent with the role that Congress assigned the MSPB.

4.      Cumulative Effect of the Three Executive Orders.

The government argues that taken together, the EOs do not violate any statutory provision. Gov't Br. at 55-57.  The government's arguments are based on its reading of 5 U.S.C. § 7117(a)(1) and its attempt to distinguish NTEU v. Chertoff.  NTEU has addressed those arguments, supra.  See supra, pp. 14-19.

IV.     **This Court Has the Authority to Grant the Relief Sought Against the Defendants.**

The government argues for broad Presidential power that cannot be constrained, directly, by the federal judiciary.  Gov't Br. at 64-66.  Its argument is unsupported by the authority on which it relies. and it is at odds with this Circuit's jurisprudence.  NTEU's requests for injunctive and declaratory relief against the President are properly before this Court.

1.      As a baseline matter, as this Circuit has emphasized, "no immunity established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief."  NTEU v. Nixon, 492 F.2d 587, 609 (D.C. Cir. 1974).  "If the King of Great Britain is subject to suit, although under the polite guise of 'petition,' it would be

27

anomalous to conclude that the President of the United States, likewise the Head of State, but certainly not entitled to claim the status of a King under the Constitution (see The Federalist, Number 69), is immune from any lawsuit whatsoever."  Id.

This Circuit, moreover, has made clear that judicial review of executive action would become a nullity if the President could shield such action from judicial review, unilaterally, by carrying that action out himself through executive order.  In Nixon v. Sirica, it highlighted the obvious:  "[t]he practice of judicial review would be rendered capricious—and very likely impotent—if jurisdiction vanished whenever the President denoted an Executive action or omission as his own."  487 F.2d 700, 709 (D.C. Cir. 1973).

That is what adoption of the government's position in this case would mean.  Indeed, the government's position here is nearly as broad the one that this Circuit rejected in NTEU v. Nixon:  it argues that the President cannot be enjoined from unlawful action and that, furthermore, the President's executive orders cannot be declared unlawful.  Gov't Br. at 65-66.[6]

The government's support is limited to dicta from the plurality decision in Franklin v. Massachusetts, 505 U.S. 788 (1992) and language from a concurrence in that decision.  The central language from Franklin on which the government relies is taken from an 1867 Supreme Court decision—a decision that had been on the books for over a century at the time of the D.C. Circuit's observations in NTEU v. Nixon and Nixon v. Sirica.  See Gov't Br. at 65-66 (relying on Franklin plurality's observation that "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties'").  This Circuit did not give that

---

[6]  Further, the government broadly suggests that it would be improper for the judiciary to order the President to perform "particular executive [] acts."  Gov't Br. at 65.  Even if that were so—and the cases in this section suggest that this is an overstatement—the government's contention misunderstands the objective of NTEU's litigation. NTEU is seeking an injunction to stop the President and his subordinates from breaking the law.  The judiciary, here, would not be dictating Presidential action; it would be doing the opposite, rendering nearly all the decisional language on which the government relies inoperable.  See Gov't Br. at 65.

language the type of broad reading that the government urges here, and this Court should not do so now.  Franklin, moreover, as interpreted by this Circuit, does not support the broad and troubling position that the government espouses, as further discussed below.

      **2.**      The Franklin plurality's observations, as the D.C. Circuit has confirmed, do not foreclose the injunctive relief sought here against the President.

      As the Franklin plurality made clear, it did not "decide whether injunctive relief against the President was appropriate, because [it] conclude[d] that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone."  505 U.S. at 803.  The plaintiffs in Franklin sued the Secretary of Commerce and the President seeking injunctive and declaratory relief related to the allocation of overseas federal employees to different states for purposes of the 1990 census.  A plurality of the Court stated that "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"  Id. at 802-03 (quoting Mississippi v. Johnson, 71 U.S. 475, 501 (1867)).

      This Circuit clarified the limitations of the Franklin plurality's observations in Swan v. Clinton, in which the plaintiff argued that the President was acting in violation of federal statute and should be enjoined.  See 100 F.3d 973 (D.C. Cir. 1996).  Selectively quoted by the government, a full reading of Swan shows that Franklin does not foreclose injunctive relief in a situation where (1) the injunction sought would require only that the President comply with federal statute; and (2) the enjoinment of another defendant would not redress plaintiff's injuries.

      In Swan, President Clinton removed appellant Robert H. Swan from his position as a member of the Board of the National Credit Union Administration (NCUA) and, using his recess appointment clause powers, appointed Yolanda T. Wheat to take Swan's place.  100 F.3d at 974.

Mr. Swan sued President Clinton, seeking to have his removal and Wheat's appointment declared unlawful and to be reinstated as a Board member.  Id.

In assessing whether Mr. Swan could seek this relief against the President, this Circuit properly noted that Franklin does not "decide the question of whether this court has the power to grant Swan the injunctive relief he seeks, because the plurality opinion there specifically noted that the Court had 'left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty.'"  Id. at 977 (quoting Franklin, 505 U.S. at 802, which in turn quoted Mississippi v. Johnson, 71 U.S. 475, 498-99 (1867)).

