**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO,<br><br>        Plaintiff,<br><br>        v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>        Defendants. | Consolidated Case No. 1:18-cv-01261-KBJ<br><br><br>**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES, FD-1, IAMAW, AFL-CIO, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>        Defendants. | |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al*.,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>        Defendants. | |

NATIONAL TREASURY
EMPLOYEES UNION,

            Plaintiff,

    v.

DONALD J. TRUMP, *et al*.,

            Defendants.

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I.   PLAINTIFFS' CLAIMS FALL OUTSIDE THIS COURT'S JURISDICTION ............... 3

   A.   The D.C. Circuit Has Rejected Plaintiffs' Argument That the District Court
        May Hear a Challenge to the Validity of the Executive Orders. ........................... 4

   B.   Because Plaintiffs Can Obtain Meaningful Judicial Review of Their
        Claims in the Courts of Appeals, Jurisdiction in This Court Is Foreclosed........... 5

   C.   *NTEU v. Devine* Does Not Compel Jurisdiction in this Case,
        as Plaintiffs Wrongly Contend. ............................................................... 8

II.  THE CHALLENGED PROVISIONS DO NOT IMPERMISSIBLY RESTRICT
     THE SCOPE OF COLLECTIVE BARGAINING. ........................................ 10

   A.   Certain Provisions of the Orders Are Properly Considered Government-Wide
        Rules under 5 U.S.C. § 7117(a). .......................................................... 10

   B.   *NTEU v. Chertoff* Does Not Support "Collective" Invalidation of the Orders......... 14

III. THE CHALLENGED EXECUTIVE ORDERS VIOLATE NEITHER THE
     CONSTITUTION NOR THE STATUTE. ..................................................... 16

   A.   The President Has Ample Authority to Issue the Executive Orders,
        and Plaintiffs' Claims to the Contrary Are Either
        Not Justiciable or Baseless.................................................................. 16

        1.   AFSCME's Take Care Clause claim is not justiciable. ........................... 16

        2.   The President did not act *ultra vires* in issuing the Executive
             Orders. ....................................................................................... 17

   B.   The Collective Bargaining Order Does Not Conflict With the Statute. ................... 21

   C.   The Official Time Order Does Not Conflict With the Statute and
        Does Not Violate the First Amendment.................................................... 24

        1.   The Official Time Order does not conflict with the Statute. .................... 24

        2.   Section 4(a)(v) does not infringe Plaintiffs' right to free
             association................................................................................... 27

D.   The Removal Procedures Order Does Not Conflict With the Statute. ...................... 30

IV.   SEPARATION OF POWERS CONCERNS COUNSEL AGAINST GRANTING
      INJUNCTIVE OR DECLARATORY RELIEF AGAINST THE PRESIDENT. ............ 33

CONCLUSION ............................................................................................................................. 35

## TABLE OF AUTHORITIES

## CASES

*AFGE v. Nicholson*,
475 F.3d 341 (D.C. Cir. 2007) .................................................................... 5

*AFGE v. Pierce*,
697 F.2d 303 (D.C. Cir. 1982) .................................................................... 9

*AFGE v. Sec'y of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ........................................................... *passim*

*AFGE, AFL-CIO, Council 214 v. FLRA*,
798 F.2d 1525 (D.C. Cir. 1986) ................................................................ 26

*AFGE, Local 3013, AFL-CIO v. FLRA*,
762 F.2d 183 (1st Cir. 1985) ..................................................................... 23

*Alaska Airlines v. Brock*,
480 U.S. 678 (1987) ................................................................................... 35

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) .......................................................... 25, 30

*Ass'n of Civilian Technicians v. FLRA*,
269 F.3d 1119 (D.C. Cir. 2001) ................................................................ 26

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014) .................................................................. 28

*Barnhart v. Devine*,
771 F.2d 1515 (D.C. Cir. 1985) .................................................................. 9

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .................................................................... 19

*Bureau of Alcohol, Tobacco, and Firearms v. FLRA*,
464 U.S. 89 (1983) ..................................................................................... 26

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .................................................................. 18

*Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms Agency*,
32 F.L.R.A. 934 (Aug. 22, 1988) .............................................................. 27

*Elgin v. Dep't of the Treasury,*
  567 U.S. 1 (2012)..................................................................................................*passim*

*Fornaro v. James,*
  416 F.3d 63 (D.C. Cir. 2005) ............................................................................... 9

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992)................................................................................... 17, 33

*Gen. Elec. Co. v. EPA,*
  290 F.3d 377 (D.C. Cir. 2002) ............................................................................ 30

*Gray v. OPM,*
  771 F.2d 1504 (D.C. Cir. 1985) ........................................................................... 9

*Healy v. James,*
  408 U.S. 169 (1972).......................................................................................... 29

*IRS v. FLRA,*
  996 F.2d 1246 (D.C. Cir. 1993) ..............................................................*passim*

*Janus v. AFSCME,*
  138 S. Ct. 2448 (2018)................................................................................ 29, 30

*Kuhn v. Nat'l Ass'n of Letter Carriers, Branch 5,*
  570 F.2d 757 (8th Cir. 1978) ............................................................................. 19

*Leedom v. Kyne,*
  358 U.S. 184 (1958)........................................................................................ 5, 28

*Local 1498, AFGE v. AFGE, AFL/CIO,*
  522 F.2d 486 (3d Cir. 1975)............................................................................... 19

*Lyng v. Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am.,*
  485 U.S. 360 (1988)........................................................................................... 27

*Manhattan-Bronx Postal Union v. Gronouski,*
  350 F.2d 451 (D.C. Cir. 1965) ........................................................................... 19

*Mississippi v. Johnson,*
  71 U.S. (4 Wall) 475 (1866) .............................................................................. 17

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel,*
  437 F.3d 1256 (D.C. Cir. 2006) ......................................................................... 18

*Nat'l Ass'n of Gov't Emps., Inc. v. FLRA,*
  179 F.3d 946 (D.C. Cir. 1999) ........................................................................... 23

*Nat'l Ass'n of Gov't Emps., Local R5-136 v. FLRA*,
  363 F.3d 468 (D.C. Cir. 2004) ..................................................................... 23

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ............................................................. 17, 35

*NTEU v. Chertoff*,
  385 F. Supp. 2d 1 (D.D.C. 2005) ................................................................. 10

*NTEU v. Chertoff*,
  452 F.3d 839 (D.C. Cir. 2006) ............................................................ *passim*

*NTEU v. Devine*,
  577 F. Supp. 738 (D.D.C. 1983) ............................................................... 8, 9

*NTEU v. Devine*,
  733 F.2d 114 (D.C. Cir. 1984) ...................................................................... 9

*NTEU v. Horner*,
  854 F.2d 490 (D.C. Cir. 1988) ...................................................................... 9

*NTEU v. Horner*,
  No. CIV. A. 83-0279, 1987 WL 8704 (D.D.C. Mar. 13, 1987), *aff'd in part,
   vacated in part*, 869 F.2d 571 (Fed. Cir. 1989) ........................................ 9

*NTEU v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ............................................................... 17, 33

*NTEU v. Von Raab*,
  649 F. Supp. 380 (E.D. La. 1986) ............................................................... 9

*NTEU v. Von Raab*,
  488 U.S. 886 (1988) .................................................................................... 10

*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ...................................................................... 5

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen*,
  144 F. Supp. 2d 1 (D.D.C. 2000) ............................................................... 10

*Old Dominion Branch, Nat'l Ass'n of Letter Carriers, Local 4965, AFL-CIO v. Austin*,
  418 U.S. 264 (1974) .................................................................................... 19

*OPM v. FLRA*,
  864 F.2d 165 (D.C. Cir. 1988) ...................................................... 11, 12, 14

*Overseas Educ. Ass'n v. FLRA,*
   876 F.2d 960 (D.C. Cir. 1989) ............................................................ 1

*Perry v. Sindermann,*
   408 U.S. 593 (1972) .......................................................................... 28

*Ralls Corp. v. Comm. on Foreign Investment in the U.S.,*
   926 F. Supp. 2d 71 (D.D.C. 2013) .................................................... 18

*Regan v. Taxation with Representation of Wash.,*
   461 U.S. 540 (1983) .......................................................................... 27

*Rust v. Sullivan,*
   500 U.S. 173 (1991) ............................................................... 27, 28, 29

*Swan v. Clinton,*
   100 F.3d 973 (1996) .................................................................. *passim*

*Switchmen's Union v. Nat'l Mediation Bd.,*
   320 U.S. 297 (1943) .......................................................................... 18

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ............................................................................ 8

*True the Vote, Inc. v. IRS,*
   831 F.3d 551 (D.C. Cir. 2016), *cert. denied,* 137 S. Ct. 1068 (2017) .................................... 29

*United States v. Fausto,*
   484 U.S. 439 (1988) ............................................................................ 7

## ADMINISTRATIVE CASES

*Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms Agency and NTEU,*
   32 F.L.R.A. 935 (1988) ..................................................................... 27

*NFFE, Local 15 and U.S. Dep't of the Army,*
   30 F.L.R.A. 1046 (1988) .................................................................... 11

*NFFE, Local 2015 and U.S. Dep't of the Interior Nat'l Park Serv.,*
   41 F.L.R.A. 1158 (1991) .................................................................... 11

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II ............................................................. 2, 16, 19, 34

U.S. Const. art. II § 3 ............................................................................ 2, 16, 17, 34

U.S. Const. amend. I ............................................................................. 2, 24, 27, 28

## **STATUTES**

5 U.S.C. § 704 ............................................................................................................ 9

5 U.S.C. § 706 ............................................................................................................ 9

5 U.S.C. § 3328 .......................................................................................................... 7

5 U.S.C. § 4304 ........................................................................................................ 32

5 U.S.C. § 7105 ...................................................................................................... 3, 7

5 U.S.C. § 7106 ................................................................................................. *passim*

5 U.S.C. § 7114 ........................................................................................................ 22

5 U.S.C. § 7116 .......................................................................................................... 4

5 U.S.C. § 7117 ................................................................................................. *passim*

