UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
------------------------------X

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL-CIO, et al.,

                Plaintiffs,

        v.                          Civil Action  18-1261

DONALD J. TRUMP, et al.,

                Defendants.

------------------------------X
                                    Washington, D.C.
                                    Wednesday, July 25, 2018
                                    2:15 p.m.

                    TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE KETANJI B. JACKSON
                    UNITED STATES DISTRICT JUDGE
APPEARANCES:

For the Plaintiffs:  Andres M. Grajales, Esq.
                     Chad E. Harris, Esq.
                     AMERICAN FEDERATION OF GOVT. EMPLOYEES
                      Office of the General Counsel
                     80 F Street, NW, 10th Floor
                     Washington, DC 20001
                     (202) 639-6426

                     Richard J Hirn, Esq.
                     Suzanne Summerlin Tzuanos, Esq.
                     NAT. FEDERATION OF FEDERAL EMPLOYEES
                     5335 Wisconsin Avenue, NW, Suite 440
                     Washington, DC 20015
                     (202) 274-1812

Court Reporter:      Lisa Walker Griffith, RPR
                     U.S. District Courthouse, Room 6507
                     Washington, D.C.  20001
                     (202) 354-3247

```
APPEARANCES: (Cont'd.)


For the Plaintiffs:   Gregory J. O'Duden, Esq.
                      Larry J. Adkins, Esq.
                      NATIONAL TREASURY EMPLOYEES UNION
                      Office of General Counsel
                      1750 H Street, NW
                      Washington, DC 20006
                      (202) 572-5500

                      Matthew Blumin, Esq.
                      Teague P. Paterson, Esq.
                      AMERICAN FEDERATION OF
                       STATE, COUNTY and MUNICIPAL EMPLOYEES
                      1101 17th Street, NW
                      Washington, DC 20036
                      (202) 775-5900



For the Defendants:   Rachael Lynn Westmoreland, Esq.
                      Andrew Zee, Esq.
                      Christopher Hall, Esq.
                      U.S. DEPARTMENT OF JUSTICE
                      Civil Division, Federal Programs Branch
                      20 Massachusetts Avenue, NW
                      Washington, DC 20530
                      (202) 514-1280
```

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Good afternoon, Your Honor.
This is Civil case 18-1261, American Federation of Government
Employees, AFL-CIO, et al., versus Donald J. Trump, et al.

I'm going to ask counsel please approach the podium
and identify yourselves for the record, also introduce any
parties at your table.

MR. GRAJALAS:  Andy Grajales for AFGE.

THE COURT:  Good morning -- or afternoon.  Lost
track of time already.

MR. HIRN:  Good afternoon, Your Honor.  I am
Richard Hirn for the National Federation of Federal Employees
and the 12 other unions that are on the complaint.

THE COURT:  Good afternoon.

MR. O'DUDEN:  Good afternoon, Your Honor.  Gregory
O'Duden for the National Treasury Employees Union.

THE COURT:  Mr. O'Duden.

MR. BLUMIN:  Good afternoon, Your Honor.  Matt
Blumin for the American Federation of State, County and
Municipal Employees and also for the American Federation of
Teachers.

THE COURT:  Mr. Blumin.

Anyone else?  That's all of the plaintiffs.

All right.  There are others at the table, however.
Can we have you introduce yourselves as well?

1          MS. SUMMERLIN:  Good afternoon, Your Honor.  I'm

2    Suzanne Summerlin, Associate General Counsel for the National

3    Federation of Federal Employees.

4          THE COURT:  Thank you.

5          MR. PATERSON:  Your Honor, it's Teague Paterson for

6    AFSCME, American Federation of State, County and Municipal

7    Employees.

8          THE COURT:  Thank you.

9          MR. ADKINS:  Larry Adkins for National Treasury

10   Employees Union.

11         THE COURT:  Thank you.

12         MR. HARRIS:  Chad Harris for AFGE.

13         THE COURT:  Good afternoon to all of you.  I think

14   that's everyone on the plaintiffs' side.

15         Defendants?

16         MS. WESTMORELAND:  Good afternoon, Your Honor.

17   Rachael Westmoreland for defendant.

18         THE COURT:  Ms. Westmoreland.

19         MR. ZEE:  Good afternoon, Your Honor.  Andrew Zee

20   from the Department of Justice for the government.

21         THE COURT:  Mr. Zee.

22         MR. HALL:  Good afternoon, Your Honor, Christopher

23   Hall with the Department of Justice.

24         THE COURT:  Mr. Hall.

25         MR. ABEL:  Good afternoon, Your Honor.  Steven

1    Abel, Office of Personnel Management.

2            THE COURT:  All right.  Good afternoon to all of

3    you.

4            This Court has scheduled this hearing in order to

5    give the parties in this matter the opportunity to provide

6    argument and hopefully insight into the arguments that are

7    being made with respect to the pending dispositive motions.

8    These motions are four separate motions that the unions have

9    made, Motions for Summary Judgment, and the government's

10   cross Motion for Summary Judgment in what has turned out to

11   be a very complex legal matter.

12           As you know, this case and the motions before the

13   Court involve issues pertaining to this Court's authority,

14   the president's authority, the authority that Congress has

15   delegated to the independent agency known as the Federal

16   Labor Relations Authority.  And various alleged conflicts

17   between, on the one hand, the provisions of three federal

18   labor-related executive orders that President Trump signed

19   earlier this year.  And on the other, a statute governing

20   federal labor relationships that Congress enacted in 1978.

21           With that said, I am really glad that you all are

22   here to help me sort through the thicket of complicated

23   questions that arise in this case.  And I certainly

24   appreciate your expertise with respect to the various

25   arguments that have been made in the briefs and that you will

 1    be making here again today.

 2           As a general matter, as we have previously

 3    discussed, we will be addressing whether or not this Court

 4    has subject matter jurisdiction to hear the claims at issue

 5    in this case; whether or not the president had the statutory

 6    and/or constitutional authority to issue the challenge to

 7    executive orders; whether or not the particular prescriptions

 8    of the challenged orders conflict with the F.S.L.M.R.S.  And

 9    whether or not these orders are otherwise unconstitutional

10    and therefore unlawful.

11           I am familiar with your arguments regarding why

12    summary judgment should be granted in your favor.  But you

13    should feel free to restate them and to provide as much

14    background detail as you think will be necessary in order to

15    illuminate the issues.

16           And, of course, because the purpose of this hearing

17    is to provide the Court with the information that it needs in

18    order to be able to rule on these motions, I will be asking

19    clarifying questions, although I will try not to interrupt

20    you too much.

21           As far as the procedure we will follow, I don't

22    impose time limits.  I find them distracting.  We will

23    continue until my questions are answered or until we're all

24    exhausted, whichever comes first.  And as we have previously

25    discussed, I intend to have us try to address these various

1    topics by subject matter.

2         I do realize there are many plaintiffs' counsels

3    who would like to speak.  I'm trying to keep track of

4    everyone and make sure that we have all topics replied to as

5    well.  And that's going to be a challenge.  But consistent

6    with what we previously discussed, here is what I propose.

7         I think we should start with subject matter

8    jurisdiction and ripeness.  And I'm going to ask government

9    counsel to address those threshold issues first since it is

10   the government's argument that this Court has no subject

11   matter jurisdiction over the claims at issue in this case and

12   the claims are not ripe.

13        AFGE counsel can then respond.  I believe AFGE

14   counsel was going to address those topics.  Then we'll move

15   to the question of presidential authority, which I understand

16   will be addressed by counsel for NFFE.  At that point I will

17   give the government a chance to address both the

18   jurisdictional argument that AFGE made and NFFE's

19   presidential authority argument.

20        We'll then turn to NTEU, who will be focused

21   primarily on the particulars of the executive orders and the

22   alleged conflicts with the F.S.L.M.R.S.  Once that argument

23   has been made, the government will be able to respond.

24        And then finally we will have AFSCME discussing

25   remedy and the constitutional issues.  And I will give the

1    government a chance to reply to that argument as well.

2         You'll have to excuse me.  There are so many

3    acronyms in this case.  I hope I got everybody correct.  I

4    may mess it up, but we'll do our best.  And also if I have

5    done that correctly in terms of who will be speaking when,

6    that will mean that each side will be up four times.  But

7    this is a fluid process and so I may entertain other replies

8    as well.

9         And we will certainly have to take a break during

10   this process because I can imagine that each of you will have

11   a lot to say.

12        So with that, let's start with the first topic

13   which is subject matter jurisdiction and ripeness.  And we'll

14   have government's counsel approach.

15        MR. ZEE:  Thank you, Your Honor.

16        With respect to subject matter jurisdiction I

17   intend to handle the argument with the government as advance

18   with respect to the channeling of plaintiffs' claim and the

19   preclusion of jurisdiction in this court based on the Federal

20   Service Labor Management Relation Statute, which, with the

21   Court's permission, I think I'll will refer to as "the

22   statute."

23        THE COURT:  All right.  Thank you.

24        MR. ZEE:  So we think, Your Honor, that it's clear

25   under the precedent both of the D.C. Circuit and the

1   *Secretary of the Air Force* case, as well as under the Supreme

2   Court under both *Thunder Basin Coal Company* --

3           THE COURT:  Let me have you speak right into the

4   microphone as best you can because we have a lot of people

5   who'd like to hear.

6           MR. ZEE:  Certainly.

7           THE COURT:  Thank you.

8           MR. ZEE:  With the precedent of the Supreme Court

9   in both *Thunder Basin Coal Company*, and more to the point,

10  Your Honor, *Elgin versus Department of the Treasury*, that the

11  claims that plaintiffs are seeking to have heard in this

12  court should -- may not, in fact, be heard in this court.  In

13  fact, Congress intended that those claims be brought through

14  the dedicated and particularly review scheme that it

15  established for precisely these kinds of challenges that the

16  plaintiffs are trying to make.

17          THE COURT:  Do any of the cases that you just cited

18  involve executive orders challenges to the authority of the

19  president to intervene in this kind of circumstance?

20          MR. ZEE:  None of those three cases involved

21  executive orders.

22          THE COURT:  All right.  So why do you think that

23  they preclude this Court's review?

24          MR. ZEE:  We don't think that there's any

25  meaningful distinction between whether the challenged

1    government action as an executive order, as it is in this

2    case, as opposed to a federal statute, as it was in *Elgin*.

3    Or to a government rule or regulation, as it was *AFGE versus*

4    *Secretary of the Air Force*.

5            The principle is that where a plaintiff challenges

6    the validity of a rule pursuant to which they believe -- the

7    plaintiff believes that that will affect issues related to

8    the duty to bargain, issues related to negotiability.  The

9    courts have held that such claims, regardless of whether

10   they're framed as challenges to the authority of the

11   government to issue those rule or the challenges of Congress

12   to issue that statute, that the channeling requirement still

13   applies.

14           THE COURT:  Let me ask you why that's so given that

15   we're talking about an executive order and presumably the

16   remedy would be for the agency to tell their boss, the

17   president, that he could not do whatever it was that was

18   inconsistent with the statute.  And you're suggesting there's

19   no discernible difference between that and the FLRA telling

20   another agency that their rule is unlawful.

21           MR. ZEE:  Well, it's not -- the parties have

22   disputed the extent to which the agency, that is, the Federal

23   Labor Relations Authority, would be able to actually rule on

24   the validity of the actual regulations themselves.  There's

25   no question, and there's no dispute among the parties whether

1    the -- that the authority can, in fact, rule on the questions

2    about the duty to bargain, the negotiability, the effect of

3    the provisions of the executive orders.

4          THE COURT:  All right.  But that's not the claim

5    that's being made here.  So what you say we've disputed the

6    extent to which they can rule on something like striking down

7    a presidential executive order, what's the government's

8    position as to whether the FLRA can do that?

9          MR. ZEE:  Well, I would point -- well, I think that

10   the government's position, I don't want to prejudice what the

11   government's position might be in any given individual FLRA

12   proceeding that may occur with respect to these provisions

13   that may be challenged by individual unions or agencies in

14   that context.  But I would point to the court's opinion in

15   *Elgin* which involved the challenge to -- a constitutional

16   challenge, in fact, to the statute that authorized the

17   conduct that the plaintiffs in *Elgin* complained of.

18          And the court in *Elgin* held that those claims,

19   notwithstanding the fact that they were challenges to the

20   validity of those statutes, to the constitutionality of those

21   statutes, that those claims, regardless of whether or not the

22   administrative agency, the MSPB, the Merit Systems Protection

23   Board in that case, could, in fact, rule on that particular

24   issue.  There was no question that the Court of Appeals

25   could.

1          THE COURT:  So your suggestion is that the issue

2    has to be tendered to the agency, and even if the agency's

3    own view is that it cannot reach constitutional questions or

4    questions about the extent of the president's authority in a

5    case like this, that it still has to go to the agency and

6    then get to the Court of Appeals?

7          MR. ZEE:  Correct, and that's not merely our

8    suggestion, to be clear.  That is the holding of *Elgin* as we

9    view *Elgin*.

10         THE COURT:  With respect to constitutional

11   questions in the context of whatever issue was being

12   presented there.  But I'm still worried about executive

13   orders in particular.  You think there's no difference.

14         MR. ZEE:  We recognize that there is a distinction,

15   of course, between a federal statute and executive order.

16   But I think that the principle of *Elgin* is that to the extent

17   that a plaintiff seeks to challenge the validity of the

18   authorizing law, be it a statute, be it a federal regulation,

19   be it an executive order, that regardless -- the Supreme

20   Court said it didn't matter in *Elgin* whether the MSPB in that

21   case could rule on the validity of the order because the

22   Court of Appeals could.  There's no difference here.

23         THE COURT:  Well, let me ask you about that.

24   Because as I read the judicial review provision at issue

25   here, it's unclear to me that the Court of Appeals could

1    reach any sort of extraneous constitutional question.  I'm

2    looking at 7123.  I mean, obviously each one of these cases

3    are going to be coming up in the context in which they exist.

4    So I don't know if any of these cases involve the

5    F.S.L.M.R.S. or the statute we're dealing with here.

6            But in this statute, it looks as though even the

7    Court of Appeals is somewhat constrained with respect to how

8    it reviews the FLRA's determination.

9            MR. ZEE:  Your Honor, we don't read Section 7123 as

10   precluding the Court of Appeals to the extent that there is a

11   petition filed out of a FLRA proceeding to the Court of

12   Appeals to preclude the Court of Appeals in any way from

13   adjudicating the validity of the -- the authorizing of law,

14   again be it a regulation, be it a statute, be it an

15   executive order.

16           THE COURT:  But why would they reach that?  Under

17   what circumstance would they reach that?  I mean, yes, I

18   understand it was presented to the FLRA.  But for whatever

19   reason, let's say the FLRA says we can't decide; it's not

20   within our power to determine whether the executive order

21   that caused the agency to include this term or to refuse to

22   bargain in this way was lawful or not.  All we know is the

23   agency didn't do what it was supposed to do, we think, under

24   the statute.

25           How would the Court of Appeals in reviewing that

1   ever reach the issue of the lawfulness or unlawfulness of the

2   precipitating executive order?

3            MR. ZEE:  So long as the plaintiff, the plaintiff's

4   union, let's assume hypothetically in this case, is

5   presenting a claim that the -- a certain provision of the

6   executive order is, in fact, unlawful.  That would be

7   preserved in the FLRA proceeding, that could be part of the

8   proceeding before the FLRA, and Section 7123(c) gives the

9   Court of Appeals jurisdiction over the, and I'm going to

10  quote from the statute here, Your Honor, it gives the Court

11  of Appeals that it shall have jurisdiction of the proceeding

12  and of the question determined therein.

13           And I would analogize between this --

14           THE COURT:  I don't know if that helps you or hurts

15  you.

16           MR. ZEE:  Well, I would argue that it helps us,

17  Your Honor, because this judicial review statute is very

18  similar to the judicial review statute that was at issue in

19  *Elgin*, which involved the meaningful judicial review, as that

20  court held, that the federal circuit would have over an MSPB

21  determination.

22           So again, regardless, the Supreme Court found it

23  unnecessary to rule on whether the MSPB could entertain or

24  could ultimately decide the validity of the federal statutes

25  challenged in that case but confronted with a judicial review

1   provision that looks very similar for all intents and

2   purposes functionally the equivalent of Section 7123, the

3   Supreme Court had no trouble concluding that the Court of

4   Appeals would offer an opportunity for meaningful judicial

5   review of the plaintiffs' constitutional challenges to those

6   statutes.

7          THE COURT:  All right.  I'm going to have to go

8   back and actually dig in and try to figure out whether the

9   particular provision in terms of the channeling that was

10  going on in *Elgin* is, in fact, the same to the extent that

11  the language here is the Court of Appeals has authority to

12  review the question presented therein.

13         MR. ZEE:  Correct.  And I believe, Your Honor --

14         THE COURT:  And, I'm sorry, can you just help me

15  figure out, this paragraph is enormous.  Where does that

16  language live?  Is it in 7123(a)?  No.  (c)?  Sorry, the

17  language of the Court of Appeals' authority that you just

18  quoted, where is that?

19         MR. ZEE:  It's in 5 U.S.C. 7123 for purposes of an

20  appeal out of the FLRA.

21         THE COURT:  Which subdivision?  712 -- I'm trying

22  to find it.

23         MR. ZEE:  It's Section 7123, Subsection little c.

24         THE COURT:  Little c, all right.  Give me a second

25  here.  I'm trying to -- there's like 25 sentences in that,

1    could you give us --

2              MR. ZEE:  Can I focus Your Honor on -- what we are

3    focused on is the second sentence of that subsection.

4              THE COURT:  Okay.  All right, go ahead.

5              MR. ZEE:  And so the point, Your Honor, in the

6    analogy that I'm trying to draw to the *Elgin* case is that the

7    statute at issue in *Elgin*, which if memory serves, was --

8    it's also part of the Civil Service Reform Act, Section 7703,

9    if memory serves.  It is functionally the equivalent of the

10   statute that I just pointed Your Honor's attention to,

11   7123(c).

12             And so given that the Supreme Court concluded that

13   regardless of whether the MSPB could decide the issue, the

14   Court of Appeals could in the face of a judicial review

15   provision that is the same for all intents and purposes.

16             THE COURT:  I understand.  But do you appreciate

17   that the language really matters?  Because I -- and I don't

18   doubt or dispute necessarily your characterization of what's

19   happening in *Elgin*.  But the language that you've helped me

20   to find says that the Court of Appeals shall have

21   jurisdiction of the proceeding and of the question determined

22   therein.

23             So, if the FLRA and, I guess in *Elgin*, the MSPB

24   didn't determine the question, I'm still confused as to why

25   the Court would think that they could reach a constitutional

1    question that the agency itself did not determine.

2              MR. ZEE:  Because I think it has -- the Court of

3    Appeals has jurisdiction, not only of the question determined

4    therein, but of the proceeding which would necessarily

5    include arguments presented to the FLRA, which, let's just

6    assume hypothetically, the FLRA said, you know what?  We lack

7    the ability or we decline to consider for whatever reason,

8    I'm not going to foresee what the FLRA might say in that

9    instance, but it's not merely -- as the plaintiffs' briefing,

10   the plaintiffs' briefing, I think attempts to convey a

11   cramped, a former cramped scope of judicial review under

12   Section 7123(c) than is actually offered.

13             THE COURT:  Yes.  And yours reads it to be

14   duplicative, right, because if it's the proceeding, then why

15   do we need to have the word and of the question determined

16   therein.  If the proceeding is enough to get us into

17   everything that is being involved at the agency, I don't

18   understand why Congress saw fit to specify and the question

19   determined --

20             MR. ZEE:  Well, I still think the term that

21   Congress included that the Courts of Appeal would have

22   jurisdiction over the proceeding can't be read out as

23   plaintiffs would have it in favor strictly of the question

24   determined before the FLRA.

25             And as we read *Elgin*, that is the import of *Elgin*.

1    The court simply found it irrelevant whether the

2    administrative agency in that case could or could not decide

3    the validity claim that the plaintiffs there were possessing

4    because there was no question the Court of Appeals could.

5         THE COURT:  All right.  Well, let me ask you this.

6    Because you've given me cases that I will go and find and

7    look up and try to evaluate.  But I'm also aware of perhaps

8    more recent D.C. Circuit precedent, the *Jarkesy* case, Judge

9    Srinivasan's case, that as it tried to evaluate whether or

10   not this channeling occurred within the context of the

11   statute that was being evaluated there.  Do you believe that

12   his principles as to how you assess this apply or no?

13        MR. ZEE:  I can't claim that level of familiarity

14   with that SEC case.

15        THE COURT:  Okay.  Yes.

16        MR. ZEE:  The recent D.C. Circuit case post-*Elgin*

17   that we have relied on, which is an FLRA channeling case --

18        THE COURT:  Yes.

19        MR. ZEE:  -- is *AFGE versus Secretary of the Air*

20   *Force*, which we believe is also -- it's an illustration of

21   the *Elgin* principle, if you will.

22        THE COURT:  All right.

23        MR. ZEE:  And unlike *Elgin*, it was not a *Merit*

24   *Systems Protection Board* case, set that aside.

25        THE COURT:  Right.

1          MR. ZEE:  But set that distinction aside.  But in

2     *Secretary of the Air Force*, the plaintiffs there challenged

3     the validity of an Air Force rule imposing certain dress code

4     requirements on civilian members of the Air Force.  The union

5     plaintiffs sought to challenge the validity, it sought to

6     challenge the authority of the Air Force there to issue that

7     rule pursuant to the statute.  The D.C. Circuit there said

8     that claim is precisely the type that needs to be channeled.

9     And there are no fewer than three different mechanisms by

10    which that claim can be channeled through the FLRA.

11          And the D.C. Circuit, in fact, stated that to the

12    extent that certain plaintiffs, in that case I believe the

13    National AFGE was a party as well as different locals of AFGE

14    were also parties, it distinguished between the locals and

15    the nationals and the defense that the locals may well be

16    able to present cases -- present their disputes through the

17    FLRA whereas in response to the National AFGE plaintiff's

18    argument, which was that we're unable to do so, we are unable

19    to present our claims through that channeling process.

20          The response of the D.C. Circuit in that case,

21    well, in that case you have no claim at all.  That does not

22    mean that you simply are allowed to sue in District Court.

23          THE COURT:  Let me ask -- can I just ask you this?

24    And I will look at the Army case as well.  I recognized in

25    your reply brief that you relied on it pretty heavily.