After noting this limitation on the Franklin plurality decision, this Circuit informed the term "ministerial duty," and it did so in a way that shows that Franklin does not divest the Court of jurisdiction here.  As it explained, "[a] ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty."  Id. at 977.[7]  Applying this principle to Mr. Swan's case, the Court explained:

> Swan alleges that the President violated a duty to comply with removal restrictions contained in the NCUA statute and not interfere with Swan's holdover status until Swan's successor had "qualified."  This duty, if it exists, is ministerial and not discretionary, for the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes.  See U.S. CONST. art. II, § 3, cl. 3 (the President "shall take Care that the Laws be faithfully executed"); Kendall v. United States, 37 U.S. (12 Pet.) 524, 613, 9 L. Ed. 1181 (1838) ("To contend that the obligation imposed on the President to see the laws faithfully executed implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissible"); Chamber of Commerce v. Reich, 316 U.S. App. D.C. 61, 74 F.3d 1322, 1332 (D.C. Cir. 1996) (denying that the President can "bypass scores of statutory limitations on governmental activity"); NTEU v. Nixon, 160 U.S. App. D.C. 321, 492 F.2d 587, 604 (D.C. Cir. 1974) (the President may not refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary).

---

[7] Accord Beatty v. Washington Metro. Area Transit Auth., 860 F.2d 1117, 1127 (D.C. Cir. 1988) ("'Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level.'") (alteration in original and emphasis omitted) (quoting Jackson v. Kelly, 557 F.2d 735, 737-38 (10th Cir. 1977)).

Id. at 977-78.  Indeed, "a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'"  Id. at 978 (quoting 13th Regional Corp. v. Dep't of the Interior, 654 F.2d 758, 760 (D.C. Cir. 1980).

NTEU's lawsuit seeks injunctive relief aimed at stopping the President and his subordinates from using the challenged executive order provisions to defy federal statute.  NTEU Am. Compl. at 41-42.  Swan and the other Circuit precedent discussed in this section confirm that the government's argument that this Court lacks jurisdiction over these requests for relief (see Gov't Br. at 65-66) relies on an overreading of dicta from the Franklin plurality decision.

Notably, in Swan, this Circuit avoided the question of the President could be enjoined and instead enjoined other federal officials who "could on balance substantially redress Swan's injury."  100 F.3d at 980 (granting summary judgment to plaintiff).  Here, however, enjoining the other named defendant, Defendant Pon, would not redress NTEU's complained of injuries; if NTEU's legal claims are valid, the President must be enjoined to redress the harm that NTEU has and will suffer due to the challenged executive order provisions.

In sum, (1) the Supreme Court and this Circuit indicated that the President may be enjoined for a ministerial act; (2) this Circuit has indicated that compliance with federal statute by the President would be a ministerial act; and (3) the President must be enjoined for NTEU's injuries to be redressed because an injunction as to Defendant Pon only would not redress the harm that NTEU has or will suffer at the hands of the EOs.

**3.**     The government has even less support for its argument that the President is immune from declaratory judgment, which largely hinges on the same reasoning that underlies

its flawed view of grants of injunctive relief against the President.  See Gov't Br. at 65-66 (arguing that the two types of relief are effectively the same).

The government cites, again, to the Franklin plurality decision, which, as discussed above, has no application to the injunctive—and certainly not the declaratory—relief that NTEU seeks.  See Gov't Br. at 65-66.  And the government's own description of what is essentially its only other support—Newdow v. Roberts, 603 F.3d 1002 (D.C. Cir. 2010)—shows its inapplicability.  As the government notes, this Circuit's decision in Newdow is to whether declaratory (or injunctive) relief against the President is available for the President's "non-ministerial conduct."  See Gov't Br. at 66 (emphasis added).  Here, in contrast, NTEU seeks declaratory relief that is, under Circuit precedent, ministerial in nature because it would require only that the President to comply with federal statute.

Further, as this Court has recognized, "the D.C. Circuit has issued a declaratory judgment directly against the President."  Citizens for Responsibility & Ethics in Wash. v. Trump, 302 F. Supp. 3d 127, 139 (D.D.C. 2018).  As Judge Cooper has written, "[i]n National Treasury Employees Union v. Nixon, 492 F.2d 587, 160 U.S. App. D.C. 321 (D.C. Cir. 1974), a federal employees union brought suit against then-President Richard Nixon (and only him) seeking to force the President to effectuate a pay raise passed by Congress."  Id.  "After concluding that it could issue a writ of mandamus directing the President to implement the pay raise, the court instead elected to enter a declaratory judgment stating that the President had a constitutional duty to do so."  Id. ("In light of this D.C. Circuit decision, it is not fully established that Johnson forecloses the issuance of a declaratory judgment order against the President for a Take Care Clause violation.").