5 U.S.C. § 7118 .......................................................................................................... 4

5 U.S.C. § 7121 ........................................................................................................ 31

5 U.S.C. § 7123 .......................................................................................................... 7

5 U.S.C. § 7131 ...................................................................................... 24, 25, 26, 27

5 U.S.C. § 7301 ................................................................................................... 19, 24

5 U.S.C. § 9701 ........................................................................................................ 14

28 U.S.C. § 1331 ...................................................................................................... 19

Civil Service Protection Act,
    Pub. L. 95-454, 92 Stat. 1111 .............................................................................. 20

## **FEDERAL REGULATIONS**

5 C.F.R. § 430.210 ................................................................................................... 32

## **EXECUTIVE ORDERS**

Exec. Order No. 12,107, 44 Fed. Reg 1,055 (Dec. 28, 1978)....................................................... 20

Exec. Order No. 12,128, 44 Fed. Reg. 20,625 (Apr. 4, 1979)...................................................... 20

Exec. Order No. 12,871, 58 Fed. Reg. 52,201 (Oct. 1, 2013) ................................................ 20, 23

Exec. Order No. 12,983, 60 Fed. Reg. 66,855 (Dec. 21, 1995)................................................... 20

Exec. Order No. 13,156, 65 Fed. Reg. 31,785 (May 17, 2000).................................................... 20

Exec. Order No. 13,203, 66 Fed. Reg. 11,227 (Feb. 17, 2001) ................................................... 20

Exec. Order No. 13,522, 74 Fed. Reg. 66,203 (Dec. 9, 2009)..................................................... 20

Exec. Order No. 13,708, 80 Fed. Reg. 60,271 (Sept. 30, 2015) .................................................. 20

Exec. Order No. 13,812, 82 Fed. Reg. 46,367 (Sept. 29, 2017) .................................................. 20

Exec. Order No. 13,836, 83 Fed. Reg. 25,239 (June 1, 2018)............................................... *passim*

Exec. Order No. 13,837, 83 Fed. Reg. 25,335 (June 1, 2018) .............................................. *passim*

Exec. Order No. 13,839, 83 Fed. Reg. 25,343 (June 1, 2018) .............................................. *passim*

## **OTHER AUTHORITIES**

OPM's *Guidance for Implementation of Executive Order 13839* ................................................ 32

## INTRODUCTION

Plaintiffs' claims fall outside this Court's jurisdiction because Congress created a dedicated review scheme for disputes related to federal-sector collective bargaining, a scheme that involves a meaningful opportunity for judicial review of the claims Plaintiffs advance.  Plaintiffs' attempt to bypass this scheme by filing suit in district court betrays Congress's intent that such controversies be raised before the Federal Labor Relations Authority ("FLRA") and, ultimately, the courts of appeals.  As Defendants showed, this attempt cannot succeed.  That Plaintiffs now seek to recast their claims exclusively as standalone challenges to the facial validity of the Orders—rather than disputes over negotiability and the duty to bargain—makes no difference, as the Supreme Court and D.C. Circuit have both expressly held.  *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 14-15 (2012); *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 635 (D.C. Cir. 2013).

Even if the Court reaches the merits of Plaintiffs' claims, they should be dismissed.  In responding to Defendants' Motion for Summary Judgment, Plaintiffs assume the truth of their own position: that the challenged provisions of the three Executive Orders violate the Federal Service Labor-Management Relations Statute (the Statute).  But that assumption is precisely the question this Court would have to decide—if it has jurisdiction to decide it at all.  Plaintiffs' claims cannot escape dismissal simply by taking as an irrefutable given that there has been a violation of the Statute.

As an unbroken line of cases confirms, section 7117(a) of the Statute authorizes the Government, which certainly includes the President, to issue Government-wide rules that "foreclose[] bargaining" on the matters addressed by the rule.  *Overseas Educ. Ass'n v. FLRA*, 876 F.2d 960, 962 n.7 (D.C. Cir. 1989).  This § 7117(a) authority is not unlimited—notwithstanding

Plaintiffs' attempt to attribute that position to Defendants.  As Defendants recognized in their Motion, such a rule cannot create additional rights not present in the Statute.  Defs.' Mot. 28.

Plaintiffs' claims of *ultra vires* executive action, whether asserted under the Take Care Clause or the separation-of-powers doctrine, are meritless, to the extent they can proceed at all. The President enjoys authority under both Article II of the Constitution and the Statute to issue executive orders regulating employee conduct and labor relations in the federal workforce. Plaintiffs' contention that passage of the Statute somehow stripped away all such authority is belied by the Statute's text recognizing the President's *preservation* of all pre-enactment authority, as well as by the considerable history of post-enactment Executive Orders in this area.

Plaintiffs' claims of conflict between the Orders and the Statute fare no better.  As Defendants have shown, none of the labor-relations provisions issued here creates any conflict with the Statute.  So Plaintiffs' cart-before-the-horse arguments that a Government-wide rule cannot be used to "legislate" or override provisions of the Statute rely on an untenable premise. Meanwhile, Plaintiffs' First Amendment claim of a violation of their right to free association has no basis—they and their members remain free to associate with and pursue grievances on behalf of third-parties, and nothing in the Orders interferes with that right.

Finally, even were Plaintiffs to prevail on the merits of any of their challenges, separation-of-powers precludes the remedy they seek.  The D.C. Circuit has found it "painfully obvious" that a judicial injunction may not issue against the President.  *Swan v. Clinton*, 100 F.3d 973, 978 (1996).  And if declaratory relief against the President is available—itself a tenuous proposition— that is only so in the case of ministerial acts.  Under no reasonable standard could the Executive Orders be viewed as "ministerial" conduct.  In issuing the orders, the President was clearly

exercising his discretion to prescribe rules of conduct for Executive Branch employees and to guide appropriate labor-relations policy in the federal sector.

Defendants' Motion for Summary Judgment should be granted and Judgment entered for Defendants on all claims.

## ARGUMENT

## I.      PLAINTIFFS' CLAIMS FALL OUTSIDE THIS COURT'S JURISDICTION.

Plaintiffs maintain that they can bypass Congress's reticulated review scheme and sue directly in this Court. Plaintiffs may do so, they theorize, because they challenge the "legality" of certain Order provisions, rather than their "implementation." NTEU Opp'n 2, ECF No. 48. But that precise argument has been rejected by the D.C. Circuit in *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 635 (D.C. Cir. 2013), a decision Plaintiffs fail to acknowledge and which alone compels dismissal.

Even if they could overcome that precedent, Plaintiffs' argument is at odds with *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012). In *Elgin*, the Supreme Court held that so long as a congressional review scheme permits meaningful judicial review of a plaintiff's claims, that scheme must be followed—even where the plaintiff challenges the legal authority under which a federal agency acts. *See id.* at 15. Plaintiffs are wrong that they cannot obtain such judicial review here. The FLRA is authorized to determine whether the duty to bargain extends to certain matters and, if it does, to order an agency to bargain—precisely what the unions ultimately seek. *See* 5 U.S.C. § 7105(a)(2)(E), (G). And even if the FLRA were unable to decide the lawfulness of the challenged Orders, there is no question that the courts of appeals can do so.

This action should be dismissed for lack of jurisdiction.

**A.      The D.C. Circuit Has Rejected Plaintiffs' Argument That the District Court May Hear a Challenge to the Validity of the Executive Orders.**

Effectively foreclosing the arguments Plaintiffs raise in their opposition briefing, the D.C. Circuit has held that a district court lacks jurisdiction to hear a union's challenge to the lawfulness of a Government rule. Such claims, the court held, must instead be channeled through the Statute's review scheme, as Congress intended. *See Sec'y of the Air Force*, 716 F.3d at 639.

In *AFGE v. Secretary of the Air Force*, National AFGE and several AFGE locals sued in district court to invalidate an Air Force military dress code rule. *Id.* at 635. The suit challenged not only implementation of the dress code, but also its overall validity, just as Plaintiffs here characterize their actions. *See id.* But because the Statute provided "at least three administrative options" for AFGE locals "to challenge the dress code"—a negotiability appeal, arbitration, or an unfair labor practice charge—the plaintiffs could not proceed in district court. *Id.* at 637-38 (citing 5 U.S.C. §§ 7117(c), 7121, 7116(a)(7), 7118(a)(1)).

Further, the fact that National AFGE contended that it had no administrative recourse under the Statute "does not mean that [it] has access to the courts" but rather "means that National AFGE may not raise the claim at all." *Id.* at 638 (emphasis added). Thus, Plaintiffs cannot shoehorn their way into district court by arguing that their claims "fall outside the Statute's scope" or are "not a typical labor dispute between federal employee and federal employer." AFGE Opp'n 3, ECF No. 50; NFFE Opp'n 3, ECF No. 45. Instead, the claims must be channeled as Congress intended to the FLRA and, if necessary, to a court of appeals. And if any Plaintiff determines that it has no basis to pursue administrative review under the Statute, it means the Plaintiff "may not raise the claim at all." *Sec'y of the Air Force*, 716 F.3d at 638.

The D.C. Circuit's decision in *Secretary of the Air Force* also disposes of other arguments Plaintiffs maintain here. For example, the court noted that the supposed "efficiency" of a district

court challenge could not overcome Congress's decision to preclude district court jurisdiction over challenges to a rule's overall validity.  *Id.* at 639 ("Nor may a party avoid the [Statute] because it provides only an 'inconvenient' remedy[.]").  The court also distinguished *AFGE v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007), on the ground that it involved a challenge to an order issued pursuant to a VA-specific statute "insulating the underlying [arbitration] dispute from review, an order that [wa]s 'expressly outside FLRA's purview.'"  *Sec'y of the Air Force*, 716 F.3d at 640 (quoting *Nicholson*, 475 F.3d at 348).  Plaintiffs' reliance on *Nicholson* to sustain jurisdiction here is thus unavailing.  NTEU Opp'n 4, 6; AFGE Opp'n 5-6.  Finally, the D.C. Circuit rejected the *Leedom v. Kyne*, 358 U.S. 184 (1958), exception to jurisdictional preclusion, which it described as "'a Hail Mary pass' that 'rarely succeeds.'"  *Sec'y of the Air Force*, 716 F.3d at 639 n.6 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).  AFGE's invocation of that exception here (AFGE Opp'n 8) likewise fails, not least because the Government has not acted contrary to the Statute and Plaintiffs have ample means of vindicating their rights through the Statute's review scheme.