1          At least one aspect of plaintiffs' challenges

2    relates purely to the scope of the president's authority, not

3    about any conflict with respect to the particular provisions,

4    you know, requiring some sort of interpretation of the

5    statute.  But I read as more in nature of the statutory

6    scheme that Congress has put forward is such that the

7    president has no authority to legislate, essentially, through

8    these executive orders in this area, period, full stop.

9          Are you suggesting that, let's say the union had

10   only that claim, they were perfectly fine, I'm giving you a

11   hypothetical.  Perfectly fine.  The president comes in, he's

12   got these executive orders.  No problem, they say, with the

13   contents of those executive orders.  But we still believe,

14   because we're foreseeing down the line that maybe we won't

15   like what the president does, we're arguing now that the

16   president has no authority to legislate in this area.  Is it

17   the government's position that that claim, too, goes only to

18   the FLRA?

19          MR. ZEE:  We think that that claim, to the extent

20   that there was a challenge to a particular provision of the

21   E.O. as opposed to the sort of -- of the NTEU plaintiffs that

22   have lodged a cumulative challenge, we think that that claim

23   might be heard by the District Court, but would be subject

24   to -- would essentially be subject to compulsory dismissal

25   under the authorities, the Supreme Court authority we've

1    cited which make clear that the --

2              THE COURT:  So I'm sorry, there's no subject matter

3    jurisdiction problem, but for other reasons the claim would

4    go?

5              MR. ZEE:  For other reasons, the claim would

6    certainly go, yes.

7              THE COURT:  All right.  But that one's not

8    channeled.  So at the very least we have that one in this

9    case, correct?  We have that one -- that one of the unions is

10   making that kind of claim.

11             MR. ZEE:  It's not clear to us, Your Honor, whether

12   that claim -- it's not clear to us that that claim is not

13   merely a mirror image of their claim of statutory conflict,

14   whether they're --

15             THE COURT:  No, but it's a different claim.  There

16   is a different basis they say for the argument that what the

17   president has done here is unlawful.  One argument is this

18   entire scheme is such that Congress did not intend for the

19   president to retain any authority over legislating in the

20   area of collective bargaining once the statute was enacted.

21   So even if we like it, it doesn't matter, the president can't

22   do it.

23             MR. ZEE:  I mean, I think, considering Your Honor's

24   hypothetical, I now understand, were it simply an objection

25   to the help fact of the president's action --

1           THE COURT:  Yes.

2           MR. ZEE:  -- without any substantive objection on

3    the merits to what the president happens to have done, I

4    would question whether they have standing in the first

5    instance to raise that.  So I think that that would --

6           THE COURT:  Well, I mean, by virtue of his action,

7    they're affected.  By virtue --

8           MR. ZEE:  But if they don't have --

9           THE COURT:  Sorry.

10          MR. ZEE:  If they take no issue, which I believe

11   was the hypothetical, if they take no issue, as they

12   obviously do here, with the content of the provisions and the

13   relationship of the provisions to the actual statute, I think

14   they would struggle if not be utterly unable to state any

15   injury to that.

16          THE COURT:  All right.  What if they're injured,

17   they hate the provisions, the provisions are doing terrible

18   things, but their claim doesn't arise out of the conflict,

19   the claim arises out of the argument that's being made by one

20   of the unions that the president can't do this.

21          MR. ZEE:  In that case, which is much closer, of

22   course, to this case, where they hate the provisions --

23          THE COURT:  Correct.

24          MR. ZEE:  The provisions are going to restrict

25   unduly the duty to bargain, et cetera, et cetera.

1          THE COURT:  Yes.

2          MR. ZEE:  That is precisely the sort of questions

3     the FLRA has the competence, has the expertise to answer.

4     And as Congress set it up, District Courts, not that they

5     lack the competence to do so or the expertise to do so, but

6     the FLRA was created for that very purpose.

7          THE COURT:  So where in the authorizing statute is

8     there language that suggests that the FLRA is supposed to

9     reach the kind of question that I'm talking about?  I'm

10    looking at 7105, powers and duties of the authority and the

11    kinds of things the authority is supposed to address don't

12    seem to encompass what appears to me to be at least one claim

13    that is wholly collateral to this notion of conflict with the

14    statute.

15         MR. ZEE:  I think that the FLRA, I mean, there

16    seems to be no dispute they can address questions of

17    conflict.  Statute.  They can certainly assess, as the FLRA

18    routinely does, whether something that the government has

19    done, be it by an agency or even by an executive order, is or

20    is not a government-wide rule.

21         If the question, though, is whether the FLRA is

22    empowered to rule on the idea of whether the president has

23    statutory or constitutional authority under Article 2 to do

24    what he has done, again I would revert back to the *Elgin*

25    argument.  That's exactly the type of claim that was being

1    presented in *Elgin*.

2         THE COURT:  So you're saying that the Supreme Court

3    through *Elgin* decided that that kind of claim,

4    notwithstanding the fact that our statute doesn't really seem

5    to provide the agency with any authority to address it, the

6    Supreme Court says nevertheless because the Court of Appeals

7    swoops in at the end under this kind of scheme, that should

8    be enough to keep the District Courts from hearing what is

9    quintessentially a District Court kind of legal issue, right?

10        MR. ZEE:  That is our argument, Your Honor.  I

11   think the *Elgin* Court said, as we have here, the *Elgin* Court

12   confronts in an argument from the plaintiff that the agency,

13   the reviewing agency lacks competence, lacked authority, was

14   unable to review whether the Selective Service Act was

15   constitutional.

16        THE COURT:  All right.

17        MR. ZEE:  The court said that doesn't matter.  We

18   don't even need to answer that question.  We need not delve

19   into that question because the Court of Appeals can resolve

20   that question.  And that's how Congress wanted it to happen.

21   Regardless of whether District Courts, that's the type of

22   dispute and other contexts, not in the special context of the

23   labor statute.

24        THE COURT:  Right.

25        MR. ZEE:  In other context obviously District

1   Courts do pass on the validity of federal laws and so forth.

2          THE COURT:  All right.  So I don't have to care

3   about really what the remedial power is of the FLRA.  The

4   issue for purposes of your argument is whether the Court of

5   Appeals could actually address through this system this kind

6   of argument.

7          MR. ZEE:  Correct.  And I don't want my argument

8   here before you to convey a sense that the FLRA is bereft of

9   any remedial authority, has significant remedial authority to

10  order the parties to bargain, to declare something the

11  government-wide rule, these are the very issues that the

12  plaintiffs are contesting in this case.

13         THE COURT:  Some of them, many of them.

14         MR. ZEE:  Many of them, perhaps not all of them, I

15  understand that.

16         THE COURT:  Right.

17         MR. ZEE:  Perhaps not all of them, but many of

18  them.  And to the extent that the FLRA agrees with the

19  plaintiffs, we think that that would certainly provide the

20  very relief that they appear to be seeking in this case.

21         THE COURT:  All right.  Are you also addressing

22  ripeness?

23         MR. ZEE:  I may allow my colleague, Ms.

24  Westmoreland, to address ripeness.

25         THE COURT:  All right.  Do you have anything more

1    on this?

2           MR. ZEE:  Other than our argument on the *AFGE*

3    *versus Secretary of the Air Force* case, which unlike the many

4    cases the plaintiffs rely on, which for the most part

5    exclusively predate, not only *Elgin*, but *Thunder Basin Coal*

6    *Company*, we think that those latter cases effectively decide,

7    decide the question.

8           THE COURT:  All right.  Thank you.

9           MR. ZEE:  Thank you.

10          THE COURT:  Ms. Westmoreland.

11          MS. WESTMORELAND:  Your Honor, with respect to

12   ripeness, we don't have anything additional to add to the

13   argument set forth in our opening brief.  And we believe that

14   our channeling argument is sufficient to warrant dismissal of

15   this case in its entirety.

16          THE COURT:  All right.  Well, let me just ask you a

17   couple questions about ripeness.

18          I've been working hard with your colleague to try

19   to isolate the issue of challenge to presidential authority

20   to act.  Isn't that claim at least ripe under these

21   circumstances?  I mean, we don't need any more factual

22   development.  We have action by the president that these

23   plaintiffs contend is unlawful insofar as Congress did not

24   authorize him to act, they say.  Do you have a ripeness

25   contention with respect to that claim?

1          MS. WESTMORELAND:  Your Honor, we recognize the

2     weaknesses of our ripeness claim with respect -- with our

3     ripeness argument with respect to that type of claim, but we

4     do believe that our channeling argument would cover that type

5     of claim, and that's why we're content to rest.

6          THE COURT:  On that.

7          MS. WESTMORELAND:  On that.

8          THE COURT:  All right.  And let me just make sure I

9     understand your ripeness before we allow plaintiffs to

10    respond.  So your suggestion is that without the sort of

11    actual application of these presidential executive orders in

12    the context of collective bargaining, the Court can't really

13    know, assuming I have jurisdiction, I'm going to assume the

14    jurisdiction for the moment, the Court can't really know

15    whether or not this actually is a conflict with the statute.

16    Is that your argument in a nutshell?

17         MS. WESTMORELAND:  I would just refine it slightly,

18    Your Honor, to say that we're not contesting the fact that

19    plaintiffs have stated an injury that would be sufficient for

20    constitutional ripeness or constitutional ripeness has two

21    parts:  Injury and then also there's the doctrine of

22    prudential ripeness.

23         And in the prudential ripeness doctrine inquiry is

24    not whether plaintiffs have been injured and have some injury

25    that may be considered typically ripe at this moment, but

1   whether there's some sort of administrative process that may

2   play out that would clarify or have the potential to clarify

3   some of plaintiff's injury and to avoid the Court having to

4   act twice, once now and once after the process has played

5   out.

6           So with respect to Section 4 of the official time

7   order, in particular, for example, Section 4(c) of that order

8   has a provision saying that within 45 days the Office of

9   Personnel Management is supposed to consider whether there

10  has been conflict with -- whether between the E.O.s and the

11  regulations that are currently in force.  And if there has

12  been such conflict, the O.P.M. is directed to create new

13  regulations that would clarify and assist with implementation

14  of the provisions of Section 4, consistent with applicable

15  law.  And so that would give plaintiffs through that notice

16  and comment opportunity a chance to raise their arguments and

17  for O.P.M. to clarify and assist the agencies in implementing

18  the provisions of E.O.s.

19          THE COURT:  Right.  And, of course, you picked the

20  best case scenario.  I understand you to be raising a

21  ripeness challenge, though, with respect to all of the

22  particulars that are on the table here.  And they're not all

23  like that.  Some of these orders are the president saying

24  don't do this.  Period, full stop.  Right?  I mean, so some

25  of them, you're right, are in the nature of please consider

1    this or you must consider this or you must change your rules.

2    And so I understand in those circumstances we don't have the

3    ultimate change that really allows the Court, you argue, to

4    evaluate how this plays out.

5            But don't you concede that there are some that do

6    appear to be fully formed in that there really is no

7    discretion from the agency's perspective, they have to do

8    certain things or not do certain things.

9            MS. WESTMORELAND:  Yes, Your Honor, we do

10   understand that those provisions would be ripe under both,

11   both from an injury standpoint and also from a potential

12   ripeness standpoint.

13           THE COURT:  All right.  So at least some of these

14   might be ripe.  But you think that channeling means that I

15   don't get to see any of them anyway.

16           MS. WESTMORELAND:  That's correct.

17           THE COURT:  All right.  Thank you.

18           Counsel for AFGE, are you ready to go?  And you

19   might just state your name again, that would be helpful,

20   thank you.

21           MR. GRAJALAS:  Andy Grajales for AFGE.  Just one

22   housekeeping matter.  My colleague, Mr. O'Duden, is going to

23   address ripeness.

24           THE COURT:  All right.

25           MR. GRAJALAS:  And I'll speak to this preclusion

1    argument.  I'm sure it doesn't surprise the Court that from

2    the plaintiffs' perspective we kind of disagree.

3         That whole argument doesn't hold here that

4    plaintiffs' claims are precluded for a number of reasons.

5    But just to piggyback on what your conversation was with

6    defendants, the FLRA cannot assess the validity of an

7    executive order, and the Court of Appeals assessing the

8    validity of the FLRA's order isn't going to hear it either.

9         And it's not just because of the statutory

10   differences that the Court noted.  And there is a statutory

11   difference.  But it's also because we know this because both

12   the authority and the Court of Appeals have found this.

13        One thing I want to draw the Court's attention to

14   is a Fifth Circuit case, it's *AFGE National Council of Grain*

15   *Inspection Locals versus FLRA*.  And the cite is 794 F.2d

16   1013.  And the pertinent language is found on pages 1015 to

17   1016.

18        In that case, which is a Fifth Circuit case, AFGE

19   did what I understand the defendants to be proposing, which

20   is attack the validity of a government-wide rule through a

21   negotiability appeal.  FLRA found they can't hear the

22   validity of an executive order in the context of a

23   negotiability appeal.

24        THE COURT:  Let me just be clear.  Are you talking

25   about an executive order?

1            MR. GRAJALAS:  I'm talking about -- it's a

2   government-wide rule in that case.  It was an O.P.M.

3   Regulation.

4            THE COURT:  Okay.

5            MR. GRAJALAS:  But given that the defendants do

6   make the contention, at least that these are, in fact,

7   government-wide rules, I see no meaningful distinction.

8            THE COURT:  All right.  I'm not looking at the

9   case.  I will go run it down.  I'm just trying to understand

10  it as you describe it, which we have an O.P.M. rule.

11           MR. GRAJALAS:  Correct.

12           THE COURT:  And AFGE's argument is that rule was

13  invalid, but they bring it to the FLRA?

14           MR. GRAJALAS:  AFGE puts forth a bargaining

15  proposal --

16           THE COURT:  Yes.

17           MR. GRAJALAS:  -- which is the only way you're

18  going to get to a negotiability appeal, as it's called.  It's

19  really a petition for review, but it's colloquially called a

20  negotiability appeal.

21           THE COURT:  All right.

22           MR. GRAJALAS:  So there's bargaining.  AFGE puts

23  forth the proposal that in essence is contrary to the

24  government-wide rule.  And the basis is the government-wide

25  rule is invalid.

1        THE COURT:  Okay.

2        MR. GRAJALAS:  FLRA says, well, you're telling us

3   that your proposal is contrary to the government-wide rule.

4   We have no ability to assess the legality of that rule.  So

5   therefore, your proposal is nonnegotiable.  AFGE files a

6   petition for review with the Fifth Circuit arguing the

7   government-wide rule is invalid.  And therefore their

8   proposal should be negotiable.

9        The Fifth Circuit enforces the order of the FLRA on

10   the basis that AFGE's challenge to the underlying regulation

11   belonged in District Court.

12        Now, this has been cited with approval by this

13   circuit in a case called --

14        THE COURT:  By this circuit?

15        MR. GRAJALAS:  That's correct, Your Honor.  *United*

16   *States Department of the Air Force versus Federal Labor*

17   *Relations Authority*, and that cite is 952 F.2d 446.  And

18   we're at 453 is the pin cite.

19        THE COURT:  All right.  So what do you do with

20   these other cases and the analysis that the government would

21   have me make?  Is the idea that those are obviously talking

22   about different statutory schemes, different channeling

23   schemes, not applicable to this one?

24        MR. GRAJALAS:  They're just not applicable for a

25   number of reasons.  The first and foremost is the president

1   is not an agency.  This is not an agency action which is what

2   the statute is very much concerned with.  The president's

3   executive orders are something that are outside the purview

4   of the statute.

5        So, not only is this not an agency action because

6   the president is not an agency, we're not challenging the

7   covered action.  I've heard the government attempt to

8   recharacterize several times what the plaintiffs are

9   alleging.  But there's nothing of a negotiability appeal or

10  an unfair labor practice in any of the plaintiffs' claims.

11       THE COURT:  So you perceive that to be pretty much

12  the scope of the FLRA's authority under the statute?

13       MR. GRAJALAS:  Yes, Your Honor.  That's more or

14  less correct, but there are other distinguishing factors that

15  I can address.  So they put a lot of reliance on the

16  *Secretary of the Air Force* case.  This is a very good

17  example.

18       The problem from a preclusion standpoint in that

19  case was that what AFGE was challenging was an agency

20  regulation.  It wasn't even a government-wide rule or

21  regulation.  And that's also if you look at *AFGE Local 446*

22  *versus Nicholson*, that's how these cases are harmonized.  And

23  just to also --

24       THE COURT:  So you're saying I should take stock,

25  when I'm drilling down on all of these cases, I have to care

1    about what is being challenged?

2             MR. GRAJALAS:  Absolutely.

3             THE COURT:  All right.  So if it's an agency

4    regulation you say that's going to be different than a

5    government-wide rule or an executive order.

6             MR. GRAJALAS:  Right.  And we know this, I mean,

7    not only the Fifth Circuit case and the 1991 case in this

8    circuit, we have other authority for the proposition that the

9    FLRA cannot assess the legality of an executive order.

10            THE COURT:  Well, what about the Court of Appeals?

11   The government counsel deftly said, you know, you don't have

12   to really worry about, I don't want to prejudice any view

13   that the FLRA has such small authority, but you don't even

14   really have to care about that because under the channeling

15   scheme in this case, the Court of Appeals can have authority

16   over the matter, whatever the language is, and the question

17   decided.

18            MR. GRAJALAS:  I have three answers to that.  And I

19   think the first is yes, you do have to care.  And no, the

20   Court of Appeals is not going to have meaningful review of

21   the core validity claim directed at the executive orders.

22            The first is, as the Court points out, it is a

23   different statute.  And when you look at *Elgin*, one of the

24   things you find in that case, aside from it being precisely a

25   matter that's covered by the statute, right, that was a

1    removal.  So any claims directed at the removal were

2    intertwined with the covered action.  That's not the case

3    here, one.

4          Two, when the Supreme Court was looking at it, they

5    noted that the Federal Circuit had never addressed this

6    question.  So we have a different statute entirely that

7    doesn't have in 7703, which is the statute that controls MSPB

8    review.

9          THE COURT:  Yes.

10         MR. GRAJALAS:  It doesn't have that language about

11   the question determined.  It's different language, and it

12   does matter.

13         THE COURT:  Okay.

14         MR. GRAJALAS:  And the Court in *Elgin* notes, on top

15   of that, the Federal Circuit, which is the reviewing court

16   that reviews the majority of MSPB decisions, has never held

17   that it wouldn't have authority to review the entire --

18         THE COURT:  That it would or would not, I'm sorry?

19         MR. GRAJALAS:  That court had not held that it

20   could not review the entirety of the case.  So we have a very

21   different factual setting, where it's a covered action.  We

22   have a different statute.  And we have a very different

23   precedent backdrop from what we have here.

24         Here, we have FLRA cases standing for the

25   proposition that they can't review the validity.  Here we

1   have a different statutory review language.  And here we have

2   circuit cases standing for the proposition that actually the

3   Court has held they can't review those claims.  That the only

4   thing before them arising from an FLRA ordering a

5   negotiability appeal is the question of negotiability.

6           THE COURT:  All right.  So that leads you to the

7   conclusion, I think, that there must be jurisdiction in this

8   court.  That is -- is that the point you're making?

9           MR. GRAJALAS:  That's correct.  That's absolutely

10  correct.

11          THE COURT:  And is that the kind of challenge that

12  that -- I mean, I suppose if this wasn't the kind of

13  challenge that I heard anyway, there wouldn't necessarily

14  have to be a place that you could go even if the FLRA scheme

15  wouldn't get you there, right?

16          MR. GRAJALAS:  Well, I think we have to look at

17  whether or not there was something removing it from the

18  Court's review.

19          THE COURT:  Right.

20          MR. GRAJALAS:  I mean, I think there are some cases

21  that stand for that proposition in those circumstances, the

22  question would not be whether or not it's within federal

23  question jurisdiction.  The question would be whether there

24  was something that removed it from the Court's review.  But

25  we do think that's a little bit distinguishable.

1          And I did want to apologize if I'm off track a

2   little bit.

3          THE COURT:  No, no, that's all right.

4          MR. GRAJALAS:  Have I answered the Court's

5   question?

6          THE COURT:  Yes, yes.

7          MR. GRAJALAS:  Okay.

8          THE COURT:  And the only other case that I was

9   directed to through the government's briefing that I thought

10   would be helpful for you to address is the *Loy* case.

11          MR. GRAJALAS:  Yes.  I did mean to address it, and

12   that's actually where I was going.  You know, *Loy* is just not

13   applicable here for a number of reasons.  They cite a number

14   of cases that again deal with covered actions, first of all.

15   So in *Loy*, that arose from an election petition.  That was an

16   appeal arising from an election petition that AFGE had filed.

17   All right.

18          Second --

19          THE COURT:  And so, with that, you mean it was

20   within the core competency of the FLRA.

21          MR. GRAJALAS:  Exactly.  That's exactly what I'm

22   saying.

23          THE COURT:  All right.

24          MR. GRAJALAS:  And the court in *Nicholson* does a

25   very good job of distinguishing *Loy*, saying *Loy* doesn't apply

1    here because what we have in front of us is a claim that's

2    outside the purview of the statute.  And that the FLRA can't

3    review.  So, *Loy* follows of a piece with the *Secretary of the*

4    *Air Force* case and with *Elgin*.  These cases don't apply to

5    the particular challenges raised by the plaintiffs in this

6    case.

7              THE COURT:  Do you concede that at least some of

8    the challenges, assuming they went to the FLRA, that the FLRA

9    could review?  I mean, aren't there things about your case

10   and your claims that require interpretation of the statute,

11   the extent to which the particular bargaining practices that

12   would arise if the orders are applied conflict with the

13   statute?  And that is in the competency of the FLRA, isn't

14   it?

15             MR. GRAJALAS:  No, Your Honor, we wouldn't concede

16   that at all.  You know, we recognize that maybe there's some

17   overlay at first blush.  But because what we're looking at is

18   the applicability of the executive orders or the validity, I

19   should say, of the executive orders, in assessing that

20   validity, there may be cause or need to review provisions of

21   the statute.  That doesn't mean that that's something that

22   only the FLRA can do.  It just means we're talking about the

23   same statute.

24             THE COURT:  I understand.  But in the ordinary

25   course, setting aside an executive order, just, you know, in

1    the midst of bargaining the parties have a breakdown in terms

2    of their dispute over some aspect of the terms of bargaining

3    and they go to the FLRA, is it your suggestion that the FLRA

4    doesn't have the ability to determine whether this is an

5    unfair labor practice and therefore in violation of the

6    statute or interpret what the statute requires as applied in

7    that particular context?