The government omits mention of <u>NTEU v. Nixon</u> and other Supreme Court and Circuit decisions on point.  <u>See, e.g.</u>, <u>Clinton v. City of New York</u>, 524 U.S. 417 (1998) (affirming declaratory judgment against the President); <u>NTEU v. Reagan</u>, 663 F.2d 239 (D.C. Cir. 1981) (allowing challenge to Presidential hiring freeze to continue).

In sum, there is no binding or even persuasive Circuit authority to support the government's argument that this Court lacks jurisdiction to grant the declaratory relief that NTEU seeks against the President.

4.      If this Court disagrees and concludes that it lacks jurisdiction over either of NTEU's requests for relief against the President, <u>Swan</u> shows that the Court has the authority to substitute or add the persons it believes to be the appropriate government defendant(s).  <u>See</u> 100 F.3d at 979-80 & n.3.  In <u>Swan</u>, this Circuit granted relief as to one defendant named by Mr. Swan, while also adding an additional federal defendant, <u>sua sponte</u>, so that Mr. Swan's injuries would be properly redressed.

As the Court explained, "[a]lthough Swan has not included the Chairman, other NCUA Board members or the Board Secretary as defendants in this action, it seems indisputable that he would have done so had he thought that suit against the President, Nash, and Hoyle would not be sufficient to provide the relief he desires."  <u>Id.</u> at 979.  "Indeed, the Supreme Court has held that a court has power under the All Writs Act to issue commands that apply to 'persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice.'"  <u>Id.</u>  at 980 (quoting <u>United States v. New York Tel. Co.</u>, 434 U.S. 159 (1977)).

Thus, this Circuit concluded that "it would elevate form over substance in a case of this dimension not to treat Swan's complaint as if it also sought injunctive or declaratory relief

against these individuals in their official capacity." Id. at 980 & n.3.  It added additional federal defendants, sua sponte, because "these added defendants could on balance substantially redress Swan's injury and is sufficient to satisfy the redressability requirement of standing." Id.  As the Court noted, "[s]ince the NCUA Chairman, other Board members and Secretary of the Board are all government officers who, if added, would be sued in their official capacity and would be represented by the Attorney General and United States Attorney as are President Clinton, Nash, and Hoyle, we need not be concerned that they might suffer prejudice by being added as defendants at this point in the proceedings." Id. at 980 n.3.

If alteration to the named parties is merited, in the Court's view, then NTEU respectfully requests that those parties be substituted by the Court or that the Court grant NTEU leave to amend its complaint.  Because the parties agree that the issues present are purely legal in nature, neither situation should require any additional briefing by the parties or any delay in the Court's decision.

**5.**      Finally, OPM is wrong that NTEU has failed to allege unlawful conduct by Defendant Pon.  See Gov't Br. at 64-65.  NTEU has alleged, in detail, the illegality of the challenged executive order provisions; in addition, it has specifically alleged that "[t]he President has tasked OPM, and thus Defendant Pon, with either implementing or guiding the agencies' implementation of the challenged portions of the executive orders. Because the challenged portions of the executive orders are invalid, no agent of the President, including Defendant Pon, may implement them." NTEU Am. Compl. ¶ 6.  NTEU further alleges Defendant Pon's specific role in implementing each of the EOs.  See NTEU Am. Compl. ¶¶ 7-9.  There is no dispute, moreover, that Defendant Pon has begun "guiding the agencies' implementation of the

challenged portions of the executive orders" (NTEU Am. Compl. ¶ 6) through agency-issued guidance.  <u>See</u> Note 3, <u>supra</u>.  Defendant Pon is thus a proper defendant.

## **<u>CONCLUSION</u>**

For the reasons stated above and in NTEU's opening brief, NTEU's Motion for Summary Judgment should be granted, and the defendants' Cross-Motion for Summary Judgment should be denied.

Respectfully submitted,

/s/ Gregory O'Duden

GREGORY O'DUDEN
General Counsel
D.C. Bar No. 254862

/s/ Larry J. Adkins

LARRY J. ADKINS
Deputy General Counsel
D.C. Bar No. 425653

/s/ Julie M. Wilson

JULIE M. WILSON
Deputy General Counsel
D.C. Bar No. 482946

/s/ Paras N. Shah

PARAS N. SHAH
Assistant Counsel
D.C. Bar No. 983881

/s/ Allison C. Giles

ALLISON C. GILES
Assistant Counsel
D.C. Bar No. 439705

/s/ Jessica Horne

JESSICA HORNE
Assistant Counsel
D.C. Bar No. 1029732


July 20, 2018

NATIONAL TREASURY
EMPLOYEES UNION
1750 H Street, N.W.
Washington, D.C.  20006
Tel:  (202) 572-5500
Fax:  (202) 572-5645
Email:  greg.oduden@nteu.org
Email:  larry.adkins@nteu.org
Email:  julie.wilson@nteu.org
Email:  paras.shah@nteu.org
Email:  allie.giles@nteu.org
Email:  jessica.horne@nteu.org

Attorneys for Plaintiff NTEU