### B.     Because Plaintiffs Can Obtain Meaningful Judicial Review of Their Claims in the Courts of Appeals, Jurisdiction in This Court Is Foreclosed.

Plaintiffs also argue that under the Statute's exclusive review scheme, there is no way for them to obtain a decision on the lawfulness of the disputed Sections of the Executive Orders.  If that were true, it would not give Plaintiffs free license to sue in district court, it would mean that they could "not raise the claim at all."  *See supra* Part I.A; *see also Sec'y of the Air Force*, 716 F.3d at 638.  But in any event, Plaintiffs—or their local affiliates—can pursue their claims under the Statute, and they therefore cannot establish jurisdiction in this Court.

First, Plaintiffs do not dispute that the FLRA can provide relief in the form of ordering an agency to bargain over a specific matter, by declaring certain subjects negotiable under the Statute,

or by finding that an agency has committed an unfair labor practice.  Instead, Plaintiffs quibble with that remedy, implying that it would be insufficient since they challenge the overall validity of certain provisions of the Order.[1]  AFGE Opp'n 4; NTEU Opp'n 5; AFSCME Opp'n 2-3; NFFE Opp'n 3-4.  Plaintiffs fail to explain, however, any basis on which they can defy congressional intent and insist on a specific remedial outcome when a FLRA order could adequately redress the bargaining injuries they contend they will otherwise suffer.

Second, assuming *arguendo* that Plaintiffs are correct that the FLRA cannot rule on the validity of an Executive Order provision, Congress has provided for review of such provisions in the courts of appeals.  *See* 5 U.S.C. § 7123(a).  The Statute grants to a court of appeals "jurisdiction of the proceeding and of the question determined therein" and authorizes the court to grant "any temporary relief (including a temporary restraining order) it considers just and proper."  *Id.* § 7123(c).  The Supreme Court in *Elgin* approved of precisely such a review scheme, and Plaintiffs cannot distinguish this scheme from that case.  *See Elgin*, 567 U.S. at 18.  They cite no case holding that a court of appeals' "authority to decide particular legal questions is derivative of the [FLRA's] authority."  *Id.*  Nor could they, as courts of appeals in reviewing FLRA orders can decide whether particular statutes or agency rules are lawful.  The Statute accordingly permits meaningful judicial review, which Plaintiffs cannot circumvent by filing suit in this Court.

That conclusion, like the D.C. Circuit's decision in *Secretary of the Air Force*, is reinforced by the Supreme Court's decision in *Elgin*.  Much like this case, *Elgin* involved a challenge to the validity of provisions of federal law—5 U.S.C. § 3328 and the Military Selective Service Act—

---

[1] This attempted disavowal of any relief related to agencies' actual implementation of the Orders is squarely at odds with Plaintiffs' pleadings.  *See, e.g.*, NTEU Am. Compl. ¶ 6, 18-cv-01348, ECF No. 21 (alleging that "no agent of the President, including Defendant Pon, may implement" the challenged Executive Orders); AFGE Am. Compl. ¶ 14, ECF No. 9 ("Implementation and enforcement of the Official Time Order should be enjoined."); AFSCME Compl. ¶ 45, 18-cv-01444, ECF No. 1 (alleging that "the President and his subordinates seek to implement" the challenged Orders); NFFE Compl. at 4, 18-cv-01395, ECF No. 1 (seeking "to prohibit . . . implementation" of the Orders).  Plaintiffs cannot have it both ways.

and the plaintiffs sought declaratory relief and an injunction prohibiting enforcement.  *Id.* at 7-8.

The Court held that that the Civil Service Reform Act's (CSRA) exclusive review scheme deprived

the district court of jurisdiction to hear the case.  The plaintiffs were required to present their claims

first to the MSPB and then to the Federal Circuit, where they could obtain meaningful judicial

review as Congress intended, *even if* the MSPB could not adjudicate the claims in the first instance.

*Id.* at 15, 17 (intent to preclude district court jurisdiction "fairly discernible in the statutory scheme

'[e]ven if' the administrative body could not decide the constitutionality of a federal law").

　　*Elgin* forecloses Plaintiffs' bid for review in this Court by rephrasing their challenge as one

to the "validity" of the Executive Orders.  As the Supreme Court explained, when a statutory

review scheme confers rights to "administrative and judicial review," "extrastatutory review" is

unavailable.  567 U.S. at 11; *id.* (statutory review rights cannot be "'expand[ed] . . . by resort to'

judicial review outside of the [statutory] scheme" (quoting *United States v. Fausto*, 484 U.S. 439,

450 n.3 (1988)).  After all, in creating such a scheme, "Congress intended to deny . . . an *additional*

avenue of review in district court."  *Id.* at 12 (emphasis added).  The *Elgin* plaintiffs' claim to an

"exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal

statutes" made no difference:  "Nothing in the CSRA's text suggests that its exclusive review

scheme is inapplicable simply because a covered employee challenges a covered action on the

ground that the statute authorizing that action is unconstitutional."  *Id.* at 13.

　　*Elgin*'s reasoning applies with equal force to the Executive Orders.  The Statute confers

both administrative and judicial review on Plaintiffs.  *See* 5 U.S.C. §§ 7105, 7123.  An agency's

implementation of the labor-relations provisions challenged here would be subject to the Statute's

review scheme.  *Id.* § 7105(a)(2)(E), (G).  Plaintiffs cannot evade that scheme simply by

challenging the validity of the Executive Orders that authorize the agency conduct they wish to prevent. *Elgin*, 567 U.S. at 18.

Plaintiffs' attempt to seek district court review by positing their claims as "wholly collateral" to the Statute (AFGE Opp'n 9) fails. Plaintiffs' challenge to the Executive Orders is merely "the vehicle by which they seek," preemptively, to force agencies to negotiate over certain subjects during the collective bargaining process; resolving such negotiability and duty-to-bargain questions is "precisely the kind[] of relief that the [Statute] empowers the [FLRA] and the [courts of appeals] to provide." *Elgin*, 567 U.S. at 22. That courts afford no special deference to the FLRA's interpretation of an Executive Order (NTEU Opp'n 8) does not mean the FLRA is powerless to review it, and in any event "overlook[s] the many threshold questions . . . to which the [FLRA] can apply its expertise." *Elgin*, 567 U.S. at 22. Moreover, the fact that courts afford no special deference to the FLRA only confirms the meaningful review that will be available in the courts of appeals. Even if Plaintiffs' argument had not been expressly rejected by the D.C. Circuit in *Secretary of the Air Force*, it could not survive the Supreme Court's decision in *Elgin*.

### C.    *NTEU v. Devine* Does Not Compel Jurisdiction in this Case, as Plaintiffs Wrongly Contend.

Rather than grapple with the above precedents, Plaintiffs instead place considerable emphasis on the district court's ruling in *NTEU v. Devine*, 577 F. Supp. 738 (D.D.C. 1983). But even if that decision survives *Elgin* and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), it cannot rescue Plaintiffs' assertion of jurisdiction.

In *Devine*, the plaintiff union sought to invalidate final OPM labor regulations under the APA on the extraordinary basis that an express congressional funding restriction precluded OPM from implementing the regulations. 733 F.2d 114, 115-116 (D.C. Cir. 1984). The district court concluded that it had jurisdiction, resting its conclusion on several factors not present here.

First, unlike Plaintiffs here, the union in *Devine* did not assert "that the agency ha[d] infringed on the collective bargaining rights of a union." 577 F. Supp. at 745. Had it done so, the district court reasoned, jurisdiction would have been lacking in light of the Statute's "exclusive" review scheme, which, the district court noted, "will generally preclude suits in federal district court." *Id.*

Second, *Devine* involved "a traditional rule-making challenge brought under the APA" alleging that the OPM rules were "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 577 F. Supp. at 745 (quoting 5 U.S.C. § 706(2)(A)). Plaintiffs here do not purport to proceed under the APA; nor could they since, *inter alia*, there has been no "final agency action." 5 U.S.C. § 704.

Third, the specific claim advanced in *Devine* was highly unusual—involving congressional legislation that expressly forbade OPM's regulations—and the D.C. Circuit has not since read *Devine* to necessitate district court review of such collateral challenges to OPM rules.[2]

---

[2] *See Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (rejecting argument that that "a collateral, systemwide challenge to OPM policy" escapes preclusion); *id.* at 68 ("Allowing an alternative route to relief in the district court because plaintiffs frame their suit as a systemwide challenge to OPM policy would substitute an entirely different remedial regime for the one Congress intended to be exclusive."); *Gray v. OPM*, 771 F.2d 1504 (D.C. Cir. 1985) (applying preclusion principles to bar suit challenging general OPM practices regarding promotion of ALJs); *Barnhart v. Devine*, 771 F.2d 1515, 1527 (D.C. Cir. 1985) (applying preclusion principles to bar suit seeking to compel OPM to conduct position comparison affecting sizable class of employees).

Furthermore, Plaintiffs' "long list" of cases in which district courts heard challenges to agency rules actually consists of cases, unlike this one, that involved APA challenges or in which a channeling argument under the Statute was not raised, or both, or were cases that are otherwise distinguishable. *See* NTEU Opp'n 4; NFFE Opp'n 3; *NTEU v. Horner*, No. CIV. A. 83-0279, 1987 WL 8704, at *1 (D.D.C. Mar. 13, 1987) (APA action in which OPM argued that § 701(a) of the APA, not the Statute's exclusive review scheme, precluded judicial review), *aff'd in part, vacated in part*, 869 F.2d 571 (Fed. Cir. 1989); *NTEU v. Horner*, 854 F.2d 490, 495-96 (D.C. Cir. 1988) (same); *AFGE v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982) (concluding, with no reference to the Statute's exclusive review scheme, that the "unique" right of a member of the House Appropriations Committee gave Congressman the right to challenge HUD's reduction-in-force); *NTEU v. Von Raab*, 649 F. Supp. 380, 385 (E.D. La. 1986) (reaching merits, in a later-vacated opinion, *see* 488 U.S. 886 (1988), of a challenge to an agency program that was not a "personnel action[] within the statutory scheme" and therefore not subject to preclusion); *OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1, 7 (D.D.C. 2000) (in APA challenge to DOD rule, rejecting preclusion argument on grounds that (unlike this case) the CSRA "provided no judicial review" of the administrative decision).