8              MR. GRAJALAS:  As a hypothetical, I'm sure there

9    are always going to be fact patterns in which the FLRA would

10   have jurisdiction to review whether some discreet set of

11   facts constituted an unfair labor practice or whether a

12   particular proposal was negotiable.  But again, the FLRA is

13   not going to be able to reach the question of whether the

14   orders are valid.  And the FLRA is really not going to be

15   able to reach the question of do these orders do violence to

16   the scheme as a whole.  That's not something that's in the

17   FLRA's province.  We're operating just entirely outside of

18   the scheme.

19             THE COURT:  All right.  I mean, I understand that.

20   I am, of course, also mindful of the arguments that the

21   government's made.  And I would like to ask whoever is

22   addressing ripeness.  And I'll let you continue on with your

23   argument, but I just want to tee this up because to the

24   extent that the FLRA can't address the sort of gestalt of

25   this, which is what I heard you suggest, the president has

```
1   made orders that direct agencies to consider certain things

2   or not to consider certain things, or take terms off the

3   table in the context of their bargaining with the federal

4   unions.

5          So why, says Ms. Westmoreland, shouldn't this Court

6   wait, even if I had jurisdiction, to see how this plays out

7   in the context of negotiations.  It's very hard, I would

8   think, to evaluate whether the president's directives to the

9   agencies which have not in the main been applied yet in the

10  context of collective bargaining, whether there really are

11  going to be conflicts or hurtful or anything else.

12         So, whoever's addressing prudential ripeness, I

13  think that's a part of the thrust of what the government is

14  saying, and I think they may have a fair point.

15         MR. GRAJALAS:  Again, I think that we don't see it

16  that way.  I'm not going to address that subject, so I'll

17  leave it for my colleague to address, and unless the Court

18  has other questions, I only have one other --

19         THE COURT:  Please, yes.

20         MR. GRAJALAS:  -- somewhat responsive.  You know,

21  on page 36 of the government's opening brief, they take the

22  position that Sections 4(a)(1) through 4(a)(5) of the

23  executive order, which I believe we all challenge, perhaps

24  with the exception of 4(a)(4).

25         THE COURT:  I'll tell you the truth, I lost track
```

1    of who was challenging what.  I went through all of this.

2             MR. GRAJALAS:  As have I.

3             THE COURT:  Okay.

4             MR. GRAJALAS:  And I apologize.  But I think it's

5    true that that section certainly is subject to challenge.

6             They say it's meant to prescribe uniform rules for

7    employee conduct that are applicable across the entire

8    government.  And in their own words, entirely remove contrary

9    proposals from the scope of collective bargaining.  Leaving

10   aside, I guess ripeness, an inconsistency with statute.

11   There's no way that the plaintiffs can get meaningful review

12   of their claim that that section is invalid.

13            THE COURT:  All right.  Point me to a particular

14   statute -- I mean, section because I really want to home in

15   on --

16            MR. GRAJALAS:  It's 4(a) Roman numeral 1, through

17   4(a) Roman numeral 5 of executive order 13837, which is the

18   official time statute.

19            THE COURT:  Okay.  So why is it that you are

20   suggesting that through the channeling process we never get

21   there?

22            MR. GRAJALAS:  Because by the government's own

23   admission in their brief they're saying it entirely removes

24   contrary proposals from the scope of collective bargaining.

25   So again, that brings us back to the FLRA can only review for

1   consistency with an executive order, they're never going to

2   be able to review whether that order is valid.  And that's

3   why this Court has jurisdiction.

4                THE COURT:  All right.  I think I understand.

5                Mr. O'Duden.

6                MR. GRAJALAS:  Thank you, Your Honor.

7                THE COURT:  Hello.

8                MR. O'DUDEN:  May it please the Court.  While my

9   job here is to talk about ripeness, that's what I'll do.  The

10  government's ripeness argument, it is our view, completely

11  fails.  The claims that are before the Court are purely legal

12  issues.  And as you know, that's the first prong of the

13  *Abbott Labs* case, you examine whether the issue presented is

14  purely legal.  This one is.  There is no need for further

15  factual development.

16               And I'm sure as Your Honor also knows there are

17  many cases that say that once you satisfy that first prong in

18  the *Abbott Labs* case, you don't even have to move on to

19  decide the second issue of undue hardship.  But in any event,

20  and this I hope goes to answering some of the questions that

21  you posed before. in any event, there has been harm that's

22  been done.

23               There may be places in the government that haven't

24  felt the full effect of it yet, but we have bargaining units

25  which have contracts that are up.  And our agencies where we

1    are trying to bargain.  And as Judge Edwards noted in the

2    *Chertoff* case, in this kind of situation where you have rules

3    that are in place that constrict the ability to bargain, that

4    is a discreet harm to what he called the bargaining process.

5         THE COURT:  All right, but let's not talk in

6    generalities.

7         I mean, you know, we'll get into the specific

8    provisions with whoever's going to discuss the conflicts that

9    at least in a few of them they are constructed to preserve

10   some discretion on the agency's part to act otherwise.  At

11   least some of them suggest that the agency can or should

12   endeavor to do X or should consider Y, right?

13        MR. O'DUDEN:  Yes.

14        THE COURT:  And in those circumstances with respect

15   to those provisions, I'm not sure whether there's a challenge

16   that's ripe from a prudential standpoint because we don't

17   have a concrete factual circumstance in which the agency has

18   exercised its discretion against the backdrop of that new

19   guiding principle.

20        MR. O'DUDEN:  Well, we would, I guess we disagree

21   in terms of our assessment of what the harm is, even --

22        THE COURT:  But I'm not talking about harm, I'm

23   talking about ripeness in the sense that the Court has a hard

24   time being able to evaluate a claim that this particular

25   guidance provision by the president is horrible and needs to

1    be struck down because it's inconsistent with the statute --

2              MR. O'DUDEN:  The labor statute.

3              THE COURT:  We'll call it the statute, because it

4    may not, you can imagine worlds in which it actually doesn't

5    end up being inconsistent because when the agency exercises

6    the discretion that remains, they put it into the bargain.  I

7    mean, there are some of them that say consider taking it off

8    the table, but what if they don't take it off the table, at

9    which point I don't understand why you would have a claim.

10   So don't I have to wait and see?

11             MR. O'DUDEN:  No, you don't.  Because as the

12   declarations that we have submitted show, even with respect

13   to the scenario that you've just described, where at least

14   arguably the provisions of the executive orders are not

15   binding or their guidance or their claim to be

16   recommendations.  That isn't the reality.  What we've seen in

17   every circumstance is that the agency feels compelled,

18   compelled to follow the executive order.  So it is as if the

19   president told them, this is binding and you have to do it.

20             There are a couple of circumstances that the

21   government describes to be guidance or just policy advice.

22   But where they also say, and the so-called one hour cap on

23   official time is an example of this.  Where you fail to

24   achieve the goal, even where it's not technically binding,

25   this is the situation where you're taken to the woodshed.

1   You have to explain why you did not reach that goal.  So as a

2   consequence we see that in real life agencies are saying no,

3   we're not going to talk to you about that.  We have to

4   proceed with respect to those questions.

5          THE COURT:  I understand.  But that's your

6   allegation.  You've given me some examples, you've given

7   me --

8          MR. O'DUDEN:  Yes.

9          THE COURT:  But aren't you making a facial

10  challenge to some extent?  In other words, aren't you

11  challenging these executive orders on their face such that

12  that's what defeats the whole prudential ripeness concern is

13  if you're making sort of like on their face, these executive

14  orders are inconsistent with the statute.  With that kind of

15  argument you're suggesting to me that what's happening is

16  even though on its face it's saying, agency, you still have

17  some discretion, in practice as applied, it's a problem.

18         MR. O'DUDEN:  In the *Chertoff* case, the agency

19  claimed that our challenge was not ripe.  And it said, just

20  like here that, no, we don't know yet whether any of these

21  provisions will actually have any impact.  You should wait,

22  Your Honor, they were saying, you should wait till we see if

23  these things ever actually cause harm.  And both the lower

24  court and Judge Edwards really gave that argument the back of

25  their hands because they realized that in reality these

1  things had real life application.  And so we make the same

2  argument here.  Our ripeness argument is just the same as was

3  made in the *Chertoff* case.

4          THE COURT:  All right.  I'll go look at *Chertoff*.

5          MR. O'DUDEN:  Yes.

6          THE COURT:  Let me ask you a question, though,

7  because I'm trying to understand how this works.

8          MR. O'DUDEN:  I understand.

9          THE COURT:  And Mr. Grajales got into it a little

10 bit.  And so maybe you can help me out.

11         In a situation like any of these that leave a

12 little bit of discretion, the official time or whatever else,

13 you say in reality the agency believes that it doesn't have

14 any authority.  That it has to apply the union time rule, or

15 whatever it is, with respect to official time.

16         MR. O'DUDEN:  That's right.

17         THE COURT:  What I'm trying to understand is

18 whether the unions' response isn't then to bring this to the

19 FLRA in the context of those negotiations in which that's

20 actually happening.  And make the argument that what's

21 happening on the ground with respect to this agency's

22 decision-making is unlawful.

23         MR. O'DUDEN:  Well, the government made that

24 argument too in the *Chertoff* case, that you had to bring

25 everything to the FLRA because of the so called expertise of

1  the agency.  That was addressed there in the lower court.

2  And that argument was rejected.

3          THE COURT:  In other words, I guess I'm just trying

4  to understand whether you have a basis for doing what it is

5  that Mr. Grajales says you're doing, which is instead of

6  challenging in the context of each collective bargaining

7  negotiation, an agency's application of these principles, you

8  would like to go to the source.  Nobody should be able to do

9  this because the president --

10         MR. O'DUDEN:  That's exactly right.

11         THE COURT:  -- has conflicted the statute or

12  whatever with these rulings.

13         MR. O'DUDEN:  Yeah, that's right.

14         THE COURT:  And I'm just trying to understand

15  whether the law doesn't require you to do the former rather

16  than the latter.

17         MR. O'DUDEN:  I don't think the law requires that

18  we engage in piecemeal litigation over these various areas.

19  And we should not be required to go to the FLRA, which

20  doesn't have, as they've made very clear themselves, doesn't

21  have the authority to deal with the underlying problem, which

22  is the executive order.

23         THE COURT:  What is the binding nature of their own

24  authority within their scheme?  So in one case, what you say

25  is allegedly unlawful executive order pertaining to union

1    time is applied.

2             MR. O'DUDEN:  Right.

3             THE COURT:  And you're in the negotiation, and

4    there it is, and you say, don't do that, and the agency says,

5    we feel like we have to, and so they do.

6             MR. O'DUDEN:  That's right.

7             THE COURT:  And then you bring it to the FLRA, and

8    the FLRA, albeit not reaching the president's authority who

9    made the rule --

10            MR. O'DUDEN:  That's right.

11            THE COURT:  -- but it can still, I think, address,

12   maybe the union time was the wrong one, but it could still

13   address whether in the context of that particular negotiation

14   the term should be considered or not, why is it that you

15   don't have to do that?  I mean, first of all, what is the

16   binding nature of their own review of that?

17            MR. O'DUDEN:  The binding nature, you mean --

18            THE COURT:  In subsequent cases where that term is

19   applied, would somebody just be able to point to the FLRA

20   decision in this case and it would be taken care of or would

21   you have to actually litigate this issue over and over and

22   over again?

23            MR. O'DUDEN:  Litigate this issue with respect to

24   individual --

25            THE COURT:  Collective bargaining.

1      MR. O'DUDEN:  Collective bargaining controversies?

2      THE COURT:  Yes.

3      MR. O'DUDEN:  You mean, would it be res judicata,

4 in other words?

5      THE COURT:  Essentially.  I mean, I don't

6 understand, and I'm hoping for your expertise.  When the FLRA

7 says we can't talk about whether the president was allowed to

8 do this particular provision.  But in the context of this

9 negotiation, we think this should be negotiable and not taken

10 off the table, whatever it is.  Well, does that bind

11 future negotiation?

12      MR. O'DUDEN:  Of course, no answers are easy, but

13 if they issued what's called a negotiability decision --

14      THE COURT:  Yes.

15      MR. O'DUDEN:  -- that made a clear determination

16 regarding the negotiability of a proposal, that would be

17 applied in the future, yes.

18      THE COURT:  All right.  So then you don't have to

19 litigate it a thousand times.  Why can't you just do that?

20      MR. O'DUDEN:  Because I'm only talking about a

21 single example or a single provision in the executive order

22 concerning official time.  It would still leave you in the

23 position of litigating on a piecemeal basis every single

24 other one of these changes in the way official time is to be

25 allocated.  So, you could -- and as you put it so well

1   earlier, we want to get to the source.  And that we cannot do

2   if we're relegated to going to the FLRA and litigating these

3   issues one by one.

4          The problem here is in the illegality of the

5   executive order.  That cannot be left on the books because it

6   would just continue to generate controversy.

7          THE COURT:  Right, but from the standpoint of

8   prudential ripeness, part of your argument, I think, turns on

9   whether the executive order is, in fact, illegal because it

10  conflicts with the statute.

11         MR. O'DUDEN:  Yes.

12         THE COURT:  And that's the kind of thing, says the

13  government, that the FLRA is the expert body designed to

14  opine on.  Shouldn't you be required, shouldn't we have

15  factual development where you raise that issue to the agency

16  in the context of collective bargaining and whether you bring

17  it to me or the FLRA, we will at least have some agency

18  decision or thought process regarding the conflict that you

19  say has occurred here.

20         MR. O'DUDEN:  Well, when we go to the Federal Labor

21  Relations Authority, it has to do with either unfair labor

22  practices or their negotiability disputes.  But what they

23  don't deal with, and I need to be very clear about this, we

24  will not get a determination from them about the validity of

25  the president's order.

1          THE COURT:  I understand.  But don't many of the

2     president's orders relate to negotiability?

3          MR. O'DUDEN:  No, they don't.

4          THE COURT:  They don't.  Why not?  I mean, the ones

5     where you said no negotiations.

6          MR. O'DUDEN:  What the president's order does at

7     every turn is to shrink the scope of bargaining just like the

8     system that was in place in the *Chertoff* case.  And in the

9     *Chertoff* case, the courts there completely rejected the

10    notion, as the government suggests, and as you're asking me

11    about today, whether the -- the courts there rejected the

12    notion that you had to go to the FLRA with respect to each

13    circumstance because going there didn't go to the source of

14    the problem.  That's essentially what happened there.

15         Judge Edwards said that she needed to look at the

16    entirety of the elements of the labor relation scheme that

17    was at issue there.  And that is what prompted him to say,

18    this is not collective bargaining, and that's our point here

19    is that the changes being made have so transformed the scheme

20    that it is no longer collective bargaining.  And that is not

21    the kind of determination we would get from the FLRA.

22         THE COURT:  All right.

23         I mean, I think I understand your point.  I just

24    have to sort of sort it through because it's a fundamentally

25    different conception of how to approach this.  The government

1    says we can't know whether the changes have dramatically

2    transformed collective bargaining because you haven't let it

3    play out long enough.

4                MR. O'DUDEN:  I understand.  I think you may find

5    Judge Collyer's decision in the *Chertoff* case to be

6    instructive.

7                THE COURT:  All right.  I will take a look.  Thank

8    you.

9                MR. O'DUDEN:  Thank you.

10               MS. WESTMORELAND:  Your Honor, may we respond now

11   or do you prefer for us to wait until our first response?

12               THE COURT:  Why don't you come now so we can keep

13   them all straight.

14               MR. ZEE:  Thank you, Your Honor.  I promise to be

15   brief.  I wanted to just respond to two points that were

16   raised.  Mr. Grajales, I believe in the context of the

17   channeling argument raised, a decision of the Fifth Circuit

18   and a decision of the D.C. Circuit, both of which to my -- I

19   believe the Fifth Circuit decision dates from the 1980s.  I

20   believe the D.C. Circuit dates from the early '90s.  In fact,

21   both of them predate *Thunder Basin*, *Elgin*, as well as the

22   D.C. Circuit decision in *Secretary of the Air Force*.

23               In addition, the argument that Mr. Grajales was

24   putting forward with respect to channeling focused only on

25   the capacity of the FLRA to decide the validity of the -- of

the certain provisions of the executive order.

THE COURT:  Well, in fairness he said the Fifth

Circuit says that the Court of Appeals can't do it either.

MR. ZEE:  Correct, but I think that -- well, my

point is that in *Elgin*, some nearly 20-odd years later, the

Supreme Court said to the contrary.  So, it's not clear to me

that that Fifth Circuit, the ruling of the Fifth Circuit

there survives the import of what the *Elgin* Court said on

that issue.

THE COURT:  All right.

MR. ZEE:  And then just briefly, with respect to

Mr. O'Duden's argument about an inefficiency, as I understand

it, that piecemeal litigation would not be efficient or it

would -- it's better for them to just simply proceed here

with --

THE COURT:  In fairness, I spun it that way.  I was

trying to get him -- but he agreed, as I think was, you know,

probably a good thing from his perspective to agree with the

way the Court was setting it up.  But go ahead.

MR. ZEE:  I just wanted to point out that the D.C.

Circuit in the *Secretary of the Air Force* case rejected that

argument from the efficiency standpoint, and stated, in fact,

that it rejected AFGE's argument that the District Court has

jurisdiction because AFGE can more -- because the District

Court can more efficiently adjudicate AFGE's claim that the

1   Air Force instructions, the military dress code challenged

2   there, is contrary to the statute, rather than on a local by

3   local basis as those would be brought to the FLRA.  That

4   particular claim, which is what I understood plaintiff NTEU

5   to be making, was explicitly rejected in *Secretary of the Air*

6   *Force*.

7        THE COURT:  I understand.  But it's very

8   complicated because on the one hand the government is

9   suggesting that it doesn't really matter whether the FLRA can

10  reach these particular issues.  And on the other hand, you're

11  saying they can and you should do them one at a time.  So,

12  you know, I'm just trying to piece through the ripeness and

13  jurisdiction arguments, which are sort of working together in

14  a way.

15       MR. ZEE:  Understood, Your Honor.  I think our

16  position is that at a minimum, I think there's no dispute, in

17  fact, among the parties that the FLRA can address questions

18  such as whether the provisions are government-wide rules,

19  whether they create, whether they conflict with the statute

20  such that the agency should be ordered to bargain on a

21  particular issue or whether a particular matter is

22  negotiable, that's certainly -- I don't think that's disputed

23  at all.  There may be a dispute about whether the FLRA is

24  competent to rule on the validity of a particular law.  And I

25  recognize that's plaintiff's argument.  Our counterargument,

1    and I won't dwell on this any further, is that that simply

2    doesn't matter, that simply doesn't matter given the fact

3    that the Court of Appeals can.

4          THE COURT:  All right.  I think I understand.  Let

5    me have Mr. Hirn.  Oh, sorry, did you want to --

6          MR. ZEE:  I think my colleague had one brief point

7    on that.

8          MS. WESTMORELAND:  One additional point, Your

9    Honor.  Mr. O'Duden mentioned the *Chertoff* case in great

10   detail.

11         THE COURT:  Yes.

12         MS. WESTMORELAND:  And when we're talking about

13   presidential authority, I think that will probably come up

14   again there.  But I would just like to point out that the

15   *Chertoff* case did not actually deal with the FLRA.  It was a

16   regulation promulgated by the Department of Homeland Security

17   to create a human resources system for the Department of

18   Homeland Security.

19         And so I would just caution Your Honor when -- that

20   we don't read *Chertoff* to be applicable in this case for a

21   variety of reasons, some of which I'm sure we'll address

22   later, but one of the issues in that case was actually

23   whether they were -- whether the Department of Homeland

24   Security was trying to change the scope of the FLRA's

25   authority to review.  And that certainly is not what we're

1   dealing with here with these orders, where each individual

2   provision could create some conflict that would be

3   addressable by the FLRA.

4              THE COURT:  All right.  Thank you.

5              All right, Mr. Hirn.

6              MR. HIRN:  Yes, thank you.  My task is to address

7   the threshold issue of whether the president has the

8   authority to issue the executive orders in the first place.

9   And whether there are government-wide rules and regulations

10  within the meaning of Section 7117.

11             But before I do that, may I -- if I might briefly

12  bring to the Court's attention a case from my client, NFFE,

13  where the D.C. Circuit specifically talked about this

14  channeling argument, and Judge Edwards called it a

15  discredited theory of subject matter jurisdiction.

16             THE COURT:  And which case is this?

17             MR. HIRN:  This is *National Federation of Federal

18  Employees versus Weinberger*, 818 F.2d 935, and that was a

19  challenge to the constitutionality of some drug testing

20  regulations.  And the government made the same argument, they

21  should go to the FLRA.

22             Judge Edwards said the FLRA proceeding focused on

23  the duty to bargain will not resolve the issues concerning

24  the legality of the drug testing program.

25             THE COURT:  And I take it you don't have a case

1    that comes after *Elgin* or any of the other cases.

2            MR. HIRN:  Well, here's the difference with *Elgin*

3    and why *Elgin* doesn't apply.  In *Elgin*, the Supreme Court,

4    and forgive me if I've read it wrong because I read it very

5    quickly this morning.

6            My understanding of it was it was predicated on the

7    Federal Circuit acknowledging that they did have the

8    authority to review the constitutionality of the underlying

9    statute even though the MSPB does.  This circuit and the

10   Fifth Circuit says they don't.  And Your Honor's reading of

11   the statute, the review provision of the statute, that where

12   the Court of Appeals limited their review to the question

13   decided by the authority, is the correct answer to that, and

14   what makes it different.

15           THE COURT:  All right.

16           MR. HIRN:  And, in fact, in that Fifth Circuit

17   case, the Fifth Circuit case said if AFG wishes to challenge

18   the validity of O.P.M. regulations there are other means

19   available, citing *NTEU versus Devine*, which we have as the

20   authority to bring this challenge.

21           THE COURT:  All right.

22           MR. HIRN:  On the ripeness, Your Honor, in support

23   of NFFE's and our co-plaintiffs, a Motion for Summary

24   Judgment, we've exhaustedly provided a host of affidavits

25   from various locals and the various different union

1    plaintiffs explaining in detail how the agencies have already

2    implemented the executive orders in their bargaining units.

3    How contracts have been canceled, how official time has been

4    canceled.  And I'm not familiar with the details, but I would

5    suggest that we have well documented how it has been applied.