In sum, that the district court in *Devine* reached the merits of a dispute concerning the scope and effect of an appropriations restriction bears little, if at all, on the propriety of reaching the merits of Plaintiffs' claims here.

## II.       THE CHALLENGED PROVISIONS DO NOT IMPERMISSIBLY RESTRICT THE SCOPE OF COLLECTIVE BARGAINING.

Ignoring § 7117(a) of the Statute, Plaintiffs continue to argue that the President may not lawfully prescribe Government-wide rules that have the effect of removing subjects from the scope of collective bargaining as he has done here.   Plaintiffs' arguments both misconstrue binding precedent setting forth the limits of valid Government-wide rules and rely on inapposite case law concerning the scope of collective bargaining under a labor-management relations system not subject to the Statute.

### A.       Certain Provisions of the Orders Are Properly Considered Government-Wide Rules under 5 U.S.C. § 7117(a).

Section 6 of the Collective Bargaining Order, Exec. Order No. 13,836, 83 Fed. Reg. 25,239 (June 1, 2018), Sections 4(a) and (b) of the Official Time Order, Exec. Order No. 13,837, 83 Fed. Reg. 25,335 (June 1, 2018), and Section 4 of the Removal Procedures Order, Exec. Order No. 13,839, 83 Fed. Reg. 25,343 (June 1, 2018), are Government-wide rules under 5 U.S.C. § 7117(a) and thus lawfully remove certain subjects from the scope of collective bargaining.  Section 7117(a) "is an exception to the general duty to bargain." *See, e.g.*, NTEU Opp'n 15.  And, as all parties acknowledge, there are some limits on what may constitute a Government-wide rule.  *See IRS v. FLRA*, 996 F.2d 1246 (D.C. Cir. 1993); *OPM v. FLRA*, 864 F.2d 165 (D.C. Cir. 1988); Defs.' Mot.

---

The district court's opinion in *NTEU v. Chertoff* also lends no support to Plaintiffs' argument.  In that case, DHS had, pursuant to the Homeland Security Act (HSA), "waive[d] application of [the Statute]," and, "[a]s a result, the FLRA [wa]s without jurisdiction to adjudicate" the plaintiffs' claims. 385 F. Supp. 2d 1, 22 (D.D.C. 2005).  Moreover, the HSA expressly provided that the DHS HR system was "subject to review under the APA," a statute that Plaintiffs here have not invoked (and could not). *Id.* at 23.

28.  But the provisions of the Orders at issue here do not run afoul of these limits.  Rather, they are a lawful exercise of the President's authority to issue consistent rules across the federal workforce, as acknowledged by Congress in § 7117(a).[3]  *See, e.g.*, *NFFE, Local 2015 and U.S. Dep't of the Interior Nat'l Park Serv.*, 41 F.L.R.A. 1158, 1185-86 (1991) (concluding that a drug testing regime established following President Reagan's Drug-Free Workplace Executive Order appropriately overrode the agency's duty to bargain over official time for a private drug test); *NFFE, Local 15 and U.S. Dep't of the Army*, 30 F.L.R.A. 1046, 1070-71 (1988) (finding union proposals non-negotiable because they conflicted with President Reagan's Drug-Free Workplace Executive Order).

In *OPM*, the D.C. Circuit first considered the scope of § 7117(a) in determining whether a section of the Federal Personnel Manual that restated management rights codified in the Statute at 5 U.S.C. § 7106(a)(2) was properly considered a Government-wide rule.  *See OPM*, 864 F.2d at 166-67.  Section 7106 is unique in that it is structured to deem non-negotiable the management rights listed in § 7106(a)(1)-(2), while permitting bargaining over "appropriate arrangements for employees adversely affected" by the exercise of these rights in § 7106(b)(3).  OPM construed the Manual as a Government-wide rule, which would have prevented bargaining over any topic related to these management rights.  *Id.* at 166.

The court concluded that "where a government-wide rule is no more than a restatement of management prerogatives contained in section 7106(a), it cannot bar negotiations over 'appropriate arrangements,'" which are specifically provided for in § 7106(b)(3).  *Id.* at 171. Because "OPM's interpretation, taken to its logical conclusion, would allow it and other agencies

---

[3] As a threshold matter, AFGE and NFFE's arguments that the President cannot issue Government-wide rules are obviously misplaced, as they would invert the structure of the Executive Branch.  *See* AFGE Opp'n 22 n.10; NFFE Opp'n 12 n.4.  Such an argument would deprive the President of authority to regulate labor relations, while at the same time allowing the agencies he controls to maintain this authority.

to circumvent section 7106(b)(3) simply by promulgating a regulation that tracked section 7106(a) word-for-word," the court concluded that "OPM cannot prevent bargaining by issuing regulations that merely parrot statutory management rights which do not themselves prohibit bargaining." *Id.* at 168 (citation omitted).   But the court was careful to emphasize the narrowness of its holding, noting that if a Government-wide rule had "direct[ed] the exercise of existing management prerogatives in a *specific* way, so that *particular* subjects or appropriate arrangements are identified as inappropriate topics of bargaining," the outcome would have been different.   *Id.* at 171; *see also id.* at 169 ("Our holding today does not preclude OPM from using its expertise to identify particular arrangements that, if subject to bargaining, might threaten the governmental efficiency and merit objectives of the statute.").

A few years later in *IRS*, the D.C. Circuit again had the opportunity to consider the scope of § 7117(a).   There, the court considered an OMB circular relating to the process for contracting out work that contained a provision specifically prohibiting grievances.   The FLRA argued that the circular could not be a valid Government-wide rule because it conflicted with statutory provisions requiring grievance procedures.   The court rejected this interpretation.   Citing *OPM*, the court found that the circular was a valid Government-wide rule because it did not "purport to expand on management rights recognized in the Statute" but, instead, "restrict[ed] rights already granted."   *IRS*, 996 F.2d at 1251.

As in *IRS*, the Government-wide rules at issue here do not "develop[] new management powers."   *Id.*   Instead, they are rules of conduct that "direct" the Agencies to exercise existing powers to manage federal employees "in a *specific* way."   *Id.*   Section 4 of the Official Time Order provides an instructive example.   Contrary to Plaintiffs' suggestion that it "reads out" § 7131(d) (*e.g.*, NTEU Opp'n 18-19; AFGE Opp'n 23), its provisions leave it fully operative. Agencies and

federal unions remain free, under section 7131(d) to make agreements respecting official time in amounts that both the agency and the union "*agree*" to be reasonable and in the public interest. Thus, each agency retains the right to agree or disagree to any given proposal for official time under § 7131(d).  Section 4 is thus fully consistent with § 7131(d).

If anything, Plaintiffs' arguments are an attempt to "read out" § 7117(a).  Plaintiffs argue that the provisions of Section 4 of the Official Time Order cannot be Government-wide rules because unions also have the right to determine what amounts of official time are reasonable and in the public interest pursuant to § 7131(d), and Section 4 transfers that right to management.  *See, e.g.*, AFGE Opp'n 23-24.  But, in *IRS*, the Court chastised the FLRA for similar reasoning.  There, the FLRA made "repeated assertion[s]" that the terms of a Government-wide rule "cannot undermine a right . . . granted by the statute" itself.  996 F.2d at 1252.  The court found this to be "circular reasoning" because it "fail[ed] to recognize that the statute itself, in section 7117(a), provides the exemption from the duty to bargain."  *Id*.  As in *IRS*, Plaintiffs here cannot read a "general right" under § 7131(d) to overcome the "explicit exception" from the duty to bargain provided for in § 7117(a).  Rather, Section 4 of the Official Time Order, like the other challenged provisions identified as Government-wide rules, represents an effort by the President to exercise his authority "in a *specific* way," which has the effect of making "*particular* subjects"—*e.g.*, a union proposal requiring official time for lobbying or third-party grievances—"inappropriate topics of bargaining."  *OPM*, 864 F.2d at 171 (emphasis in original).  That is no more anomalous than the fact that government-wide ethics, anti-smoking, or anti-drug rules make any inconsistent union proposals non-bargainable.

**B.**      ***NTEU v. Chertoff* Does Not Support "Collective" Invalidation of the Orders.**

Relying on *NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), NTEU argues that, regardless of any individual provision's validity, the Orders collectively violate the Statute by impermissibly reducing the scope of collective bargaining. *See* NTEU Opp'n 14-15. NTEU's argument overstates both the holding of *Chertoff* and its applicability to this case. Defs.' Mot. 54-57.

In *Chertoff*, the D.C. Circuit considered whether Department of Homeland Security (DHS) regulations creating a human resources management system (HR system) pursuant to the Homeland Security Act of 2002 (HSA) violated the same. 452 F.3d at 843. Although the HSA required the DHS HR system to "ensure" that employees may "bargain collectively," the HR system was otherwise not subject to the Statute (a point virtually ignored by NTEU). *Id.* at 843, 845 (quoting 5 U.S.C. § 9701(b)(4)). Nor did the HR System contain a provision dealing with Government-wide rules and regulations, analogous to the one at issue here. Because the regulations promulgated by DHS reduced the scope of bargaining under the HR system to "virtually nil," the court held that the regulations did not comply with the HSA's directive to ensure collective bargaining. *Id.* at 860-65.