6              THE COURT:  So I don't need any more, wait and see,

7    you say.

8              MR. HIRN:  Yes.

9              THE COURT:  All right.

10             MR. HIRN:  But the core of our argument, what we

11   have joined with the other unions' argument, we have raised

12   the threshold argument that the president doesn't have

13   authority to issue these executive orders anyway.

14             As can be seen from an examination of both the text

15   and legislative history of the statute, Congress explicitly

16   divested the president of any authority to regulate federal

17   sector collective bargaining through executive orders except

18   in two discreet circumstances.

19             Representative Clay said that the new law would

20   provide for a statutory federal labor relations program which

21   cannot be unilaterally altered by any president.

22             THE COURT:  I'm sorry, but you're reading from the

23   legislative history.

24             MR. HIRN:  Yes.

25             THE COURT:  Usually we start with the text.  So

1   tell me what --

2           MR. HIRN:  The text, well, if we look at the text,

3   Section 7103(d) --

4           THE COURT:  Yes.

5           MR. HIRN:  -- says the president can issue orders

6   suspending the application of the statute or exempting

7   certain intelligence and investigative agencies from coverage

8   of the statute for national security reasons.

9           THE COURT:  Okay.

10          MR. HIRN:  Two specific reservations of authority

11  for the president to issue executive orders limiting the

12  application of statute.  We suggest the age-old maxim of, and

13  excuse my Latin, expressio unius est exclusio alterius, to

14  express the mention of one thing is to exclude the other,

15  applies.

16          THE COURT:  So the fact that Congress specifically

17  authorized the president to do certain things should indicate

18  that you can't do other things.

19          MR. HIRN:  He can't issue executive orders on other

20  things having to do with the statute.

21          THE COURT:  All right.

22          MR. HIRN:  And that's exactly what the proponents

23  of the law said during the debate.  Representative Clay said

24  that those who testified before him, his civil service

25  subcommittee supported the statute because the existing

1    program was susceptible to the whims of an incumbent

2    president.  Representative Derwinski said that the new law

3    was meant to codify a system into statutes, which cannot,

4    like executive orders, be revoked by the White House at will.

5           THE COURT:  Let me ask you a question.  Is it your

6    view that prior to the statute the president did have such

7    authority?  The reason I ask is because, in their reply

8    brief, which I would not fault you if you didn't get all the

9    way through since it was just filed, the government points to

10   a provision that seems to suggest that no provision of this

11   act shall be construed to limit, curtail, abolish or

12   terminate any function of or authority available to the

13   president which the president had immediately before the

14   effective date of the act.

15          MR. HIRN:  Except where it was changed by the

16   statute.

17          THE COURT:  Right.  But you -- you, except as

18   otherwise expressly provided in this act.  And so how do you

19   read that?

20          MR. HIRN:  And so the president, as the Congress

21   expressly provided that the president had authority to issue

22   executive orders in two narrow circumstances.

23          THE COURT:  I see.  But, of course, you know, the

24   real express provision would have been to say in the statute,

25   whatever the president was doing before, he can't do, no

1   executive orders except in these two circumstances.  It

2   doesn't really say that.

3           MR. HIRN:  Your Honor, if you take the volume of

4   the legislative history it says from beginning to end, the

5   purpose of why we are enacting the statute, the sole purpose

6   of enacting the statute is to codify it and take it out of

7   the president's hands so that federal sector labor relations

8   are no longer regulated by executive orders.

9           You had a system, but Congress said, no, we're not

10  going to let the president change it any more.

11          THE COURT:  I see.

12          MR. HIRN:  That was the whole point of the statute.

13  There would have been no purpose of the statute, but not for

14  the fact that Congress no longer wanted the president to

15  monkey around or the define the collective bargaining rights

16  of federal employees except they said in the national

17  security sphere.

18          THE COURT:  So they preserved that and that alone.

19          MR. HIRN:  Yes.

20          THE COURT:  All right.

21          MR. HIRN:  Yes.  I did note in the government's

22  brief -- well, let me go back.  Looking at the claims

23  statutory authority for the executive orders.  In each of the

24  preambles, nowhere, nowhere does the president cite any

25  provision of the statute as authority for issuing the

1    executive orders.

2           In fact, Executive Order 18, excuse me, 13-836, the

3    methods of collective bargaining cites no statutory authority

4    whatsoever.  No specific statutory authority whatsoever for

5    its issuance.  The official time executive order cites 5

6    U.S.C. 7301, which is the statute where Congress said the

7    president may issue regulations concerning the conduct of

8    employees in the executive branch.

9           Now, under that statute, presidents have issued

10   executive orders concerning a drug-free workplace, domestic

11   violence in the workplace, smoking in the federal workplace,

12   employee ethics, investigation of employees for positions of

13   public trust, things having clearly to do with employee

14   conduct.

15          Using -- acting as an union representative, using

16   official time is not misconduct.  In fact, the Supreme Court

17   in *Bureau of Alcohol, Firearms and Tobacco* said that union

18   representatives are not even acting in their official

19   capacity as federal employees or on the job or in duty status

20   while on official time.

21          In a D.C. Circuit case, *Department of the Air Force

22   versus FLRA*, 877 F.2d 1036, this circuit parsed 7131, which

23   is the official time provision, and noted that the statute

24   authorized time, time only when the employee would otherwise

25   be in a duty status, suggesting that while on official time,

1   the employee is not on duty status.

2          THE COURT:  All right.  But don't some of the

3   executive orders go to conduct?  Some of them --

4          MR. HIRN:  One executive order.

5          THE COURT:  Yeah.

6          MR. HIRN:  13-839, which addresses merit

7   principles --

8          THE COURT:  Right.

9          MR. HIRN:  -- does have some conduct related

10  language.  But the two sections that we have challenged, in

11  particular, section three, standard for negotiating grievance

12  procedures.  And Section 4, which exempts non-conduct matters

13  from the grievance procedure, have nothing to do with

14  employee conduct.

15         And, in fact, under civil service law, conduct and

16  performance are two different animals.  They're regulated or

17  Congress has promulgated the -- chapter 75 of Title V is a

18  whole law about federal employee conduct and how to deal with

19  discipline.

20         Chapter 43, an entirely different statutory scheme

21  covers employee performance.  Performance, the quality of the

22  ability of the employee to perform their job, and the conduct

23  are two separate concepts under federal civil service law.

24         THE COURT:  So, you're saying 7301, which is cited

25  repeatedly by the president in these executive orders, in two

1    of the three, does not give rise to any authority to talk

2    about --

3              MR. HIRN:  Well, certainly official time.  And the

4    scope of grievance procedures and what can be in a collective

5    bargaining agreement, that executive order, the official time

6    limit in particular, and Section 4 of the merit system

7    protection one, that is about -- not about employee conduct.

8    That is about the relationship between the federal government

9    and the federal unions, my clients, as institutions.

10             THE COURT:  All right.  So what do you say to the

11   government's alternative argument, which is that it appears

12   to them that the executive orders insofar as they pertain to

13   those sorts of things are government-wide rules that are

14   authorized under 7117.

15             MR. HIRN:  Okay, 7117 does not authorize any rules.

16   It is not an independent reg by Congress to anybody to issue

17   regulations.  All that says is when an agency has issued a

18   government-wide regulation, to the extent a proposal that

19   conflicts with that is nonnegotiable.  It is not an

20   independent grant of issuing regulations.  And, in fact,

21   despite what the government has in their reply brief

22   represented otherwise, the FLRA has never held that an

23   executive order is a government-wide rule or regulation.

24             On page 11 of the brief that they filed last night

25   they cited a NFFE case, NFFE, local 2015, and the Interior

1    Department, FLRA 41 -- 41 FLRA 1158, for that proposition.

2    In that case, however, the FLRA found that the union's

3    proposal conflicted with a regulation, the mandatory

4    guidelines for federal workplace drug testing issued by the

5    Department of Health and Human Services and published in the

6    "Federal Register."  It was not a conflict with the executive

7    order.

8             Similarly, in *NFFE Local 15 versus the Army*, which

9    the government cited in their brief, 30 FLRA 1046, the FLRA

10   did not hold that the executive order in that case was a

11   government-wide rule and regulation.

12            The executive order drug free federal workplace,

13   the FLRA found was a federal law and not a government-wide

14   rule and regulation.

15            THE COURT:  So you don't think that these executive

16   orders, even assuming that they're right about 7117

17   authorizing somehow government-wide rules --

18            MR. HIRN:  It doesn't authorize.

19            THE COURT:  No, I understand.  But I'm trying to

20   hold constant certain arguments to test the viability of

21   others.  So fine.  Let's assume that 7117 authorities, quote,

22   government-wide rules.  It's your contention that an

23   executive order does not count as an executive --

24   government-wide rule.

25            MR. HIRN:  And I'll say the FLRA has never found it

1    to be.  And let me give you some more reasons why they can't

2    be, if I may.  In order to be a government-wide rule or

3    regulation, according to the FLRA, the regulation must be

4    generally applicable to the federal government.  The House

5    report accompanying the statute said, "The term

6    government-wide shall be construed literally.  Only those

7    regulations which affect the civilian workforce as a whole

8    are government-wide rule and regulations, no other

9    regulations are part of negotiations."

10           The three executive orders we're talking about, and

11   particularly the official timeline aren't regulating the

12   civilian workforce as a whole.  They're regulating the

13   unions.  And to the extent they're regulating any federal

14   employee, the official time one is only regulating union

15   representatives while they're acting on official time, when

16   the Supreme Court has said they're not even government

17   employees.  They're being paid by the government, they're not

18   working for the government at that time.

19           THE COURT:  All right.

20           MR. HIRN:  Okay?  So when you have -- just because

21   the president issues it --

22           THE COURT:  Yes.

23           MR. HIRN:  -- doesn't mean it's a government-wide

24   rule or regulation.  And let me contrast it with the kinds of

25   regulations the FLRA has found to be government-wide rule and

1    regulations.  Those are, for example, O.P.M. regulations

2    establishing minimum waiting periods for promotion in the

3    General Service, schedule employees.  The General Service

4    Administration's travel and per diem regulations governing

5    the reimbursement rates of federal employees when they

6    travel.  OSHA health and safety regulations for safety in the

7    federal workplace.  Department of State standardized

8    regulations that govern housing and other allowances for all

9    federal agency -- all the agency, all the employees of all

10   federal agencies oversees.

11         What these regulations have in common is that they

12   are (A) facially neutral.  They're not issued just to take

13   something off the bargaining table.  And they're also -- they

14   applied throughout the federal government to regulate civil

15   service and are all issued by Congressional direction, some

16   authority somewhere in some -- in, for example, the Title V,

17   you will see throughout where it tells O.P.M. or the GSA what

18   are issue regulations implementing this --

19         THE COURT:  All right.  I think I understand your

20   point, which, let me just summarize with respect to 7117.

21   You would say that as insofar as OSHA, pursuant to the

22   authority that you were just talking about.

23         MR. HIRN:  Yes.

24         THE COURT:  Issues regulations about safety and

25   require certain things in the federal workforce.  Those

1    matters per 7117 would not be subject to the duty of good

2    faith bargaining --

3           MR. HIRN:  Right, you couldn't make a proposal that

4    conflicted.

5           THE COURT:  Correct, correct.

6           MR. HIRN:  Yes.

7           THE COURT:  And that's the function, that's the

8    work of 7117, in your view.

9           MR. HIRN:  No, if I can add a caveat to that, or a

10   correlator, in 7117, there is, for government-wide rule and

11   regulations, there's a concomitant right for federal unions

12   to engage in consultation rights over government-wide rule

13   and regulations.

14          The FLRA, in 3 FLRA somewhere, it's in our brief, I

15   apologize.

16          THE COURT:  That's all right.

17          MR. HIRN:  The FLRA said that there's a concomitant

18   right for, since you can't bargain over government-wide rule

19   or regulations, federal employees have the right to have

20   national consultation rights.  So much for notice and

21   comment.  In 7117(d), it says that federal unions represent a

22   minimum number of employees can be granted consultation

23   rights by agents, any agency who issues government-wide

24   regulations and before those regulations are issued, the

25   unions have a right to be told what they might be, to

1    consult, to be heard out, and be given reasons why their

2    suggestions not --

3              THE COURT:  Do you have input before these rules

4    come into effect and through 7117 impact your bargaining?

5              MR. HIRN:  Right.

6              THE COURT:  Understood.

7              MR. HIRN:  Right.  By the way, that was 3 FLRA at

8    754.  And if I can expand upon that a little bit, during the

9    debate over this, Chairman Clay, Civil Service Commission

10   Chairman Clay explained that that was the tradeoff for taking

11   the government-wide regulations off the bargaining table.  He

12   said, quote, In Section 117, the substitute removes any

13   government-wide regulations from collective bargaining.  We

14   have agreed to this change with the understanding that the

15   consultation rights accorded exclusive representatives are to

16   be rigidly enforced.

17             THE COURT:  All right.  So we see from your

18   perspective no presidential branch of authority to get

19   involved with executive orders pertaining to collective

20   bargaining in 7117.  And you say 7301 doesn't get us there

21   either.

22             MR. HIRN:  Yes.  If I can just comment on 7301 a

23   little bit more?

24             THE COURT:  Yes.

25             MR. HIRN:  In the brief this morning, the

1    government claims that the FLRA held, excuse me, that the

2    Supreme Court held in the *Old Dominion Branch 496 Letter*

3    *Carriers* case that 7301 was authority for President Nixon to

4    issue the executive order before the statute creating the

5    government relations program.

6          We dispute that that was the holding.  It seems

7    curious that a holding would have been put in a footnote,

8    which is where it is found.  But we would want to bring to

9    the Court's attention that subsequent to that case, another

10   NFFE case, from our client here, *Karahalios versus National*

11   *Federation of Federal Employees*, the Supreme Court wrote that

12   the executive orders were not legislative in nature.  And

13   cited an Eighth Circuit decision which in turn cited the

14   decisions of numerous circuits for the proposition that

15   Executive Order 11491 was not issued under statutory

16   authority.  Also cited a Third Circuit case, *AFGE Local 1493*,

17   that's a quote, 7301 has no relationship with the substance

18   of Executive Order Number 11-491.

19         THE COURT:  That's the conduct issue.

20         MR. HIRN:  Right.

21         THE COURT:  All right.  So let me just --

22         MR. HIRN:  And there's also D.C. Circuit case.

23         THE COURT:  Yes.  A D.C. Circuit case, go ahead.

24         MR. HIRN:  Yes, that is *Manhattan Bronx Postal*

25   *Union*, referring to President Kennedy's executive order and

1    referring to the predecessor language for 7301, 7301 language

2    was recodified in the interim, but referring to the

3    predecessor language, rejected that predecessor language as

4    the authority for the issuance of Executive Order 10988, that

5    was President Kennedy's labor relations executive order,

6    quote, said that, "The executive order had no specific

7    foundation of Congressional action, nor was it required to

8    effectuate any statute."

9            THE COURT:  All right.

10           Before you go on in this way, let me just -- I'm

11   curious as to what your position is with respect to the

12   government's argument in the reply brief that essentially, if

13   you are right, that there is no statutory authority, then

14   why, since the statute, have there been several executive

15   orders by other presidents, previous presidents, dealing with

16   collective bargaining rights in the federal labor force.

17           MR. HIRN:  In the absence of Congressional statute,

18   there the courts, and I think in the D.C. Circuit case that I

19   talked about, said this was merely a policy that the

20   president decided to implement as good management tactics for

21   the federal workforce.

22           THE COURT:  But why isn't that the same thing here?

23   You happen to disagree with the policy, but --

24           MR. HIRN:  Because Congress went -- because

25   Congress went and enacted a comprehensive statutory scheme

1   which limited, which with the specific intent of not having

2   it in the president's hands anymore, and codified it.

3          THE COURT:  No, I understand that.  What I'm trying

4   to figure out is if you are correct, then really what I need

5   to determine is why presidents since the statute was enacted

6   have continued to issue executive orders that pertain to this

7   area.

8          MR. HIRN:  Okay, I understand.  President Clinton,

9   for example, issued one creating federal labor relation

10  partnerships.  But that didn't force anything on the union.

11  That was merely an invitation to his agencies to go to the

12  union and say, hey, would you like to join us in --

13         THE COURT:  But you can't have it both ways in a

14  way.  In other words, either it turns on the contents of what

15  the president is actually doing or it doesn't.  And I

16  understood your argument to be whether the president does

17  something that helps the unions, hurts the unions, whatever,

18  Congress's intention with respect to the enactment of the

19  statute was to take it out of the president's hands because

20  there will be times in which the unions may like the

21  president's intervention, there may be times when they don't.

22  But is your argument the president has no authority to act in

23  this area or not?

24         MR. HIRN:  Interestingly, interestingly, that

25  Clinton executive order, which he told federal agencies, "I'd

1    like to go negotiate matters, the federal agencies by and

2    large ignored that.  There was a whole host of litigation

3    trying to enforce the executive order.  And the FLRA and the

4    court said, but it's really not binding, it really doesn't

5    count.  It really wasn't held to be enforceable.  It didn't

6    have the force and effect of law.

7            THE COURT:  And was that because the FLRA

8    determined that the president didn't have the authority to do

9    it?  We don't know why.  Or I mean, maybe you do.

10           MR. HIRN:  I was involved, but I --

11           THE COURT:  I mean, this matters, right?  Because

12   we've just had like two hours worth of discussion about

13   whether the FLRA can touch the president's authority to issue

14   an order.

15           MR. HIRN:  No, you know, I don't think the

16   president -- President Clinton didn't need to do that in an

17   executive order.  He could have just advised his agencies,

18   hey, you know, I'd like to go make nice to unions and invite

19   them to do something in partnership with you.  It was

20   voluntary, it wasn't mandatory, and it wasn't enforceable.

21   It's not to say that the president, for example, in the

22   executive order on collective bargaining, I don't know that,

23   I'm afraid to make this concession, but I don't know that we

24   have necessarily challenged the president telling O.P.M. to

25   coordinate the agencies and their bargaining positions and

1   stuff like that.  That seems like internal management.

2   That's not regulating or anything, it's not binding us, it's

3   just giving some guidance as to how he wants his folks

4   to prepare for negotiations.

5           THE COURT:  I understand that you are targeting

6   your challenges to certain aspects of this.  But this claim

7   has broader implications.  And so I'm concerned about it now

8   suddenly because I thought that your argument was whether the

9   president was helping, hurting, whether we like him, whether

10  we don't.  It doesn't really matter because Congress was

11  saying very clearly per all of the legislators --

12          MR. HIRN:  All right.  Let me --

13          THE COURT:  Hold on.  Per all the legislators who

14  you read saying we're taking this out of the president's

15  hands.

16          MR. HIRN:  Right.  But it goes on substance of what

17  was ordered.  Let me give you another.  If the president

18  were -- if one of the more liberal Democrats became elected

19  president and she issued a regulation, an executive order

20  saying notwithstanding what the statute says about 7106,

21  management rights, you can't negotiate management rights, I'm

22  ordering everybody to negotiate management rights, and those

23  contracts will be honored.  She wouldn't have authority to do

24  that.

25          THE COURT:  Yes, but is that because there's a

1  conflict or because she wasn't supposed to say anything about

2  this?

3          MR. HIRN:  She wasn't supposed to say anything of

4  substance about it.  Of substance.

5          THE COURT:  All right.  I'm a little nervous.

6  Because I did not interpret your argument to be drawing that

7  distinction in terms of the scope of the president's

8  authority.  Now suddenly we have a substance versus not

9  really substantive distinction that is popping up.

10          MR. HIRN:  On the face, I mean, on the face these

11  are of substance.

12          THE COURT:  But what I can't focus on is --

13          MR. HIRN:  It changes people's rights.  It changes

14  people's rights, it affects what Congress envisioned.

15          THE COURT:  So your view is that Congress

16  envisioned not having the president say things that change

17  people's rights.

18          MR. HIRN:  Yes.

19          THE COURT:  In the context of collective

20  bargaining.

21          MR. HIRN:  Yes.

22          THE COURT:  All right.  Okay.  I think I understand

23  it.

24          I'd like to have, unless you have any other

25  pressing points, I know there are so many people in the

1    queue, and I want to have the government respond just to

2    this, and then we'll take a break.  All right.  Thank you.

3         MR. ZEE:  Thank you, Your Honor.  As I understand

4    the plaintiffs' position is that the president is utterly

5    bereft of authority to act in federal labor relations, that

6    seemed to be the gist and import of what plaintiffs were

7    trying to argue.  I think that argument can be quickly

8    dispatched.

9         First, we would point to the Supreme Court's

10   holding, not dicta.  It's a holding in the *National*

11   *Association of Letter Carrier's* case in which the court held

12   that pursuant to the president's inherent authority under

13   Article 2 of the Constitution, as well as the president's

14   authority under Section 7301 of the statute, he had ample

15   authority to issue a standalone federal labor relations

16   regime via executive order.

17        THE COURT:  All right.  That's a lot of things.

18   Let's unpack this a little bit because you threw in the

19   constitutional piece.  Are you suggesting that the Supreme

20   Court undertook a sort of Youngstown analysis of the scope of

21   the president's authority in this area?

22        MR. ZEE:  I don't know that there was an explicit

23   Youngstown's analysis conducted, this, of course, was

24   pre-statute, pre-enactment of the federal labor relations

25   statute.

1          THE COURT:  All right.  Before the statute you say

2     the Supreme Court says --

3          MR. ZEE:  Before the statute, federal labor

4     relations, labor relations in the federal sector was governed

5     exclusively by executive order from President Kennedy, 1962

6     onwards, until the passage of the statute.  It was executive

7     orders that governed federal labor relations.

8          THE COURT:  Okay.

9          MR. ZEE:  In the *National Association of Letter*

10    *Carriers'* case, the Supreme Court held that the president, in

11    analyzing the then governing executive order, I believe was

12    President Nixon's executive order, the Supreme Court held

13    that the president had authority to issue that executive

14    order under Article 2 of the Constitution in Section 7301.

15         THE COURT:  Okay.

16         MR. ZEE:  We think that ends the question, frankly.

17         THE COURT:  Well, I don't think so because I think

18    I hear the union saying, and then came the statute.  So what

19    the Supreme Court said pre the statute might be all well and

20    good, but I thought their main point was Congress then,

21    perhaps responding to the Supreme Court, but no, perhaps not,

22    said we don't want this in executive order land.  We are

23    creating a statute.  So what about that?