Even if *Chertoff* were applicable here, the HR system at issue there was vastly different in scope than the Challenged Orders. *See* Defs.' Mot. 54-57. In determining that the regulations impermissibly narrowed the scope of bargaining, the court focused on aspects of the HR system not present in the challenged Orders. Defendants pointed out four such distinctions in their opening brief; NTEU responded to only two of them, that the HR system did not include an impasse panel and sought to change FLRA jurisdiction. NTEU Opp'n 15 (claiming these distinctions were not "central" to the *Chertoff* holding). NTEU's responses are unconvincing for three separate reasons.

14

First, and central to the holding in *Chertoff* was that parts of the HR system, taken together, "permit[ted] unilateral abrogation of collectively bargained contracts."   452 F.3d at 859; Defs.' Mot. 55.  The challenged Orders have no analogous provision; indeed, they explicitly provide that they shall not abrogate any collective bargaining agreement.[4]  Collective Bargaining Order, Sec. 9(c); Official Time Order, Sec. 9(a); Removal Procedures Order, Sec. 8(b).  Second, the court also noted the provision of the DHS regulations that "empower[ed] DHS to take any matter off the bargaining table at any time, regardless of what concessions have already been made by union representatives."  *Chertoff*, 452 F.3d at 862.  As the court recognized in *Chertoff*, "no analogous power exists anywhere in [the Statute]," *id.*, and no provision of the challenged Orders here purports to create such a broad power.  Finally, and "[m]ost strikingly," the court noted that the DHS regulations did not contain bargaining rights over the procedures and effects relating to the exercise of management rights.  *Id.*  Here, those bargaining rights, protected by § 7106, are unaffected by the Challenged Orders.  NTEU reckons with none of these crucial distinctions between the DHS HR system and the Orders it challenges in this action, preferring instead a gestalt approach based on its allegation of an ill-defined "cumulative effect."  NTEU Opp'n 27.

Despite Plaintiffs' best efforts to analogize the HR system to the challenged Orders, the latter are significantly more limited in their effect.  Importantly, *Chertoff* did not involve the Government's express authority, under § 7117(a), to exempt certain subjects from bargaining by Government-wide rule.  Indeed, the HR system at issue in that case was not governed by the Statute.  The Statute was only relevant in *Chertoff* insofar as the D.C. Circuit looked to it to inform its definition of collective bargaining.  But the decision does not, as NTEU contends, supply a basis to "collectively" invalidate the Orders, simply because NTEU believes "this dispute is more

---

[4] To the extent that agencies are using provisions within CBAs to give notice of an intent to renegotiate provisions of that agreement, agencies are not "abrogating" the CBA.

compelling." NTEU Opp'n 15. That is particularly so when none of the challenged provisions conflicts with the Statute, *see infra* Parts III.B – III.D. Under Plaintiffs' reading, *Chertoff* would require the invalidation of practically any Government-wide rule that removes a subject from the scope of bargaining. And such a reading cannot stand, as it would deprive § 7117(a) of all meaning and impose a significant constraint on the President's authority to manage the Executive Branch, contrary to Congress's expressed intent.

## III.   THE CHALLENGED EXECUTIVE ORDERS VIOLATE NEITHER THE CONSTITUTION NOR THE STATUTE.

As Defendants have demonstrated, there is no conflict between the challenged provisions of the Executive Orders and the Statute. Nor can Plaintiffs prevail on their constitutional challenges to the Orders, either because such claims are not justiciable or because they lack any viable legal basis.

### A.   The President Has Ample Authority to Issue the Executive Orders, and Plaintiffs' Claims to the Contrary Are Either Not Justiciable or Baseless.

As has long been held, a Take Care Clause claim is not justiciable in federal court. Meanwhile, the President had ample authority, under both Article II of the Constitution and congressional statute, to issue the Executive Orders. These claims should be dismissed.

#### 1.   AFSCME's Take Care Clause claim is not justiciable.

Claims brought under the Take Care Clause are not justiciable, and AFSCME fails to show otherwise. In language that AFSCME does not attempt to address, the Supreme Court was explicit: "the duty of the President in the exercise of the power to see that the laws are faithfully executed" is "purely executive and political," and an "attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might justly be

16

characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.'" *Mississippi v. Johnson*, (4 Wall) 475, 499 (1866).

Rather than address this holding, AFSCME points to the D.C. Circuit's decision in *NTEU v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), which suggested that a district court could enter a writ of mandamus against the President to force him to comply with his ministerial obligations but that declaratory relief would be more appropriate. *Id.* at 616. At the outset, the plaintiff in that case sought a writ of mandamus, and did not purport to assert a standalone claim under the Take Care Clause. *Id.* at 589. Further, the court explicitly declined to enter mandamus relief against the President, belying AFSCME's argument that the cases are "on all fours." AFSCME Opp'n 4. In any event, the D.C. Circuit has called into question the continuing vitality of *NTEU v. Nixon*. *See Swan*, 100 F.3d at 978 ("It is not entirely clear, of course, whether, and to what extent, these decisions remain good law after *Franklin* [*v. Massachusetts*, 505 U.S. 788 (1992)]. For while the Court in *Franklin* explicitly left open the question of whether a court may enjoin the President to perform a ministerial duty, it also issued a stern admonition that injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken."); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions.").[5]

### 2.    The President did not act *ultra vires* in issuing the Executive Orders.

---

[5] Even if the Court could entertain AFSCME's purported Take Care Clause claim, that claim essentially just recites AFSCME's opinion that issuing the Orders was "a bad faith act by the President." AFSCME Opp'n 12. Mere disagreement with the particular choices the Government has made cannot sustain such a claim, even assuming it could be asserted.

NFFE's and AFGE's claims of *ultra vires* executive action fares no better.[6]  As an initial matter, Plaintiffs' claim to *ultra vires* Presidential action, like their other claims, is equally subject to the preclusive channeling of these disputes to the FLRA and the courts of appeals.  *See, e.g.*, *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 305 (1943) (holding that the Railway Labor Act—by providing judicial review for certain other matters but only administrative review of an agency's certification of a collective bargaining representative—impliedly precluded *ultra vires* review because congressional "intent seems plain" that "[t]here was to be no dragging of the controversy into other tribunals of law").[7]

Assuming jurisdiction exists, however, the bar for maintaining a claim of *ultra vires* Presidential action is high.  *Ultra vires* review requires Plaintiffs to show both that the challenged action is "contrary to a specific [statutory] prohibition which 'is clear and mandatory,'" and "that barring review by the district court 'would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights.'"  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).  As Defendants have shown and reiterate *infra* in Parts III.B through III.D, there is not only no "clear and mandatory" statutory prohibition against the Executive Orders, but no conflict with the Statute whatsoever.  Moreover,

---

[6] AFGE also appears to sometimes frame this claim of *ultra vires* action as a violation of separation-of-powers (AFGE Opp'n 9-13,), but draws no meaningful distinction between these two doctrinal labels.  Just by stating its subjective view that "in reality" the Executive Orders are legislation is not sufficient for a nominal separation-of-powers claim to survive dismissal, and in any event AFGE chose to plead these two claims together as one.  *See* AFGE Am. Compl. at 15-19 (pleading Counts II-VI as "Violations of the Separation of Powers/Ultra Vires").  Even if AFGE had pleaded two distinct theories, they would both fail for the reasons discussed above.

[7] While it is true that the D.C. Circuit has stated courts are "normally available" to correct *ultra vires* action, Congress can "preclude[] non-statutory judicial review."  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also id.* at 1327 (noting that such review has been described as "a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction" (quotation omitted)); *Ralls Corp. v. Comm. on Foreign Investment in the U.S.*, 926 F. Supp. 2d 71, 87 (D.D.C. 2013), *rev'd on other grounds*, 758 F.3d 296 (D.C. Cir. 2014) ("In *Reich*, the D.C. Circuit recognized that even where non-statutory judicial review is normally available, Congress might expressly preclude such review[.]").

Plaintiffs maintain full recourse to a "meaningful and adequate means of vindicating" the rights they assert under the Statute through the review scheme Congress designed.

In any event, as Defendants showed in their opening brief, the Supreme Court has held that the President is authorized by both Article II of the Constitution and congressional statute to issue executive orders regulating labor relations in the federal government.  Defs.' Mot. 4-5, 58-60; *see also, e.g.*, *Old Dominion Branch, Nat'l Ass'n of Letter Carriers, Local 4965, AFL-CIO v. Austin*, 418 U.S. 264, 273-74 and 273 n.5 (1974); *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002).  Plaintiffs ignore those authorities and instead focus narrowly on one particular statutory provision, 5 U.S.C. § 7301.

NFFE argues that the Supreme Court—in a holding NFFE erroneously characterizes as "dicta"—mistakenly concluded that § 7301 authorizes the President to regulate federal labor-management relations, citing to various circuit court decisions.  NFFE Opp'n 15-16 (citing *Kuhn v. Nat'l Ass'n of Letter Carriers, Branch 5*, 570 F.2d 757 (8th Cir. 1978); *Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975); *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 452 (D.C. Cir. 1965)).  The Supreme Court's decision would of course control over contrary court of appeals case law, but Plaintiffs mistakenly read the cases in any event.  Those cases found that because particular Executive Orders were not issued pursuant to § 7301, they were not "laws of the United States" for purposes of establishing jurisdiction under 28 U.S.C. § 1331.  But the courts did not in any way question the validity of the Orders or the proposition that the President has authority to regulate federal labor relations.