24         MR. ZEE:  Right.  So I did hear counsel quote a

25    number of isolated statements from the legislative history.

1    I prefer to focus on the text of what Congress said when it

2    passed the statute in 1978.

3            THE COURT:  Right.

4            MR. ZEE:  This is page 20 of our reply brief, it's

5    also cited in our opening brief.  In the 1978 statute, the

6    Congress said, "Except as otherwise expressly provided in

7    this act no provision of this act shall be construed to

8    limit, curtail, abolish or terminate any function of or

9    authority available to the president," which the president

10   had immediately before the effective date of this act.

11           THE COURT:  Yes, and I quoted that language to him,

12   and he very deftly pointed out that it started with "except

13   as otherwise provided."  And so one could interpret this

14   language to be carefully placed by Congress to avoid

15   residual, unintended consequences with regard to what was in

16   this act.

17           But as provided by the act, we're not doing

18   executive orders anymore with respect to labor relations,

19   with respect to collective bargaining.  But we put this kind

20   of savings clause language because, you know, we don't know,

21   it might impact some other thing of the president.  We want

22   to make sure that that's not impacted.  But the statute seems

23   pretty clear in its text when it says things like 7134

24   regulations, it lists the people who shall prescribe rules

25   and regulations to carry out this chapter, and the president

1    is not in there.

2              MR. ZEE:  Correct.

3              THE COURT:  So I don't understand why that text

4    can't be and shouldn't be interpreted consistent with the

5    union's position that Congress did not intend for the

6    president to be prescribing regulations in this area.

7              MR. ZEE:  Well, I don't think that -- well, the

8    first response I think is that the Congress would not have

9    used the language that I just recited if it intended to

10   actually curtail the president's authority to act.

11             THE COURT:  No, it curtailed the authority in the

12   actual statute, and then it said in that language "except as

13   provided," right?

14             MR. ZEE:  Correct.  With respect to the statutes

15   that have been -- with the provisions of the statute that

16   have been cited, Section 71, I believe it was Section

17   7303(d), which gives the permission to suspend the statute in

18   certain specified circumstances, that does not -- that is not

19   an exclusive, nowhere is that articulated as an exclusive

20   authority of the president.

21             THE COURT:  No, but let's focus on the one that I

22   pointed out.

23             MR. ZEE:  Okay, I was coming to that, Your Honor.

24             THE COURT:  Yes.  7134 clearly tells us who gets to

25   prescribe rules and regulations to carry out the provisions

1   of this chapter.  It's got a lot of agencies, independent

2   agencies listed, but it does not have the word "the

3   president."

4           MR. ZEE:  Correct, Your Honor.  We don't view that

5   as a description of who gets to prescribe rules.  It's a

6   directive from the Congress, tasking these agencies to

7   provide rules applicable to them in order to carry out the

8   duties that Congress is imposing on them by passing the

9   statute.

10          THE COURT:  All right.  But what do you do with the

11  whole legislative history that suggests that the entire point

12  was to do exactly what you say -- to do away with what you

13  said was happening before.

14          MR. ZEE:  There is no question that the legislative

15  history insofar as it states that the -- no longer will

16  federal labor relations be regulated by executive order,

17  we're moving to a Congressional model where it's regulated by

18  statute, that is certainly accurate.  The fact is that it is

19  regulated by statute, but the legislative history does not

20  foreclose the president from acting within the framework of

21  that statute, subject to the rights that are provided by that

22  statute.

23          And then I would point to the history, the

24  post-enactment history of the statute, which are also cited

25  in our reply brief.  There have been a number of executive

1    orders that presidents have issued beginning with President

2    Carter, and I think mere months after the statute was passed.

3    Obviously, the most recent example are the three that are

4    before this Court now.  But that was continued through

5    President Clinton, President Obama have all issued executive

6    orders.

7              THE COURT:  What have they cited for the authority

8    of that?

9              MR. ZEE:  I believe they cited the inherent

10   authority of the president under the Constitution, a

11   combination, in combination with Section 7301 authority.

12   There may have been additional statutes, which I would be

13   happy to provide to Your Honor.

14             THE COURT:  What I'm a little concerned about is

15   7301 seems to be in a different section of the statute.  That

16   it doesn't really, at least as codified, it's not in, and I

17   think it's enacted.  It wasn't in the collective bargaining

18   federal labor relations piece of this.

19             And your argument is to some extent that even

20   though Congress was moving into this arena with the statute,

21   they really didn't intend to preclude the president.  But we

22   don't see anything in the actual applicable provisions that

23   indicate that.  And we know they could have done it because

24   in 7301, another provision, they say specifically the

25   president may prescribe regulations for the conduct of

1    employees in the executive branch.  If you're right, I'm

2    wondering why Congress didn't say we're moving into this

3    area, but the president may also continue to act, et cetera,

4    in the statute in this way.

5              MR. ZEE:  Well, I think they did say that in the

6    language that --

7              THE COURT:  You think that was the point of that

8    residual language at the very least?

9              MR. ZEE:  I do.  And I think that it's not

10   necessary, it was not necessary for Congress.  Given the

11   history, Congress was well aware that the president had

12   authority under Section 7301, which predated the passage of

13   the labor relations statute.  Congress was well aware that

14   the president had authority not only under that provision,

15   but also under the Constitution to regulate the conduct of

16   the federal workforce, as well as to, as he had since

17   President Kennedy, as presidents have since President Kennedy

18   established standalone labor relations schemes.  So I don't

19   know that Congress had to -- I don't know that we can impute

20   a requirement to Congress to specifically authorize the

21   president.

22             THE COURT:  No, but they did it at some times.  I

23   mean, your argument is a little stronger if you actually

24   don't have 7301 because there were times when Congress did

25   say:  President, you get to prescribe regulations about X,

1    which indicates that they were speaking to the president

2    about the scope of his authority.

3         Now, I don't know whether he had that authority

4    before or not, but presumably he did under Article 2 or

5    whatever else, and they spoke specifically in 7301, but not

6    in chapter 71.

7         MR. ZEE:  There's nothing in chapter 71 that

8    grants -- that purports to grant authority to the president.

9    To the extent that counsel, counsel made a different argument

10   with respect to Section 7117.  We think that Section 7117 is

11   a recognition of the effect of the kinds of rules, laws,

12   regulations that may be passed of which an executive order

13   would certainly qualify.  These executive orders, certain

14   provisions of them, I should say, certainly qualify.

15        THE COURT:  As government-wide rules, he says that

16   even under the sort of current interpretation of what the

17   FLRA says about government-wide rules, these executive orders

18   don't qualify, even under the plain definition.  A

19   government-wide rule has to impact everyone in the civil

20   service in a neutral way or whatever, that's not happening

21   with respect to these executive orders.  So how is it that

22   these qualify under --

23        MR. ZEE:  I'm going to let my colleague to speak

24   more specifically about that.  But I don't think -- I didn't

25   quite, to be quite honest, with respect, I didn't quite

1    follow that argument.  These executive orders do affect --

2          THE COURT:  He says they affect the unions.

3    They're addressed to union employees who are working, you

4    know, on behalf of the union, doing collective bargaining and

5    other union activities, they tell how much official time you

6    can get.  They address all of those kinds of things.  And

7    they're not rules that apply across the board to everyone in

8    the civil service.

9          MR. ZEE:  Your Honor, the executive orders are

10   directives to the president's subordinate in the form of

11   agencies and agency officials, as well as regulations that

12   apply to federal employees in the federal workforce.

13         THE COURT:  So let me just be clear.  And I don't

14   know if one of you are speaking to 7117 versus the other.

15   But you don't read 7117 as affirmatively granting authority

16   to the president to do anything.

17         MR. ZEE:  I don't know it's necessary to read it

18   that way.  I don't think that --

19         THE COURT:  I'm asking you, whether it's necessary

20   or not, you have cited 7117 as a source of the president's

21   authority.  So I'm trying to understand whether you're

22   suggesting that that is where he gets his power to,

23   statutorily to do this.

24         MR. ZEE:  I think that 7117 is a recognition of the

25   president's authority under the sources that I've alluded to

1    in the form of the constitutional authority in the form of

2    Section 7301.

3            THE COURT:  So prior to the statute then, the

4    president had authority, you say the Supreme Court recognized

5    7301, what about this constitutional authority?  It's not

6    really fleshed out in your brief very well in terms of me

7    understanding to the extent that the president previously

8    operated in this scheme and was doing things by executive

9    order.  How am I supposed to view that as a constitutional

10   matter vis-a-vis the legislature now being in that scheme.

11   I'm sort of getting back to the Youngstown view of this.  Are

12   both of them operating?

13           MR. ZEE:  We think there's no question that both

14   the Congress and the president are operating in the field of

15   federal sector labor relations.  But we do not think that

16   anything that Congress did in passing the statute in 1978

17   purported to strip or deprive the president of any of his

18   existing authority, whether under Section 7301 or under the

19   Constitution.

20           THE COURT:  How big is that existing authority?

21   Justice Jackson in Youngstown tells me I'm supposed to think

22   about various, you know, whether it's at its apex, whether

23   it's tiny, ow whatever, based on what Congress has said about

24   it to some extent.

25           MR. ZEE:  If I understand Your Honor's question.

1          THE COURT:  Yes.

2          MR. ZEE:  The authority, the size of the authority,

3     the scope of the authority that existed prior to the statute

4     was at least large enough to pass a standalone regime

5     governing federal labor relations by executive order alone,

6     which is far more substantial than what the president has

7     done here with these far more limited and targeted executive

8     orders on various topics within, within and subject to the

9     congressional framework.

10         THE COURT:  And you say this statute doesn't touch

11    that.  So now you suggested that Congress's enacting the

12    statute was not reducing the president's preexisting

13    authority.  And that the preexisting authority is large

14    enough to have its own scheme.  So now I have two schemes

15    operating as a constitutional matter.  And I'm trying to

16    understand what to do with that.

17         MR. ZEE:  To be clear, the provision from the 1978

18    act that I read to you when I first stood up here, does say,

19    as Your Honor pointed out, except as otherwise provided in

20    this chapter.  But which we have taken to read to the extent

21    that there are duties or there are restrictions that are

22    imposed by Congress, that the president is not to contravene

23    those.  And this gets into, of course, a section by section

24    analysis.

25         THE COURT:  Yes.  So you take the language that is

1    pointed out to at least be a congressional putting down

2    stakes that the -- while the president can still operate in

3    this arena, he can't do anything that contravenes what we

4    said.

5         MR. ZEE:  "We" being Congress.

6         THE COURT:  "We" being Congress in the context of

7    this statute.

8         MR. ZEE:  Correct.

9         THE COURT:  So it's all about conflict from your

10   perspective.

11        MR. ZEE:  Correct, of which, of course, we submit

12   there is none.

13        THE COURT:  All right.

14        MR. ZEE:  But I should allow my colleague to

15   supplement my argument on 7117.

16        THE COURT:  Thank you.

17        MS. WESTMORELAND:  So as my colleague just argued

18   there's an independent source authority for the president to

19   do what he's done here in issuing these E.O.s.  And Section

20   7117 is just a recognition that when the president or other

21   relevant bodies sets a government-wide policy under their

22   existing authority, that that should be removed from the

23   scope of collective bargaining.

24        THE COURT:  No, I understand your argument in that

25   sense.  But really the issue on the table is what is this

1    independent authority that you speak of.  It might recognize

2    it, but it doesn't identify it for the purposes of me

3    understanding where it's coming from.

4            MS. WESTMORELAND:  Yes, Your Honor, and so I think

5    my colleague's arguments spoke to that.  I would like to

6    address some of NFFE's counsel's arguments about whether what

7    we're dealing with here would follow under 7117 to the extent

8    that it would remove something from the scope of collective

9    bargaining, assuming, as my colleague argued, that the

10   president does have authority.

11           THE COURT:  All right.

12           MS. WESTMORELAND:  So, a few things.  To start

13   with, NFFE's counsel argued that a government-wide rule has

14   to be generally applicable to every federal employee.  And I

15   would point out that the government-wide rules at issue here

16   are applicable to every federal employee.  It is not the

17   president's determination whether an individual employee is

18   conducting union activities or not.

19           THE COURT:  That's not -- that is not how generally

20   applicable is ordinarily interpreted.  It has to actually

21   apply, not it could apply if you chose to be a part of this

22   group to which I'm applying the rule.  I mean, that doesn't

23   even sort of get to the level of plausibility, that the

24   government's suggestion is that anyone, whether it's the

25   president or an agency or whatever could apply a rule to a

```
1    particular group, and then say because anyone in the
2    government could join that group, it's a generally applicable
3    rule.  So if that's your argument, let's move on to a
4    different one.
5         MS. WESTMORELAND:  Well, it just -- for example,
6    Your Honor, with respect to no lobbying, congressional
7    representative, on official time.  That applies to every
8    employee.  No employee may lobby their congressional official
9    on -- while on paid duty -- time.
10        THE COURT:  Do any employees outside of the union
11   have the ability to lobby at all regardless of official time?
12   Isn't that a right of the union that was established
13   specifically relative to the union?
14        MS. WESTMORELAND:  Sure, I see your point, Your
15   Honor.  And so, to that extent, we would just argue that the
16   statute does state that every individual, regardless of
17   whether they choose to be an affirmative dues paying member
18   of a bargaining unit, is indeed a part of that bargaining
19   unit.  So to that extent, every individual could be --
20        THE COURT:  Can I just follow up by asking, does
21   that mean that every federal employees is counted in the
22   president's new union time rule?  I thought it had something
23   to do with the number of people in your unit as to how much
24   time you got.  And so to the extent you're making the
25   argument now that everybody is in the union whether they pay
```

1    dues or not, does that mean the time is spread across

2    everybody then?

3          MS. WESTMORELAND:  Every person in that bargaining

4    unit for which a C.B.A. would apply.  My point was just that

5    once a bargaining unit is established, my understanding is

6    that regardless of whether you pay union dues or not, you are

7    still counted in that bargaining unit.

8          THE COURT:  Are you counted for union time purposes

9    under the president's executive order?

10         MS. WESTMORELAND:  Every member is counted in

11   the -- in the bargaining unit would be counted.

12         THE COURT:  All right.

13         MS. WESTMORELAND:  But moving on.  The legislative

14   history on this issue says that 7117(a)(1) should be

15   construed broadly to include all policies and not just rules

16   and regulations that are promulgated through notice and

17   comment.  And courts have construed the government-wide rules

18   and regulations language very broadly.

19         THE COURT:  Can I just cut to the chase about what

20   bothers me about your argument?

21         MS. WESTMORELAND:  Sure.

22         THE COURT:  Because we do need to take a break.  I

23   have no idea why Congress would establish a provision.  And

24   I'm trying to find it here, that would in essence undermine

25   any attempt by Congress per your colleague to say we are the

1  ones with the authority to determine particular federal

2  bargaining terms.

3      MS. WESTMORELAND:  Uh-huh.

4      THE COURT:  So he says Congress sets up the

5  statute, it recognizes that the president is already in the

6  space.  But it says except as provided by law, president, you

7  can still operate, which means our terms govern.  And yet

8  somehow you read 7117 to allow the president, through this

9  exception, calling it a government-wide rule, to come up with

10  rules, whatever the president wants to in executive orders,

11  and because of 7117, that's the thing that takes precedent.

12  I don't understand how that makes any sense, given where we

13  are.

14      MS. WESTMORELAND:  Your Honor, we acknowledge that

15  there are limits on what the president could do and call a

16  government-wide rule.  And so the *IRS* and *O.P.M.* cases in the

17  D.C. Circuit speak to this.

18      So, in the *O.P.M.* case which predated the *IRS* case,

19  the court had to consider whether an O.P.M. rule that

20  parroted exactly the management rate provision of the statute

21  could remove those issues in the management rate question of

22  the statute from the scope of bargaining despite the fact

23  that the statute has a separate provision saying that the

24  union shall be allowed to bargain over appropriate

25  arrangements and implementation of any policies that agency

1    comes up with under management rates.

2           So essentially what O.P.M. did was they tried to

3    re-state a provision of the statute as a government-wide rule

4    so as to preclude bargaining that was specifically allowed

5    under the statutes.  And the D.C. Circuit said no, you can't

6    do that because the statute specifically provides for this

7    type of bargaining.  And you've done nothing.  You haven't

8    exercised any authority to make a more specific, some

9    particular arrangement that you view as being worthy of a

10   government-wide rule or regulation that would lawfully remove

11   something from the --

12          THE COURT:  So you're saying if there's an express

13   conflict between what the government-wide rule says and what

14   the statute says, then you can't do it.  But presumably per

15   7117, if the statute indicates that you can bargain about

16   something, the government-wide rule can take that off the

17   table.

18          MS. WESTMORELAND:  That's correct, Your Honor.  And

19   it's slightly more --

20          THE COURT:  But why isn't that a conflict, too?

21   It's just a different kind of conflict.  It's not term for

22   term.  But to the extent that Congress has said this is open

23   for bargaining and something, government-wide rule is taking

24   it off the table in the way that you described, why isn't

25   that a conflict?

1          MS. WESTMORELAND:  So that brings me to *IRS*.  So in

2     *O.P.M.*, I think the language that they use is that you can't

3     just restate the provision in its entirety to prevent

4     bargaining about any of those things.  But, if -- I have the

5     language.  But the O.P.M. could have identified particular

6     arrangements that would not be subject to bargaining as long

7     as it didn't leave the bargaining out altogether.  So the

8     fact that the O.P.M. regulation was to weed out all

9     bargaining related to management rates.  Not to rule out

10    bargaining on one particular issue or one particular

11    arrangement that would pertain to management rights.

12          And then later in the *IRS* case, the D.C. Circuit

13    considered another government-wide rule and whether that ran

14    afoul of the limit set forth in *O.P.M.*

15          THE COURT:  All right.  I'm going to need to take a

16    break.  But let me just ask you sort of a straightforward

17    question.  You are reasoning from these cases that you say

18    talk about government-wide rules and the way in which they

19    need to be interpreted with respect to 7117.  Is it the

20    government's position that the FLRA or any court has held

21    that executive orders that deal with these kinds of subjects

22    count or qualify as government-wide rules?

23          MS. WESTMORELAND:  Your Honor, the FLRA and courts

24    have found the executive order to count within the scope of

25    7117 regardless of whether it's a government-wide rule or not

1    because 7117 doesn't only apply to government-wide rules and

2    regulations.

3             THE COURT:  So then why do I care about all the

4    cases that are defining government-wide rules?

5             MS. WESTMORELAND:  Because they shed light on the

6    scope of what is permissible as -- under 7117(a)(1), which

7    would be government-wide rules and regulations as well as

8    law.  So a prior FLRA case interpreted an executive order as

9    law in that area, but still found that any proposals

10   inconsistent with it were prohibited and nonnegotiable

11   because 7117 removes anything from the scope of bargaining

12   that is either government-wide rule or regulation, which we

13   believe that these executive orders are, or law.

14            THE COURT:  All right.  I'm going to take a break.

15   Try to think about what you just said.

16            MS. WESTMORELAND:  Okay.

17            THE COURT:  Let's have -- gosh, we're getting late

18   in the time here.  Let's have ten minutes.  Thank you.

19            (A brief recess was taken.)

20            THE COURT:  All right.  Thank you for indulging me

21   a break.  I think I have just about an hour remaining in

22   terms of the time that I had allotted to devote to this

23   matter.

24            Ms. Westmoreland, I think I understand your

25   argument.  I don't know if you want to say anything else, but

1    I want to make sure we have enough time for the particular

2    conflicts discussion.

3         MS. WESTMORELAND:  I can be very brief, Your Honor.

4    Two additional points.

5         THE COURT:  All right.

6         MS. WESTMORELAND:  Just with respect to how broadly

7    these government-wide rules apply, I would just like to point

8    out that at least with respect to Section 4 of the official

9    time order, what we're calling the official time order, the

10   prohibition actually applies to all lobbying or other things

11   that happened on paid time which actually does have --

12   meaning outside of the union context.

13        For example, with EEOC proceedings and whatnot,

14   there are other times when an employee may want to lobby or

15   whatnot or one of these other activities while on paid time.

16   So that's just kind of a quick clarifying point.

17        But moving forward, one that Your Honor is

18   considering the D.C. Circuit cases that I mentioned, *IRS* and

19   *O.P.M.* as well as others cited in our brief, we'd just like

20   to point out that those cases deal with the scope of 7117

21   broadly.  And that the FLRA has held executive orders to be

22   law under the scope of 7117.  And that is including the

23   president's drug testing order and has found union proposals

24   to be nonnegotiable because they conflict with that executive

25   order and citing to 7117.

1       And in that regard, there are many other areas that

2  are governed, at least in part by executive order that would

3  clearly be something that would be not --

4       THE COURT:  Let me ask you a question.  I mean,

5  what's interesting to me is whether or not, even assuming

6  executive orders are cognizable within this provision,

7  whether what is really being captured in 7117 are neutral

8  rules governing things outside of the collective bargaining

9  context.  They don't pertain to collective bargaining.

10  They're things like no smoking in the workplace or whatever.

11       Even if those things, let's say for the sake of

12  argument, are a little bit narrower than that, they're not

13  applying to all employees, but they're not related to in a

14  direct sense collective bargaining and the work of 7117 is to

15  say we had this thing that covers that topic.  So that's not

16  going to be something that's negotiable.

17       What I don't know and what I'm concerned about is

18  the suggestion that the president, through executive order,

19  could issue, quote/unquote, government-wide rules that

20  pertain to collective bargaining and use those under 7117 to

21  alter the nature of negotiations.  That seems to me to be a

22  fundamentally different thing than what 7117 is allowing to

23  happen in the context of collective bargaining.

24       MS. WESTMORELAND:  So, with respect to 7117, it's

25  an exception from the duty to bargain.  And the D.C. Circuit

1   and the Supreme Court have all acknowledged that when

2   something, when 7117 applies it creates an exception to the

3   duty to bargain.  And so if you'll indulge me a comparison, I

4   know we talked about *O.P.M.* a little bit earlier.  But in

5   that case -- I mean, in *IRS*, the case that came after it,

6   there was a conflict with the statute in the grievance

7   procedures that were laid forth in that O.M.B. circular that

8   was being challenged in that case.

9           So the D.C. Circuit said yes, this is a

10  government-wide rule or regulation.  And even though the

11  grievance and the regulation said that there should be no

12  grievance, some sort of prohibition on grievances in that

13  government-wide rule or regulation, and the FLRA, I believe,

14  and certainly the union in that case had said, wow, actually

15  the grievances are covered under the statute.  So there's a

16  conflict here, and the government-wide rule or regulation, it

17  can't say anything about grievances because it's covered in

18  the statute.