Plaintiffs are also wrong when they assert that passage of the Statute "curtailed" the President's authority under § 7301.  AFGE Opp'n 20.  Congress did not seek to "with[old]" or "divest" the President of essentially all authority to act in the field of federal labor relations, as

Plaintiffs contend.  NFFE Opp'n 13; AFGE Opp'n 13.  The Statute in fact says exactly the opposite: "Except as otherwise expressly provided in this Act, no provision of this Act shall be construed to limit, curtail, abolish, or terminate any function of, or authority available to, the President which the President had immediately before the effective date of this Act."  Civil Service Protection Act of 1978, Pub. L. 95-454, § 904, 92 Stat. 1111, 1224.[8]

Plaintiffs ignore this text in favor of isolated legislative history and a snippet from President Carter's signing statement.  NFFE Opp'n 13; AFGE Opp'n 20.  Their argument is also contrary to the considerable history of Presidential action by executive order in federal sector labor-relations *after* the Statute was enacted.  *See, e.g.*, Exec. Order No. 13,522, 74 Fed. Reg. 66,203 (Dec. 9, 2009) *as amended by* Exec. Order No. 13,708, 80 Fed. Reg. 60,271 (Sept. 30, 2015), *revoked by* Exec. Order No. 13,812, 82 Fed. Reg. 46.367 (Sept. 29, 2017); Exec. Order No. 12,871, 58 Fed. Reg. 52,201 (Oct. 1, 2013), *as amended by* Exec. Order No. 13,156, 65 Fed. Reg. 31,785 (May 17, 2000), Exec. Order No. 12,983, 60 Fed. Reg. 66,855 (Dec. 21, 1995), *revoked by* Exec. Order No. 13,203, 66 Fed. Reg. 11,227 (Feb. 17, 2001); Exec. Order No. 12,128, 44 Fed. Reg. 20,625 (Apr. 4, 1979); Exec. Order No. 12,107, 44 Fed. Reg. 1,055 (Dec. 28, 1978).  Plaintiffs make no effort to reconcile this history with their flawed theory of congressional "divestment" of executive authority.[9]

Meanwhile, contrary to Plaintiffs' contentions, Defendants have not argued that the President can "issue executive orders contrary to the specific language of the Statute" (AFGE

---

[8] Plaintiffs' argument is also irreconcilable with § 7117(a)(1), which authorizes the issuance of Government-wide rules.

[9] Indeed, rather than decrying it as a fundamental threat to the constitutional order, as they do now, Plaintiffs applauded this earlier regulation of labor relations by executive order.  *See* AFGE Leaders Honored on All Fronts ("The creation of the Council [under Executive Order [No. 313,522] is yet another positive step toward building the relationships between Federal agencies and labor.") (statement of AFGE National President John Gage), Janell King, *AFGE Leaders Honored on All Fronts* (Mar. 24, 2010), https://www.afge.org/publication/afge-leaders-honored-on-all-fronts/.

Opp'n 19) or that he "has the right to revoke any portion of the Statute through an Executive Order, and make the scope of bargaining a null set" (NFFE Opp'n 14). On the contrary, Defendants have expressly recognized statutory limitations on the President's authority to act in this area. Defs.' Mot. 28.

### B.     The Collective Bargaining Order Does Not Conflict With the Statute.

Defendants have detailed why none of Plaintiffs' claims of statutory conflict between the Collective Bargaining Order and the Statute have any merit. *See* Defs.' Mot. 29-33. Plaintiffs' responses do nothing to disturb that conclusion.

Section 5(a). This provision provides guidance to agencies on periods that "should ordinarily be considered reasonable" for negotiating ground rules (up to six weeks) and term CBAs (four to six months). Collective Bargaining Order, Sec. 5(a). It further states that ground rules negotiations "that do not conclude after a reasonable period" should be advanced to mediation and the Panel for resolution. Finally, it reminds agencies of their "obligation to bargain in good faith."

Only AFSCME continues pressing a claim of statutory conflict. AFSCME Opp'n 13-14. And as it concedes, nothing in Section 5(a) prevents Plaintiffs from negotiating ground rules for *longer* than six weeks before advancing, if necessary, to mediation. *Id.* at 14. At bottom, AFSCME simply disagrees with the President's conclusion that a six-week period for negotiating ground rules "should ordinarily be considered reasonable." *Id.* at 13. But it cannot and does not cite any provision of the Statute that mandates a different period—or, for that matter, any particular period at all.

Section 5(c). This Section provides agency guidance for situations in which a union fails to comply with its duty to negotiate in good faith, informing agencies when they should "consider" whether to file an unfair labor practice complaint or propose new contract terms. In doing so,

Section 5(c) restates the circumstances in which Congress, in 5 U.S.C. § 7114(b), deemed that such actions might be appropriate; for that reason, no "conflict" is possible.  Defs.' Mot. 31.

AFSCME devotes but one sentence in response: a conjectural assertion that Section 5(c) will cause agencies to "approach negotiations in an adversarial fashion and with a predisposition to filing complaints."  AFSCME Opp'n 14.  But even if so, the Statute imposes no requirement that an agency, facing a union's failure to comply with its duty to negotiate in good faith, must refrain from seeking redress.  AFSCME's challenge to Section 5(c) thus lacks merit.

Section 5(e).  Section 5(e) directs agencies to "request" that the parties exchange written proposals during negotiations.  If an agency's existing agreements require an approach *other than* an exchange of written proposals, Section 5(e) further states that agencies "should . . . take steps to eliminate" any such requirements.

AFSCME again misunderstands both Section 5(e) and Defendants' arguments.  Section 5(e) does not purport to eliminate negotiating over ground rules *altogether*, as AFSCME wrongly contends.  AFSCME Opp'n 14-15.  Otherwise Section 5(a)—setting forth ordinarily reasonable periods for negotiating ground rules—would make no sense.  Instead, Section 5(e) only provides a directive that agencies seek to eliminate particular requirements governing how proposals are exchanged that may be found in *existing* agreements.  Further, Section 5(e) does not prohibit agencies and unions from agreeing to use written proposals *in combination with* some other method of exchange.  AFSCME's claim of a statutory conflict is unfounded.[10]

Section 6.  This provision is a Government-wide rule precluding agency heads from negotiating over the optional subjects set forth in 5 U.S.C. § 7106(b)(1).  The Statute expressly provides that whether to negotiate over these subjects is "at the election of the agency."  5 U.S.C.

---

[10] NFFE, which also challenged Sections 5(a), 5(c), and 5(e), provides no response to Defendants' arguments defending these provisions other than to "incorporate" AFSCME's arguments.

§ 7106(b)(1).  Bargaining over the subjects set forth in § 7106(b)(1) is accordingly "not required." *Nat'l Ass'n of Gov't Emps., Local R5-136 v. FLRA*, 363 F.3d 468, 471 (D.C. Cir. 2004); *AFGE, Local 3013, AFL-CIO v. FLRA*, 762 F.2d 183, 183 (1st Cir. 1985) (agency "may lawfully refuse to bargain with the union on" a subject set forth in § 7106(b)(1)).

NTEU's response is to assert an alleged injury on behalf of the *agencies*—that they are "deprived" of their choice whether to bargain.  NTEU Opp'n 19-20.  Setting aside NTEU's attempted invocation of agency interests, that argument supposes that the President, in his discretion as head of the Executive branch, is prohibited from directing his subordinates which "election" to make.  NTEU offers no support for that dubious proposition.  Indeed, as Defendants showed, the President has previously done precisely that without incident or any adverse comment from the D.C. Circuit.  *See Nat'l Ass'n of Gov't Emps., Inc. v. FLRA*, 179 F.3d 946, 951 (D.C. Cir. 1999).  And lest NTEU be heard to argue that the President has somehow violated § 7106(b)(1) by making the actual decision reserved to the agencies, it is not the President who has made the election, but the "heads of agencies" who are told that they "may not negotiate."  *See id.* at 950 (recognizing that "[d]irecting another to undertake an act is not necessarily the same as undertaking the act oneself" and concluding that "the mandatory language [of Executive Order 12,871 requiring agencies to negotiate] does not constitute a section 7106(b)(1) election").

Finally, NTEU argues that *Chertoff* requires invalidation of Section 6.  As Defendants have argued, the applicability of *Chertoff*, which arose under the *sui generis* Homeland Security Act and did not involve the provisions of the Statute at issue here, to this case is tenuous at best.  *See supra* Part II.B.  NTEU Opp'n 20.  But again, *Chertoff* effectively precluded all collective bargaining, 452 F.3d at 858, whereas Section 6 effectively precludes only certain optional subjects of bargaining.  NTEU Opp'n 20.  But *Chertoff* did not hold that making these optional subjects

"off limits" to bargaining was *alone* sufficient to unduly "shrink[] the scope of bargaining," as NTEU implies.  452 F.3d at 862.  Instead, that decision was but one of many reasons the *Chertoff* court faulted DHS's flawed HR system for unduly reducing the scope of bargaining.  *Id.*  In any event, the *Chertoff* court neither confronted nor contemplated a Government-wide rule under § 7117(a)(1) wherein the President directs agencies as to an "election" they are statutorily authorized to make.

### C.     The Official Time Order Does Not Conflict With the Statute and Does Not Violate the First Amendment.

The Official Time Order does not conflict with the Statute.  Rather, it is the President's responsibility, using authority acknowledged by Congress in §§ 7301, 7101(b), and 7117(a), to promote "an effective and efficient government."  Official Time Order, Sec. 1.  In furtherance of this objective, Section 3 sets a goal for agencies in determining how much official time they should agree to grant under § 7131(d) and Section 4 lists a sequence of Government-wide rules intended to increase the amount of "duty hours" employees spend "performing the work of the Federal Government and serving the public."  *Id.*  It is a reasonable policy goal to reduce the number of federal employees, qualified for specific federal work, who are spending all or the vast majority of their paid time on activities other than those they are employed to perform.  The Executive branch has a clear policy interest in ensuring that Federal employees remain capable of fulfilling their oath to "well and faithfully discharge the duties of the office" they enter.  Plaintiffs' arguments that the provisions of the Official Time Order conflict with the Statute and violate the First Amendment are unavailing.