19          And the D.C. Circuit said no, that doesn't make any

20  sense because Section 7117 is as much a part of statute as

21  any order to bargain or any order to have certain grievance

22  procedures.  And so you should read 7117, which is a general

23  exception to the collective bargaining against a specific --

24          THE COURT:  I'm just worried about whether we're

25  reading that provision to swallow the rule in the way that

1    you have articulated it.  Yes, we read it.  It's part of a

2    statute.  And that's what concerns me, that Congress would

3    set it up so that the very provisions that it was authorizing

4    could be undermined in this way.

5              MS. WESTMORELAND:  But I don't think they are being

6    undermined, Your Honor, and when we move forward with the

7    section by section analysis, we can explain why each

8    provision of the executive order does not conflict with the

9    statute and why the executive order scheme as a whole does

10   not conflict with Congress's idea of collective bargaining.

11   But the actual specific provisions that we are arguing are

12   government-wide rules and regulations under 7117 take narrow

13   issues, like lobbying on paid time out of the scope of

14   bargaining.  It doesn't say that you can't negotiate under

15   7131(d) for official time.  The scope is much narrower, so

16   it's not gutting entire sections or provisions that were

17   contemplated by Congress.

18             THE COURT:  But what would keep it from doing that?

19   I mean, yes, maybe not in this particular situation.  But if

20   I read the statute the way you want me to, I don't understand

21   what the limiting principle is.

22             MS. WESTMORELAND:  The limiting principle is that

23   you can't create a rights that are sort of broader than the

24   statute.  You can direct.  So the president has the

25   authority, right?  And what makes something either valid as

1    an exception to the scope of collective bargaining under 7117

2    or not, according to the D.C. Circuit precedent in *O.P.M.* and

3    *IRS* is whether it directs the agencies in it to bargain in a

4    specific way or about a specific arrangement, or in this case

5    a specific prohibition on official time, of which there are

6    many.  The average collective bargaining agreement have many,

7    many, many activities that you can do on official time,

8    negotiated for.  And this only takes out just a couple of

9    them.  And so those are very, very small and specific

10   exceptions to the duty to bargain over certain activities

11   that would be conducted on official time.

12         And so, the limiting principle is that you can't

13   wholesale, just restate provisions of the statute as

14   government-wide rules so that you can't bargain about those

15   things.  But you can take out specific items from the scope

16   of collective bargaining is what the president is doing here.

17         THE COURT:  I understand your points.

18         Okay.  So I think we really need to move quickly to

19   the plaintiffs' contention that these particular provisions

20   of the three executive orders conflict with the statute.  I'm

21   not sure who's up in that regard.  Is that Mr. O'Duden?

22         MR. O'DUDEN:  Yes, ma'am.

23         Your Honor, before turning to the particular ways

24   that the executive order is contrary to the statute, I did

25   want to add a comment, if I may, to the discussion about 7117

1   because that's really the premise of the government's

2   argument.  If it's wrong about 7117, it can't win.

3          THE COURT:  It can't win this whole conflict idea

4   you're saying because that's the thrust of the case.

5          MR. O'DUDEN:  Yes, because every time we say

6   something conflicts, every time we say there's a conflict

7   between what has been set forth in the executive orders and

8   statutes, they say, oh, no, that's not contrary to the

9   statute because we have this 7117 power.

10          THE COURT:  All right.

11          MR. O'DUDEN:  It was a bit curious to hear my

12   friend with the Justice Department argue what in essence was,

13   hey, this is no big deal.  This is only minor changes in what

14   can be done.  And that betrays a complete failure to

15   understand what is going on here.  And it's not subtle.

16          The president is weaponizing 7117 in order to

17   destroy collective bargaining in the federal sector.  That

18   may sound provocative, but I think we all know that is

19   exactly what is going on here.

20          These government-wide rules, as they refer to them,

21   being used for this purpose is unprecedented in the entire

22   history of the statute, you won't see anything resembling

23   this.  It's only when this plan, and it is part of a plan,

24   was concocted to go after labor unions, that they seized on

25   7117 and have tried to weaponize it.

1          So, you know, we've talked, and I was glad to see

2     the Justice Department admitting that 7117 is an exception to

3     the duty to bargain.  I wasn't pleased with the rest of what

4     they said because it simply cannot be, as the government

5     argues, that Congress created this very detailed collective

6     bargaining system, a statute that the Supreme Court called

7     finally rot, to turn around and say, oh, by the way,

8     Mr. President, you can use 7117 to totally dismantle core

9     elements of the statute.

10         So, let me go ahead now and talk about how we

11    believe there are defects in the executive orders and what

12    impact they have had.

13         First of all, with respect to the official time

14    limitations, there are many ways in which the provisions of

15    that order are defective.  Beginning with grievance handling.

16    The statute does not allow any longer any official time for

17    the purpose of grievance handling.

18         THE COURT:  Sorry, the statute or the executive

19    order?

20         MR. O'DUDEN:  In the executive order.

21         THE COURT:  Does not allow --

22         MR. O'DUDEN:  Does not allow official time to be

23    used for grievance handling.  For example, the official time

24    order, and this is at 4(a)(v), small v, says that agencies

25    may not use official time to handle grievances.  There is a

1    limited exception that allows an employee to get official

2    time for grievances on their own behalf.  But the order says

3    that the employees cannot get official time to represent

4    another employee or the employee's union even though, it says

5    even though their opposite number for management gets paid

6    time for that activity.  This unilateral approach squarely

7    conflicts with 7131(d) of the statute, which requires what

8    we've called a bargaining based approach with respect to

9    official time.

10            The government believes that the president has

11   unilateral authority to say no official time for grievance

12   handling, and to state the obvious, grievance handling is one

13   of the core functions of what a labor union does.  Employees

14   who confront problems in the workplace, whether it's because

15   he or she is suffering from harassment or he or she is

16   suffering from discrimination, or there is a safety issue in

17   the workplace.  Where do they go?  They go to their

18   collective bargaining representative.

19            THE COURT:  Don't they have to in the E.E.O.

20   context at least?  I mean, isn't that -- I don't know, I

21   mean, I've had a lot of Title 7 cases.  Don't they have to

22   start out by going to their person?

23            MR. O'DUDEN:  They have to exhaust their

24   administrative remedies, yes.

25            THE COURT:  Yes.  Can I just focus you in on a few

1   things?  And I have read these provisions.

2            MR. O'DUDEN:  Yes.

3            THE COURT:  I have a lovely chart that my law clerk

4   has prepared that tells me what you think they conflict with

5   so I know the parameters.

6            MR. O'DUDEN:  Right, okay, you know that already.

7            THE COURT:  I'd like to focus in on a couple of

8   things.  One, with respect to the very provision that you

9   read.  You talked about excluding or employees may not use

10  taxpayer funded union time to prepare or pursue grievances.

11           MR. O'DUDEN:  Yes, ma'am.

12           THE COURT:  But what do I do with the language in

13  the executive order that goes on to say except where such use

14  is otherwise authorized by law or regulation?

15           MR. O'DUDEN:  Yeah, you know, they throw that buzz

16  phrase in periodically throughout the order.  And what does

17  it mean?

18           THE COURT:  Why doesn't it mean that you make the

19  proposal the way you always did, because you believe that the

20  law allows it or that you continue to operate in this way and

21  then we bring that issue to, I guess either me or the FLRA or

22  something, as to whether or not the statute that you say is

23  conflicted, whether or not there really is a conflict.  Do

24  you understand what I'm saying?

25           MR. O'DUDEN:  Well, sort of.  But I think this is

1   similar to the discussion that we had this morning.  I don't

2   think it's an answer to what we're saying.  Oh, if they won't

3   bargain with you or if there's something about our rule

4   concerning grievance handling, you can take that up with the

5   FLRA.

6           THE COURT:  Well, let me say it in a different way.

7           MR. O'DUDEN:  Okay.

8           THE COURT:  Okay?  And I admit that this is coming

9   from a place of not really having knocked it on the ground in

10  terms of how these things work.  I'm relying on your

11  expertise.

12          I understand the unions to be making facial, legal

13  challenges indicating that these various provisions of the

14  executive order conflict with some statutory provision.

15  There's a conflict that the president is saying here, don't

16  use official time for grievances.  And under the statute, the

17  statute says that is a negotiable thing.  That you can --

18  that's not right?

19          MR. O'DUDEN:  No, that's not right.

20          THE COURT:  Well, tell me what the statutory

21  provision is that it conflicts with.

22          MR. O'DUDEN:  Well, it conflicts with 7131(d).

23          THE COURT:  Okay.

24          MR. O'DUDEN:  So let's talk about that for a

25  moment, if we may.

1              THE COURT:  All right.

2              MR. O'DUDEN:  7131(d) is the provision that applies

3    when you're trying to figure out what the scope of official

4    time would be, whether it's appropriate.  And it very clearly

5    says that the way Congress envisioned it was that the parties

6    to the collective bargaining relationship, management and

7    labor, they would bargain over what the appropriate amount of

8    official time --

9              THE COURT:  Right.  I thought I just said that,

10   maybe I didn't.

11             MR. O'DUDEN:  Well, I'm sorry.

12             THE COURT:  I said that it's a negotiable term.

13   How much official time you have, the parties can decide.

14             MR. O'DUDEN:  I thought you meant if they refused,

15   you know, what --

16             THE COURT:  No, no, no.  I'm saying you read the

17   statute to say the parties and the agency and the union will

18   figure out and agree upon how much official time can be used

19   and essentially for what purpose.  You can use it for

20   grievances, et cetera.

21             MR. O'DUDEN:  Right.

22             THE COURT:  The president comes along in this

23   executive order and says, no official time can be used for

24   grievances.  That's what you're mad about because you see

25   that as a conflict.

1       MR. O'DUDEN:  Because it doesn't permit what the

2  statute requires.

3       THE COURT:  I understand.  But here's my problem.

4  To the extent that you are bringing a facial challenge,

5  that's not all the president says.  He doesn't just say no

6  official time for grievances.  He says no official time for

7  grievances except as provided by law.

8       MR. O'DUDEN:  What law could he possibly be talking

9  about?  You think he's saying no overtime, excuse me,

10  official time for grievances, but you really do get it

11  because when I look at the --

12       THE COURT:  No, he doesn't have to look at it.

13  He's saying my preference, what I would like to have happen

14  is no official time for grievances.  But if the law per this

15  Court, per the FLRA, per whoever says you do get to negotiate

16  over this term, then ignore me.

17       MR. O'DUDEN:  No.  He's not saying, you know, that

18  he's just making a recommendation about how official time is

19  to be used.

20       THE COURT:  He says except as -- I can't read that

21  out of executive order.  If he didn't say that, then I see a

22  clear conflict, but to the extent he's saying here's what I

23  want, but I'm deferring to what the law requires, I don't

24  understand why that's a conflict.

25       MR. O'DUDEN:  Even the Justice Department has

1    recognized that what he is doing is banning the use of

2    official time for all these things that are on my page right

3    here, including grievance handling.

4            THE COURT:  All right.  So I'm to ignore the step.

5    I'm just wrong about reading anything into "except as

6    provided by law."

7            MR. O'DUDEN:  As you might imagine, we considered

8    what that language meant.  This isn't the first time that it

9    has come up.  And it just seemed completely meaningless

10   because why is the president going through all this trouble

11   to say that you don't get official time for grievance

12   handling, you don't get it for lobbying.  Now we're going to

13   cap you in terms of how much time you're going to have.  Now

14   you can't bargain for office space.  All in the official time

15   order.  Why does he say that if he doesn't really mean it?

16           THE COURT:  I'm not saying he doesn't mean it.  I'm

17   saying he's deferring to the law.  He says you don't get --

18   but notice, but notice that he doesn't say it everywhere.

19   There are some places when he says, you know, don't use free

20   or -- you can't get free or discounted use of property.  That

21   doesn't have "except as provided by law."  So I can

22   understand, to the extent you have a statutory provision that

23   says we're allowed to do it or we negotiated over that, fine.

24   But there are certain places where there's that language.

25   And it's hard for me to accept that I'm just supposed to

1  pretend that it is not there and that it has no effect on

2  anything when you're asking me to look at this and strike it

3  down as facially invalid because there is a conflict with the

4  statute.

5      MR. O'DUDEN:  You know, as I say, when you look at

6  the language, it's quite clear it's boilerplate.  And it's

7  quite clear that to make sense of the order overall, you can

8  see very plainly what he's doing.  He doesn't want these

9  things to have the benefit of official time.  And he expects

10  that --

11      THE COURT:  And you don't think he's giving FLRA or

12  this Court or anybody else the room to say this is not

13  consistent with the law, but the executive order says I'm not

14  enforced if I'm not --

15      MR. O'DUDEN:  His position would be I have the

16  power, I have the power to impose these things.  I don't even

17  have to bargain with the union about it.  I just did it.  If

18  you want to take me to the FLRA, fine, but I'm going to tell

19  them that I have the power to do it.  That's what will

20  happen.

21      THE COURT:  All right.  So give me -- I know what

22  the provisions are.  I think I know what statutes.  Give me

23  the highlights of the ones that you think most clearly

24  demonstrate a conflict.

25      MR. O'DUDEN:  Well, let me go about it this way.

1   With respect to grievance handling, which we've talked about,

2   and again, the reason I was talking about it in part the way

3   I was is to make sure that it's well understood that these

4   are not minor provisions that, you know, we can just live

5   with.  These are core elements of how collective bargaining

6   works.

7           THE COURT:  Yes.  Understood.

8           MR. O'DUDEN:  Okay.  So we've talked some now about

9   grievance handling.  We've talked in passing, as others, I

10  believe, about the total ban on getting official time--

11          THE COURT:  Yes.

12          MR. O'DUDEN:  -- for lobbying.  These things are

13  defective, again because they are contrary to 7131(d), which

14  doesn't bless the president.  It doesn't give him the power

15  to bigfoot the process and to say that he can order these

16  limitations on official time.

17          With respect to the 25 percent cap, as you know,

18  the official time order says that you can only spend up to 25

19  percent of your time engaged in official time work.  There is

20  no basis for that.  Under 7131(d), the parties negotiate the

21  allocation of official time.  The president can't intervene

22  and decide how he wants it to be and instructs this is the

23  way it will be.

24          And the same is true with respect to the so-called

25  one hour cap, which the government tries to characterize as,

1   you know, mere guidance.

2            THE COURT:  But don't they have a point?  I mean, I

3   was trying to discern whether there was a difference between

4   the myriad provisions that seem to conflict with what

5   Congress says can be negotiated.  The parties shall agree on

6   this.

7            MR. O'DUDEN:  Right.

8            THE COURT:  The parties shall talk about this and

9   come to a conclusion.  And the president is saying in this

10  order, here's the answer.  I get that there's -- there's a

11  category of them like that.

12           MR. O'DUDEN:  Yes.

13           THE COURT:  But then with respect to the one hour,

14  isn't there some more flexible language, the ones that the

15  government identify as guidance, I think have a different

16  flavor to them because the agency's sort of still making some

17  decision, isn't it?

18           MR. O'DUDEN:  Well, you know, at first glance you

19  might have that impression.

20           THE COURT:  Okay.

21           MR. O'DUDEN:  And then when you check in, as we did

22  in support of the declaration that we -- the two declarations

23  we've submitted to you, we see that despite the nice language

24  how this is only guidance and, you know, we don't really --

25           THE COURT:  Tell me which provision we're looking

1    at.

2              MR. O'DUDEN:  Okay.  We're looking at Section 3 --

3              THE COURT:  Yes.

4              MR. O'DUDEN:  -- of the official time order.

5              THE COURT:  Okay.

6              MR. O'DUDEN:  Okay?  So when they say that, you

7    know, obviously they're acting sincerely.  But when you take

8    stock of what's going on, all of the agencies are saying, as

9    far as we're concerned, this is a mandate.

10             THE COURT:  Well, I understand your argument.

11   Here's what's hard for me.  What's hard for me is that

12   you're --

13             MR. O'DUDEN:  It's a facial challenge.

14             THE COURT:  Yes, your argument is --

15             MR. O'DUDEN:  I get it.

16             THE COURT:  But I want to make it plain because it

17   keeps coming back, right?

18             MR. O'DUDEN:  Yes, it does.

19             THE COURT:  Your argument has the flavor of we all

20   really know what's going on.

21             MR. O'DUDEN:  No.

22             THE COURT:  And that's not the way that courts

23   evaluate, whether or not the president or anybody else can do

24   what it is that they've done.

25             MR. O'DUDEN:  Of course not.  We submitted the

1    declarations that we did because we had an obligation to show

2    harm in order to make sure that the Court understood why we

3    had standing and why the case was ripe.  At the same time,

4    those declarations are relevant to these points because the

5    government is choosing to characterize this particular rule

6    that we're talking about as guidance.  I don't think that

7    word is used in the executive order.

8               THE COURT:  No, it's not, but --

9               MR. O'DUDEN:  I think it's something that counsel

10   brought in.

11              THE COURT:  It's not.  But I thought, and maybe I'm

12   wrong, I'm desperately trying to get to this.

13              MR. O'DUDEN:  Yeah.

14              THE COURT:  I thought this particular section said

15   things like whenever reasonable agency heads should attempt

16   to negotiate collective bargaining agreements that exclude,

17   maybe I'm looking at the wrong one.  That was removal.

18              Anyway --

19              MR. O'DUDEN:  Yeah.

20              THE COURT:  -- I was looking at the wrong one.

21              MR. O'DUDEN:  A similar type argument, though.

22              THE COURT:  But ordinarily, ordinarily --

23              MR. O'DUDEN:  I understand.

24              THE COURT:  -- one hour is the right mark, it says.

25              MR. O'DUDEN:  Right.

1          THE COURT:  So I don't know that that's

2    suggesting -- maybe it is.  Maybe it's suggesting that the

3    agency will do that in every case, and your affidavits say

4    that they definitely will, but what I'm looking at the

5    statute on its face, it's not removing the agency's

6    discretion to find that in this particular collective

7    bargaining one hour is not going to be enough.

8          MR. O'DUDEN:  When you read the entirety of the

9    sections that we're now talking about, where they're saying

10   something a little bit less than it being a total ban, when

11   you read the entirety of the provision and when they say

12   things like, this is the recommendation or this is guidance,

13   then they have the punchline at the end where they say, but

14   if you don't reach this cap, you have to report it to the

15   President of the United States.

16         THE COURT:  But they say it doesn't go on to say

17   what happens.  You report it.  It is your little thing that

18   says here it is.

19         MR. O'DUDEN:  No.  Look, I'm sure that when people

20   have to report that, they don't feel like they're putting the

21   suggestion in the suggestion box at the office.  I suspect

22   that they interpret as a very clear signal that they are to

23   do what the goal is.  They are to accomplish that.  And

24   that's why they're behaving the way they are, as we described

25   in our declarations.  When don't get any -- when we put those

1    declarations together, we wanted to know how -- what's going

2    on?  How can we show that we're being injured now?  And that

3    is the answer that was provided to us.

4          THE COURT:  But whose fault is that?  I mean, I

5    hear you saying, I keep giving you declarations, Your Honor,

6    it's showing that this is the way the agencies are

7    interpreting it, and this goes back to my "except as provided

8    by law" point, right?  Whose fault is that if the president

9    said only listen to me when I am not conflicted with the law,

10   if the agencies are mistakenly reviewing that and saying, oh,

11   he must really want us to only do one hour, whose fault is

12   that?  Isn't it up to the agencies under those circumstances?

13         MR. O'DUDEN:  There are two different types of

14   orders he's giving here.  He's giving the absolutely clear,

15   undeniable order that something must be done.  And then the

16   other type of order is one that has a softer touch, but which

17   nonetheless makes clear, given the -- you have to engage in

18   the contextual analysis here.  When you do that, it's quite

19   clear that he expects all of these things to be accomplished.

20         And in any event, there are far more of these

21   prescriptions than there are in the category that you've been

22   asking me about.

23         THE COURT:  All right.

24         MR. O'DUDEN:  And they have a far reaching effect.

25   And I suspect that if you take a careful look at the *Chertoff*

1   case and Judge Edwards' decision, you will see that based on

2   the logic there, and I appreciate how the Justice Department

3   tries to distinguish it, but you will see that he, too,

4   assessed similar types of limitations on the scope of

5   collective bargaining and came to the conclusion that what

6   was left wasn't collective bargaining at all.  It was a

7   completely hollow system.  That's why he struck that down.

8           THE COURT:  And so are you interested in the Court

9   looking at these provision by provision?

10          MR. O'DUDEN:  No.

11          THE COURT:  Or is it your thought that what is

12  conflicting is the entire web of things that the president

13  has now just put out there?

14          MR. O'DUDEN:  We have challenged the provisions

15  that we've challenged.  And that's in our amended complaint.

16  What we are suggesting to you is, you know, when you go

17  through these things item by item, maybe they seem like the

18  government says, it's just one provision, two, whatever.  I

19  think you have to step back and take a look at these

20  proscriptions in their entirety.  And that's what tells you

21  the full story about whether the statute is being

22  deliberately undermined.  That is what is illegal.

23          THE COURT:  All right.

24          MR. O'DUDEN:  I know Your Honor is feeling pressed

25  for time.  And I'll leave it right there.

1        THE COURT:  Well, can I just ask you one quick

2  thing?

3        MR. O'DUDEN:  Of course.

4        THE COURT:  I noted that there were a couple of

5  provisions in, I think the removal area.

6        MR. O'DUDEN:  Yeah, we probably should talk about

7  those.

8        THE COURT:  Yes.  Well, I'm thinking about the ones

9  that don't actually conflict with this statute, but you

10  suggest conflict with other provisions.  So help me to

11  understand that.

12        MR. O'DUDEN:  Okay.  Well, let's take as an

13  example, I think, of one that fits into the category that you

14  describe.  And this is found at Section 4(c) of the removal

15  procedures executive order.  And this is the provision

16  concerning performance improvement periods.

17        THE COURT:  Yes.

18        MR. O'DUDEN:  Okay.  And our contention is that the

19  order on that issue is contrary to 4302 of Title V.

20        THE COURT:  Right.

21        MR. O'DUDEN:  Okay?  And so you'll have to bear

22  with me just a moment.  But that's the provision that says

23  that if you are subject to an adverse action for poor

24  performance, you are to get an opportunity to demonstrate

25  that you can do the job in the proper way.  It's left

1    undefined.