### 1.     The Official Time Order does not conflict with the Statute.

24

Section 3.   Section 3 of the Official Time EO is an aspirational provision instructing agencies to "strive" for a negotiated union time rate[11] of one hour per bargaining unit employee. *See* Official Time Order, Sec. 3(a); Defs.' Mot. 34-36.   Rather than engaging with Defendants' explanation of this provision, Plaintiffs brush past the actual language of the Order, claiming that Defendants' "concede[]" that the Order limits unions to "no more than one hour of official time per bargaining unit member per fiscal year in the aggregate." NFFE Opp'n 18.   Defendants made no such concession.   As Defendants explained in their motion, *see* Defs.' Mot. 34-36, Section 3(a) expressly directs agencies to take into account factors which may counsel in favor of a larger union time rate, including the size of the bargaining unit and the amount of official time which is likely to be granted under §§ 7131(a) and (c).   Official Time Order, Sec. 3(a).   Moreover, Section 3 instructs agencies to "bargain in good faith," and contemplates a procedure for informing relevant individuals if the agencies do not meet this goal.   *Id.*, Secs. 3(a), (b).

NTEU's reliance on *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) is inapposite.   In *Appalachian Power Co.*, the D.C. Circuit considered whether an EPA document labeled as "guidance" was "final agency action" under the APA.   *Id.* at 1023.   Putting aside the fact that this is not an APA case—nor could it be, as the President is the decision-maker—and that the metric of "final agency action" is irrelevant to the question at bar, the document at issue in *Appalachian Power Co.* is significantly different from that at issue here.   The EPA's "guidance" placed "obligations on the part of the State regulators and those they regulate." *Id.*   In contrast, and as described above, Section 3 merely asks agencies to try to reach a goal, while at the same

---

[11] "Union time rate" is defined as "the total number of duty hours in the fiscal year that employees in a bargaining unit used for taxpayer-funded union time, divided by the number of employees in such bargaining unit."   Official Time Order, Sec. 2(j).

time acknowledging the agencies' duty to bargain in good faith and that there may be circumstances in which the agencies does not achieve the goal set forth in Section 3.

AFGE similarly blows past the nuance of both Section 3 and relevant precedent.  In *Bureau of Alcohol, Tobacco, and Firearms* ("*BATF*") *v. FLRA*, 464 U.S. 89, 101 (1983), the Supreme Court described Congress's intent to overturn the scheme put in place by prior executive orders with respect to the amount of official time granted for *collective bargaining* activities—not, as AFGE contends, *see* AFGE Opp'n 16-17, official time granted for *other* union activities.  *BATF*, 464 U.S. at 100-02.  Thus, as Defendants previously explained, *see* Defs.' Mot at 34-36, Section 3, which explicitly excludes the unlimited grants of official time for collective bargaining activities under § 7131(a), is entirely consistent with Congress's determination that for other union activities besides collective bargaining and FLRA proceedings, the Executive should have some discretion to determine what is reasonable and in the public interest.

<u>Section 4</u>.  As with Section 3, Plaintiffs fail to engage with Defendants' argument defending the provisions of Section 4(a).  Instead, and ignoring the fact that the provisions of Section 4(a) are properly construed as Government-wide rules, Plaintiffs insist that each provision conflicts with § 7131(d) because it removes the unions' ability to negotiate over certain grants of official time.  *See, e.g.*, AFGE Opp'n 17 (Section 4 is "contrary to the plain language of" § 7131(d) which "mandates that official time be granted in any amount that an agency and its counterpart labor organization may mutually agree upon.").  But that is precisely what Congress intended in enacting § 7117(a), which provides for an exception to the duty to bargain that would otherwise

26

apply throughout the Statute, including to § 7131(d).[12]  *See Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1119, 1120 (D.C. Cir. 2001).

For example, the Federal Law Enforcement Training Center (FLETC) has a rule that trainees accept "on-site housing," which the FLRA has determined to be a Government-wide rule under § 7117(a).  *Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms Agency and NTEU*, 32 F.L.R.A. 934, 935 (1988).  Certainly if Plaintiffs were to propose that employees be granted official time to attend union training requiring them to stay "off-site" while at FLETC, such a proposal would be nonnegotiable.  Moreover, Plaintiffs incorrectly interpret Section 4(a)(ii) of the Official Time Order as placing a cap on the use of all official time.  *See, e.g.*, NFFE Opp'n 18 (stating that Defendants "concede[]" that the Orders limit union officials to "spending no more than 25% of their time" on union activities).  In fact, Section 4(a)(ii) provides an express exception for any official time spent on activities under § 7131(a) and (c).[13]

### 2.    Section 4(a)(v) does not infringe Plaintiffs' right to free association.

The Supreme Court has "soundly rejected" the proposition "that if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights."  *Rust v. Sullivan*, 500 U.S. 173, 194 (1991).  Plaintiffs AFSCME and AFGE's claim of a First Amendment violation therefore cannot proceed, as Defendants showed in their opening brief.  Defs.' Mot. 60-64.  That is because a union's right of association, including the pursuit of third-party grievances, "does not require the Government to furnish funds to maximize the exercise of that right."  *Lyng v. Int'l*

---

[12] AFGE's reliance on *AFGE, Council 214 v. FLRA*, 798 F.2d 1525 (D.C. Cir. 1986) is misplaced.  In that case, the D.C. Circuit explicitly acknowledged that it was not opining on the interaction of §§ 7117(a) and 7131(d), and observed that the outcome might change upon remand to the FLRA to consider the consequences of a Government-wide rule on § 7131(d).  *See id.* at 1530 n.6.

[13] Plaintiffs appear to have abandoned their claims alleging statutory conflict between Section 4(c) of the Official Time Order and the Statute.

*Union, United Auto., Aerospace and Agr. Implement Workers of Am.*, 485 U.S. 360, 368 (1988); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983) (Government's "decision not to subsidize the exercise of a fundamental right does not infringe [that] right, and thus is not subject to strict scrutiny.").

Plaintiffs are incorrect that *Perry v. Sindermann*, 408 U.S. 593 (1972), "requires" judgment in their favor on the First Amendment claim. AFSCME Opp'n 7. True, *Perry* "limits the government's power to condition governmental benefits on recipients' relinquishment of constitutionally protected rights[.]" *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014). But Section 4(a)(v) does not require unions to relinquish any right to associate with their members or anyone else.

Moreover, Plaintiffs advance an interpretation of *Perry* that the Supreme Court has already rejected. In *Rust v. Sullivan*, the Court considered a Department of Health and Human Services regulation that restricted public funding for certain abortion-related activities. It distinguished *Perry* and explained that such a restriction "is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized." *Rust*, 500 U.S. at 196. Just as the funding grantees in *Rust* could "continue to perform abortions, provide abortion-related services, and engage in abortion advocacy" "through programs that are separate and independent from the project that receives Title X funds," *id.*, Plaintiffs here may continue to pursue third-party grievances without interference. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193. Nothing in Section 4(a)(v) precludes unions from associating with their members or others to prepare grievances on their own unpaid time, and the

Official Time Order expressly contemplates their doing so during business hours.  *See* Official Time Order, Sec. 4(e).

Further, Plaintiffs' claim of "significant disabilities" imposed by Section 4(a)(v) (AFSCME Opp'n 9) amounts to little more than a complaint that the policy is changing from the *status quo* regime they prefer.  While employees' receipt of a federal salary for the performance of union business—rather than the Government work they were hired to perform—may, in Plaintiffs' view, be "the norm for grievance handling" (AFSCME Opp'n 8), that does not mean any change from such a "norm" violates the First Amendment.[14]  Unlike in *Healy v. James*, 408 U.S. 169 (1972), where the university's denial of formal recognition to a student group worked "serious problems for the organization's existence and growth" and means of communicating with students, *id.* at 176, 181, the Plaintiff unions' ability to pursue third-party grievances is entirely unaffected.

AFGE's claim of "viewpoint-based interference" is likewise unsustainable.  AFGE Opp'n 25.  On its face, application of Section 4(a)(v) does not turn on "particular views taken by speakers on a subject" or "the specific motivating ideology or the opinion or perspective of the speaker." *True the Vote, Inc. v. IRS*, 831 F.3d 551, 560 (D.C. Cir. 2016) (quotations omitted), *cert. denied,* 137 S. Ct. 1068 (2017); *see also Rust*, 500 U.S. at 193 ("[T]he Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.").

Finally, AFSCME cites the Court's recent decision in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), to argue that union participation in all grievance proceedings promotes the interests of union members.  AFSCME Opp'n 8 ("'Representation of nonmembers furthers the

---

[14] The reason why allowing an employee official time to pursue her own grievance, while denying official time to a union representative, *see* AFGE Opp'n 27, promotes efficiency and economy should be readily apparent.  Under Section 4(a)(v), only one employee's union activity is subsidized through a grant of official time, as opposed to multiple union representative employees being paid a federal salary for non-agency business.

union's interest in keeping control of the administration of the collective-bargaining agreement, since the resolution of one employee's grievances can affect others.'" (quoting *Janus*, 138 S. Ct. at 2468)).  While that may be true, it has no bearing on the viability of Plaintiffs' First Amendment claim.  If anything, the quoted passage from *Janus* supports upholding Section 4(a)(v) and denying public funding of union grievance activities, given the Court's recognition that union participation in grievance proceedings "furthers the *union's* interest" and is not undertaken solely for the benefit of others.  *Janus*, 138 S. Ct. at 2468 (emphasis added).

### D.      The Removal Procedures Order Does Not Conflict With the Statute.

Section 3.   Contrary to Plaintiffs' insistence, Section 3 is not a binding requirement.  Instead, Section 3 sets a "goal" for agencies during negotiations to "endeavor" to exclude employee removals from negotiated grievance procedures.  Section 3 on its face contemplates that in some situations, agencies will not achieve this goal, reinforcing that it is not a requirement.  *See* Removal Procedures Order, Sec. 3 (directing agency head to explain to the President, through the OPM Director, any "fail[ure] to achieve *this goal*" (emphasis added)).

NTEU seizes on language in Section 3 stating that agencies "shall commit" time and resources to meet its goal, and that agencies "shall provide" an explanation to the President if they fail to meet it.  NTEU Opp'n 24 (citation and emphasis omitted).   But requiring an agency to commit resources to achieve a goal does not mean the goal must be met.  It means only that agencies are expected to devote resources to pursuing it.  Further, the fact that agencies must explain instances when they *do not* meet that objective only illustrates that it is merely an objective,

not a requirement.   No matter how stridently Plaintiffs insist that Section 3 "constitutes a command", its actual text does not permit that conclusion.[15] NTEU Opp'n 24.