2          O.P.M.'s regulations say, well, that means it has

3    to be a reasonable period of time, which seems fair enough.

4    And with that language, we have, over the years, negotiated

5    different durations for PIP's, as they're known, depending on

6    the complexity of the job.

7          THE COURT:  In the context of particular collective

8    bargaining agreements?

9          MR. O'DUDEN:  Exactly.

10          THE COURT:  Okay.

11          MR. O'DUDEN:  So these have always been subject to

12    bargaining.  Now, however, you know, the president says as a

13    general rule 30 days or less.  And then he has his exception.

14    Except, if it's in the best interest of the agency, we can do

15    a little more.  We can give somewhat more.

16          We think, as a practical matter, what he has done

17    is to set up a requirement that essentially one size fits all

18    subject to this exception, which the union has no ability to

19    argue about, and which cannot be challenged to the MSPB.

20    We're just stuck with whatever they come up with.  That's the

21    major change.

22          THE COURT:  But is this conflict arising out of the

23    statutory provisions that relate to the terms of a bargain or

24    not?  I mean, it seems to me that part of your challenge in

25    the way that you just described it is the concern that this

1  says in the sole and exclusive discretion of the agency --

2            MR. O'DUDEN:  Yes, uh-huh.

3            THE COURT:  -- but that seems to suggest that

4  you're worried about not being able to bargain over it.

5            MR. O'DUDEN:  Well, that's part of it.

6            THE COURT:  And yet you don't seem to be relying on

7  the -- is there something in the bargaining world that says

8  you're entitled to bargain over this?

9            MR. O'DUDEN:  Yes, this is a condition of

10  employment.  That's why our contracts have these provisions

11  in them because we have a right to bargain about them, yes.

12            THE COURT:  So why didn't you cite one of the

13  chapter 71 provisions as the basis for the conflict that you

14  allege in this --

15            MR. O'DUDEN:  Because the conflict is provided when

16  you compare, not what's in chapter 71, but when you compare

17  4302(c)(6) to Title V and the executive order provision that

18  I mentioned to you, which is 4(c) of the removal procedure.

19            THE COURT:  All right.  I will look at -- it's just

20  odd because you have a bunch of other conflicts that you root

21  in chapter 71 on the basis of your contention that this thing

22  should be subject to bargaining and yet, it's not.  And so

23  that's why you say there's a conflict.  In this one you are

24  suggesting that this thing is always subject to bargaining,

25  but you don't cite to 71, you cite to this other statute.

1          MR. O'DUDEN:  Yes, because this is the source of

2     the substantive right to have what we believe is the

3     reasonable performance improvement period.  And we're being

4     deprived of that, in our view, because the president is

5     pushing very strongly, as he might put it, to have something

6     in place that allows the agencies entirely control the

7     duration of the performance improvement plan.

8          THE COURT:  All right.

9          MR. O'DUDEN:  And there are other provisions here

10    as well.  And I don't know if Your Honor has any interest in

11    discussing them.

12         THE COURT:  Well, I do have to give the government

13    a chance.

14         MR. O'DUDEN:  I know you do.

15         THE COURT:  Unfortunately from your perspective.

16         MR. O'DUDEN:  I'm sure they'll appreciate it.  But

17    I'll leave it there for now.

18         THE COURT:  All right.  Thank you.

19         MS. WESTMORELAND:  Your Honor, first with respect

20    to some of the specific conflicts that --

21         THE COURT:  I think it might be helpful, to the

22    extent possible, to kind of address my broader categorization

23    as opposed to the specifics.  Meaning there are some of these

24    that have this language that seems what you, I think, have

25    characterized as guidance in the way that you've described

1    them versus the others.

2            MS. WESTMORELAND:  Right.

3            THE COURT:  So let's start with the others.  There

4    are some of them that say do not use government property

5    during official time.  Why isn't that, you know, directly

6    conflicted with the provisions in the statute that say that's

7    the kind of thing you guys can talk about and come to some

8    agreement over?

9            MS. WESTMORELAND:  So, in that case -- well, first,

10   just as a clarifying matter, the government-wide there just

11   says that you can't use government property to the extent

12   that other groups aren't allowed to use government property,

13   not that you can't use government property at all.

14           THE COURT:  I understand that.  But there's

15   previously been a special thing.  So that part really doesn't

16   do anything for the analysis.  The union used to be able to

17   negotiate over the use of government property.  Now they

18   can't.

19           MS. WESTMORELAND:  And that, Your Honor, is where

20   our 7117 argument comes into play.  There are these specific

21   things, government-wide property, lobbying, grievances,

22   certain time limitations on official time.  And those things,

23   though they were previously permissible subject to bargaining

24   and are permissible subject to bargaining, to the extent that

25   the FLRA determines what can -- is bargainable, what is not

1   bargainable, before the issuance of a rule or law that would

2   create a conflict under 7117, it's now Section 7117 that is

3   removing that thing from the scope of bargaining, though it

4   was previously bargainable.

5           And to plaintiff's point about --

6           THE COURT:  Can we just be -- just to clarify.

7   7117 doesn't do it.  It's your interpretation of 7117 to

8   include the president's order saying don't bargain about --

9           MS. WESTMORELAND:  Yes, Your Honor.

10          THE COURT:  All right.

11          MS. WESTMORELAND:  But with respect to those

12  specific issues, the government recognizes that the FLRA has

13  considered them to be permissive subjects of bargaining.

14          THE COURT:  So there is a conflict, but you say

15  7117 allows the president to supersede the statute when it

16  says you can bargain about those things.

17          MS. WESTMORELAND:  Well, 7117 allows for removal of

18  specific things from the scope of bargaining.  So in that

19  sense there's not a conflict with the statute because 7117 is

20  also a part of the statute.  And that's what the court was

21  getting at in *IRS*.

22          THE COURT:  So where's the limiting principle?

23  We're back to this.  I hear you and Mr. O'Duden's heard you

24  talk about, well, it's just a small thing, no lobbying, you

25  know, it's just a minor.  Why does the government contend --

1   first of all, how do you draw the line between what is just a

2   small thing and therefore 7117 permits it and what undermines

3   the statutory provision.  And yeah, so why don't you start

4   there.  Why are you suggesting that that's just a small

5   thing?

6           MS. WESTMORELAND:  First, Your Honor, I have with

7   me, it might be helpful to give some context to the kinds of

8   things that might be negotiated in the C.B.A. under 7131(d)

9   as official time.  So I have a long, long list of things that

10  would be negotiable in that respect.  So it might help give

11  some context, in fact, these are really just a few specific

12  things.  And none of these are affected by the executive

13  orders.  So --

14          THE COURT:  No, I'm sorry, I don't want to hear all

15  the other things.  I know you have a very, very long list

16  because, says the plaintiffs, Congress intended for this

17  entire thing to be subject to negotiation.  So, everything is

18  on the table, and we spend a year negotiating how this is

19  going to work.  So I can imagine that against that backdrop

20  you have a very long list.

21          They're indicating that with respect to the use of

22  government property, which had previously been something

23  about which you can negotiate and bargain, that is an

24  enormous, enormous thing from the union standpoint with

25  respect to their ability to operate.

1          Also, they say, lobbying is, you know, 90 percent

2    of what a union does.  So, suddenly now the president is

3    saying those two things, although they are minor in the sense

4    that you have 500 things, those two things are really

5    important.  So now why is it that you suggest that those

6    things are the kind of things that 7117 allows the president

7    to say no more?

8          MS. WESTMORELAND:  Well, Your Honor, 7117 doesn't

9    put any limitation in the text of 7117 that would say that

10   government-wide rules or regulations or laws only applicable

11   to certain things are what creates the exception from the

12   scope of collective bargaining.  There's nothing in the text

13   of the statute.  In fact, in the legislative history in the

14   committee report, they say that that's to be construed very,

15   very broadly to include --

16         THE COURT:  Right.  But here's my problem.  If we

17   concluded -- if we read it as broadly as you suggest to allow

18   the president to swoop in and take off the table one, if not

19   more of the very key core things that a union does, then it

20   seems to me that the part of the statute, 7101, the findings

21   and purposes of this statute, the recognition that labor

22   organizations and collective bargaining and civil service are

23   in the public interest is conflicted.

24         If the president is doing things through 7117 that

25   undermines labor organizations and collective bargaining, why

1    do you think that Congress intended him to be able to do that

2    in conflict of their very purposes?

3           MS. WESTMORELAND:  Your Honor, we don't believe

4    there's a conflict with the very purposes.  And I think it

5    might be helpful here, although the government has brought to

6    the Court's attention the fact that *Chertoff* dealt with a

7    different type of system promulgated through DHS regulation,

8    through H.R. management system, it is true that the court in

9    that case looked to what collective bargaining meant in the

10   contexts of the FLRA to determine whether the regulations in

11   that case had preserved collective bargaining in that

12   statutory scheme.

13          And the kinds of things there where they said

14   certainly no, this cannot be what Congress intended with

15   collective bargaining, were provisions such as management can

16   take any measure it deems necessary at any time in

17   furtherance of management prerogatives.  Or management can

18   abrogate a collective bargaining agreement at any time.

19          Nothing -- you know, we have these sort of outer

20   limits.  And certainly nothing in these executive orders go

21   so far as to say management can abrogate any collective

22   bargaining agreement.  In fact, they all make specific points

23   of saying these provisions do not abrogate of any collective

24   bargaining agreement.

25          And so contrary to making it so that I believe the

1    words in *Chertoff* were that management, unions had virtually

2    nil, nothing to negotiate over, that is simply not the case

3    here because unions can still negotiate over so many

4    different things.

5           THE COURT:  Only if anybody is ever there.  Only if

6    they -- I mean, if they spend their personal time in the

7    lobbying to continue to have Congress support union rights,

8    it's like you -- these executive orders are set up to perhaps

9    not use the language that you say the D.C. Circuit found

10   offensive in *Chertoff*.  But to the extent that no federal

11   facilities can be used by a union any more the way this is

12   set up, and the employees can't lobby during their time at

13   work.  They can only do it on the weekends, I guess, in their

14   off hours or whatever, when Congress is closed, after hours.

15   You know, I don't understand why you suggest that those are

16   minor things in terms of the union's ability to operate.

17          And what's confusing me about this is that when I

18   look at the purposes of the executive orders, I see that the

19   president is very careful about talking about the effective,

20   you know, efficient and effective operation of government.

21   But when I look at the statute, that is one aspect of the

22   things that Congress was concerned about.

23          But they were also very clear that labor

24   organizations and collective bargaining are in the public

25   interest.  And the statute appears to be balancing those two

1   different concerns.  And yet, the president's executive

2   orders are all about one half of that equation and not the

3   other.

4         MS. WESTMORELAND:  Well, Your Honor, where Congress

5   intended for unlimited time to be spent on union activity, it

6   said so.  For example, in 7131(a), it says that no cap may be

7   placed on the amount of official time that union

8   representatives are allowed to spend in collective

9   bargaining.

10        THE COURT:  But Congress also said the union and

11  the agency get to decide.  They very clearly said that.  And

12  so now suddenly, they're not getting to decide, says the

13  union, in effect, if not in the details of the particular

14  order, but the way you set this up, the president has now

15  directed the agency official heads not to participate in

16  bargaining over these kinds of things.  And these are the

17  core, says the union, of what -- how we operate and what we

18  do.

19        MS. WESTMORELAND:  Well, that -- it kind of boils

20  down to these are just the things that the union says are

21  most important to it.  It doesn't mean that the president

22  doesn't have authority to remove specific -- to issue an

23  executive order that would remove specific things from the

24  scope of collective bargaining.

25        THE COURT:  But what you're trying to do is

1   convince me what Congress intended with respect to the scope

2   of the president's authority.  And what's hard is to suggest

3   that Congress would have intended through 717 to allow the

4   president to go so far as to issue executive orders that gut

5   the union's ability to operate when Congress simultaneously

6   in the statute said we recognize that effective labor unions

7   are in the public interest.

8          MS. WESTMORELAND:  Your Honor, we don't read these

9   executive orders as gutting the union's ability to operate.

10  We read them as specific provisions that don't conflict with

11  the statute.  And it's the union's say so that it guts their

12  ability to operate.  And to say that the unions get to decide

13  under 7131(d) what must happen on official time or what is

14  non-negotiable under official time.

15         THE COURT:  I'm not sure that's what they're

16  saying.  They're saying we get to talk about it.  And now

17  suddenly one other party has been told that they can't.  The

18  background, again, based on what the unions have said, based

19  on what the statute says, is that all of these things are on

20  the table when we should sit down and try to figure out how

21  these employees are going to operate.

22         How the union is going to operate, how the

23  employees who are in the union are going to operate.  We have

24  traditionally, and per the statute, talked about it.  And so

25  what you're suddenly saying is this one minor provision

1  tucked away, way down in the statute somewhere that talks

2  about government-wide rules can be used to allow the

3  president to say don't talk about that anymore or that or

4  this.  And you suggest that as long as the president seems to

5  think that those things are not that big a deal, that that's

6  okay.  That that's what Congress intended.

7        But the union has provided affidavits and

8  information that indicate that those things are a big deal.

9  Even if not big in number, they matter to how unions operate.

10        MS. WESTMORELAND:  Well, Your Honor, the unions'

11  declarations belie the facts that they're making a facial

12  attack on these executive orders.  And when the parties are

13  making a facial attack on an executive order to say that they

14  know how it's going to implement -- that they know what the

15  effect is going to be later down the road, that's not a

16  facial attack on the president's executive order.

17        THE COURT:  All right.  I think I understand that

18  argument.  So that kind of goes to the ones that there's

19  still some room for its possibility to be considered.  I

20  mean, again, we have a category of these that seem to be sort

21  of prohibitions about talking about things, you know,

22  entirely.  And then we have some that says -- that seems more

23  like the president is saying agency head, you should consider

24  this, you should endeavor to do that, et cetera.  Those may

25  not have played out yet.  I hear you going back to your

```
1    prudential ripeness argument to some extent, right?  I mean,

2    that's the point you're making on those.

3              But I'm still struggling to understand why you

4    would say that they don't conflict in substance.  And I sort

5    of hear you now suggesting that maybe they do conflict in

6    substance, but that Congress has authorized the president to

7    do so through 7117.  Is that your point?  Like those

8    prohibitions you acknowledge or concede that when the

9    president says don't bargain about this, and it's something

10   that has been recognized in the statute as a subject of

11   bargaining, we have a conflict.  But you say it's authorized

12   by 7117.

13             MS. WESTMORELAND:  That's correct, Your Honor.  We

14   recognize that the issues have been considered bargainable.

15   But 7131(d) says that any subject, anything that's under the

16   statute could be bargainable for the purposes of official

17   time under 7131(d).  So to say that everything is on the

18   table there, to say that nothing can be taken away under 7117

19   would gut 7117 of the meaning.  So I take Your Honor's point

20   about needing to balance.

21             THE COURT:  Well, 7117 is not specific to official

22   time.  So you can't really say gut -- no, you only get there

23   if I go through the, like five steps that you would like me

24   to get to to interpret 7117 in that way.  You know, if 7117

25   said referencing 7131(d), executive orders and/or
```

government-wide rules that pertain to official time shall be
honored and don't worry about what we said in 7131(d), I hear
your point.

But it's much broader than that.  It arguably
doesn't even apply to executive orders.  I have to accept
that it does.  I have to accept it.  You know, Congress would
have intended for the president to be -- trump what Congress
has said in these certain ways in order to read 7117(d) to
not create a conflict with 7131 in this case.

MS. WESTMORELAND:  My last point on that issue,
Your Honor, is 7131(d) says that there's just a duty to
bargain.  The same as there's a duty to bargain throughout
the statute.  And 7117 provides an exception to that duty to
bargain.  So there'd be no reason to believe that an
exception to the duty to bargain would apply in the context
of nonofficial time, but then also --

THE COURT:  But you're only begging the question
how broad is that exception.  What did Congress mean when it
was setting up an exception.  And I posited when I was
talking maybe to Mr. Zee or whoever, that what they meant in
carving out that exception was not nearly as broad as what
you intended.

MS. WESTMORELAND:  And to that, Your Honor, I just
say that there's no indication in the text of 717 or in the
legislative history that 7117 was meant to be a narrow

1    provision.  In fact, I believe it was the House version of

2    the bill wanted it to be more narrow.  And then in the

3    final -- in the final bill they were careful to say that it

4    was a very broad provision including all sorts of government

5    policies, rules and regulations, and that is the intent

6    behind that provision.

7              THE COURT:  All right.  I will look into it.

8              MS. WESTMORELAND:  Thank you.

9              I'm not sure if my colleague has a few points to

10   add.

11             THE COURT:  I think we have one final on the

12   plaintiffs' side as well.  One more?  Why don't we hold

13   Mr. Zee, and I'll give you the last word, all right?  But

14   let's have plaintiffs' counsel come.

15             MR. BLUMIN:  Thank you, Your Honor.

16             THE COURT:  Yes.

17             MR. BLUMIN:  And thank you for your patience and

18   attention during what's been a very long hearing.  Matt

19   Blumin for AFSCME and AFT.  And I'm here to discuss concisely

20   three points.

21             THE COURT:  All right.

22             MR. BLUMIN:  The first is the appropriateness of a

23   remedy against the executive, either via declaratory relief

24   or injunctive relief.  And while Your Honor has the authority

25   to fashion an appropriate remedy and, in fact, quite broad

1    discretion to determine how best to do so.

2            Second, why Section 4(a)(v) of the official time

3    order, if it's not held, for whatever reason, to violate the

4    statute as a conflict itself, quite clearly violates the

5    First Amendment.  And in addressing that point, I will return

6    to Your Honor's questions about what meaning, if any, the

7    savings clause that the president inserted into that

8    provision has.

9            And third, the meaning of the take-care clause and

10   its application of the freestanding constitutional claim to

11   this dispute and why it warrants ruling for the plaintiffs.

12           THE COURT:  All right.

13           MR. BLUMIN:  Beginning with the appropriate remedy.

14   There are two cases within the circuit which quite clearly

15   provide Your Honor with the ability to issue either

16   declaratory or injunctive relief against the president or

17   whichever of his subordinate officials Your Honor deems,

18   regardless of whether they were named in the complaint, are

19   necessary to afford plaintiffs the relief they seek.

20           The first such case is *NTEU versus Nixon* decided by

21   Judge Kaufman in 1973.  And in that case the D.C. Circuit

22   issued a declaratory judgment against the president,

23   interestingly specifically in the area of federal employee

24   labor relations, mandated a pay raise.

25           And Judge Kaufman advised in that case that the

1    District Courts in this circuit should not put form over

2    substance when complying with what he characterized with

3    their duty under Article 3 to ensure that the president

4    faithfully executes the law.

5         THE COURT:  What do you do with the fact that the

6    government has argued that I actually don't have the ability

7    to tell the president what to do?

8         MR. BLUMIN:  Well, I think you turn -- first of

9    all, I disagree.  They rely on *Franklin versus Massachusetts*,

10   a 1992 case of the Supreme Court, which did not so hold.  It

11   was decided by a plurality.  And it purposely evaded that

12   issue in order to hold it a declaratory judgment against

13   subordinate federal officials would be sufficient to afford

14   the plaintiff in that case the relief they sought.  And it

15   did so for concerns of comity and certainly Your Honor has

16   the discretion to fashion such a remedy yourself.

17        THE COURT:  If I did that because who am I to go

18   beyond the scope of what the Supreme Court has already

19   authorized.  If I were to do that, would that be sufficient

20   to afford the plaintiffs the relief that they seek in this

21   case?

22        MR. BLUMIN:  I believe that it would, Your Honor.

23   And I believe that the appropriate guidance for fashioning

24   that relief comes from a decision of the D.C. Circuit decided

25   four years later, *Swan versus Clinton*.  And cited by

1    defendants quite extensively for the sole proposition that

2    this Court does not in their view have the authority to issue

3    declaratory relief against the president, notwithstanding the

4    fact that *Swan versus Clinton* did not say that and withheld

5    judgment on whether *NTEU versus Nixon* appropriately ordered

6    such relief.

7           What the court did in *Swan* was to say that under

8    the All Writs Act, in order to appropriately reach the

9    president and issue for the plaintiffs the appropriate relief

10   that they sought in that case, it would issue against all

11   appropriate subordinate officials whether named in the

12   complaint or not the requisite declaratory judgment.  And

13   this Court could do precisely the same thing, consistent with

14   Supreme Court precedent and not contrary to any Supreme Court

15   case, but actually in line with precisely the approach the

16   Supreme Court took in *Franklin versus Massachusetts*.

17          So I think the issue of how to fashion relief here

18   is entirely within your discretion, and the notion that it

19   forecloses what plaintiffs seek is a distraction.

20          THE COURT:  All right.

21          MR. BLUMIN:  And with that I'll turn to the First

22   Amendment claim that AFSCME and AFGE have both forwarded in

23   this case.

24          But before doing so, I think it's appropriate

25   because that is specifically about the official time limit on

1    handling union grievances, that we discuss Your Honor's

2    question about the language in the executive order with

3    respect to official time, which says otherwise authorized by

4    law, what could that properly mean.

5         And actually before I get there, I'll point you to

6    the defendant's own Motion for Summary Judgment at page 12

7    where they concede otherwise.  They say, "Section 4(a)

8    consists," and I'm reading from their brief, "of a set of

9    five government-wide rules that restrict employees' use of

10   paid time and government property."  And they go on to

11   characterize this section as one that prohibits employees

12   from using official time to prepare or pursue grievances on

13   behalf of third parties under negotiated grievance procedure.

14        So the Justice Department has already conceded that

15   this is a flat prohibition.  And that that savings clause, if

16   you want to call it that, has no meaning in this context.

17   But if we're looking for meaning in the executive order

18   despite the fact that the defendants have conceded, there is

19   no --

20        THE COURT:  I really don't know how to conceive of

21   that.  Because on the one hand, yes, I mean, obviously the

22   president thinks that what he's doing is consistent with the

23   law or else he wouldn't have done it.  But, to the extent

24   that he says "except as provided by law" or whatever, why

25   isn't that a way of indicating to the agencies to whom he's

1   speaking or federal employees to whom he's speaking that if a

2   court tells you otherwise, if you want to argue otherwise, go

3   for it.  But this is what I think about what it is that's

4   supposed to be happening right now.