Section 4(a).   Section 4(a) is a Government-wide rule directing agencies to exclude performance ratings and incentive pay awards from grievance procedures contained in CBAs. Under § 7117(a)(1), Section 4(a) lawfully "pull[s] [these] subjects out of the bargaining process" and therefore permits agencies to reject proposals to include these topics.  *IRS*, 996 F.2d at 1250.

As Defendants pointed out, Congress did not mandate the inclusion of performance ratings and incentive pay awards (if it had, Section 4(a) would not have been issued), and indeed expressly contemplated that certain matters would be excluded from grievance procedures.  5 U.S.C. § 7121(a)(1); Defs.' Mot. 45-47. Contrary to NFFE's contention, just because Congress did not expressly exclude a topic, as it did in § 7121(c), does not mean no other topics may be excluded, particularly by virtue of a Government-wide rule.   NFFE Opp'n 19-20.   NTEU, meanwhile, has no response other than to recycle its flawed argument based on *Chertoff*, addressed *supra* Part II.B. NTEU Opp'n 24.

Section 4(c).   Section 4(c) is a Government-wide rule that generally requires agencies to set a presumptive 30-day limit on an employee's opportunity to demonstrate acceptable performance.  On its face, Section 4(c) contains an exception to this presumptive period when an agency in its discretion determines that a longer period "is necessary to provide sufficient time to evaluate an employee's performance."  Defs.' Mot. 50.

---

[15] NTEU's reliance on decisions finding other agency documents, on the specific facts of those cases, to be "final agency action" subject to judicial review under the APA or other judicial review statutes does not support its contention that Section 3 violates the Statute.  *See* NTEU Opp'n 24 (citing *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002); *Appalachian Power Co.*, 208 F.3d at 1023 (stating of EPA Clean Air Act guidance document, "It commands, it requires, it orders, it dictates")).

NTEU derides as "too facile" the conceded fact that no statutory provision establishes a required time limit—let alone one in excess of 30 days—for a performance improvement period. Far from "facile," Defendants' point is a truism—there can be no conflict with Section 4(c) when no statute is to the contrary, a point that NTEU admits and that disposes of its claim. Moreover, NTEU is wrong to label Section 4(c) a "*per se* 30-day limit" when the provision expressly allows agencies to agree to a longer period. Just as flawed is NTEU's rebuttal to its own hypothetical "1-day" improvement period—that is a straw man, not what Section 4(c) provides. It is highly unlikely that, for almost any federal position, such a brief period would be deemed "reasonable," either by the President or OPM. *See* 5 U.S.C. § 4304(b)(1); 5 C.F.R. § 430.210.

Sections 2(a) and 2(b). On the face of the Removal Procedures Order, these Sections are "principles for accountability," not requirements. Removal Procedures Order, Sec. 2. Because they are mere principles rather than binding requirements, they could not, even in theory, "conflict" with a contrary statutory provision, assuming Plaintiffs had identified one (which they have not done). Plaintiffs cannot sustain their claim by stating merely that the "role" of the MSPB is "grounded in statute." NTEU Opp'n 26-27.

Moreover, even assuming that a conflict with certain *Douglas* factors—rather than the Statute itself—presented a cognizable legal claim, NTEU has no substantive response to Defendants' detailed explanation why there is no conflict between those factors and Sections 2(a) and 2(b). *See* Defs.' Mot. 53-54 (reconciling Sections 2(a) and 2(b) with *Douglas* factors). For the reasons Defendants articulated, the challenge lacks merit.

Finally, NTEU points to a selected excerpt from OPM's *Guidance for Implementation of Executive Order 13839*, arguing that its text differs from Section 2(b) of the Order. NTEU Opp'n 26. NTEU cannot shift midstream the target of its challenge from Sections of the Removal

Procedures Order to OPM's guidance document.  Insofar as Plaintiffs independently take issue with the OPM guidance document, they may separately seek to pursue relief through whatever avenues may be available.[16]

## IV.     SEPARATION-OF-POWERS CONCERNS COUNSEL AGAINST GRANTING INJUNCTIVE OR DECLARATORY RELIEF AGAINST THE PRESIDENT.

Plaintiffs' request for injunctive relief against the President raises significant separation-of-powers concerns.  *See* Defs.' Mot. 64-67. The D.C. Circuit has acknowledged these concerns, citing the Supreme Court's decision in *Franklin v. Massachusetts*.  As interpreted by the D.C. Circuit, the plurality opinion of the *Franklin* Court "concluded that 'in general, this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"  *Swan*, 100 F.3d at 977.  Plaintiffs flatly ignore this precedent, instead choosing to rely on cases predating both *Franklin* and *Swan* to argue that the Court may enjoin the President in the exercise of his official duties.  *See* NTEU Opp'n 27-29; NFFE Opp'n 23.  Indeed, the primary case cited by both NTEU and NFFE, *NTEU v. Nixon*, 492 F.2d at 609, was specifically called into question by the court in *Swan*.  100 F.3d at 978 ("It is not entirely clear, of course, whether, and to what extent, these decisions remain good law after *Franklin*.).

The same concerns underlying issuance of an injunction against the President in his official capacity also apply to the issuance of an injunction against the President in the performance of his ministerial duties.  While it has been suggested that Supreme Court precedent leaves open "the question whether the President might be subject to a judicial injunction requiring the performance

---

[16] Notably, the Removal Procedures Order does not explicitly prohibit agencies from engaging in progressive discipline; it states that agency officials should not be required to do so.  *See* Secs. 2(b), 4(b)(iii).  NTEU's apparent concerns over certain language in OPM's guidance, NTEU Opp'n 26, would surely be aired during any notice-and-comment rulemaking that OPM initiates concerning progressive discipline.  During that process, OPM would have an opportunity to describe in detail its reasoning and consider any responsive comments. *See* Removal Procedures Order, Sec. 7; Defs.' Mot. 52.  Those issues, however, are beyond the scope of this litigation.

of a purely 'ministerial' duty," *Franklin*, 505 U.S. at 802, 827 n.2 (Scalia, J., concurring), the D.C. Circuit has "never attempted to exercise power to order the President to perform a ministerial duty." *Swan*, 100 F.3d at 978. However, assuming this question of enjoining the President's performance of ministerial duties remains open, the Court need not attempt to answer it because the challenged actions at issue here are not ministerial in nature. "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Id.* at 977. Plaintiffs argue that, if the Court finds the Orders to be unlawful, the President will have a ministerial duty to comply with the law, and thus may be enjoined. *See* NFFE Opp'n 24; NTEU Opp'n 30-31.

This argument misunderstands the *Swan* court's reasoning. In *Swan*, the Plaintiff argued that the President "violated a duty to comply with removal restrictions contained in the [relevant] Statute." *Swan*, 100 F.3d at 977. The Government responded by arguing that, "since the NCUA statute nowhere expressly limits the President's removal power, the statute cannot impose a nonremoval duty of sufficient clarity to create a ministerial duty." *Id.* at 978. The court rejected the Government's argument, concluding that a "ministerial duty can exist even where the interpretation of the controlling statute is in doubt, provided that the statute, once interpreted, creates a peremptory obligation for the officer to act." *Id.* Here, even under Plaintiffs' reading of the Statute, there would be no affirmative duty for the President to act. And Plaintiffs have not identified any provision of the Statute that would impose such a duty. Plaintiffs' arguments are no more than an attempt to allow courts to enjoin the President in the exercise of his Article II duty to comply with the Take Care clause, even though such claims are nonjusticiable and, in any event, there is no violation here, *see supra* Part III.A.1.

Continuing to ignore the separation-of-powers concerns raised by the Supreme Court and the D.C. Circuit, Plaintiffs argue this court can issue declaratory relief against the President.  In *Swan*, however, the court went out of its way to note that, while the discussion was "couched in terms of [the court's] ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to [the plaintiffs'] request for a declaratory judgment."  100 F.3d at 976 n. 1.  Relying on the fact that the D.C. Circuit once before issued a declaratory judgment against a sitting President, in a case predating both *Franklin* and *Swan*, and subsequently questioned by the D.C. Circuit, Plaintiffs conclude that declaratory relief is appropriate in this case.  *See* NFFE Opp'n 25; NTEU Opp'n 32.  To the contrary, recent precedent makes clear that "a court—whether via injunctive or declaratory relief— does not sit in judgment of a President's executive decisions."  *Newdow*, 603 F.3d at 1012.  For the same reasons that an injunction against the President is not appropriate, this Court should not enter a declaratory judgment against the President.[17]

## CONCLUSION

For the foregoing reasons and for the reasons stated in Defendants' Opposition to Plaintiffs' Motions for Summary Judgment and Defendants' Cross-Motion for Summary Judgment, Defendants' Motion should be granted, and Judgment should be entered for Defendants.

---

[17] Should the Court determine that it is proper to invalidate any portion of the Orders, it is appropriate to sever these portions from the Orders, while leaving the remainder intact.  NFFE's argument to the contrary ignores the plain language of the Orders.  *See* NFFE Opp'n 17 n. 6.  As NFFE acknowledges, the Court should look to the intent of the President in determining whether severability is appropriate.  *Id.* (citing *Alaska Airlines v. Brock*, 480 U.S. 678, 686 (1987).  There is no indication in any of the three Orders that the President intended for all of the provisions to rise or fall together as one.  To the contrary, in the Official Time Order and the Removal Procedures Order he explicitly directed that "[i]f any provision of this order, including any of its applications, is held to be invalid, the remainder of this order and all of its other applications shall not be affected thereby."  Official Time Order, Sec. 9(f); Removal Procedures Order, Sec. 8(e).

Dated:  July 24, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

CHRISTOPHER HALL
Assistant Branch Director


*/s/ Rachael Westmoreland*
RACHAEL WESTMORELAND
(GA Bar #539498)

*/s/ M. Andrew Zee*
M. ANDREW ZEE
(CA Bar #272510)

Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-1280
Fax:  (202) 616-8460
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*