5        MR. BLUMIN:  Yes, so I think the only plausible

6   reading is that perhaps they're talking about official time

7   not under 7131 or that comes from some other statute where

8   there has been authorized official time for some other

9   purpose.  But the prohibition is so clear.  "All employees,"

10   I'm reading from the preamble to Section 4.  "All employees

11   shall adhere to the following requirements."  So their task

12   is requirements.

13        And then here in sub-5, you have, "Employees may

14   not use taxpayer funded union time to prepare or pursue

15   grievances except where such use is otherwise authorized by

16   law or regulation."  It might contemplate a future law or a

17   future regulation so that this is not viewed as foreclosing

18   future regulation of an agency or a future law.  But there's

19   no way to read the flat requirement language in the preamble

20   combined with the government's own concession in its briefs

21   that this is a requirement and a prohibition.

22        You know, they could have tried to explain the

23   savings clause or incorporate it into their papers in some

24   way.  They absolutely chose not to do that.  And, in fact,

25   when defense counsel was at the bar explaining to Your Honor

1    her view of 7117 and what that section meant, she was quite

2    clear that it means it's a government-wide rule.  It's a

3    government-wide regulation, and you asked whether there was

4    any exception, and the answer was no.  So, both in papers and

5    at the bar, the position of defense counsel has been that

6    this requirement is binding.

7           I don't know what plaintiffs are supposed to do

8    with that other than sit by and wait to be irreparably harmed

9    by a violation of their constitutional First Amendment

10   rights.  And I'll tell you why it violates the first

11   standard.

12          THE COURT:  All right.  So tell me why -- segue

13   that --

14          MR. BLUMIN:  Wow.  So the relevant cases here are

15   those cases beginning with *Perry versus Sindermann*, that's

16   the fountainhead case, okay.  That no entitlement -- that

17   despite not having an entitlement to a federal benefit in the

18   employment context, the government still cannot interfere for

19   unconstitutional reasons with the access to that benefit in

20   the employment context.

21          And the culmination of that line of cases,

22   beginning with *Perry*, is the Second Circuit's decision in

23   *State Bargaining Employees' Coalition versus Rowland*, in

24   which that court looked at precisely the same type of

25   situation and said, okay, if a group of employees are

1   associating, and in the employment context, have no

2   entitlement to a particular benefit, but are denied that

3   benefit because of their association, then the requisite test

4   is strict scrutiny based on --

5          THE COURT:  How could you say that they're being

6   denied that benefit because of their association when

7   government counsel points out that nobody else gets this.

8   What do you mean?  Aren't they just being treated equally

9   with all the other associations who can't use government

10  property?

11         MR. BLUMIN:  Well, Your Honor, we're speaking

12  specifically about the ability to -- Section 4(a)(v) of the

13  release time order.

14         THE COURT:  Okay.

15         MR. BLUMIN:  So not the tradition --

16         THE COURT:  Not the property.

17         MR. BLUMIN:  No.

18         THE COURT:  Section 4(a)(v) is to use taxpayer

19  funded time, meaning their official time, to prepare or

20  pursue grievances brought against an agency.  And this is --

21  you interpret this to be on behalf of the unions.  And you

22  think other associations get that or no?

23         MR. BLUMIN:  Well, only unions have official time

24  under their collective bargaining agreement.  So I think it's

25  useful to think about how grievance handling worked the day

1  before this executive order went into effect and how it

2  worked the day after, right?

3          THE COURT:  Okay.

4          MR. BLUMIN:  The day before an individual is

5  suspended for a week and wants to challenge that suspension.

6  They can either go pro se, as it were, and handle the

7  grievance themselves, or they can go to their union and have

8  the union handle the grievance for them, and both of those

9  types of grievance handling can happen, with the exact same

10  activity, and they can both happen on official time.  And

11  that's pursuant to statute.

12          THE COURT:  Okay.

13          MR. BLUMIN:  By executive order, the president has

14  carved that statute in half.  And what he said is, the

15  employee who wants to go pro se, and not associate for

16  expressive purposes with their union, can go pro se.  But the

17  minute that -- and receive official time.  But the minute

18  that she wishes to do so in an associated fashion with her

19  labor union, there's no longer federal funding for that

20  activity.  And that is the *Perry versus Sindermann*, that is

21  *State Bargaining Coalition versus Rowland*.

22          And the reason why, Your Honor, is that this a

23  substantial burden on the union's core activity.  And I think

24  Your Honor recognizes that based on some of your comments.

25  But I want to make clear that we have so alleged in our

1  statement of material facts.  And the Supreme Court recently

2  recognized that same fact in *Janus versus AFSCME*.  That

3  grievance handling by the union is core union activity.  This

4  is not a distraction or a sideshow.  This is what unions do,

5  they represent their members in an associational capacity

6  when the contracts that the union has negotiated on behalf of

7  their members have been violated by management.

8          THE COURT:  Have any of cases that you cite, and

9  again, I have not gotten to the bottom of all of the case law

10 that has been cited in these briefs.  Have any of them

11 recognized that grievance process, as you described it,

12 implicates the First Amendment?

13         MR. BLUMIN:  Well, *Janus*, in the sense that the

14 court opines at length about how core to a union's advocacy

15 handling grievances on behalf of employees in the bargaining

16 unit is.  And actually reading the reply brief filed late

17 last night by the defendants, they criticize our argument on

18 this point by saying, well, that's not about what's good for

19 the employees, that just targets the unions.

20         Well, that's exactly the First Amendment claim here

21 because the union is not some third party entity here.  The

22 union is the employees associating.  All right.

23         THE COURT:  All right.

24         MR. BLUMIN:  And so looking at *Perry* and looking at

25 *Rowland*, it's important to remember that in those cases the

1    employees had no contractual or other right to the employment

2    related benefit that they sought, none.  But the court

3    nevertheless held that the government acting in an executive

4    fashion could not deny them that benefit because of the way

5    in which they associated.

6          And I want to be clear that it's for this very

7    reason that the cases that the defendants cite contrary to

8    this argument are entirely inapposite.  Those cases are cases

9    like *UAW v. Lyng*, and these are Supreme Court cases about

10   public benefit programs, public facing benefit programs

11   outside of the employment context, not specifically based on

12   two classes, one of which is associating and one of which is

13   not.  They're totally and utterly distinguishable.

14         And you don't have to take my word for that because

15   the D.C. Circuit has said the same thing in the *Pritzker* case

16   from 2014, which defendants cite.  This circuit, and I

17   believe it was Judge Tatel, specifically chose not to extend

18   the reasoning of those cases beyond that sort of public

19   facing benefit capacity, in striking down or at least I think

20   denying a motion to dismiss, a challenge to President Obama's

21   ban on having registered lobbyists serve in certain executive

22   agency capacities.

23         THE COURT:  All right.

24         MR. BLUMIN:  So with that having been said and

25   being respectful of the Court's time, I want to close by

1   talking about why it is that AFSCME and AFT have raised the

2   "take care" clause here and why we think it's so critical.

3           As Your Honor knows, the Supreme Court in *Texas*

4   *versus the United States* ordered, asked for a briefing on the

5   question of the application of the take care clause to

6   executive action, that case deadlocked 4 to 4.  And so the

7   question was not resolved.  But it's obviously one that we

8   should be thinking about.  And the rule of that case is that

9   the president may -- I should say the rule of the take care

10  clause cases, is that the president --

11          THE COURT:  Which are only a handful, by the way,

12  right?

13          MR. BLUMIN:  Yeah, and we will march through them.

14  But that the president may not execute a statutory duty in

15  bad faith.  And that courts may prevent the president or the

16  president's subordinate officials from doing so.  And the

17  first hallmark case on this --

18          THE COURT:  Well, why isn't that a political

19  question?  How am I supposed to know?

20          MR. BLUMIN:  Well, the D.C. Circuit answered that

21  question in *NTEU versus Nixon*.  And in citing the "take care"

22  clause specifically said that although the key case that

23  defendants rely on, which is *Mississippi versus Johnson* from

24  1867, that although that had been cast as a justiciability

25  decision with respect to the take care clause, but it was

really no such thing.  It was really a political question

case that did not apply in the context of a clear statutory

duty by law that the president is clearly disregarded.

So, you know, we've got not just the D.C. Circuit's

opinion in *NTEU versus Nixon*, which has not been disturbed on

this point, but also Judge Kavanaugh's decision in 2013 in a

case called *In Re: Bacon*.  And that was a case in which a

federal agency refused to engage in a licensing process.

THE COURT:  Can I just ask you, is the reason why

we have so little case law on this ground because, to the

extent that the president is violating a clear statutory duty

that requires him to do something or tells him not to do

something, then the presidential, unlawful action is visited

on that basis.  And so we don't need the take care clause

because we have a clear statutory violation, and the Court is

able to address it in that context.

What I worry about is that every statutory

violation turns into a constitutional question under this

theory.  And that's concerning because you have to have, in

order for it to be justiciable, I have to have the

guidelines.  If the guidelines are coming from the statute

that the president is clearly violating, then I don't

understand why I ever reach the constitutional question.  I

just do it on the statutory grounds.

MR. BLUMIN:  Well, I would be crystal clear that,

1    you know, constitutional avoidance is a principle that I also

2    agree is important.  And if Your Honor is inclined to find a

3    statutory conflict that covers the same statutory sections --

4         THE COURT:  But I think I have to in order for it

5    to be justiciable.  No?  I mean, if there isn't such a clear

6    conflict, and therefore I am reaching the constitutional

7    question, I don't know how I'm supposed to answer it because

8    I don't have the guidance.

9         MR. BLUMIN:  So I think this is a unique case with

10   respect to the take care clause being a really tight fit.

11   And the reason is this:  The language of the take care clause

12   itself speaks of the -- says the president shall take care

13   that the laws be faithfully executed.  And faithfully in some

14   context may be a difficult word to apply.  But it's actually

15   not that difficult of a word to apply when we're dealing with

16   a statutory duty, which is true bargain in good faith.  And

17   so the question then becomes has the president instructed his

18   subordinates to bargain in bad faith?

19        And I think Your Honor has wrestled with the

20   question of FLRA preemption and what happens if the agencies

21   may happen to deviate from what the president has instructed

22   or ostensibly required, but the answer is that here we have

23   the concrete presidential action telling the agencies to act

24   in bad faith.

25        And so this is that rare case where the statutory

1    duty speaks of faithfulness.  And therefore there is a unique

2    fit between the language of the constitution and the

3    statutory duty violated.

4           But I will also say, and I think it's important,

5    that in their reply brief for the first time defendants start

6    to talk about, well, this only applies to ministerial duties.

7    As if ministerial is some magic word that extraordinarily

8    narrows the application of the take care clause.  And Judge

9    Kavanaugh's opinion, as well as the D.C. Circuit's opinion in

10   *Swan versus Clinton* are clear that that's not the case.

11   Where the take care clause applies, as Your Honor has said,

12   when the statute lays out a duty, speaks in terms of a

13   mandatory duty by the president.

14          And the fact that, and this is what the circuit

15   said in *Swan versus Clinton*, the fact that that requires some

16   statutory interpretation by the courts to determine what that

17   duty means does not remove jurisdiction from this Court under

18   Article 3 does not make that question not justiciable.

19   That's what Judge Kaufman said, quite to the contrary, it is

20   the court's duty under Article 3 when there is a statutory

21   duty to determine how that duty -- whether that duty has been

22   violated.  And if so, to fashion appropriate relief.

23          THE COURT:  All right.  Thank you.

24          MR. BLUMIN:  Thank you, Your Honor.

25          THE COURT:  Mr. Zee, you have the last word.

<table>
<tbody>
<tr><td>1</td><td>MR. ZEE:  So there is a lot there to respond to.</td></tr>
</tbody>
</table>

1          MR. ZEE:  So there is a lot there to respond to.

2          THE COURT:  I'm sorry I made you wait.

3          MR. ZEE:  I will try to be brief.  I'm sensitive to

4    the Court's time constraints.  So the first thing I will say

5    is just with respect to the First Amendment, our position is

6    that Section 4(a)(v) imposes no interference with the right

7    to associate.  The plaintiff unions and their members remain

8    entirely free pursuant to that section to pursue grievances

9    on behalf of third party employees.  The only effect that it

10   has is that it declines to authorize official time for that

11   activity.  In other words --

12         THE COURT:  Yes, but they allow official time

13   apparently pursuant to the argument that was just made for

14   that activity with respect to someone who isn't associating.

15   So why isn't that the problem?

16         MR. ZEE:  For the employee themselves, for the

17   employee themselves, that's correct.

18         THE COURT:  Right, but once that same employee

19   decides to associate, suddenly official time goes away.  And

20   so why doesn't that create some sort of a burden on their

21   First Amendment right to associate?

22         MR. ZEE:  Because, well, if you think about the

23   scheme of what official time is, it is payment of a federal

24   salary for work that the employee has been hired to do.

25         THE COURT:  I understand.  I didn't make it to be

1    the case to begin with.  I'm saying now that we have a world

2    in which some people are being paid in order to execute

3    grievances, namely the employees who say I'd like to bring my

4    own, right, that's the backdrop.

5              MR. ZEE:  Right.

6              THE COURT:  It's not my rule that someone can get

7    paid for that.  But apparently someone is until they get to

8    associate.  Now, why don't we have a First Amendment problem

9    based on the association under those circumstances?

10             MR. ZEE:  The reason why we don't is because the

11   Supreme Court has repeatedly held that to be -- when the

12   issue is the subsidy of the exercise of a First Amendment

13   right, it does not amount to a First Amendment violation.

14             THE COURT:  Even when people who aren't associating

15   are -- the key to me is, so you have some people who are

16   being subsidized and some people who aren't.  And the reason

17   why they aren't is because of the association.

18             MR. ZEE:  I would point Your Honor to the *Lyng* case

19   in which the benefit at issue were food stamps, government

20   food stamps.  To the extent that the -- a household was

21   engaged in a strike, members of that household were no

22   longer, pursuant to federal statute, eligible to receive that

23   food stamp benefit, whereas others were.

24             THE COURT:  Uh-huh.

25             MR. ZEE:  The Supreme Court summarily rejected the

1    claim that there was even any First Amendment right of

2    association problem to be begin with, let alone one that --

3             THE COURT:  Because a strike is not associational

4    or no?

5             MR. ZEE:  A strike is not only associational, but a

6    strike is --

7             THE COURT:  Expressive, yes.

8             MR. ZEE:  On both fronts, post *Perry versus*

9    *Sindermann*, I believe the *Lyng* Court, in fact, distinguished

10   *Perry versus Sindermann*, found that there was no First

11   Amendment problem whatsoever.  The same is true in *Rust*

12   *versus Sullivan*, again, distinguishing *Perry versus Sullivan*

13   [sic].  I don't need to dwell on the details, but the

14   arguments there are in our brief.  I'm happy to, if the Court

15   has questions.

16            THE COURT:  No.

17            MR. ZEE:  But our position is effectively that

18   there is no First Amendment right of association violation

19   here.

20            THE COURT:  All right.

21            MR. ZEE:  Briefly then moving on to the argument

22   about remedy.  Suffice to say that our position is that at

23   most in this case, what a court could award, what this Court

24   could award against the president is a declaratory judgment

25   for ministerial acts and ministerial acts only.  That is the

1    sum total of what the case law says.  And I think there's no

2    question under any reasonable definition of what a

3    ministerial act is, that what the president is doing and has

4    done here is not a ministerial act.  There is no duty to do

5    or not to do this sort of thing.

6            In fact, it would be -- it's entirely inconsistent

7    with plaintiff's position that the president has somehow

8    violated the take care clause.  The take care clause is a

9    classic.  The responsibility under the take care clause are

10   classic instances of non-ministerial duties.

11           THE COURT:  I understand.  But as I heard counsel

12   make the argument, I think he suggested that I didn't -- that

13   I could reach the same result without even getting to the

14   president.  So I'm not sure -- in other words, he said you

15   could issue a declaratory judgment that is addressed to the

16   subordinates who were actually following the president's

17   orders, right?

18           MR. ZEE:  In the papers, I don't know if counsel

19   argued that, I wasn't --

20           THE COURT:  Yeah.

21           MR. ZEE:  I don't doubt that he did.

22           THE COURT:  Yes.

23           MR. ZEE:  I saw that argument in the papers.  I

24   believe that the case law does authorize --

25           THE COURT:  All right.  So I mean, I think I asked

1    him would that do it for you in terms of the relief that

2    you're seeking, and he said "yes."  So whether or not I can

3    get to the president, it doesn't really seem to matter,

4    right?

5              MR. ZEE:  Well, our argument is only in response to

6    plaintiff's efforts to enjoin an issue with declaratory

7    relief to the president, we're responding to that.

8              THE COURT:  Okay, I understand.  All right.

9              MR. ZEE:  With respect to the take care clause, for

10   similar reasons, I think, Your Honor, there's no -- this

11   claim as we understand it seems to proceed basically on the

12   say-so of the plaintiffs that the president is acting in bad

13   faith.  That seems to be the basis of their take care clause

14   claim.

15             THE COURT:  Well, I mean, do you dispute that the

16   statute at issue here requires the president -- well,

17   requires the negotiating officials to act in good faith in

18   their negotiations?  Isn't that all within the statute?

19             MR. ZEE:  It certainly requires the negotiating

20   officials to act in good faith.  But the plaintiff's position

21   on the other hand is that the president has no authority and

22   no responsibility and can't do anything under the statute.

23   So it's hard to square that with the idea that he has somehow

24   acted in bad faith in exercising some duty that he --

25             THE COURT:  Well, we have a thousand different

1    plaintiffs.  And I'm sure that different people are assuming

2    different parts of the argument for the purpose of their

3    summary judgment motion.

4              MR. ZEE:  True.

5              THE COURT:  Assuming the president can act in

6    directing his subordinates who are negotiating, do you

7    concede that whatever he tells them to do cannot conflict

8    with their duty to operate in good faith during their

9    negotiations?

10             MR. ZEE:  I do think that that is -- I do concede

11   that.  Of course, we dispute whether that is actually what

12   happened here.

13             THE COURT:  Correct.

14             MR. ZEE:  We also dispute, to our knowledge no

15   court has ever allowed a take care clause to proceed and

16   actually afforded relief on that basis.  And that is for the

17   reason, which I think Your Honor alluded to.

18             THE COURT:  Right.

19             MR. ZEE:  That is not court's job, it is not the

20   judicial branch's job to second guess how the president is

21   exercising a responsibility that resides in Article 2, and

22   only in Article 2.  It is the president's responsibility to

23   take care that the law is being faithfully executed.  It's

24   strictly an Article 2 --

25             THE COURT:  And so you're suggesting in that broad

1    stroke that there really is no claim that can arise under the

2    take care clause, the justiciable claim.

3              MR. ZEE:  Correct, Your Honor.

4              THE COURT:  That you can never argue in any event

5    that the president is not fulfilling his duties under that

6    constitutional provision.

7              MR. ZEE:  Correct, Your Honor.  It's not the role

8    of courts to wade into whether the president is or is not

9    fulfilling that responsibility, which under the

10   constitutional structure belongs to him.

11             THE COURT:  All right.

12             MR. ZEE:  So attempting to be pithy.

13             THE COURT:  I'm trying to look hard, I'm very

14   sorry.  The case is very complicated.

15             MR. ZEE:  I'm happy to do it.  I'm happy also to

16   respond to any of the section by section analyses, to the

17   extent the Court has questions, I know that Mr. --

18             THE COURT:  No, I mean, I'm working it through.

19   There are lots of different provisions.  I think I understand

20   the government's position.  If there's anyone that you think

21   I didn't quite get, I'm happy to hear your argument.

22             MR. ZEE:  I think I would just make a general

23   argument --

24             THE COURT:  Yes.

25             MR. ZEE:  -- with respect to those sections that do

1   not impose binding requirements.

2            THE COURT:  Yes.

3            MR. ZEE:  Those sections that are auditory as we

4   put it in our papers that encourage agencies to achieve

5   certain goals.  Those cannot by definition be in conflict

6   with the statute.

7            THE COURT:  Why, why not?

8            MR. ZEE:  Because they're directed to try to do

9   something.  They contemplate failure to achieve that goal.

10  And so, to the extent that the plaintiff's position is that

11  the statute requires that a certain outcome or that a certain

12  process be followed, a nonbinding directive by definition

13  does not --

14           THE COURT:  But does that mean it doesn't have the

15  force or effect of law then?  So you're suggesting that an

16  agency can or cannot do what the -- I mean, the president

17  says try to do this.  Can an agency just ignore it?

18           MR. ZEE:  No, I'm saying that the agencies do have

19  to follow it as between within the executive branch,

20  certainly the directive from the president to the agency and

21  an agency's disregard would be an issue --

22           THE COURT:  Right.

23           MR. ZEE:  -- between the president and that agency.

24           THE COURT:  Right.  But what if the president's try

25  to do this is try to do something that is contrary to what

1    the statute says?  What do we do with that?  I mean, in other

2    words, the president's thing is not directing, mandating that

3    you do it.  He says consider this, give me a report, if you

4    don't manage to get there, and I understand that's not a

5    mandate, but what if he's suggesting that they do something

6    that isn't kosher in terms of the statute?

7         MR. ZEE:  Sure.  That, of course, is not what any

8    of these provisions do.  However, if there were a provision

9    in one of the executive orders that said, for instance, try

10   your best to negotiate out of any C.B.A. official time for

11   time spent negotiating collective bargaining, which is

12   mandatory.  We recognize that.  Congress says that has to be.

13   Official time has to be authorized for that purpose.  The

14   president issued a directive to agency saying, you know what,

15   try your best to not make that happen.  That would be a

16   problem.

17        THE COURT:  That would be a problem.

18        MR. ZEE:  That would be a problem.

19        THE COURT:  That would be a conflict.

20        MR. ZEE:  That would be a conflict.

21        THE COURT:  Notwithstanding the --

22        MR. ZEE:  I don't know that the actual order itself

23   would be a conflict.  Were the agency to fulfill that

24   directive, then -- I mean, I don't want to -- I'm not the

25   FLRA, almost certainly the FLRA would invalidate that effort

1    on behalf of the agency.

2            THE COURT:  Interesting.  All right.  Thank you.

3            MR. ZEE:  Thank you, Your Honor.

4            THE COURT:  Very, very, very interesting case.

5    Lots of issues to address.  I will take the motions under

6    advisement and issue a written ruling.  Thank you.

7            (Court adjourned at 6:00 P.M.)

8                           - o -

CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_8-9-18_
Lisa Walker Griffith, RPR          Date