# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| DONALD J. TRUMP, *et al.*, | ) ) |
| Defendants. | ) ) |

No. 1:18-cv-1261 (KBJ)

**MEMORANDUM OPINION**

NATIONAL FEDERATION OF
FEDERAL EMPLOYEES, FD-1,
IAMAW, AFL-CIO, *et al.*,

        Plaintiffs,

        v.

DONALD J. TRUMP, *et al.*,

        Defendants.

AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

        Plaintiffs,

        v.

DONALD J. TRUMP, *et al.*,

        Defendants.

NATIONAL TREASURY EMPLOYEES
UNION,

                    Plaintiff,              )
                                            )
            v.                              )
                                            )
DONALD J. TRUMP, *et al.*,                  )
                                            )
                    Defendants.             )
_____        )

## **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................1

II.  BACKGROUND ..............................................................................................7

  A.  An Historical Overview Of The Management Of Federal Public Employees .......7

  B.  The Statutory Provisions That Are Relevant To The Instant Dispute .................10

      1.  The Purpose, Structure, And Provisions Of The FSLRMS ..........................11

      2.  The Federal Labor Relations Authority .......................................................14

      3.  Relevant Miscellaneous Provisions Of The United States Code ..................16

  C.  The Challenged Executive Orders .....................................................................17

      1.  Executive Order 13,836 ("The Collective Bargaining Procedures Order") ...17

      2.  Executive Order 13,837 ("The Official Time Order") ..................................19

      3.  Executive Order 13,839 ("The Removal Procedures Order") .......................23

  D.  Procedural History ............................................................................................25

III. APPLICABLE LEGAL STANDARDS ........................................................27

IV.  ANALYSIS .....................................................................................................31

  A.  This Court Has Subject-Matter Jurisdiction Because Congress Did Not
      Intend For This Matter To Be Resolved Through The FSLMRS Or CSRA
      Administrative Review Schemes .......................................................................33

      1.  Both The FSLMRS And The CSRA Evince A Fairly Discernable
          Congressional Intent To Channel Certain Claims To The FLRA
          And The MSPB .........................................................................................35

      2.  The Unions' Claims Are Not Of The Type That Congress Intended To
          Funnel Through The FLRA or CSRA Statutory Review Schemes ...............37

          a.  Meaningful Judicial Review Of The Unions' Claims Would Be
              Foreclosed If The District Courts Could Not Hear These Claims .....37

          b.  The Unions' Claims Are Wholly Collateral To The FSLMRS
              And The CSRA Administrative-Judicial Review Schemes ..............48

      c.     Although Potentially Helpful, The Agencies' Expertise Is Not Essential To Resolving The Instant Claims .....................................56

B.  The Unions' Claims Are Fit For Judicial Resolution .................................59

C.  The President Has The Statutory And Constitutional Authority To Issue Executive Orders That Pertain To Federal Labor-Management Relations, So Long As His Orders Do Not Conflict With The Will Of Congress ................66

    1.  Before The Enactment Of The FSLMRS And CSRA, Presidents Had The Authority To Issue Executive Orders Regulating Federal Labor-Management Relations .................................................................66

    2.  The FSLMRS And CSRA Did Not Divest The President Of Any Authority In This Field ...............................................................71

    3.  The President's Executive Orders Concerning This Area Must Be Consistent With Congress's Pronouncements ..............................75

D.  Many Of The Order Provisions The Unions Have Challenged In This Case Impermissibly Infringe Upon The Statutory Right To Bargain Collectively ......76

    1.  Section 7103(a) And D.C. Circuit Caselaw Define The Contours Of The Statutory Right To Bargain Collectively ...............................78

        a.     The Duty To Bargain ......................................................80

        b.     The Duty To Act In Good Faith ......................................82

        c.     Takeaways Regarding Agency Conduct With Respect To Federal   Labor Negotiations .......................................83

    2.  Certain Provisions Of The Challenged Executive Orders Dramatically Curtail The Scope Of Bargaining Because Agencies And Unions Will No Longer Negotiate Over A Host Of Significant Issues .............................88

        a.     The Orders Remove These Matters From The Scope Of The Right To Bargain Despite The Fact That Congress Has Made Them Negotiable .........................................................88

        b.     The Removed Topics Are Important To The Functioning Of Labor Organizations And The Fairness Of Collective Bargaining Negotiations ..............................................92

    3.  Certain Provisions Of The Executive Orders Impede The Prospect Of Good Faith Negotiations .....................................................100

    4.  Defendants' Best 'No-Conflict' Counterarguments Are Meritless ..............105

        a.     The Specious Section 7117 Suggestion .........................105

        b.     The Mistaken 'Mere Guidance' Characterization ...........................111

E.  The Remaining Challenged Provisions Of These Executive Orders Are Legitimate Exercises Of The President's Authority ........................................113

V.  CONCLUSION ................................................................................118

## MEMORANDUM OPINION

### I.      INTRODUCTION

The Constitution of the United States divides the powers of the Federal government into three spheres: "[t]o the legislative department has been committed the duty of making laws, to the executive the duty of executing them, and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).  Because "the accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . pose[s] an inherent threat to liberty[,]" each branch of government must stay within its proper domain. *Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) (plurality opinion) (internal quotation marks and citations omitted).  When one of the three branches exceeds the scope of either its statutory or constitutional authority, it falls to the federal courts to reestablish the proper division of Federal power.  *See, e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (rebuking Congress's intrusion into the judicial sphere); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (preventing the Judiciary from intruding into the executive sphere); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (halting the President's encroachment upon the legislative sphere).  The instant case implicates these fundamental principles, for it relates to the power of the Judiciary to hear cases and controversies that pertain to federal labor-management relations; the power of the President to issue executive orders that regulate the conduct of federal employees in regard to collective bargaining; and the extent to which Congress has made policy choices about federal collective bargaining rights that supersede any presidential pronouncements or priorities.

On May 25, 2018, President Donald J. Trump issued three executive orders relating to the administration of the federal civil service and the rights of federal employees to engage in collective bargaining.  *See* Exec. Order No. 13,836, 83 Fed. Reg. 25329 (May 25, 2018); Exec. Order No. 13,837, 83 Fed. Reg. 25335 (May 25, 2018); Exec. Order No. 13,839, 83 Fed. Reg. 25343 (May 25, 2018) (collectively, "the Orders").  Among other things, these Orders seek to regulate both the collective bargaining negotiations that federal agencies enter into with public-sector unions and the matters that these parties negotiate.  The Orders place limits on the activities that federal employees may engage in when acting as labor representatives; guide agencies toward particular negotiating positions during the collective bargaining process; and address the approaches agencies shall follow when disciplining or evaluating employees working within the civil service.

Between May 30, 2018 and June 18, 2018, numerous federal employee unions ("the Unions" or "Plaintiffs") filed the instant consolidated cases against President Trump, the U.S. Office of Personnel Management ("OPM"), and the Director of OPM (collectively, "Defendants"), challenging the validity of the President's executive orders in various respects.[1]  The Unions contend that the Orders conflict with the

---

[1] The lead plaintiff unions are: the American Federation of Government Employees, AFL-CIO ("AFGE"); the National Treasury Employees Union ("NTEU"); the National Federation of Federal Employees, FD1, IAMAW, AFL-CIO ("NFFE"); and the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME").  Joining those Plaintiffs are the International Association of Machinists and Aerospace Workers, AFL-CIO; the Seafarers International Union of North America, AFL-CIO; the National Association of Government Employees, Inc., the International Brotherhood of Teamsters, the Federal Education Association, Inc.; the Metal Trades Department, AFL-CIO; the International Federation of Professional and Technical Engineers, AFL-CIO & CLC; the National Weather Service Employees Organization; the Patent Office Professional Association; the National Labor Relations Board Union; the National Labor Relations Board Professional Association; the Marine Engineers' Beneficial Association, District No. 1 PCD, AFL-CIO; and the American Federation of Teachers, AFL-CIO.

Federal Service Labor-Management Relations Act ("the FSLMRS"), 5 U.S.C. §§ 7101–7135—and therefore constitute *ultra vires* and unconstitutional actions on the part of the President—and also that the Orders impinge upon the constitutional rights of federal employees. Several union plaintiffs initially insisted that the Orders amounted to such an egregious violation of presidential power, and worked such an immediate harm to the collective bargaining rights of federal employees, that a preliminary injunction was warranted. (*See, e.g.*, Pl. AFGE's Mot. for a Prelim. Injunction, ECF No. 10.) However, the parties subsequently agreed to proceed straight to the merits of the Unions' challenges by having this Court resolve the instant dispute on cross-motions for summary judgment handled in an expedited fashion. (*See* Scheduling Order, ECF No. 16, at 1.)[2]

Before this Court at present are Plaintiffs' and Defendants' ripe cross-motions for summary judgment.[3] The Court held a lengthy hearing on these motions on July 25, 2018, and since then, it has worked diligently to sort out, and resolve, the myriad complicated and contentious issues that the parties' arguments raise. For example, each of the four motions for summary judgment that the Unions have filed assails various

---

[2] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

[3] *See* Pls.' Mem. in Supp. of Their Mot. for Summ. J. ("NFFE's Mem."), ECF No. 26; Pls. AFSCME's & AFT's Stmt. in Supp. of Mot. for Summ. J. & Joinder in Mots. Filed by Pls. AFGE, NTEU and NFFE, *et al.* ("AFSCME's Mem."), ECF No. 27-1; Mem. Supporting Pl. NTEU's Mot. for Summ. J. ("NTEU's Mem."), ECF No. 29-2; Mem. in Supp. of Pl. AFGE's Mot. for Summ. J. ("AFGE's Mem."), ECF No. 30-1; Defs.' Opp'n to Pls.' Mots. For Summ. J. & Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF 40; Pls.' Opp'n to Defs.' Cross Mot. for Summ. J. & Reply to Defs.' Opp'n to Pls.' Mot. for Summ J. ("NFFE's Reply"), ECF No. 45; Pl. NTEU's Consol. Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply in Supp. of its Mot. for Summ J. ("NTEU's Reply"), ECF No. 48; Pls. AFSCME & AFT's Opp'n to Defs.' Cross-Mot. for Summ. J., Reply in Supp. of Pls.' Mot. for Summ. J., & Joinder in Opp'n to Defs.' Mot. for Summ. J. ("AFSCME's Reply"), ECF No. 49; Pl. AFGE's Opp'n to Defs.' Cross Mot. for Summ. J. & Reply to Defs.' Opp'n to AFGE's Mot. for Summ. J. ("AFGE's Reply"), ECF No. 50; Defs.' Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 51.

provisions in the Orders (a total of twenty provisions are targeted), and each motion makes different claims regarding the validity of the challenged provisions.  By and large, this Court has treated the Unions' four motions as one.  Generally speaking, the Unions collectively contend that (1) the President has no statutory or constitutional authority to issue executive orders pertaining to the field of federal labor relations; (2) the challenged provisions conflict with particular sections of the FSLMRS in a manner that abrogates the Unions' statutory right to bargain collectively; and (3) certain provisions of the Orders transgress Article II's Take Care Clause, and also, in one instance, the First Amendment's right to freedom of association.

For its part, the summary judgment motion that has been filed on behalf of Defendants raises two threshold issues: that this Court lacks subject-matter jurisdiction over the instant dispute due to the channeling effect of the FSLMRS's administrative review scheme, and that some of the Unions' claims are insufficiently concrete to be prudentially ripe for judicial decision.  On the merits, Defendants' summary judgment motion maintains that the President has ample statutory and constitutional authority to issue executive orders in the field of federal labor relations, and that the Orders do not, in fact, conflict with the FSLMRS's complicated statutory regime, either because the challenged provisions only constitute "guidance" to federal agencies or because a section of the FSLMRS specifically authorizes the President to reduce the scope of collective bargaining through the issuance of "government-wide rules or regulations." Defendants further assert that the Take Care Clause claim is nonjusticiable, and that the First Amendment freedom-of-association claim is baseless.

For the reasons explained at length below, this Court has decided that the Unions

have the better of this argument. With respect to Defendants' threshold concerns, the Court concludes that it has subject-matter jurisdiction over the instant claims because, even though most disputes concerning federal labor-management relations must be channeled through the administrative review scheme that Congress has prescribed, this matter is different in kind than the disputes that Congress intended the FSLMRS's channeling provisions to cover. The Court further finds that the Unions' legal claims are generally fit for judicial resolution, and therefore, the prudential ripeness doctrine poses no bar to this Court's consideration of these challenges now.

As to the merits of the Unions' contentions, while past precedents and pertinent statutory language indicate that the President has the authority to issue executive orders that carry the force of law with respect to federal labor relations, it is undisputed that no such orders can operate to eviscerate the right to bargain collectively as envisioned in the FSLMRS. In this Court's view, the challenged provisions of the executive orders at issue have that cumulative effect. Stated succinctly, by enacting the FSLMRS, Congress undertook to guarantee federal employees the statutory right to engage in good-faith collective bargaining with agencies and executive branch officials, and the pronouncements that the FSLMRS makes are clearly based upon Congress's stated opinion that "the right of employees" to "bargain collectively . . . safeguards the public interest, contributes to the effective conduct of public business, and facilitates and encourages the amicable settlements of disputes" in regard to the "conditions of [federal] employment." 5 U.S.C. § 7101(a)(1). Viewed collectively, the challenged executive orders *reflect a decidedly different policy choice*; namely, the President's stated view that federal employees' right to engage in collective bargaining over the

conditions of their employment is not apropos of an "effective and efficient Government[,]" Exec. Order No. 13,836 § 1(b), and should be rendered subordinate to the agencies' interest "in developing efficient, effective, and cost-reducing collective bargaining agreements[,]" *id.* (preamble); *see also* Exec. Order No. 13,837 (preamble); Exec. Order No. 13,839 (preamble).

Certain provisions of the Orders plainly further the President's intention to restrict the scope and effectiveness of federal employees' right to collective bargaining vis-à-vis the agencies (*e.g.*, those directives that stunt negotiations by narrowing the terms that the agency can entertain related to significant matters, such as access to government office space for union business and the amount of official time that can be allotted to negotiations and counseling), *see* Exec. Order No. 13,836 § 5(e), 6; Exec. Order No. 13,837 §§ 4(a), 4(b); Exec. Order No. 13,839 §§ 4(a), 4(c), or clearly constrain agency negotiators' ability to conduct collective bargaining negotiations in good faith (*e.g.*, those mandates that direct agency representatives to pursue specific positions "whenever possible," such as limiting the annual aggregate official time awarded amount to one hour per employed union member per year), *see* Exec. Order No. 13,836 §§ 5(a), 5(e); Exec. Order No. 13,837 §§ 3(a); Exec. Order No. 13,839 §§ 3. Therefore, this Court finds that these provisions conflict with congressional intent in a manner that cannot be sustained.  (*See* Part IV.D, *infra*.)  What remains of the Orders are those provisions that the Unions have not opted to challenge, and the few challenged provisions described in Part IV.E.  *See* Exec. Order No. 13,836 § 5(c); Exec. Order No. 13,837 §§ 2(j), 4(c); Exec. Order No. 13, 839 §§ 2(b), 2(c), 4(b)(iii), 7.

This all means that, ultimately, both sides' motions for summary judgment must

be **GRANTED IN PART AND DENIED IN PART**, and this Court will enjoin the President's subordinates within the Executive Branch to disregard: sections 5(a), 5(e), and 6 of Executive Order 13,836; sections 3(a), 4(a), and 4(b) of Executive Order 13,837; and sections 3, 4(a), and 4(c) of Executive Order 13,839.  In this Court's view, these directives undermine federal employees' right to bargain collectively as protected by the FSLMRS, and as a result, the President must be deemed to have exceeded his authority in issuing them.  A separate order accompanies this Memorandum Opinion.

## II.    BACKGROUND

### A.    An Historical Overview Of The Management Of Federal Public Employees

The history of federal public employment in the United States evidences two competing visions of the proper relationship between the President and the individuals who are employed to work for the federal government within the Executive Branch. *See The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1619 (1984).  The first of these visions emphasizes "broad deference to the executive in matters of public employment[,]" and is based on the belief that such deference "is essential both to efficient public administration and [to] the realization of the popular will." *Id.*  According to this view, the President must have free reign to discharge federal employees, and to regulate labor relations between the government and its employees, because such authority is necessary to run a capable and efficient Federal Government. *See id.* at 1620.  This belief also maintains that such power is necessary to ensure that the President can promote the will of the people by installing federal bureaucrats who actually seek to achieve the political platform that undergird the President's election. *See id.*

7

The second vision of public employment worries that unfettered "executive discretion" to hire and fire civil servants can damage "the integrity of public administration in general," especially if an unchecked administration arbitrarily discharges career employees who hold contrary political views or who seek to blow the whistle on abusive employment practices within the Executive Branch. *Id.* This second vision of public employment also often asserts that a public employee has acquired a "property interest of sorts in his office[,]" *id.*, and expresses concerns not only about the impact that an abrupt dismissal might have on the administration of the federal government as a whole, but also on that employee's future employment prospects, *see id.* at 1621. Based on such concerns, the second vision of the civil service system "fosters the view that the public executive ought to be extensively constrained in employment decisions" regarding apolitical civil service employees. *Id.* at 1619; *see also, e.g.*, *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987) (discussing how certain statutes constrain executive discretion to remove employees).

As relevant here, these two different visions of the role of the President in managing the civil service have proven ascendant at different moments in American history, including during periods that precede the statute at issue in this case. Indeed, because "[i]nitially, presidents had broad powers to fill the civil service with their [own] appointees[,]" Jacob Marisam, *The President's Agency Selection Powers*, 65 Admin. L. Rev. 821, 863 (2013), throughout the nineteenth century, newly inaugurated presidents would regularly purge the ranks of the civil service, *see id.*; *see also U.S. Civil Serv. Comm'r v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 557–58 (1973) (describing these practices). The exercise of presidential power to manage the federal

workforce in this way waned significantly in the mid-twentieth century, as both President John F. Kennedy and President Richard M. Nixon expressly curtailed the purging practice by issuing executive orders that afforded significant procedural protections to civil servants. *See, e.g.*, Exec. Order No. 11,491, 34 Fed. Reg. 17605 (October 29, 1969); Exec. Order No. 10,988, 27 Fed. Reg. 551 (January 17, 1962). The Kennedy and Nixon orders also authorized the creation of labor unions representing federal government employees, and expressly granted federal employees "limited collective bargaining rights[,]" thus "provid[ing] the initial authorization for federal experimentation with unionization." *See* Scott L. Novak, *Collective Bargaining*, 63 Geo. Wash. L. Rev. 693, 695–96 (1995); *see also Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 91–92 (1983) ("*BATF*").

With the 1970s, the view that slothful federal employees enjoyed too much protection against discharge became increasingly popular, amidst mounting concern over government integrity in the wake of the Watergate scandal. It was against this backdrop that Congress enacted the Civil Service Reform Act of 1978 ("the CSRA"), Pub L. No. 95-454, 92 Stat. 1111 (1978), which was codified (as amended) in scattered sections of Title 5 of the United States Code. This legislation was expressly billed as an effort to codify the previous assortment of executive orders and rules that regulated the relationships between the federal government and its civil service employees. *See The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. at 1631–33. And the CSRA "comprehensively overhauled the civil service system," *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773 (1985), by replacing the "outdated patchwork of statutes and rules built up" during the previous hundred years through

executive orders and federal statutes, *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quoting S. Rep. No. 95-969, p.3 (1978)), with "an elaborate new framework for evaluating adverse personnel actions against federal employees[,]" *id.* at 443 (internal quotation marks, citation, and alternation omitted).

Significantly for present purposes, Congress crafted the CSRA with the express goal of "balanc[ing] the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445. To that end, "[t]he CSRA protects covered federal employees against a broad range of personnel practices, and it supplies a variety of causes of action and remedies to employees when their rights under the statute are violated." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009). At the same time, the CSRA also streamlined the lengthy and laborious appeals processes that pre-dated the CSRA, which made it easier for employers to take successful disciplinary or performance-based actions against federal employees. *See Fausto*, 484 U.S. at 445.

The aforementioned FSLMRS, which addresses collective bargaining and labor unions exclusively, is Title VII of the CSRA, and is "the first statutory scheme governing labor relations between federal agencies and their employees." *BATF*, 464 U.S. at 91.

### B. The Statutory Provisions That Are Relevant To The Instant Dispute

The arguments presented in the parties' cross-motions for summary judgment in this case chiefly revolve around several provisions of the FSLMRS—5 U.S.C. §§ 7101–06, 7111–23, 7131–35—as well as a few miscellaneous provisions that appear either in the CSRA or elsewhere in the United States Code, *see, e.g.*, *id.* §§ 4302, 7301.

1.  <u>The Purpose, Structure, And Provisions Of The FSLRMS</u>

The very first section of the FSLMRS lays out the purposes of the statute and the legislative findings that underlie it.  Congress makes crystal clear that, in its considered judgment, labor unions and collective bargaining "safeguard[] the public interest"; "contribute[] to the effective conduct of public business"; and "facilitate and encourage the amicable settlement[] of disputes between employees and their employers involving conditions of employment[.]"  5 U.S.C. § 7101(a)(1).  This statutory text also emphasizes the importance of adhering to "the highest standards of employee performance and the continued development and implementation of modern and progressive work practices to facilitate and improve employee performance and the efficient accomplishment of the operations of the Government."  *Id.* § 7101(a)(2).  Broadly speaking, the FSLMRS sets out to accomplish these goals by, among other things: affirming the rights of federal employees to unionize and to engage in collective bargaining, *see id.* §§ 7102, 7103(a)(12); determining what matters must, can, or cannot be bargained over, *see id.* §§ 7102, 7106, 7117, 7121, 7131; and developing a dispute-resolution mechanism for the various foreseeable issues that might arise during the collective bargaining process or as part of a final collective bargaining agreement, *see id.* §§ 7104–05, 7116, 7118–19, 7121–22, 7132.

First and foremost, the FSLMRS firmly establishes the rights of federal employees to join labor unions for the purpose of petitioning government officials about labor matters, *see id.* §§ 7102, 7102(1), and describes labor unions as entities that represent federal employees by "engag[ing] in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter[,]" *id.* § 7102(2).  The terms "collective bargaining" and "conditions of

employment" are terms of art within the FSLMRS, which means they have particular meanings that bear on this case.  "Collective bargaining" is defined as "the performance of the mutual obligation of . . . an agency and the [union] . . . to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees."  *Id.* § 7103(a)(12).  The "conditions of employment" that are subject to negotiation under the statute include "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions[.]"  *Id.* § 7103(a)(14).  Furthermore, when bargaining over such matters, both agencies and union representatives must abide by their obligation to "meet and negotiate in good faith[,]" *id.* § 7114(a)(4), and this means that the parties to the negotiation must generally "enter into discussions with an open mind and a sincere intention to reach an agreement[,]" *United Steelworkers of Am., AFL-CIO-CLC, Local Union 14534 v. Nat'l Labor Relations Bd.*, 983 F.2d 240, 245 (D.C. Cir. 1993) (quoting *Sign and Pictorial Union Local 1175 v. Nat'l Labor Relations Bd.*, 419 F.2d 726, 731 (D.C. Cir. 1969)).

After establishing that the right to good-faith collective bargaining exists, the statute lays out what matters are subject to negotiation and the extent to which those matters must be discussed.  In this regard, the FSLMRS establishes a three-tier system based upon the negotiability of matters in collective bargaining discussions.  First, the FSLMRS establishes a default presumption that it is "mandatory" for agencies and unions to bargain over the "condition[s] of employment" in the workplace.  *U.S. Dep't of the Navy, Naval Aviation Depot, Cherry Point, N.C. v. Fed. Labor Relations Auth.*, 952 F.2d 1434, 1439 (D.C. Cir. 1992); *accord* 5 U.S.C. §§ 7102(2), 7103(a)(12), (14).

12

Moreover, while the phrase "conditions of employment" is broad, the FSLMRS further explicitly emphasizes at least two mandatory bargaining matters: the scope of grievance procedures for disputes between employees and management, *see* 5 U.S.C. § 7121(a), and the availability of "official time[,]" *id.* § 7131(d)—*i.e.*, the availability of paid time to union members to work on union-related matters, *see BATF*, 464 U.S. at 91.  Second, the FSLMRS explicitly designates a narrow category of matters (section 7106(b)(1)) as 'permissive' matters for bargaining, in the sense that the parties may bargain over the matters contained within this section "at the election of the agency[.]"  5 U.S.C. § 7106(b)(1); *see id.* (allowing, "at the election of the agency," negotiation as to the "numbers, types, and grades of employees or positions assigned to" any project, or "the technology, methods, and means or performing work"); *see also Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 414 F.3d 50, 53 (D.C. Cir. 2005) (acknowledging that these matters constitute "permissive" subjects of bargaining).

Third and finally, the FSLMRS *prohibits* negotiation over matters relating to management rights or those matters subject to Government-wide rules or regulations. Accordingly, none of the bargaining rights the FSLMRS confers may interfere with the rights of federal agencies "to determine the mission, budget, organization, number of employees, and internal security practices of the agency" or "to hire, assign, direct, layoff, and retain employees . . . or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees" as allowed by law.  5 U.S.C. § 7106(a).  The statute also frees federal agencies of any obligation to negotiate over those "matters which are the subject of any . . . Government-wide rule or regulation[.]" *Id.* § 7117(a)(1).  This means that the right to collective bargaining does not extend to

13

rules or regulations that are "generally applicable throughout the Federal
Government[,]" even if the rule does not "apply[] to . . . a fixed minimum percentage of
the federal civilian workforce." *Overseas Educ. Ass'n, Inc. v. Fed. Labor Relations
Auth.*, 827 F.2d 814, 816–17 (D.C Cir. 1987) (internal quotation marks and citation
omitted); *see also Am. Fed'n of Gov't Emps., Local 2782 v. Fed. Labor Relations Auth.*,
803 F.2d 737, 741 (D.C. Cir. 1986).

As mentioned, the FSLMRS also recognizes that a number of disputes may arise
in the context of collective bargaining negotiations or during the execution of a
collective bargaining agreement.  Thus, the statute prohibits labor unions or federal
agencies from engaging in "unfair labor practices[,]" such as interfering with the ability
of employees or agencies to pursue their rights under the FSLMRS, or refusing to
negotiate in good faith.  5 U.S.C. § 7116(a)(1), (a)(5), 7116(b)(1), (b)(5).  It also
provides mechanisms for agencies and labor unions to resolve any impasse during
negotiations, *id.* § 7119, and to determine whether a union's proposal is actually
negotiable under the FSLMRS, *id.* § 7117(c).

## 2.  The Federal Labor Relations Authority

The various relevant provisions of the FSLMRS discussed above cover a lot of
substantive ground regarding the scope of federal labor-management relations.  But
there's more: to ensure that these statutory prescriptions are administered effectively,
Congress also created a permanent agency that it named the Federal Labor Relations
Authority ("FLRA").  *See id.* § 7104(a).  The FLRA has three members who are
appointed by the President with the advice and consent of the Senate.  *See id.* § 7104(a),
(b).  No more than two of its three members may come from the same political party,
*see id.* § 7104(a), and the members may "be removed by the President only upon notice

and hearing and only for" cause, *id.* § 7104(b).  Thus, the FLRA is a bipartisan,

independent agency.  *See Secs. Exch. Comm'n v. Fed. Labor Relations Auth.*, 568 F.3d

990, 997 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

Per the FSLMRS, the FLRA must "provide leadership in establishing policies

and guidance relating to matters under" the statute, 5 U.S.C. § 7105(a)(1), and the

agency is specifically tasked with promulgating regulations pertaining to the FSLMRS,

*see id.* § 7134.  The FLRA must also carry out a number of other prescribed duties, such

as "resolv[ing] issues relating to the duty to bargain in good faith under section

7117(c)[,]" *id.* § 7105(2)(E); "conduct[ing] hearings and resolv[ing] complaints of

unfair labor practices[,]" *id.* § 7105(a)(2)(G); and providing, by and large, the final

word relating to employee grievances under any grievance procedures established by a

collective bargaining agreement, *see id.* § 7122.

When the FLRA is called upon to hear a dispute, it may hold hearings and take

testimony, require an agency or labor union "to cease and desist from violations" of the

FSLMRS, or otherwise "take any remedial action it considers appropriate to carry out

the policies of this chapter."  *Id.* § 7105(g).  However, the FLRA is not the final word

on such matters; under the statute, "[a]ny person aggrieved by any final order of the

[FLRA]" may, with two minor exceptions, "institute an action for judicial review of the

Authority's order in" the federal court of appeals where that person resides, or in the

D.C. Circuit.  *Id.* § 7123(a).  The statute further provides that when such an appeal is

filed, the court of appeals "shall have jurisdiction of the proceeding and of the question

determined therein[,]" and may affirm, modify, or set aside the FLRA's order.  *Id.*

§ 7123(c).  Given the FLRA's expertise and the extensive role that Congress envisioned

15

for this agency in administering the FSLMRS, the agency is entitled to *Chevron* deference when interpreting the ambiguous provisions within the FLRA.  *See Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 645 (1990).

3.  <u>Relevant Miscellaneous Provisions Of The United States Code</u>

Other statutory provisions that are either contained within the CSRA (but outside of the FSLMRS), or appear elsewhere in the United States Code, are relevant to this case.  For example, in the CSRA, Congress created an agency known as the Merit Systems Protection Board ("MSPB") that adjudicates employee objections to certain adverse personnel actions.  *See* 5 U.S.C. § 7701; 5 C.F.R. § 1201.3 (listing the various types of actions that the MSPB may hear).  Among other things, the MSPB is specifically empowered to hear cases regarding the removal or reduction in grade of an employee "for unacceptable performance[,]" 5 U.S.C. § 4303, and cases involving an "adverse action taken against employees . . . based on misconduct[,]" *Fausto*, 484 U.S. at 446; *see also* 5 U.S.C. § 7513.  The MSPB's decisions are typically reviewable in the Federal Circuit.  5 U.S.C. § 7703.

In the category of other sections of the United States Code that specifically address the President's ability to regulate the civil service, section 3301 of Title 5 authorizes the President to "prescribe such regulations for the admission of individuals into the civil service in the [E]xecutive [B]ranch as will best promote the efficiency of that service[,]" *id.* § 3301(1), and the President is also expressly authorized to "ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought[,]" *id.* § 3301(2).  Similarly, section 7301 of Title 5 states that "[t]he President may prescribe regulations for the conduct of employees in the [E]xecutive [B]ranch." *Id.*  The public law that enacted the CSRA also expressly states:

16

"no provision of [the CSRA] shall be construed to limit, curtail, abolish or terminate any function of, or authority available to, the President which the President had immediately before the effective date of this Act."  Civil Service Reform Act of 1978, Pub. L. 95-454, § 904(1), 92 Stat. 1111, 1224 (internal quotation marks omitted).

## C.  The Challenged Executive Orders

President Donald J. Trump issued the Orders at issue in this case on May 25, 2018, as part of a coordinated effort to overhaul labor-management relations within the federal government.[4]  The Orders—dubbed "the Collective Bargaining Procedures Order"; "the Official Time Order"; and "the Removal Procedures Order," respectively—cover a variety of issues, as described below.

### 1.  Executive Order 13,836 ("The Collective Bargaining Procedures Order")

Executive Order 13,836, which is officially entitled "Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining," aims to instruct federal agencies on the procedures (*e.g.*, the methods and timing) that the President would like to see instituted with respect to collective bargaining negotiations, as well as some of the subjects of negotiation that the President would like to see eliminated from the collective bargaining process.  This executive order sets the tone at the outset, by admonishing federal agencies for "fall[ing] short" of implementing the prescriptions of the FSLMRS, which in the President's view, is "consistent with" that statute's pronouncement that the FSLMRS should be interpreted to promote an "effective and efficient Government."  *Id.* § 1(a).  The Order further

---

[4] Defendants acknowledge that these three orders were issued simultaneously, as a package deal.  (*See* Defs.' Mem. at 17 ("[T]he President issued three Executive Orders designed to promote more efficient and effective approaches to federal-sector collective bargaining and labor-management relations.").)

provides specific examples of such alleged failures: the President laments the fact that "CBAs, and other agency agreements with collective bargaining representatives, often make it harder for agencies to reward high performers, hold low performers accountable, or flexibly respond to operational needs[,]" *id.*, and notes that this suboptimal result is often reached after years of taxpayer funded CBA renegotiations, *see id.*, under circumstances in which "[a]gencies must also engage in prolonged negotiations before making even minor operational changes, like relocating office space[,]" *id.*

As relevant to this litigation, Executive Order 13,836 purports to fix these problems, primarily by changing the collective bargaining procedures that federal agencies follow.  *See id.* §§ 5(a), (c), (e), (6).  First, section 5(a) states that "[t]o achieve the purposes of this order, agencies shall begin collective bargaining negotiations by making their best effort to negotiate ground rules that minimize delay" and "set reasonable time limits for good-faith negotiations[.]" *Id.* § 5(a).  In this regard, the Order also maintains that "a negotiating period of 6 weeks or less to achieve ground rules, and a negotiating period of between 4 and 6 months for a term CBA under those ground rules, should ordinarily be considered reasonable."  *Id.*  Section 5(c), meanwhile, explains that when collective bargaining is delayed or impeded due to a union representative's "failure to comply with the duty to negotiate in good faith," the agency shall "consider" filing an unfair labor practice complaint with the FLRA or "propose a new contract, memorandum, or other change in agency policy and implement that proposal if the collective bargaining representative does not offer counter-proposals in a timely manner."  *Id.* § 5(c).

18

In a similar vein, section 5(e) purports to impact collective bargaining procedures by announcing that, when "developing proposed ground rules, and during any negotiations, agency negotiators shall request the exchange of written proposals, so as to facilitate resolution of negotiability issues and assess the likely effect of specific proposals on agency operations and management rights." *Id.* § 5(e). Moreover, "[t]o the extent that an agency's CBAs, ground rules, or other agreements contain requirements for a bargaining approach other than the exchange of written proposals addressing specific issues," agencies are required, "at the soonest opportunity, [to] take steps to eliminate them." *Id.* Finally, section 6 homes in on the substance of the negotiations: it provides that "[t]he heads of agencies . . . may not negotiate over the substance of the subjects set forth in [section 7106(b)(1) of Title 5 of the United States Code] and shall instruct subordinate officials that they may not negotiate over those same subjects." *Id.* § 6.

The net effect of these challenged provisions is to set a presumptive timeframe for the completion of collective bargaining negotiations (roughly five to seven months), *see id.* § 5(a); to remove certain matters from the bargaining table completely, *see id.* § 6; to require agencies to seek an exchange of written proposals about specific issues during rounds of collective bargaining, and to call for the elimination of other approaches, *see id.* § 5(e); and to ask agencies to consider taking certain steps (*e.g.*, the potential implementation of the agency's own unilateral agreement) if union representatives delay or impede the negotiations in bad faith, *see id.* § 5(c).

## 2.  Executive Order 13,837 ("The Official Time Order")

Executive Order 13,837 is entitled "Ensuring Transparency, Accountability, and Efficiency in Taxpayer-Funded Union Time Use[.]" Exec. Order No. 13,837. In this

Order, as with all the Orders, there is no mention of Congress's statutory statement that "labor organizations and collective bargaining in the civil service are in the public interest."  5 U.S.C. § 7101(a).  Rather, the Order suggests that the work of the agency itself is the only relevant interest that the public has as far as federal employees are concerned, and to make this crystal clear, the Order announces that "[t]o advance *this* policy, executive branch employees should spend their duty hours performing the work of the Federal Government and serving the public."  Exec. Order No. 13,837 § 1 (emphasis added).  As justification for this policy statement, the Order points to Congress's direction that the FSLMRS should be interpreted "in a manner consistent with the requirements of an effective and efficient government[,]" and asserts that "[a]n effective and efficient government keeps careful track of how it spends taxpayer's money and eliminates unnecessary, inefficient, or unreasonable expenditures[.]"  *Id.*  In so doing, the Order implies that the official duty time that some federal employees (representatives of federal labor unions) spend working on union business or representing federal employees in collective bargaining (which federal law allows) is an inefficient and ineffective taxpayer expense.  *See id.*

To this end, Executive Order 13,837 specifically redefines—and limits—the extent to which federal employees may engage in union business during working hours (a practice that the FSLMRS calls "official time" and that the Order dubs "taxpayer-funded union time"), and the Order also prohibits federal employees from using certain federal resources when working on non-agency business.  The "[p]urpose" preamble announces four animating principles: (1) that "agencies should ensure that taxpayer-funded union time is used efficiently and authorized in amounts that are reasonable,

necessary, and in the public interest"; (2) that "[f]ederal employees should spend the clear majority of their duty hours working for the public"; (3) that "[n]o agency should pay for Federal labor organizations' expenses, except where required by law"; and (4) that agencies should "eliminate unrestricted grants of taxpayer-funded union time" by "requir[ing] employees to obtain specific authorization[,]" should "monitor [the] use of taxpayer-funded union time[,]" and should make that information available to the public, to "ensure [such time] is used only for authorized purposes[.]" *Id.*

The Order then promotes these principles by laying out specific standards that pertain to how much official time an agency can authorize through a collective bargaining agreement. In this regard, the Order mandates that "[n]o agency shall agree to authorize" official time under section 7131(d) of Title 5 of the United States Code "unless such time is reasonable, necessary, and in the public interest." *Id.* § 3(a). Moreover, the Order states that, ordinarily, no federal union should, in one calendar year, receive more authorized official time under section 7131(d) than one hour per every federal employee within that union. *See id.* (asserting specifically that, while attempting to "fulfill their obligation to bargain in good faith[,]" "[a]gencies shall commit the time and resources necessary to strive for a negotiated union time rate of 1 hour or less"). Furthermore, if agency negotiators wish to present or accept a collective bargaining proposal that would result in official time in excess of the rate prescribed above, those negotiators must inform the agency head of that proposal 5 days in advance of the date they intend to offer up or accept that proposal, *see id.* § 3(b)(ii), and if the agency proceeds to authorize an amount of official time in excess of this standard, the head of that agency has 15 days to report the relevant agreement or proposal to the

head of OPM, who will subsequently report that proposal and agreement to the President of the United States, *see id.* § 3(b)(i).

The Executive Order also places limits on the activities that a federal employee may participate in while on duty; it also regulates how much official time any employee is entitled to, and what resources the government must make available to employees during activities for which official time is allotted.  To be specific, "[e]mployees may not engage in lobbying activities during" their on-duty hours, "except in their official capacities as an employee."  *Id.* § 4(a)(i).  Nor may federal employees use official time "to prepare or pursue grievances . . . brought against an agency[,]" unless that employee is working on his own pending grievance, is serving as a witness in a grievance proceeding, or is challenging an adverse personnel action as retaliation for whistleblowing activity.  *Id.* § 4(a)(v).  In addition, those employees cannot spend more than one quarter of total working hours engaged in union-related activities, *see id.* § 4(a)(ii)(1), and, if they do so, that time will count against their total permissible official time for the next calendar year, *see id.* § 4(a)(ii)(3).  The Order notes that this does not apply to official time in excess of one quarter of a union employee's total working hours if that time is used for the purposes laid out in section 7131(a) and (c) of Title 5 of the United States Code.  *See id.* § 4(a)(ii)(2).  But the use of any official time will require "advance written authorization from [the employee's] agency, except where obtaining prior approval is deemed impractical" according to regulation.  *Id.* § 4(b).

Finally, section 4(a)(iii) prohibits federal employees from receiving the "free or discounted use of government property or any other agency resources if such free or discounted use is not generally available for non-agency business by employees when

acting on behalf of non-federal organizations[,]" *id.* § 4(a)(iii), and section 4(a)(iv) disallows reimbursement of employees for expenses incurred for performing non-agency business, unless required by law or regulation, *see id.* § 4(a)(iv).  The Order also obligates both OPM and agency heads to take steps to ensure that all applicable regulations and newly-negotiated collective bargaining agreements are brought into conformance with those stated rules.  *See id.* § 4(c).

        In sum, the challenged portions of this Order not only seek to limit the *amount* of taxpayer-funded union time ("official time") that can be designated to a labor organization and/or an individual union employee, *see id.* §§ 3(a), 4(a)(ii), 4(b), but also prohibit union employees from using that time in relation to certain activities (*i.e.*, lobbying and some grievance-related proceedings), *see id.* §§ 4(a)(i), 4(a)(v).  In addition, the Order disallows union members from using government property for union business conducted during official time, and refuses to reimburse employees for any costs incurred during official time.  *See id.* §§ 4(a)(iii), 4(a)(iv).

### 3.  Executive Order 13,839 ("The Removal Procedures Order")

        The third, and final, executive order at issue in this lawsuit is entitled "Promoting Accountability and Streamlining Removal Procedures Consistent With Merit System Principles[.]"  Exec. Order No. 13,839.  Because federal agencies' purported "[f]ailure to address unacceptable performance and misconduct undermines morale, burdens good performers with subpar colleagues, and inhibits the ability of executive agencies . . . to accomplish their missions," this Order expressly seeks to "advance the ability of supervisors in agencies to promote civil servant accountability consistent with merit system principles while simultaneously recognizing employees' procedural rights and protections[.]"  *Id.* § 1.  It mainly aims to achieve these goals by

encouraging the "[r]emov[al] [of] unacceptable performers" using "a straightforward process that minimizes the burden on supervisors." *Id.* § 2(a).

The relevant challenged provisions start by rejecting the idea that federal supervisors and deciding officials should be "required to use progressive discipline" when dealing with underperforming subordinates. *Id.* § 2(b). Instead, the Order makes clear that "[a]gencies should limit opportunity periods to demonstrate acceptable performance" once the agency deems an employee to be performing inadequately, and provides instead that "[t]he penalty for an instance of misconduct should be tailored to the facts and circumstances." *Id.* § 2(a), (b). For example, depending on the specific factual circumstances, a federal employee might be removed for a first infraction—no warnings, temporary suspensions, or second chances. *See id.* § 2(d) ("Suspension should not be a substitute for removal in circumstances in which removal would be appropriate."). Of course, the Order notes that every employee's disciplinary history and work performance is unique, and thus theorizes that "[c]onduct that justifies discipline of one employee at one time does not necessarily justify similar discipline of a different employee at a different time." *Id.* § 2(c). But it states in no uncertain terms that progressive discipline should not be required, *id.* § 2(b), and to effectuate that policy, it further provides that no agency is permitted to make "any agreement, including a collective bargaining agreement that limits the agency's discretion to remove an employee from Federal service without first engaging in progressive discipline." *Id.* § 4(b)(iii). Along these same lines, the Order states that agencies shall "generally [not] afford [an underperforming] employee more than a 30-day period" to improve his unacceptable performance, unless the agency determines in its "sole

discretion" that a longer period is necessary.  *Id.* § 4(c).

In an effort to further streamline the removal process, the Order takes certain other matters off the collective bargaining table.  For example, the Order mandates that, "[w]henever reasonable[,]" agency heads shall attempt to negotiate collective bargaining agreements that "exclude from the application of any grievance procedures" those disputes "concerning decisions to remove any employee from Federal service for misconduct or unacceptable performance."  *Id.* § 3.  Agencies are also prohibited from subjecting "the assignments of ratings of record" or "the award of any form of incentive pay" (such as "cash awards[,] quality step increases[,] or recruitment, retention, or relocation payments") to any "grievance procedures or binding arbitration."  *Id.* § 4(a).

Boiled to bare essence, these provisions make it easier for the government to dismiss federal employees for bad conduct or unsatisfactory performance at work, and they remove certain matters relating to the grievance process from the collective bargaining negotiations process.  OPM and the heads of agencies are further directed to bring any current regulations, disciplinary programs, or collective bargaining agreements into conformance with these principles as soon as possible.  *See id.* § 7.

### D. Procedural History

Within a month of the President signing the Orders described above, seventeen federal employee unions filed four separate lawsuits in this Court seeking to challenge the legality of these orders.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, et al.*, 18-cv-1261 (KBJ); *Nat'l Treasury Emps. Union v. Trump et al.*, 18-cv-1348 (KBJ); *Nat'l Fed'n of Fed. Emps., FD1, IAMAW, AFL-CIO, et al. v. Trump, et al.*, 18-cv-1395 (KBJ); *Am. Fed'n of State, Cty. & Mun. Emps, et al. v. Trump, et al.*, 18-cv-1444 (KBJ).  The contours of the claims that the Unions have brought in the context of those four

25

lawsuits differ slightly, but *in toto*, the alleged claims can be grouped into four categories: (1) claims that challenge the President's authority to issue executive orders in the field of federal labor-management relations at all (*see, e.g.*, Compl., *Nat'l Fed.'n of Fed. Emps., FD1, IAMAW, AFL-CIO, et al. v. Trump, et al.*, 18-cv-1395 (D.D.C. June 13, 2018) ("NFFE's Compl."), ECF No. 1, ¶¶ 82–95); (2) claims that challenge the President's authority to issue executive orders that conflict with individual provisions of the FSLMRS (*see, e.g.*, *id.* ¶¶ 96–109); (3) claims that challenge the cumulative impact of these provisions upon the statutorily-guaranteed right to bargain collectively (*see, e.g.*, Am. Compl., *Nat'l Treasury Emps. Union v. Trump, et al.*, 18-cv-1348 (D.D.C. June 15, 2018) ("NTEU's Compl."), ECF No. 21, ¶¶ 131–134); and (4) claims that contend that the issuance of the Orders violate either the Constitution's Take Care Clause, or, in the case of section 4(a)(v) of the Official Time Order, the First Amendment right to freedom of association (*see, e.g.*, Compl., *Am. Fed'n of State, Cty. & Mun. Emps., et al. v. Trump, et al.*, 18-cv-1444 (D.D.C. June 18, 2018) ("AFSCME's Compl."), ECF No. 1, ¶¶ 94–97, 114–18).

Between June 15 and June 19, 2018, this Court consolidated all of these cases into a single action (*see* Minute Order of June 15, 2018; Minute Order of June 18, 2018; Minute Order of June 19, 2018), and shortly thereafter, the parties agreed to have these matters resolved by way of expedited summary judgment proceedings (*see* Scheduling Order at 1). Plaintiffs then filed four separate motions for summary judgment, reasserting their core claims and insisting that there is no genuine issue of material fact regarding the impropriety of the President's actions in issuing the Orders. (*See* NFFE's Mem.; AFSCME's Mem.; NTEU's Mem.; AFGE's Mem.) Defendants filed an omnibus

cross-motion for summary judgment (*see* Defs.' Mem.), and the parties' summary judgment motions have now been briefed in full (*see* NFFE's Reply; AFSCME's Reply; NTEU's Reply; AFGE's Reply; Defs.' Reply).

Defendants' motion contends that the Unions' claims about the lack of presidential authority are meritless for a variety of reasons.  (*See, e.g.,* Defs.' Mem. at 18 ("Contrary to Plaintiffs' insistence that the orders are an unlawful exercise of Presidential power, they fall well within the President's authority."); *id.* at 19 ("[S]ection 7117 of the Statute permits the government to pull a subject out of the bargaining process by issuing a government-wide rule that creates a regime inconsistent with bargaining." (internal quotation marks and citation omitted)).)  Defendants also raise threshold questions about whether this Court has subject-matter jurisdiction to hear these claims, given that Congress has created a scheme that designates the FLRA and the MSPB as the first steps for adjudicating federal labor claims (*see id.* at 17), and Defendants also question whether the Unions' claims are prudentially ripe (*see id.* at 18).  This Court held a hearing regarding the parties' cross-motions on July 25, 2018. (*See* Hr'g Tr., ECF No. 56.)

III.   **APPLICABLE LEGAL STANDARDS**

"The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself[,]'" or from a combination of the two.  *Medellin v. Texas*, 552 U.S. 491, 523 (2008) (quoting *Youngstown*, 343 U.S. at 585).  Thus, when assessing whether the President has acted beyond the bounds of his legal authority, a court may at times have to consider both the authority that congressional statutes have conferred upon him and the inherent authority

that the Constitution assigns to the President.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 675–82 (1981) (considering both aspects of the President's power).  The inquiries that are required to determine the extent of the President's statutory and constitutional authority differ substantially, but it is worth noting that a court need not assess the scope of the President's constitutional authority to take a particular action unless the President has specifically asserted that authority in the context of the given dispute.  *See Am. Fed'n of Labor and Congress of Indus. Orgs. v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc).  Hence, it is possible for a court to conclude that the President has acted *ultra vires* without concluding that the President has violated the constitutional separation of powers.  *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.  On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.").

Evaluating whether the President (or one of his subordinates) has acted in excess of his statutory authority typically presents "a difficult problem of statutory interpretation."  *Kahn*, 618 F.2d at 787.  To solve such a puzzle, a court must analyze the organic statute that supposedly confers statutory authority upon the President, assess the scope of a given executive order, and check for inconsistencies between the statute and the executive order.  *See id.* at 792–94.  It must take these three steps because there are two independent ways that the President may exceed the scope of his statutory authority in issuing these orders.  On the one hand, it is possible that no

statute has ever supplied the President with an explicit or implicit delegation of statutory authority. *See, e.g.*, *Youngstown*, 343 U.S. at 585–86. And on the other, even if the President has the authority to act in a certain field, the President nevertheless acts in excess of his statutory authority if the orders that he issues conflict with a federal statute. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996).

If the President asserts his inherent constitutional authority to take a particular challenged action, the court's analysis shifts to the well-known tripartite framework spelled out in Justice Robert Jackson's *Youngstown* concurrence. "When the President acts pursuant to an express or implied authorization of Congress" in a manner that is consistent with the will of Congress, "his [overall] authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). In such a situation, the President's action is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Id.* at 637. And, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* In these uncertain waters, "'congressional inertia, indifference or quiescence may' invite the exercise of executive power." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Finally, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power

is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). In the latter circumstance, sustaining such an exercise of "exclusive Presidential control" essentially requires a court to "disabl[e] the Congress from acting upon the subject[,]" *id.* at 637–38, and a court may affirm such a claim to power only by holding that a given action is "within [the President's] domain and beyond control by Congress[,]" *id.* at 640.

In short, like an *ultra vires* claim, a constitutional separation of powers claim requires the court to analyze what statutory authority, if any, the President possesses in relation to the challenged action. *See, e.g.*, *Medellin*, 552 U.S. at 529–30. After evaluating the scope of the President's statutory authority, the court must consider the scope of the President's inherent authority to act, looking to "the Constitution's text and structure, as well as precedent and history bearing on the question[,]" to determine what acts the President's inherent authority encompasses. *Zivotofsky*, 135 S. Ct. at 2084.

One final note, in regard to how these analytic frameworks function at the motion for summary judgment stage, is useful. The familiar standard for deciding motions for summary judgment under the Federal Rules of Civil Procedure dictates that if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" then a court must grant summary judgment in his favor. Fed. R. Civ. P. 56(a). Of course, in the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants the President the power to act in a

certain way is a pure question of law.  *See, e.g.*, *Zivotofsky*, 135 S. Ct. at 2083–84

(prescribing *de novo* review); *Chamber of Commerce of U.S.*, 74 F.3d at 1332–39

(conducting a *de novo* review).  The same can be said of any issues of interpretation

that a federal court may have to answer in parsing out the meaning of any relevant

statutes or the pertinent provisions of a challenged executive order.  *See Bldg. &*

*Constr. Trade Dep't, v. Allbaugh*, 295 F.3d 28, 32–36 (D.C. Cir. 2002).

## IV.   ANALYSIS

The circumstances presented in the instant case—*i.e.*, where the Unions have

challenged the President's authority to issue certain executive orders regarding federal

labor-management relations on a variety of grounds, and where the President maintains

that he has both the statutory and constitutional authority to direct the manner of

executive agencies' collective bargaining negotiations and other related matters but

that, in any event, this Court cannot and should not address the Unions' claims—present

complicated legal questions that require the application of myriad legal precedents and

more than one analytical framework.  The lengthy analysis below begins with the

threshold issues concerning this Court's subject-matter jurisdiction and the ripeness of

the Unions' claims, and the Court concludes that the claims at issue here are not the

types of claims that Congress intended to be funneled to the FLRA through the

FSLMRS's administrative review scheme, nor are they unfit for judicial review at this

time.  (*See* Part IV.A. & Part IV.B, *infra*.)

The Court then proceeds to tackle the merits of the claims presented in the

Unions' consolidated complaints.  It finds that the President has the constitutional and

statutory authority to issue executive orders that carry the force of law regarding federal

labor-management relations, including collective bargaining (*see* Part IV.C, *infra*), but that any such orders cannot impermissibly infringe upon the right to collective bargaining that is enshrined in the FSLMRS (*see* Part IV.D, *infra*). And because many of the executive order provisions that the Unions challenge here have that effect, this Court concludes that the President has overstepped his bounds. (*See id.*) Specifically, on their face, the Order provisions concerning matters such as the reduction of the availability of and support for official time activities, *see* Exec. Order No. 13,837 § 4, and the specific prohibitions against bargaining over section 7106(b)(1)'s permissive matters, *see* Exec. Order No. 13,836 § 6, or the unilateral narrowing of any negotiated grievance procedures, *see* Exec. Order No. 13,839 § 4(a), dramatically decrease the scope of the right to bargain collectively, because, in the FSLMRS, Congress clearly intended for agencies and unions to engage in a broad and meaningful negotiation over nearly every "condition of employment." Likewise, the Orders' requirements, such as the directive that agencies should "ordinarily" seek to conclude collective bargaining negotiations within five to seven months, Exec. Order No. 13,836 § 5(a), or should limit the applicability of grievance procedures "[w]henever reasonable[,]" Exec. Order No. 13,839 § 3, effectively instruct federal agencies and executive departments to approach collective bargaining in a manner that clearly runs counter to the FSLMRS's expectation of good-faith conduct on the part of negotiating parties.

In this Court's considered judgment, the President is without statutory authority to promulgate directives that reduce the scope of the statutory right to bargain collectively that Congress enacted in the FSLMRS; and, indeed, there appears to be no

dispute that the President does not have the constitutional authority to override

Congress's policy choice (*see* Defs.' Reply at 30–31).  Thus, the only challenged

provisions of Executive Orders 13,836, 13,837, or 13,839 that can stand are those that

neither contribute to a reduction in the scope of the collective bargaining that Congress

has envisioned nor impede the ability of agencies and executive departments to engage

in the kind of good-faith bargaining over conditions of federal employment that

Congress has required.  (*See* Part IV.E., *infra*.)

> **A.  This Court Has Subject-Matter Jurisdiction Because Congress Did Not Intend For This Matter To Be Resolved Through The FSLMRS Or CSRA Administrative Review Schemes**

"Federal courts are courts of limited jurisdiction[,]" meaning that "[t]hey possess

only that power authorized by [the] Constitution and statute." *Kokkonen v. Guardian*

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  It is well established that, "[w]ithin

constitutional bounds, Congress decides what cases the federal courts have jurisdiction

to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007); *see also* U.S. Const. art. III.,

§ 1.  Therefore, so long as Congress has provided a federal district court with an

"applicable jurisdictional grant[,]" that court has the authority to hear any case that falls

within that grant of jurisdiction. *Jarkesy v. Secs. Exch. Comm'n*, 803 F.3d 9, 15 (D.C.

Cir. 2015); *see also, e.g.,* 28 U.S.C. § 1331 (authorizing federal question jurisdiction);

*id.* § 1332 (authorizing diversity jurisdiction); *id.* § 1367 (authorizing supplemental

jurisdiction).

Of course, because Congress has the power to control the jurisdiction of federal

district courts, it may also choose to *withhold* jurisdiction, by "channeling" certain

types of claims through alternative review mechanisms. *See Elgin v. Dep't of the*

*Treasury*, 567 U.S. 1, 9 (2012); *accord Thunder Basin Coal Co. v. Reich*, 510 U.S. 200,

207 (1994).  In one such relatively common circumstance, Congress establishes a "statutory scheme of administrative review followed by judicial review in a federal appellate court[.]"  *Elgin*, 567 U.S. at 9.  It is also clear beyond cavil that when Congress erects a statutory scheme of this nature, it "implicitly preclude[s] district court jurisdiction over the claims" to which that statutory scheme applies.  *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 496 (D.C. Cir. 2018); *see also Jarkesy*, 803 F.3d at 15 (explaining that such schemes typically preclude initial judicial review by district courts because "it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies" (internal quotation marks and citation omitted)).

Defendants here insist that the administrative review schemes that appear in the FSLMRS and CSRA channel the Unions' claims to the FLRA or MSPB for resolution, and thus, this Court has no subject-matter jurisdiction to resolve the instant dispute. (*See* Defs.' Mem. at 32–33.)  To analyze whether a statutory scheme of review does, in fact, implicitly strip away a district court's power to hear a claim that it would otherwise have the authority to hear, courts apply the two-step inquiry that the Supreme Court laid out in *Thunder Basin Coal Co. v. Reich*.  *See Jarkesy*, 803 F.3d at 15. "Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'"  *Id.* (quoting *Thunder Basin*, 510 U.S. at 207, 212); *see also Elgin*, 567 U.S. at 10, 15 (applying this framework); *Free Enter. Fund v. Pub. Co. Accounting*

*Oversight Bd.*, 561 U.S. 477, 489 (2010) (same). Both elements must be present to support the conclusion that Congress has implicitly denied district court jurisdiction; however, as explained below, only the first of these two prongs is satisfied under the circumstances presented here.

###### 1. Both The FSLMRS And The CSRA Evince A Fairly Discernable Congressional Intent To Channel Certain Claims To The FLRA And The MSPB

It is well settled that the FSLMRS evinces a congressional intent to channel the resolution of at least *some* claims to the administrative agency that Congress created to address certain federal labor-management issues (the FLRA). *See* 5 U.S.C. § 7105(a). The D.C. Circuit has acknowledged that, "[w]ith the FSLMRS, . . . Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector, including the authorization of collective bargaining[,]" from which it reasoned that "[i]t follows, then, that [a plaintiff] may not circumvent that structure by seeking judicial review outside the CSRA's procedures." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (internal quotation marks and citations omitted). Moreover, the procedures for judicial review that are set forth in the FSLMRS are detailed and specific, suggesting that Congress intended for those procedures to be exclusive. *See* 5 U.S.C. § 7123(a) (providing a right of appeal to "[a]ny person aggrieved by any final order of the Authority other than an order under" section 7122 or section 7122 of the FSLMRS); *id.* § 7123(c) (outlining, *e.g.*, the court of appeals' jurisdiction, the relief that may be granted, the standard of review, and waiver rules); *cf. Elgin*, 567 U.S. at 11–12 ("Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernable that Congress intended to deny such

employees an additional avenue of review in district court.").

Thus, it comes as no surprise that the D.C. Circuit has held that "the FSLMRS's remedial regime *is* exclusive[,]" *Sec'y of the Air Force*, 716 F.3d at 637 (emphasis added), and that federal "[d]istrict courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA[,]" *Am. Fed'n of Gov't Emps., AFL-CIO, Local 446 v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004)—*i.e.*, those matters listed in section 7105 of Title 5.  In short, Congress intended for the "mine-run of cases" involving the FSLMRS to come before the FLRA—*not* the federal district courts—because "Congress create[d] procedures designed to permit agency expertise to be brought to bear on particular problems[.]" *Jarkesy*, 803 F.3d at 16 (internal quotation marks and citation omitted).

Similarly, when it enacted the other provisions of the CSRA, Congress unquestionably "established a comprehensive system for reviewing personnel action taken against federal employees." *Fausto*, 484 U.S. at 455.  Thus, the statute's scheme contains its own mechanisms for the resolution of disputes: it provides for "administrative and judicial review of specified adverse employment actions[,]" *Elgin*, 567 U.S. at 5, including the removal or reduction in grade of an employee "for unacceptable job performance" under Chapter 43 of the CSRA, and a system for the review of "adverse action taken against employees . . . based on misconduct" under Chapter 75 of the CSRA, *Fausto*, 484 U.S. at 445–46.  "Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11–12.

2.  <u>The Unions' Claims Are Not Of The Type That Congress Intended To Funnel Through The FLRA or CSRA Statutory Review Schemes</u>

Of course, the administrative and judicial review schemes that Congress adopted in the FSLMRS and CSRA are the exclusive path only with respect to the disputes to which these schemes apply.  Here, the Unions maintain that their claims are not "of the type Congress intended to be reviewed within" the pertinent "statutory structure[s]" of the FLRA or the CSRA.  *Thunder Basin*, 510 U.S. at 212.  (*See, e.g.*, AFGE's Reply at 9.)  Fortunately, the D.C. Circuit spoke at great length in *Jarkesy* about how this type of analysis should unfold.  *See* 803 F.3d at 17.

But first, it is important to note at the outset that "[t]o unsettle the presumption of initial administrative review—made apparent by the structure of the organic statute—requires a strong countervailing rationale."  *Id.* (internal quotation marks and citation omitted).  According to the D.C. Circuit, such a rationale exists "'if a finding of preclusion could foreclose all meaningful judicial review; if the suit is wholly collateral to a statute's review provisions; and if the claims are outside the agency's expertise.'"  *Id.* (quoting *Free Enter.*, 561 U.S. at 489–90) (internal quotation marks omitted).  These three conditions do not "form three distinct inputs into a strict mathematical formula[,]" but instead serve as "general guideposts useful for channeling the inquiry" at hand.  *Id.*; *see also Arch Coal*, 888 F.3d at 500 (reaffirming this holistic assessment).  This Court concludes that, on balance, these guideposts point toward the conclusion that Congress did not intend to strip away the jurisdiction of the district courts to hear cases such as this.

a.  *Meaningful Judicial Review Of The Unions' Claims Would Be Foreclosed If The District Courts Could Not Hear These Claims*

The first of these guideposts—the availability of meaningful judicial

review—requires a court to assess whether a plaintiff will, "as a practical matter[,] be able to obtain meaningful judicial review" if he is "not allowed to pursue [his] claims in the District Court." *Thunder Basin*, 510 U.S. at 213 (internal quotation marks and citation omitted).  To answer this question, courts have considered such factors as whether or not the plaintiff would suffer serious harm by dint of undergoing the administrative review process, *see Free Enter.*, 561 U.S. at 490; whether the plaintiff could obtain the evidence it needs through the administrative process, *see, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 497 (1991); and whether an Article III court will eventually have the opportunity to resolve the plaintiff's claims at some point during the administrative review scheme, *see, e.g.*, *Elgin*, 567 U.S. at 17–18.  With respect to the FSLMRS, this Court finds that the prescribed scheme for judicial review is such that the Unions will *not* be able to obtain meaningful judicial review of the claims that they bring here, because the FLRA cannot hear cases of this nature, and as a result, no court of appeals will have the opportunity to review the instant claims.

The scope of the FLRA's authority is laid out in the FSLMRS, and as a general matter, that agency can address and resolve *particular* issues of fact that arise under that statute—such as an agency's or a union's alleged violation of the statute's prescriptions in the context of a given labor-related dispute.  *See* 5 U.S.C. § 7105.  Congress has specifically conferred upon the FLRA the power to issue orders that "require an agency or a labor organization to cease and desist from violations of" the FSLMRS, and the FLRA can also "require [the agency] to take any remedial action [the FLRA] considers appropriate to carry out the policies of [the FSLMRS]." *Id.* § 7105(g)(3).  Congress has also specifically enumerated the FLRA's "powers and

duties[,]" *see id.* § 7105(a)(1)–(2), and has thus made crystal clear that the FLRA's authority extends *only* to the consideration of certain fact-specific inquiries pertaining to federal labor-management relations, and *not* to general questions of law.

For example, the FLRA is authorized to "determine the appropriateness of units for labor organization representation under [section 7112 of Title 5 of the United States Code]"; to "supervise or conduct [the] elections" that labor organizations hold under section 7111; and to "prescribe criteria" regarding such matters as "the granting of national consultation rights under section 7113" or an alleged "compelling need for agency rules and regulations under section 7117(b)[.]"  *See id.* §§ 7105(a)(2)(A)–(D). The agency can also "resolve[] issues relating to the duty to bargain in good faith under section 7117(c)[,]" *id.* § 7105(a)(2)(E), and "conduct hearings and resolve complaints of unfair labor practices under section 7118[,]" *id.* § 7105(a)(2)(G).  What does *not* appear in the statute is any authorization for the FLRA to address and resolve broad, abstract questions of law regarding labor-management relations, such as whether a systemic agency practice is unconstitutional.  *See, e.g.*, *U.S. Dep't of the Treasury, U.S. Customs Serv. v. Fed. Labor Relations Auth.*, 43 F.3d 682, 689 n.9 (D.C. Cir. 1994) ("[A] claim that the arbitration or FLRA procedures were unconstitutional would have to be brought as a collateral challenge in the district court[.]").  And this omission is remarkable, because it appears that Congress *has* authorized similar agencies to address such abstract questions in other portions of the CSRA.  *See, e.g.*, 5 U.S.C. § 1204(f) (empowering the MSPB to "review" any "rule or regulation" issued by the Office of Personnel Management); *see also Clark v. Office of Pers. Mgmt.*, 95 F.3d 1139, 1141 (Fed. Cir. 1996) (recognizing that the MSPB has this authority).

The FLRA itself has interpreted the FSLMRS to be a limited grant of authority in this regard; indeed, that agency has consistently maintained that it "lack[s] jurisdiction" to address claims that assail the general legality of agency conduct. *Nat'l Treasury Emps. Union*, 60 F.L.R.A. 782, 783 (2005) (refusing to consider a challenge to the legality of an OPM regulation); *Am. Fed'n of Gov't Emps., Local 4052, Council of Prison Locals*, 56 F.L.R.A. 414, 416–17 (2000) (same); *see also Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth.*, 794 F.2d 1013, 1015 (5th Cir. 1986) ("We find no support in either the statutes or the case law for AFGE's argument that the FLRA may rule on the legality or validity of a government-wide OPM regulation."); *cf. City of Arlington, Tex. v. FCC*, 569 U.S. 290, 307 (2013) (requiring courts to accord *Chevron* deference to an agency's interpretation of its jurisdiction).   Thus, when parties have asked the FLRA to rule in the abstract upon the validity of a rule that has some effect within the realm of federal labor relations, the FLRA has stated that such challenges should be brought in the "district court." *Am. Fed. Gov't Emps., Local 4052, Council of Prison Locals*, 56 F.L.R.A. at 416 (citing to *Nat'l Treasury Emps. Union v. Devine*, 577 F. Supp. 738, 745 (D.D.C. 1983), *aff'd*, 733 F.2d 114 (D.C. Cir. 1984)).

This all matters because the claims that the Unions have brought in the instant case are broad, facial attacks on the validity of the Orders and the President's authority to issue such directives; there are no fact-specific claims of unfair labor practices, mishandling of employment-related grievances, or negotiability disputes.  (*See, e.g.,* NFFE's Compl. ¶¶ 82–120.)  As noted, nothing in the FSLMRS's detailed statement of "the powers and duties" of the FLRA even remotely "relates to passing judgment on rules or regulations enacted by any other federal agency[,]" *Am. Fed'n of Gov't Emps.,*

794 F.2d at 1015, much less adjudicating the validity of executive orders that the President of the United States has issued, *see, e.g.*, *U.S. Office of Pers. Mgmt.*, 68 F.L.R.A. 1039, 1041 (2015) (holding that both "executive orders" and "regulations having the force and effect of law" constitute "applicable law" under section 7106(b) of the FSLMRS).  Thus, to be clear, this Court concludes that Congress has intended to funnel only *certain* types of labor-related disputes into the administrative review scheme that the FSLMRS established—*i.e.*, those arising out of specific negotiations or unfair labor practices—and that it never intended for the broad *ultra vires* and constitutional claims that the Unions have brought in this case to be resolved by the FLRA.[5]

Defendants' contention that an avenue for meaningful judicial review of the Unions' claims nevertheless exists within the prescribed administrative review scheme, because a court of appeals could still reach and resolve these claims under section 7123 of Title 5 of the United States Code despite the limited jurisdiction of the FLRA, is clever, but ultimately unpersuasive.  Defendants point to the FSLMRS's statement that

---

[5] A similar analysis would apply to any attempt to bring the claims in this case before the MSPB.  It is well established that "[t]he jurisdiction of the [MSPB] is not plenary[,]" *Schmittling v. Dep't of the Army*, 219 F.3d 1332, 1336 (Fed. Cir. 2000); rather, that agency has the authority to hear appeals only "from any action which is appealable to the Board under any law, rule, or regulation."  5 U.S.C. § 7701; *see also Schmittling*, 219 F.3d at 1336.  The specific actions that the MSPB has jurisdiction over are laid out in Part 1201.3 of Title 5 of the Code of Federal Regulations, and, as relevant here, the MSPB has jurisdiction to hear specific and concrete cases.  *See id.* (explaining how the board of appeals has the jurisdiction to hear, for example, appeals relating to adverse actions, terminations, performance-based actions, or a reduction in force that have a negative impact on individual employees).  The CSRA makes MSPB jurisdiction over an appeal "dependent only on the nature of the employee and the employment action at issue[,]" *Elgin*, 567 U.S. at 18, which means that the MSPB cannot have jurisdiction until a specific employee has been the object of some sort of employment action.  Moreover, although the MSPB has some limited authority to invalidate rules issued by OPM, that authority only extends to those rules that would require employees to take prohibited personnel actions, as defined in section 2302(b) of Title 5 of the United States Code, *see* 5 U.S.C. § 1204(f), and does not expand to invalidating rules or executive orders that carry the force of law as a general matter, *see, e.g.*, *Zirbel*, 87 M.S.P.R. 84, 86 (2000).

"'any person aggrieved by any final order of the FLRA'"—including, presumably, an order dismissing the complaint for lack of jurisdiction—"may seek judicial review of the order in the Court of Appeals for the D.C. Circuit[.]"  (Defs.' Mem at 34–35 (alterations omitted) (quoting 5 U.S.C. § 7123(a)).)  Defendants further observe that the federal courts of appeals have "jurisdiction *of the proceeding[s]* and of the question[s] determined" by the FLRA.  (Defs.' Reply at 16 (emphasis added) (quoting 5 U.S.C. § 7123(c)).)  And Defendants read this language to authorize the court of appeals to address any *ultra vires* or constitutional challenges that the Unions might bring to assail the President's executive orders in the context of an FLRA proceeding.  (*See id.* at 16.)  Of course, the trouble with this argument lies in the fact that the FSLMRS does not give the FLRA the power to adjudicate such challenges (*i.e.*, suits filed against the President claiming that executive orders are invalid) in the first place.

To understand why this is so, it is important to begin by recognizing that the FSLMRS's statutory scheme plainly makes the court of appeals' jurisdiction to review matters brought before the FLRA *entirely derivative* of the FLRA's jurisdiction.  By its terms, the "judicial review" that is provided for at section 7123(a) of Title 5 of the United States Code extends only to "the proceeding" that took place before the FLRA "and the question determined therein[,]" 5 U.S.C. § 7123(c)—language that, at the very least, suggests that Congress intended for the court of appeals to review only those matters that the FLRA *could have* considered.  Furthermore, section 7123(c) makes clear that, as a result of its review, the court of appeals may "grant any temporary relief . . . it considers just and proper," and its final decree must be crafted relative to the FLRA's decision: it can affirm (and enforce), modify (and enforce as so modified), or

"set[] aside in whole or in part the order of the [FLRA]." *Id.* The FSLMRS says nothing that would authorize the court of appeals to hear matters that are beyond the scope of the FLRA's jurisdiction through this administrative review scheme, and lest there be any doubt that Congress intended for the court of appeals to confine its review to the FLRA's own actual (or potential) determinations made in the context of proceedings that properly pertain to alleged unfair labor practices, employment-related grievances, negotiability disputes, and the like, section 7123(c) also imposes a series of procedural restrictions that clearly indicate that the scope of the court of appeals' review is no more and no less than the facts that the FLRA has already considered, should have considered, or can be compelled to consider, in order to resolve the dispute.[6]

Thus, the fact that the Unions here have sued the President of the United States and the Office of Personnel Management to challenge the validity of the President's Orders—*i.e.*, a dispute that is manifestly *not* within the purview of the FLRA—matters, and, in this Court's view, this fact ultimately disposes of the question of whether the court of appeals can address the Unions' claims under section 7123. To be sure, with respect to similar channeling statutes, binding precedents indicate that a court of appeals can reach and resolve a plaintiff's claims notwithstanding an administrative agency's lack of authority to do so, *see, e.g., Elgin*, 567 U.S. at 18; *Thunder Basin*, 510

---

[6] *See* 5 U.S.C. § 7123(c) ("No objection that has not been urged before the [FLRA], or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances. The findings of the [FLRA] with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any person applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce the evidence in the hearing before the [FLRA], or its designee, the court may order the additional evidence to be taken before the [FLRA], or its designee, and to be made a part of the record.").

U.S. at 215, but in these cases, it was clear that the unadjudicated claims arose in the context of the *kind* of proceeding that Congress had expressly funneled into the administrative review process. In such a circumstance, the plaintiff could be said to retain the prospect of meaningful judicial review of their claims, because the claim was part of a proceeding that was otherwise properly before the agency. *See Elgin*, 567 U.S. at 18.

In the instant context, however, just as in *American Federation of Government Employees, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007), no such meaningful opportunity exists. *Nicholson* involved a union's challenge to the Secretary of Veterans Affairs' determination that a particular matter was not subject to collective bargaining—a determination that the agency was purportedly authorized to make under section 7422 of Title 38 of the United States Code. *See* 475 F.3d at 345. In considering the scope of the court of appeals' authority to review that dispute pursuant to section 7123 of Title 5, the D.C. Circuit held that, because "[t]he FLRA lacked authority to review" this decision of the Department of Veterans Affairs, *see id.* at 347, the "D.C. Circuit could not provide [judicial] review" of the FLRA's dismissal of that matter under section 7123 of Title 5, *id.* at 348. In this Court's view, that analysis not only firmly establishes the derivative nature of the D.C. Circuit's judicial review, it also resolves the judicial review question presented here. The FLRA lacks jurisdiction over disputes that do not involve an unfair labor practice, grievance, negotiability dispute, or the like, as explained above, and that necessarily means that the court of appeals lacks the ability under section 7123 to decide any claim that arises out of a challenge that the FLRA did not have jurisdiction to hear, such as a challenge to the President's executive

orders.  *See U.S. Dep't of the Air Force v. Fed. Labor Relations Auth.*, 952 F.2d 446,

453 (D.C. Cir. 1991) ("Any challenge to the legality of the OPM regulation under

§ 4(b) of the Portal-to-Portal Act must be brought in an appropriate forum."); *Am.*

*Fed'n of Gov't Emps.*, 794 F.2d at 1015 (directing any challenge to a rule or regulation

to proceed through the district courts—not the FLRA).

In this regard, then, Defendants' reliance on *Elgin v. Department of the Treasury*

(*see* Defs.' Reply at 16–18), is misplaced.  The plaintiffs in *Elgin* were "former federal

competitive service employees who failed" to register for the Selective Service and

were discharged from their jobs with federal agencies as a result.  567 U.S. at 6–7.  One

of the plaintiffs (Elgin) appealed his removal to the MSPB, and claimed that requiring

male citizens between the ages of 18 and 26 to register for the Selective Service was

unconstitutional.  *See id.* at 7.  The ALJ who heard Elgin's claim held that the agency

"lack[ed] authority to determine the constitutionality of a statute[,]" *id.* (internal

quotation marks and citation omitted), and Elgin then proceeded to file a suit in district

court (instead of appealing the ALJ's determination to the full MSPB or the Federal

Circuit, which is the court of appeals authorized to hear such appeals), *see id.*  Before

the Supreme Court, Elgin explained that he had filed an action in district court because

the MSPB did not have the authority to decide certain constitutional claims, and that as

a result, the Federal Circuit also could not hear such claims, effectively foreclosing any

prospect of meaningful judicial review.  *See id.* at 16–17.  But the Supreme Court

sidestepped the issue of whether the MSPB was actually capable of deciding a

constitutional claim, *see id.* at 17, and reasoned instead that, even if the MSPB could

not hear Elgin's claims, the Federal Circuit could do so pursuant to the statutory

administrative review scheme, *see id.* at 18.  The Supreme Court emphasized that the Federal Circuit had only ever "questioned its jurisdiction when an employee appeals *from a type of adverse action over which the MSPB lacked jurisdiction*[,]" and that so long as the MSPB had jurisdiction "over [the] appeal"—because *the case* involved the type of "employee and [] employment action" that the MSPB could handle—it did not matter that the MSPB may have lacked the authority to rule on a particular claim.  *Id.* (emphasis added).

     *Jarkesy* and *Thunder Basin* speak to the same principle.  In both cases, federal agencies had charged, or would soon charge, the plaintiffs with violating laws and regulations that the agencies administered.  *See Thunder Basin*, 510 U.S. at 204 (failure to post a notice containing information regarding miners' representatives); *Jarkesy*, 803 F.3d at 13 (securities law violations).  There was also no question in *Jarkesy* or *Thunder Basin* that the Securities Exchange Commission or the Federal Mine Safety and Health Review Commission, respectively, had the power to adjudicate these alleged violations as a general matter.  *See Thunder Basin*, 510 U.S. at 205; *Jarkesy*, 803 F.3d at 19.  And both cases involved plaintiffs who challenged the agencies' ability to rule upon certain statutory and constitutional claims in the context of cases involving government action that the agencies could otherwise legitimately consider.  *See Thunder Basin*, 510 U.S. at 213–15; *Jarkesy* 803 F.3d at 18–19.  Under those circumstances, both the Supreme Court and the D.C. Circuit concluded that, even if for some reason these agencies could not adjudicate the particular claims in the proceeding before them, the courts of appeals were "fully competent" to do so on review of the agency's proceedings.  *Jarkesy*, 803 F.3d at 19; *see also Thunder Basin*, 510 U.S. at 215

("[P]etitioner's statutory and constitutional claims [] can be meaningfully addressed in the Court of Appeals.").

These situations differ significantly from the one presented here.  To recap, in *Elgin*, *Jarkesy*, and *Thunder Basin*, the agencies had jurisdiction over the underlying matters at issue: the MSPB had jurisdiction over cases concerning the removal of federal employees; the SEC had jurisdiction over cases concerning the violation of securities laws; and the FMSHRC had jurisdiction over cases concerning matters arising under the Mine Act.  In addition, the challenged conduct was generally of the type that could be addressed by the relevant agencies; therefore, the courts of appeals had no reason to "question[]" their own jurisdiction to review the underlying proceedings. *Elgin*, 567 U.S. at 18.  By contrast, the instant case does not involve such a matter— there is no alleged unfair labor practice, grievance, or negotiability dispute over which the FLRA could otherwise exercise jurisdiction.  The FLRA has no jurisdiction to hear *any part* of this case—and does not just lack the authority to hear the particular *claims* that the Unions have raised—so a court of appeals that is limited to reviewing "the proceeding and the question [the FLRA] determined therein" under section 7123(c) of Title 5 of the United States Code could not possibly reach the Unions' challenge to the President's Orders through the statutory administrative-judicial review process. [7]

---

[7] The same is true of the Federal Circuit's jurisdiction to review claims that arise in cases brought before the MSPB.  In any case "brought under 5 U.S.C. § 7701, 'the scope of the subject matter jurisdiction of the Federal Circuit is identical to the scope of the jurisdiction of the Board.'" *Schmittling*, 219 F.3d at 1337 (alterations omitted) (quoting *Rosano v. Dep't of the Navy*, 699 F.2d 1315, 1318 (Fed. Cir. 1983)).  Thus, "[i]f the [MSPB] lacks jurisdiction" over a matter, the Federal Circuit is "without authority to hear the merits of the appeal." *Id.*  Here, the MSPB could not possibly hear the case that the Unions have advanced—since there is no employment action or employee to speak of—and as a result, the Federal Circuit could not review any of the claims that the Unions have brought in this case.

The practical effect of this analysis is that all Article III judicial review of the Unions' contention that the President lacks the authority to issue the challenged executive orders would be foreclosed if the doors of the district court are shut, and *that* result counsels against concluding that Congress meant to preclude the district court from exercising subject-matter jurisdiction over the claims that the Unions have brought in this case.  *See Free Enter.*, 561 U.S. at 489 ("[W]e presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review[.]'" (citation omitted)); *Nicholson*, 475 F.3d at 348 ("[B]ecause the D.C. Circuit could not provide that review on a petition for the review of the FLRA decision dismissing the [unfair labor practice] complaint, [the case law] does not provide a basis for the district court dismissing this case for lack of jurisdiction."); *see also Chamber of Commerce of U.S.*, 74 F.3d at 1328 (indicating that courts may normally review *ultra vires* claims unless Congress has precluded all non-statutory judicial review of the President's actions); *Ralls Corp. v. Comm. On Foreign Inv. in the U.S.*, 926 F. Supp. 2d 71, 86 (D.D.C. 2013) (suggesting that congressional preclusion of jurisdiction over *ultra vires* claims must be "express"), *rev'd on other grounds*, 758 F.3d 296 (D.C. Cir. 2014).

> b. *The Unions' Claims Are Wholly Collateral To The FSLMRS And The CSRA Administrative-Judicial Review Schemes*

Not only do the FSLMRS and CSRA administrative-judicial review schemes foreclose meaningful review of the challenge that the Unions seek to make here, it is also clear that the Unions' claims themselves are "'wholly collateral' to the" statutory-review scheme at issue.  *Jarkesy*, 803 F.3d at 22.

In determining whether a lawsuit is wholly collateral to a statute's scheme of

review, the Supreme Court and the D.C. Circuit have differentiated between those claims that "arise 'outside' the [agency's] administrative enforcement scheme" and those claims that "arise from actions the [administrative agency] took in the course of that scheme." *Jarkesy*, 803 F.3d at 23. Claims that are deemed to have arisen *outside* the agency's administrative enforcement scheme are those that are essentially divorced from any action that the agency has taken, or any determination that it has made, in the context of agency proceedings. *See, e.g., Free Enter.*, 561 U.S. at 490 (challenging the very existence of an administrative agency, not any proceeding before that agency); *Nat'l Mining Ass'n v. Dep't of the Labor*, 292 F.3d 849, 855 (D.C. Cir. 2002) (per curiam) (challenging a regulation passed through the notice-and-comment rulemaking process as impermissibly retroactive). By contrast, legal claims that arise *from* actions taken by an administrative agency (and are thus not properly considered wholly collateral) include attacks on the initiation of administrative proceedings involving the plaintiff, or challenges to specific decisions that the agency made in the course of those proceedings, or any other attempt to use a federal lawsuit as "the 'vehicle by which' [the party] seeks to prevail in his administrative proceeding." *Jarkesy*, 803 F.3d at 23 (quoting *Elgin*, 567 U.S. at 22). In essence, courts seek to determine whether the claims brought in the lawsuit would impact ongoing administrative proceedings such that the plaintiff can be said to have made "an end run around" around the applicable statutory review scheme "by going directly to district court." *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 876 (D.C. Cir. 2002).

By these standards, the Unions' claims are wholly collateral to any administrative action. Again, the Unions have sued the President and OPM, and the

gravamen of their consolidated action is that the three disputed executive orders in this case are *ultra vires* and unconstitutional.  As explained above, the Unions' claims do not relate specifically to any alleged unfair labor practice, negotiability dispute, or grievance proceeding.  (*See* Part IV.A.2.a., *supra*.)  Consequently, these claims are not "inextricably intertwined with the conduct of" an enforcement proceeding or appeal that the FLRA or MSPB may "institute and resolve as an initial matter[.]"  *Jarkesy*, 803 F.3d at 23 (internal quotation marks and citation omitted); *see also Free Enter.*, 561 U.S. at 490 (explaining that a "general challenge" to the existence of an agency "is 'collateral' to any [agency] orders or rules from which review might be sought."); *cf. McNary*, 498 U.S. at 491–92 (concluding that a challenge to the agency's policies and procedures, rather than claims about any individual adjudication, were wholly collateral to a specific immigration proceeding).

   The fact that the D.C. Circuit has previously treated analogous claims as "collateral"—and has allowed them to be brought in the federal district courts—is significant.  In *National Mining Association v. Department of Labor*, the plaintiffs sought to challenge the validity of a Department of Labor regulation that revised the "rules governing the adjudication of miners' claims under" the Black Lung Benefits Act ("BLBA").  292 F.3d at 854.  The BLBA contained a statutory-review scheme that provided that "a person 'adversely affected or aggrieved by a final *order* of the Board may obtain review of that *order* in'" the courts of appeals.  *Id.* at 856 (quoting 33 U.S.C. § 921(c)).  The D.C. Circuit pointed out that the "rule" that the plaintiffs sought to challenge could not properly be understood as an "order," given the distinct meaning of those terms in the administrative law context.  *See id.*; *compare* 5 U.S.C. § 551(4)

(defining "rule") *with* 5 U.S.C. § 551(6) (defining "order").  So, while Congress may
have decided that a plaintiff should obtain judicial review of an "order" through the
statutory-review scheme, it had not specified how a plaintiff ought to challenge a rule
of the agency, and thus, the panel concluded that "persons seeking such review would
be directed by the APA to go to district court."  *Nat'l Mining*, 292 F.3d at 856; *see also
id.* (concluding that such a pre-enforcement "broad-scale attack" on an agency rule falls
outside the relevant statutory-review scheme).  Furthermore, and notably, the panel
distinguished *Thunder Basin*, and thereby indicated that even if a pre-enforcement
challenge to an inevitable adjudicatory proceeding is not wholly collateral to the
administrative process, a pre-enforcement challenge to a "rule" can constitute a wholly
collateral claim.  *See id.* at 857; *see also Nat'l Treasury Emps. Union v. Devine*, 733
F.2d 114, 117 n.8 (D.C. Cir. 1984) ("It is quite different to suggest, as appellant does,
that a detailed scheme of administrative adjudication impliedly precludes
preenforcement judicial review of rules.").[8]

    The D.C. Circuit has since affirmed this core holding of *National Mining*, *see,
e.g.*, *Arch Coal*, 888 F.3d at 500–01; *Sturm, Ruger & Co.*, 300 F.3d at 875–76,  and the
cases that have followed have identified three aspects of that decision that were
especially relevant to the D.C. Circuit's analysis.  First, *National Mining* involved a
"direct attack on the validity of a 'formal regulation,' issued pursuant to 'notice-and-
comment' rulemaking" rather than an "attack on an enforcement policy[.]"  *Sturm,*

---

[8] *Thunder Basin* had suggested that a pre-enforcement challenge in the context of an administrative
adjudication is *not* wholly collateral, but *National Mining* emphasized that *Thunder Basin* "did not
involve a regulation, which is typically treated different[ly] from an adjudication."  292 F.3d at 857.  It
is clear to this Court that the challenge to the President's Orders that the Unions bring here is more
analogous to the challenge to *National Mining*'s "rule" than *Thunder Basin*'s attack on the pre-
enforcement adjudicative policies of an agency.

*Ruger & Co.*, 300 F.3d at 875 (quoting *Nat'l Mining*, 292 F.3d at 858).  Second, the challenge to the regulations at issue in *National Mining* "require[d] analysis of 'all of the regulations together as well as the entire rulemaking process'" and "such an analysis 'would not be feasible in individual adjudications dealing with particular regulatory provisions.'"  *Id.* at 876 (quoting *Nat'l Mining*, 292 F.3d at 858–59).  Last, "and most important, *National Mining Association* was not a case in which the 'plaintiff sought to short-circuit the administrative process' through the vehicle of a district court complaint."  *Id.*

All three of these circumstances are present.  The Unions have brought a challenge to the "rules" the President has adopted in the Orders, rather than any specific "order" of the FLRA or the MSPB.  *Cf. Nat'l Mining*, 292 F.3d at 856; *see also* 5 U.S.C. § 7123 (permitting a challenge to an "order" of the FLRA); *id.* § 7703(a)(1) (permitting a challenge to an "order or decision" of the MSPB).  Moreover, although the Orders are not regulations authored through notice-and-comment rulemaking, the President's directives are similar for all intents and purposes, because they carry the force of law, and "alter the rights or interests of parties." *Arch Coal*, 888 F.3d at 501.  (*See* Part IV.C., *infra*.)  And, far from seeking to upend any particular agency determination or adjudication, the Unions have claimed that the President's new rules are *ultra vires* and violate federal law or the Constitution across the board.  *Cf. Nat'l Mining*, 292 F.3d at 856.  It is also noteworthy that the resolution of several of the Unions' claims requires an evaluation of existing laws and regulations in mass, as well as a determination of the extent to which those statutes and regulations authorize the President's action in this case (*see* Parts III.C & D, *infra*)—analyses that "would not be feasible in individual

adjudications dealing with particular regulatory provisions[,]" *Nat'l Mining*, 292 F.3d at 858.

Thus, Defendants are mistaken when they righteously maintain that Congress intended for the Unions to be forced to jam the square peg of these broad *ultra vires* and constitutional claims into the round hole of the administrative-judicial review scheme that was crafted specifically for labor representatives and federal managers to utilize as they hammer out particular collective bargaining agreements or engage in other, similar fact-bound negotiations.  (*See, e.g.*, Defs.' Reply at 14–15.)  Pointing to *American Federation of Government Employees v. Secretary of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013), Defendants insist that the Unions must challenge the President's Orders in the context of a "negotiability appeal, arbitration, or an unfair labor practice charge[,]" rather than launching a direct attack in federal district court.  (Defs.' Reply at 14.)  But the *Secretary of the Air Force* case does not require the Unions to follow that approach under the circumstances presented here.

*Secretary of the Air Force* involved a challenge to Air Force regulations that required certain civilian workers within the Air Force "to wear military uniforms while performing civilian duties."  716 F.3d at 635.  The plaintiff unions filed a lawsuit against the Air Force under section 706 of the Administrative Procedure Act, alleging that the agency had acted arbitrarily and capriciously, contrary to law, and in excess of its statutory authority, *see id.*, but the D.C. Circuit ruled that those claims improperly circumvented the FSLMRS and CSRA's statutory review schemes, primarily because the plaintiffs had myriad ways of obtaining the relief they sought *through the administrative process*: they could attempt to negotiate with the Air Force about its

dress code policy; file a grievance claiming that the dress code violated the employees' rights under the relevant statutory scheme; or, if any current collective bargaining agreement contradicted the policy, file an unfair labor charge. *See id.* at 637–38.

Here, by contrast, the Unions have brought *ultra vires* and constitutional claims against the President and OPM, and not against any particular agency, so a negotiability appeal, arbitration, or unfair labor practice charge brought in the context of a proceeding in the FLRA will not generate the relief the Unions seek. That is, in contrast to *Secretary of the Air Force* and that case's predecessors, there is not a "close[] connection between the relief sought in th[is] judicial action and that available in the administrative process." *Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005). This distinction is sufficient to place the Unions' claims outside the boundaries of the D.C. Circuit's warning that, where Congress has imposed a channeling administrative-judicial review scheme, plaintiffs should not be permitted to "short-circuit the administrative process through the vehicle of a district court complaint." *Sturm, Ruger & Co.*, 300 F.3d at 875 (internal quotation marks and citation omitted); *see also Free Enter.*, 561 U.S. at 490 ("[P]etitioners object to the Board's existence, not to any of its auditing standards."); *McNary*, 498 U.S. at 497–98 (acknowledging that while judicial review of individual determinations may be barred, a broad pattern or practice claim is not); *Nicholson*, 475 F.3d at 348 (holding that "because the *legality* of the disputed § 7422 Decision is expressly outside the FLRA's purview" the district court could hear that case (emphasis added)).

Undaunted, Defendants suggest that the Unions here must reformulate their claims to contend that, because of the President's Orders, a *particular* agency has

violated the FSLMRS; or a *particular* agency must negotiate on a certain matter with the union; or a *particular* agency has committed an unfair labor practice, such that the FLRA or MSPB can address the Unions' contentions, or else they simply cannot "'raise the[se] claim[s] at all.'"  (Defs.' Reply at 14 (quoting *Sec'y of the Air Force*, 716 F.3d at 638).)  But Defendants don't explain *why* this is so; in the ordinary course, "plaintiffs are masters of their complaints"—not defendants. *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 512 (1989); *cf. The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon[.]").  And the Supreme Court did not mandate any such transmogrification with respect to similar claims that it deemed to be outside of the prescribed administrative-judicial review process. *See, e.g.*, *Free Enter.*, 561 U.S. at 490; *McNary*, 498 U.S. at 497–98.

Indeed, Defendants' suggestion that such a reformation is the only viable way of getting the Unions' claims resolved (Defs.' Reply at 14 (quoting *Sec'y of the Air Force*, 716 F.3d at 638)), has no support in the case law.  In *Secretary of the Air Force*, the D.C. Circuit merely acknowledged that if the CSRA and FSLMRS left *certain parties* unable to pursue a claim that the FLRA could otherwise hear, then *those parties* could not raise that claim at all. *See id.* at 638–39.  And the panel did *not* suggest, as Defendants do here, that an agencies' inability to hear a claim meant that such claims could not be heard by district courts.  To the contrary, at least with regard to the constitutional and *ultra vires* claims presented in this case, such a conclusion upends well-settled principles of law. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) (noting the serious constitutional issues that would result if no court were available to hear

constitutional claims); *Chamber of Commerce of U.S.*, 74 F.3d at 1328 (explaining that courts may normally review *ultra vires* claims unless Congress has expressly precluded all non-statutory judicial review of the President's actions).

The bottom line is this: there is no hint or suggestion that the Unions in this case have "sought to short-circuit the administrative process through the vehicle of a district court complaint[,]" *Sturm, Ruger & Co.*, 300 F.3d at 876 (internal quotation marks and citation omitted), or that they have otherwise attempted to influence the course of an existing (or anticipated) agency adjudication, *see Thunder Basin*, 510 U.S. at 216.  To the contrary, it is clear that these claims against the President are not simply "the vehicle by which" the Unions intend to prevail in any one given administrative proceeding, *Elgin*, 567 U.S. at 22, and that the Unions' allegations cannot be legitimately reframed and adjudicated piecemeal by each agency that must apply the President's Orders without altering the fundamental character of the relief that is being claimed: across-the-board invalidation of those provisions of the Orders that conflict with the FLRA and CSRA, on the grounds that the President has no statutory or constitutional authority to issue the challenged directives.  (*See, e.g.*, NFFE's Compl. ¶¶ 82–120; NTEU's Compl. ¶¶ 100–34.)  As such, the Unions' claims are "wholly collateral" to the administrative-judicial review processes set forth in the FSLMRS and CSRA, and *that* finding clearly supports the conclusion that Congress did not intend to relegate these types of claims to the FLRA and MSPB in the first instance.  *See Free Enter.*, 561 U.S. at 490.

> c. *Although Potentially Helpful, The Agencies' Expertise Is Not Essential To Resolving The Instant Claims*

Finally, this Court must consider whether the Unions' claims fall "outside the

[the relevant agency's] competence and expertise." *Id.* at 491.  This inquiry asks not only whether the administrative agency to which Congress has channeled certain disputes regularly confronts the claims that a plaintiff has raised, but also whether the agency's expertise can be generally "brought to bear on the [] questions presented" in the administrative proceeding. *Thunder Basin*, 510 U.S. at 215 (internal quotation marks and citation omitted).

The statutory and constitutional claims in a given case may well be of a type that the agency typically encounters in its line of work; if so, such claims do generally fall within its expertise.  *See, e.g.*, *Jarkesy*, 803 F.3d at 28 (noting the wide array of constitutional and statutory claims that come before the SEC).  Moreover, "the challenged statute may be one that the [agency] regularly construes," *Elgin*, 567 U.S. 22, and, indeed, "there are precious few cases involving interpretation of statutes authorizing agency action in which [the court's] review is *not* aided by the agency's statutory construction[,]" *Jarkesy*, 803 F.3d at 29 (emphasis added) (internal quotation marks and citation omitted).  That said, the Unions' claims here primarily require an assessment of questions concerning executive power (including, in particular, whether or not Congress has conferred upon the President the statutory authority to issue executive orders in the area of labor-management relations at all), and thus, this Court concludes that the expertise of the agencies, though potentially helpful, would ultimately be of limited utility.

This conclusion is based primarily on the fact that, as this Court has already emphasized, neither the FLRS nor the MSPB regularly opines upon the separation-of-powers issues that are at the heart of the instant action, nor do they have any specialized

experience in determining whether a statute or the Constitution has authorized the

President to act in a particular way.  By contrast, these sorts of questions are the

proverbial bread and butter of the Judicial Branch.  *See Youngstown*, 343 U.S. at 597

(Frankfurter, J., concurring) ("The judiciary may . . . have to intervene in determining

where authority lies as between the democratic forces in our scheme of government.");

*Marbury v. Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and

duty of the judicial department to say what the law is.").

Thus, while the FLRA and the MSPB might have helpful background knowledge

about what the FSLMRS and CSRA require or authorize with respect to federal labor

relations, one cannot infer that Congress necessarily intended for these agencies to

always be the bodies that resolve any broader legal questions that might arise in the

context of their consideration of the particular fact issues within their realm of

expertise.  Truth be told, this conclusion is even more readily apparent when one

acknowledges the fact that the district courts can rely heavily upon the expertise of the

FLRA and the MSPB, as necessary and appropriate, when interpreting the appropriate

meaning of the FSLMRS and the CSRA.  *See Fort Stewart Schs.*, 495 U.S. at 645

(according *Chevron* deference to the FLRA); *Kaplan v. Conyers*, 733 F.3d 1148, 1177

(Fed. Cir. 2013) (noting that MSPB's interpretation of the CSRA would be entitled to

deference were the language ambiguous).

\* \* \*

"Having canvassed the three considerations the Supreme Court laid out in

*Thunder Basin*" and its progeny, this Court concludes that Congress did not "implicitly

preclude[] the district court's jurisdiction over cases of this type." *Jarkesy*, 803 F.3d at

29.  The FLRA and the MSPB do not have any statutory basis for exercising jurisdiction over the case presented here, which means no meaningful judicial review of the claims presented here can occur unless the district courts are available to resolve cases of this nature.  (*See* Part IV.A.2.a, *supra*.)  And the claims that the Unions have brought are wholly collateral to any administrative action, such that they cannot be reasonably construed as an effort to "short circuit" the administrative scheme that Congress enacted.  (*See* Part IV.A.2.b., *supra*.)  Finally, it strains credulity to suggest, as Defendants do here, that Congress intended for an administrative agency (even one with particular expertise in federal labor-management relations) to resolve purely legal claims that implicate the fundamental distribution of power among the different branches of the federal government, and this is especially so when those claims arise in the context of a legal challenge that is utterly divorced from any of the matters that Congress has expressly assigned to an agency for resolution.

Therefore, although Congress clearly intended for certain disputes arising under the FSLMRS and the CSRA to come before these administrative agencies in the first instance, this Court confidently concludes that Congress had no such intent with regard to the claims that the Unions have raised in the instant case.  Accordingly, and because this Court sees no other basis for questioning its own subject-matter jurisdiction, this Court concludes that the district court is open to address, and resolve, the Unions' claims.

## B.  The Unions' Claims Are Fit For Judicial Resolution

"[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once."  *Am. Petroleum Inst. v. Envtl. Prot. Agency*, 683 F.3d 382, 387 (D.C. Cir. 2012).  This "threshold inquiry[,]" *Ctr. for*

*Biological Diversity v. Envtl. Prot. Agency*, 722 F.3d 401, 408 (D.C. Cir. 2013), exists to ensure that the federal courts do not waste resources in "prematurely entangling [them]selves in abstract disagreements," *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996), and it "protect[s] the other branches from judicial interference until their decisions are formalized and their 'effects felt in a concrete way[,]'" *id.* (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148–49 (1967)). Thus, although not jurisdictional, prudential ripeness is an important initial consideration for the federal courts.

To assess whether a claim is ripe for judicial review, a court must evaluate both "the fitness of the issues for judicial decision and the extent to which withholding a decision will cause hardship to the parties." *Am. Petroleum Inst.*, 683 F.3d at 387 (internal quotation marks and citation omitted).  Generally, "[t]he fitness of an issue for judicial [review] depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the [challenged] action is sufficiently final." *Atl. States Legal Found. v. Envtl. Prot. Agency*, 325 F.3d 281, 284 (D.C. Cir. 2003) (internal quotation marks and citation omitted).  In most cases, the determination of whether a matter is fit for judicial review will be the end of the matter; an unripe claim will usually only be heard if delay threatens "immediate and significant" hardship to the plaintiff.  *Devia v. NRC*, 492 F.3d 421, 427 (D.C. Cir. 2007) (internal quotation marks omitted).  But, of course, this is not an "exact science; nor is it a matter of weaving complicated legal distinctions divorced from reality." *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 480 (D.C. Cir. 1986) (internal quotation marks and citation omitted).  Therefore, when making this determination,

courts must ultimately rely on the exercise of "practical common sense[.]"  *Continental Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 128 (D.C. Cir. 1974) (citation omitted).

At the motion hearing in this case, Defendants acknowledged "the weaknesses of [their] ripeness claim with respect" to the Unions' purely legal argument that the President does not have the statutory or constitutional authority to issue executive orders that pertain to the field of federal labor relations (Hr'g Tr. at 27:1–5); furthermore, defense counsel also appeared to concede that the subset of challenged executive-order provisions that are "fully formed" and leave "no discretion" to federal agencies are ripe for judicial review (*id.* at 29:5–12).  But counsel held fast to the assertion that certain claims that the Unions have made should be deemed prudentially unripe: (1) those claims that challenge the President's announcement of a new collective bargaining policy if the executive order provision contains a directive to OPM to issue regulations about the matter (Defs.' Mem. at 39–40; Hr'g Tr. at 28:6–18)—*e.g.*, section 4 of the Official Time Order, which both prohibits the use of official time for a variety of matters, and requires OPM to identify and change regulations that are inconsistent with this mandate, *see* Exec. Order No. 13,837 § 4—and (2) those claims that challenge provisions within the Orders that purport to set "aspirational objectives" and thus "leave room for negotiation" (Defs' Mem. at 41), such as section 5(a) of the Collective Bargaining Procedures Order, which states that "ordinarily" "a negotiation period of 6 weeks or less to achieve ground rules, and a negotiating period of between 4 and 6 months for a [collective bargaining agreement]" should suffice, Exec. Order No. 13,836 § 5(a).  Defendants argue that this Court should defer its

consideration of Plaintiffs' challenges to these kinds of provisions in the Orders, either because further clarification by OPM and other agency heads will permit helpful administrative determinations regarding "the interplay of the Orders with 'applicable law'" (Defs.' Mem. at 40), or because the Order provisions that merely "set goals for the outcome of agencies' negotiations and advise agencies on policy considerations while bargaining with individual unions" are too fact-bound to be fit for judicial review (*id.* at 41).  As demonstrated below, Defendants' ripeness contentions misconstrue either the nature of the President's orders, or the claims that the Unions are making about those orders—or both—and thus are not persuasive.

Take the first category first: with respect to the Unions' purportedly unripe challenges to those executive order provisions that authorize further 'clarification' by OPM and the like, *see, e.g.,* Exec. Order No. 13,837 § 4(c) (ordering rulemaking to "clarify and assist agencies in implementing these rules"), it is clear to this Court that any future clarification by OPM or other agencies will be of limited scope, because the anticipated future regulations will necessarily pertain to the clear and concrete policy change that the President has made regarding how federal agencies or federal employees must act going forward with respect to collective bargaining negotiations, and this Court has no doubt that the President's orders will be received as such.  (*See* AFGE's Reply at 20–21; NFFE's Reply at 13; NTEU's Reply at 16–17.)  This means that, as far as subsequent 'clarifications' are concerned, there is really not much left to be done.

For example, section 4 of Executive Order No. 13,837 announces that "[e]mployees may not engage in lobbying activities during paid time, except in their

official capacities as an employee." Exec. Order No. 13,837 § 4(a)(i).  Similarly,

section 4 of Executive Order No. 13,839 states that agencies shall not "subject to

grievance procedures or binding arbitration disputes concerning (i) the assignment of

ratings of record; or (ii) the award of any form of incentive pay[.]"  Exec. Order No.

13,839 § 4(a); *see also, e.g.*, Exec. Order No. 13,837 §§ 4(a)(ii)–(v), 4(b); Exec. Order

No. 13,839 §§ 2(b), 2(c), 4(b)(iii).  Agencies are presently interpreting and actively

implementing these challenged prescriptions, and others (*see, e.g.*, Pls.' Stmt. of

Material Facts as to Which There Is No Genuine Dispute ("NFFE's Stmt. of Facts"),

ECF No. 26-1, ¶¶ 39, 51, 66, 73–74; Pl. NTEU's Stmt. of Material Facts Not in Dispute

("NTEU's Stmt. of Facts"), ECF No. 29-3, ¶¶ 13–18, 20, 28, 36, 40, 44, 54, 72–74;

Decl. of David I. Cann, Ex. 1 to Pl. AFGE's Mot. for Summ. J., ECF No. 30-4, ¶¶ 13–

15), presumably without confusion about what the President has ordered them to do.

The fact that OPM might eventually provide additional practical guidance about how

agencies can best implement these unequivocal mandates poses no impediment to this

Court's consideration of the Unions' current contention that the President's new

policies are contrary to the labor rights that the FSLMRS guarantees.  *See Nat'l Home

Ass'n of Home Builders v. U.S. Army Corp of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir.

2005) (suggesting that such facial claims are presumptively fit for judicial review); *see

also Am. Petroleum Inst. v. U.S. Envt'l Prot. Agency*, 906 F.2d 729, 739 (D.C. Cir.

1990) (per curiam) (refusing to defer judicial review when a rulemaking will not

actually alter the status quo); *Campaign for Accountability v. U.S. Dep't of the Justice*,

278 F. Supp. 3d 303, 318 (D.D.C. 2017) (explaining that a "true prudential 'ripeness'

defect has a remarkably different appearance" and "occurs, generally speaking, when

the alleged *wrong* is insufficiently concrete . . . as a *factual* matter").

The ripeness contentions that Defendants make with respect to the executive order provisions that pertain to what agencies should "ordinarily" do in various collective bargaining circumstances fare no better.  Section 5(a) of the Collective Bargaining Procedures Order, section 3(a) of the Official Time Order, and section 3 of the Removal Procedures Order prescribe goals that agencies should "ordinarily" negotiate toward, Exec. Order No. 13,836 § 5(a); Exec. Order No. 13,837 § 3(a), and/or steps that an agency should take as part of labor negotiations "[w]henever reasonable[,]" Exec. Order No. 13,839 § 3.  Given the literal language of these Order provisions, there is no question that agencies retain a measure of discretion that will necessarily result in "a factual outcome" that is "sure to vary by agency and bargaining unit[.]"  (Defs.' Mem. at 41.)  But the question of whether these Order provisions themselves are *ultra vires* does not turn on these variable outcomes; rather, the Unions have suggested, among other things, that the President cannot prescribe these types of aspirational goals because, in doing so, he has constrained agency officials' bargaining discretion in a manner that violates the statute.  (*See, e.g.*, NTEU's Mem. at 24 ("Section 3 does not allow for any *real bargaining* on amounts of official time[.]" (emphasis added)); AFSCME's Reply at 18 ("[T]he clear effect of Section 5(a) is to set an unreasonable baseline by decree rather than to approach negotiations in good faith and with an open mind[.]").

Properly understood, then, the Unions' "conflict" contentions are not necessarily about the reasonableness of the particular presumptive period of negotiation that appears in Executive Order 13,836 (*e.g.,* 4 months, versus 6 months, versus some longer

period), or whether allowing only one hour of 'official time' per bargaining-unit member, as Executive Order 13,837 suggests, is in the public interest; with those kinds of claims, perhaps a wait-and-see approach might be warranted.  Instead, a consistent theme within the Unions' consolidated complaints is that it transgresses the statutorily-prescribed duty of good faith in the context of collective bargaining for the President to prescribe *any* presumptive timeframes or *any* procedural steps for the agency to shoot for as it bargains.  (*See* NTEU's Compl. ¶ 106 ("Section 3 would cause agencies to seek to impose a formulaic annual aggregate on official time . . . [and] would preclude the type of good faith negotiations on official time that Congress's scheme requires[.]"); *see also* AFSCME's Compl. ¶ 55.)  And the issue that such a contention raises—*i.e.*, whether and to what extent the FSLMRS requires federal agencies to enter into collective bargaining negotiations with an open mind about various aspects of bargaining (including the scope and length of the negotiations) and without pre-established constraints related to terms that Congress has identified as up for discussion—is a *legal* one that needs no further factual development.  *See Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006) (characterizing the union's claim as a challenge to the perceived "threat to the *process* of collectively bargaining[,]" and noting that "whether DHS ever chooses to" take a certain course of action "is irrelevant to the ripeness inquiry").  In Part IV.D.3, *infra*, this Court undertakes to answer that question.[9]

---

[9] Even if the Court "ha[d] doubts" about whether the Unions' challenges to the goal-setting, aspirational provisions of these the Orders are fit for judicial resolution, the ongoing hardship that the Unions allege would be sufficient to propel the Court toward commencing judicial review.  *Nat'l Ass'n of Home Builders*, 417 F.3d at 1283.  (*See, e.g.*, NFFE's Stmt. of Facts ¶¶ 39, 50, 69; NTEU's Stmt. of Facts ¶ 40.)

**C.  The President Has The Statutory And Constitutional Authority To Issue Executive Orders That Pertain To Federal Labor-Management Relations, So Long As His Orders Do Not Conflict With The Will Of Congress**

With Defendants' threshold arguments out of the way, the merits of the Unions' claims take center stage.  As has repeatedly been mentioned, the Unions have made a variety of claims in the four consolidated actions that are now before this Court; for the purpose of this Memorandum Opinion, the Court first addresses the Unions' assertion that the President of the United States cannot issue executive orders that carry the force of law in the field of federal labor-management relations, because he lacks the statutory and/or constitutional authority to do so.  (*See* NFFE's Compl. ¶¶ 82–95; AFSCME's Compl. ¶¶ 102–03.)  As explained below, this Court finds that binding precedent and the history of presidential action in this arena compels the conclusion that both section 7301 of Title 5 of the United States Code and the President's inherent constitutional power as head of the Executive Branch authorizes him to act in the field of federal labor-management relations (*see* Part IV.C.1, *infra*), and furthermore, the Unions have largely overstated the extent to which Congress sought to divest the President of any such authority with its enactment of the FSLMRS/CSRA (*see* Part IV.C.2, *infra*).  But there is no serious dispute that any orders a President issues in this area must be consistent with the will of Congress (*see* Part IV.C.3, *infra*), and ultimately, *that* is the principle that guides this Court's conclusions regarding the merits of the Unions' claims.

1.  <u>Before The Enactment Of The FSLMRS And CSRA, Presidents Had The Authority To Issue Executive Orders Regulating Federal Labor-Management Relations</u>

As this Court mentioned at the outset, both President Kennedy and President Nixon utilized executive orders to regulate federal labor-management relations in a

manner that afforded significant protections to federal workers.  (*See* Part II.A., *supra*.) *See also* Exec. Order No. 11,491; Exec. Order No. 10,988.  With their *ultra vires* arguments, NFFE and AFSCME have strongly suggested that there has never been statutory authority for Presidents to issue any such orders with respect to federal labor relations.  (NFFE's Reply at 21–23; AFSCME's Compl. ¶¶ 102–03.)  For their part, Defendants maintain that "the Supreme Court has held that the President is authorized by both Article II of the Constitution and congressional statute to issue executive orders regulating labor relations in the federal government[.]"  (Defs.' Reply at 29.)  This dispute is material to the Unions' overall attack on the source of the President's authority to act in this arena, and, as defense counsel suggests, this Court does not pen its analysis on an entirely blank slate.

In *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264 (1974), the Supreme Court discussed President Nixon's Executive Order 11,491, which was issued in 1969 and operated as the foundation for all collective bargaining and labor rights within the federal government.  In the majority opinion, the Court observed that this executive order was "plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch" that is afforded by the Constitution, and the Court also found "express statutory authorization in 5 U.S.C. § 7301."  418 U.S. at 273 n.5.  That statute provides (then, as now) that "[t]he President may prescribe regulations for the conduct of employees in the executive branch[,]" 5 U.S.C. § 7301, and the Supreme Court reasoned that the term "conduct" included how federal employees interact with management in the workplace, *see Old Dominion*, 418 U.S. at 273 n.5.  Thus, the *Old Dominion* Court had "no

difficulty" in announcing the validity of an executive order that established an entire universe of federal labor-management relations, both in light of the statutory authority that Congress had conferred upon the President in section 7301, and also on the basis of the inherent constitutional authority that the President enjoys with respect to the management of the federal administrative workforce.  *Id.*

*Old Dominion* can only be read to support the conclusion that the President of the United States possesses the authority to issue executive orders regarding federal labor-management relationships, at least in the pre-FSLMRS world.  Indeed, that appears to have been the generally accepted view throughout history, because, by executive order Presidents have dictated an entire scheme of federal labor-management relations, *see Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965), and they have also routinely determined what rights executive branch employees would enjoy as part of that scheme, *see, e.g.*, Exec. Order No. 11,491 (modifying the rights conferred by previous presidents in this field); *see also* Novak, *Collective Bargaining*, 63 Geo. Wash. L. Rev. at 695 (explaining how these executive orders were the ones to extend to federal employees "the right . . . to form, join and assist any employee or organization" and to engage in "limited collective bargaining" (internal quotation marks and citation omitted)).  Moreover, it appears that the President's exercise of authority in this arena has not ceased in modern times.  *See, e.g.*, Exec. Order No. 13,522, 74 Fed. Reg. 66,203 (Dec. 9, 2009), *amended by* Exec. Order No. 13,708, 80 Fed. Reg. 60,271 (Sept. 30, 2015), *revoked by* Exec. Order No. 13,812, 82 Fed. Reg. 46,367 (Sept. 29, 2017); Exec. Order No. 12,983, 60 Fed. Reg. 66,855 (Dec. 21, 1995), *revoked by* Exec. Order No. 13,203, 66 Fed. Reg. 11,227 (Feb. 17, 2001); Exec. Order No. 12,128, 44 Fed. Reg. 20,625 (Apr. 4, 1979); Exec. Order No. 12,107, 44 Fed.

Reg. 1,055 (Dec. 28, 1978).  If anything, the more recent pronouncements of the Supreme Court and other authorities strongly suggest in an even clearer fashion that the President of the United States possesses substantial authority over executive branch employees and operations.  *Cf. Free Enter.*, 561 U.S. at 492 ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."); *id.* at 496–97 ("Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks and citation omitted)); *see also* 5 C.F.R. 251 (citing 5 U.S.C. § 7301 as the statutory basis for certain regulations that govern the relationships between agencies and labor unions).  Consequently, NFFE's insistence that there is no "statutory foundation" for a President to issue an executive order concerning federal labor-management relations rings hollow.  (NFFE's Reply at 20.)

The best that NFFE can do to resist the conclusion that some combination of statutory authority and constitutional authority provides the President with sufficient power to enter the labor-management arena is to argue that the Supreme Court did not mean what it said in *Old Dominion*.  (*See id.* at 22.)  In this regard, NFFE highlights the Supreme Court's observation in *Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527 (1989), that the pre-FSLMRS executive orders "were not legislative[,]" 489 U.S. at 535 n.3, and it also points to a series of comments in the dicta of circuit court opinions that purport to consider whether the early executive orders were issued pursuant to any federal statute, *see Kuhn v. Nat'l Ass'n of Letter Carrriers, Branch 5*, 570 F.2d 757, 760–61 (8th Cir. 1978); *Local 1498, Am. Fed'n of Gov't Emps. v. Am. Fed'n of Gov't Emps.*, 522 F.2d 486, 491 (3d Cir. 1975).

But the question presented in each of these circuit court cases differs from the one at issue here: these cases address the status of pre-FSLMRS executive orders in the course of deciding whether or not such orders constituted "laws of the United States" (and thus can provide either subject-matter jurisdiction to the federal courts under section 1331 of Title 28, or a cause of action to private persons seeking to sue their unions or federal employers). *See, e.g.*, *Karahalios*, 489 U.S. at 534–35; *Kuhn*, 570 F.2d at 760–61; *Local 1498, Am. Fed'n of Gov't Emps.*, 522 F.2d at 490.[10] So while these courts stated that such orders were not "legislative," *Karahalios*, 489 U.S. at 535 n.3, and/or were not "issued pursuant to a statutory authority providing for presidential implementation" of a congressional scheme, *Local 1498, Am. Fed'n of Gov't Emps.*, 522 F.2d at 491, those statements cannot be read to suggest that the pre-FSLMRS executive orders were *themselves* statutorily unauthorized in the manner that NFFE suggests here.[11]

NFFE's argument also withers when viewed in light of the plain language of section 7301.  For example, NFFE emphatically argues that while section 7301 gives the President express authority to "prescribe regulations for the *conduct* of employees in the executive branch[,]" 5 U.S.C. § 7301 (emphasis added), "[u]nion official time is

---

[10] It appears that, for a time, some courts believed that the "law[s] of the United States" could not encompass presidential orders that resulted from the President's own power to pursue "federal government personnel policies," but instead had to derive from a specific congressional decision to regulate a given industry or activity.  *Local 1498, AFGE*, 522 F.2d at 491; *see also Kuhn*, 570 F.2d at 760–61 (looking for a "specific statute" to authorize an executive order with "the force and effect of law" (internal quotation marks and citation omitted)); *Stevens v. Carey*, 483 F.2d 188, 190–91 (7th Cir. 1973) ("The President . . . was under no obligation to issue the Order; and his action in doing so was simply in furtherance of a personal policy." (alteration in original) (internal quotation marks and citation omitted)).

[11] These cases actually seem to stand for the mere proposition that, because the executive orders at issue (and the regulations they contained) were not *mandated* by any overarching congressional statute or design, they could not constitute a "law of the United States" for purposes of section 1331 of Title 28.  Of course, that contention has no bearing on the question of whether the President has statutory authority to issue executive orders in the field of federal labor relations.

not a *conduct* issue" (NFFE's Reply at 21 (emphasis added)).  Apparently, the Supreme

Court thinks otherwise.  *See Old Dominion*, 418 U.S. at 273 n.5 (accepting Executive

Order 11,491 as a valid exercise of the President's statutory authority under section

7301, including section 20 of the executive order, which plainly dealt with official

time); *see also BATF*, 464 U.S. at 100–01 (describing the different approaches to

official time in Executive Order 11,491 and Executive Order 10,988).  It is also

manifestly logical to consider the express grant of statutory authority to the President to

regulate employee "conduct" under section 7301 to include the power to speak to how

an employee spends her time at work.  *Cf.* Black's Law Dictionary 358 (10th ed. 2014)

(defining "conduct" as "[p]ersonal behavior," "the manner in which a person

behaves[,]" or "collectively, a person's deeds").

> 2.  <u>The FSLMRS And CSRA Did Not Divest The President Of Any
> Authority In This Field</u>

Several of the union plaintiffs insist, in the alternative, that even if past

Presidents had the statutory and constitutional authority to issue executive orders

regarding the federal labor-management relationship, Congress unquestionably intended

to *foreclose* any such action in 1978, when it enacted the FSLMRS and CSRA.  (*See*

NFFE's Mem. at 28 ("Congress wrested the power to regulate federal labor-

management relations away from the Executive Branch with the passage of the

[FSLMRS.]"); NFFE's Reply at 20 ("[T]he overall purpose of the Statute was to *divest*

the President of authority to regulate federal sector labor relations through executive

orders." (emphasis in original)).)  The first (and, frankly, most imposing) hurdle that

the Unions have to face in sustaining this argument is the language of the FSLMRS

itself.  The codified provisions of that statute mention the President expressly in only

three respects.  First, in section 7103(b) of Title 5 of the United States Code, Congress provides "[t]he President" with the authority to "issue an order excluding any agency or subdivision thereof from coverage under [the FSLMRS]" for reasons pertaining to national security.  5 U.S.C. § 7103(b).  Second, the FSLMRS allows "the President" to appoint the members of the FLRA and its General Counsel, with the advice and consent of the Senate, *see id.* § 7104(b), (f)(1), as well as the members of the Federal Services Impasse Board, the other independent agency that the FSLMRS creates, *see id.* § 7119(c)(2).  And, third, the FSLMRS affirms that the "[p]olicies, regulations, and procedures established under and decisions issued under" prior executive orders "shall remain in full force and effect until revised or revoked by the President, or unless superseded by specific provisions of [the FSLMRS] or by regulations or decisions issued pursuant to [the FSLMRS]."  *Id.* § 7135.  The provisions of the FSLMRS do not mention the President at any other point—and, unfortunately for the Unions, that statute does *not* say, as one might rightly expect it to, something to the effect of: the President is 'hereby precluded from issuing executive orders in this arena as he has done in the past.'

This omission is crucial.  Congress clearly *knew* that Presidents had previously dabbled in regulating federal labor relations by executive order, *see, e.g.*, *id.*; in fact, it appears that the Legislature entered this arena *precisely because* it wanted to codify the gains that federal workers had made by virtue of certain executive orders.  *See* H.R. Rep. No. 95-1403 at 12 (1978) ("The committee agrees that the time has come to establish *by statute* a labor-management relations system for Federal employees[.]" (emphasis added)); President Carter's Statement on Signing the Civil Service Reform

Act of 1978, 14 Weekly Comp. of Pres. Doc. 1765 (Oct. 13, 1978) (explaining that Title VII of the CSRA "move[d] Federal labor relations from Executive order to statute"). The Unions read this history as firm support for the contention that Congress intended "to *stop* regulation of employees by executive order." (NFFE's Reply at 22 (emphasis added).)  But the statute does not say that.  And given the widely-known sweeping exercise of presidential prerogative to regulate federal labor-management relations that preceded the FSLMRS, Congress' silence on the issue of the President's authority to *continue* to act in this arena speaks volumes about whether it actually intended to oust the President entirely from this sphere.

What is more, in their briefing and during the motions hearing, Defendants pointed to language in the original Public Law that appears so definitive that it can only be understood as closing the case with respect to this investigation into Congress's intent.  At the tail end of the document that became the CSRA, Congress included the heading—"POWERS OF PRESIDENT UNAFFECTED EXCEPT BY EXPRESS PROVISIONS"—and then inserted the following statement:

> SEC. 904.  Except as otherwise expressly provided in this Act, no provision of this Act shall be construed to[:] (1) limit, curtail, abolish, or terminate any function of, or authority available to, the President which the President had immediately before the effective date of this Act; or (2) to limit, curtail, or terminate the President's authority to delegate, redelegate, or terminate any delegation of functions.

Civil Service Reform Act of 1978, Pub. L. 95-454, § 904, 92 Stat. 1111, 1224.  If there exists more explicit language about the extent to which an Act of Congress should be viewed as leaving the power of the President intact, this Court has not seen it.  The Unions themselves have provided no argument as to why this provision doesn't settle

the issue, and none of the eight separate briefs that they have filed in this matter does anything to blunt the sheer force of this clear statement of Congress.

This is not to say that the Unions are entirely wrong to observe that Congress undertook to enact a "specific statute in 1978 comprehensively governing Federal sector labor relations" (NFFE's Reply at 23), and to note that the FSLMRS "reached every aspect" of that relationship (AFGE's Mem. at 9).  *See also* H.R. Rep. No. 95-1403 at 38 (explaining that the FSLMRS represents "a new framework for the conduct of Federal labor-management relations").  Where they veer off course is with the suggestion that Congress's enactment of the FSLMRS, standing alone, is sufficient to justify the inference that Congress intended to prevent future Presidents from taking any action in this area.  (*See, e.g.*, NFFE's Reply at 20.)  Courts ordinarily require more to give subsequent legislation such preclusive effect.  *Cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541–42 (2001) ("[W]e work on the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress." (internal quotation marks, citation, and alterations omitted)).  And a clear-statement rule (or some other showing of clear congressional intent) seems all the more important where, as here, Congress's entry into a field implicates the exercise of power by a co-equal branch of the federal government.  *Cf. Bond v. United States*, 134 S. Ct. 2077, 2089 (2014) (noting that when Congress changes the balance of the vertical separation of powers, courts look for a clear statement).

All things considered, then, this Court concludes that the Unions have no sustainable basis for contending that Congress divested the President of his authority to

act in the field of federal labor relations by enacting the FSLMRS and CSRA.  That

said, whether the President can proceed to issue labor relations executive orders that

*conflict* with Congress's own pronouncements is another issue, as the Court explains

below.

> 3.  The President's Executive Orders Concerning This Area Must Be
> Consistent With Congress's Pronouncements

There is no dispute that, even if the President can issue executive orders that

carry the force of law in the field of federal labor-management relations, he does not

have a "blank check . . .  to fill in at his will."  *Kahn*, 618 F.2d at 793.  (*Compare, e.g.*,

NTEU's Mem. at 20 (stating that an executive order may not contradict a federal statue)

*with* Defs.' Reply at 30–31 (acknowledging that an executive order that conflicts with a

federal statute is without statutory authorization).)  Thus, the notion that the President

does not have the statutory authority to issue an executive order that conflicts with a

federal statute need not detain the Court for long.  Quite simply, this is now clear

beyond cavil, for the D.C. Circuit has held that executive orders that conflict with the

purposes of a federal statute are "*ultra vires*[.]"  *See Chamber of Commerce of U.S.*, 74

F.3d at 1339 (striking down a regulatory executive order under the Procurement Act

because it conflicted with the National Labor Relations Act); *see also Marks v. Cent.

Intelligence Agency*, 590 F.2d 997, 1003 (D.C. Cir. 1978) ("[A]n executive order cannot

supersede a statute.").

Of course, the President could always theoretically claim that he possesses the

inherent constitutional authority to take a given action, regardless of any conflict with a

congressional statute and his resulting lack of statutory authority.  *See, e.g.*, *Zivotofsky*,

135 S. Ct. at 2084; *Youngstown*, 343 U.S. at 585–86.  But Defendants have made no

such assertion in the instant case; instead, they have "expressly recognized statutory limitations on the President's authority to act in this area."  (Defs.' Reply at 31; *see also id.* at 30–31 ("Defendants have not argued that the President can issue executive orders contrary to the specific language of the Statute or that he has the right to revoke any portion of the Statute through an Executive Order and make the scope of bargaining a null set." (internal quotation marks and citations omitted)).)

Therefore, the claims that remain in this case turn solely upon a somewhat "difficult problem of statutory interpretation[,]" *see Kahn*, 618 F.2d at 787: whether or not the provisions of Executive Orders 13,836, 13,837 and 13,839 that the Unions have challenged do conflict with the will of Congress as set forth in any federal statute.  If such a conflict exists, then this Court must hold that the President lacks the authority to issue those Order provisions that generate the relevant conflicts.  *See Chamber of Commerce of U.S.*, 74 F.3d at 1339.

### D.  Many Of The Order Provisions The Unions Have Challenged In This Case Impermissibly Infringe Upon The Statutory Right To Bargain Collectively

The FSLMRS expressly enshrines the right of federal employees to bargain collectively with respect to their working conditions.  *See BATF*, 464 U.S. at 107.  Lest there be any doubt about the reverence that Congress appears to have had for labor organizations and collective bargaining at the time the FSLMRS was enacted, the statute *opens* with Congress's unequivocal finding that

> **(1)** experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—
> **(A)** safeguards the public interest,
> **(B)** contributes to the effective conduct of public business, and

> **(C)** facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment[.]

5 U.S.C. § 7101(a)(1).  What this means is that existing, binding federal law *fully* endorses labor organizations and collective bargaining in the federal civil service; in fact, even after Congress acknowledges that "the public interest demands the highest standards of employee performance . . . and the efficient accomplishment of the operations of Government," *id.* § 7101(a)(2), it makes the additional, unqualified proclamation that "labor organizations and collective bargaining in the civil service are in the public interest[,]" *id.* § 7101(a).

The plain text of the FSLMRS also dispels all myths about that statute's purposes: "to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government." *Id.* § 7101(b).  Thus the statute's various provisions delineating "[e]mployees' rights," *id.* § 7102, "[m]anagement rights," *id.* § 7106, "[n]ational [c]onsultation [r]ights," *id.* § 7113, and "[r]epresentation rights and duties," *id.* § 7114, as well as those proscribing "unfair labor practices," *id.* § 7116, and imposing a specific duty to bargain in "good faith," *id.* § 7117, clearly provide the *baseline* framework for the establishment of the type of "effective" and "efficient" federal sector labor-management relationship that the FSLMRS envisions.  *See* 5 U.S.C. § 7101(b) ("The provisions of this chapter should be interpreted in a manner consistent with the requirement of an effective and efficient Government.").[12]  In the instant case,

---

[12] *See also id.* § 7101(a)(1)(B) (finding, in particular, that protecting labor organizations and the right to collective bargaining "contributes to the *effective* conduct of public business" (emphasis added)); *id.* § 7101(a)(2) (explaining, without caveat, that "continued development and implementation of modern and progressive work practices" facilitates "the *efficient* accomplishment of the operations of

the Unions claim that certain directives in President Trump's recent Orders *so* undermine the core protections for federal laborers that FSLMRS says "safeguard[] the public interest," *id.* § 7101(a)(1), and are *so* at odds with the requirements that Congress has specifically prescribed "to facilitate and improve employee performance and the efficient accomplishment of the operations of Government," *id.* § 7101(a)(2), that the resulting right to collective bargaining has been rendered virtually unrecognizable.  (*See, e.g.*, NTEU's Mem. at 37; NTEU's Reply at 37; Hr'g Tr. at 115:14–22.)  When the text of the challenged executive order provisions are considered in light of existing law that delineates the scope of the right to bargain collectively and the duty of management to bargain in good faith, this Court agrees that many of the challenged Order provisions impermissibly infringe upon the right to good-faith bargaining that the FSLMRS establishes.

> 1.  <u>Section 7103(a) And D.C. Circuit Caselaw Define The Contours Of The Statutory Right To Bargain Collectively</u>

The FSLMRS not only preserves the statutory right of federal employees to "collective bargaining," but also (quite helpfully) expressly defines that term.  In relevant part, the definitions section (5 U.S.C. § 7103) states:

> "collective bargaining" means the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees in an appropriate unit in the agency *to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees* and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession[.]

---

Government" (emphasis supplied)).

5 U.S.C. § 7103(a)(12) (emphasis added).  Much of the remainder of the statute is devoted to specifying the circumstances under which the prescribed good-faith negotiations over "the personnel policies, practices, and matters . . . affecting working conditions[,]" *id.* at § 7103(a)(14) (defining "conditions of employment") must, might, or won't occur.  *See id.* §§ 7103(a)(12), 7106, 7117.  The FSLMRS also creates an independent agency to resolve certain foreseeable future disputes regarding particular negotiations and to develop the specific policies that necessarily will be required to shore up collective bargaining rights, *id.* §§ 7104, 7105.

But the primary mandate is clear: in contrast to workplace scenarios in which rules and requirements can be unilaterally imposed upon workers by the management, under the FSLMRS, labor representatives and agency managers are obliged "to consult and bargain" regarding the conditions of employment, and to proceed in "good faith" during any such collective bargaining negotiations.  *Id.* § 7103(a)(12).  In other words, boiled to bare essence, the right of collective bargaining that the FSLMRS protects is the right of federal workers *to have a say* with respect to the terms and conditions under which they will be working.  *See Overseas Educ. Ass'n, Inc. v. Fed. Labor Relations Auth.*, 876 F.2d 960, 971 (D.C. Cir. 1989) (stating that a "collective bargaining measure . . . allows [] employees to combine their views and their voices in a concerted responsive effort"); *cf. Nat'l Labor Relations Bd. v. Am. Ins. Co.*, 343 U.S. 395, 401–02 (1952) ("The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers.").

Notably, the D.C. Circuit has determined that there are certain "core element[s]"

of the protected right to bargain collectively under the FSLMRS—*i.e.*, certain aspects of that right that are so fundamental to its exercise that efforts to interfere with them qualify as violations of the FSLMRS.  *See Chertoff*, 452 F.3d at 861.  Two of these core elements are relevant to this Court's analysis of the Orders the Unions have challenged in the instant case: (1) the duty to "bargain[,]" and (2) the duty to negotiate "in good faith[.]"  5 U.S.C. § 7103(a)(12).  An understanding of the scope and nature of these obligations is essential for comprehending this Court's ultimate conclusions.

### a.  *The Duty To Bargain*

The text of the FSLMRS plainly establishes a three-tier approach that delineates the boundaries of the parties' statutory duty "to bargain" about working conditions in the federal civil service.  To begin, there is a presumptive requirement that federal agencies and labor unions *must* bargain over any "condition of employment[,]" meaning any "personnel policies, practices, and matters" that affect agency employees.  5 U.S.C. § 7103(a)(12), (14); *see also Nat'l Treasury Emps. Union*, 414 F.3d at 52 ("[T]he Statute generally obligates an agency to negotiate with its employees' bargaining representative over 'conditions of employment[.]'" (citation omitted)).  These are "mandatory" subjects of negotiation.  *U.S. Dep't of the Navy, Naval Aviation Depot, Cherry Point, N.C.*, 952 F.2d at 1439.

The FSLMRS also identifies certain other matters that courts have deemed "permissive"—*i.e.*, matters that an agency may bargain over "at [its] election[.]"  5 U.S.C. § 7106(b)(1); *see also Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 453 F.3d 506, 508 (D.C. Cir. 2006).  Per the statute, the parties might negotiate over the "numbers, types, and grades of employees" or the "technology, methods, and means of performing work[,]" and if the agency agrees, they can strike a bargain

regarding these matters.  5 U.S.C. § 7106(b)(1).  Thus, federal agencies and unions are

free to approach each other and discuss the prospect of bargaining over such matters,

and must engage in a good-faith discussion on this front, but "neither party may

lawfully insist upon agreement on such issues as a condition to a labor agreement."

*U.S. Dep't of the Interior, Bureau of Reclamation v. Fed. Labor Relations Auth.*, 23

F.3d 518, 521 (D.C. Cir. 1994).

Third, and finally, the statute specifically "places a number of substantive topics

off limits for bargaining[,]" including the "management rights" contained in section

7106(a) of Title 5 of the United States Code, *Chertoff*, 452 F.3d at 863; *see also* 5

U.S.C. § 7106(a), as well as the subject matter of "any Federal law or any Government-

wide rule or regulation[,]" 5 U.S.C. § 7117(a)(1); *see also U.S. Dep't of the Air Force*,

952 F.2d at 448 ("[A] federal agency may not negotiate over proposed conditions of

employment that are inconsistent with any Federal law or Government-wide rule or

regulation." (internal quotation marks and citation omitted)).

What this three-tier structure means is that the scope of collective bargaining

between federal agencies and unions under the FSLMRS encompasses the negotiation of

all *mandatory* subjects (*i.e.*, all conditions of employment not excluded or excludable

under sections 7106 or 7117), as well as discussions regarding the prospect of

negotiating any of the *permissive* bargaining matters laid out in section 7106(b)(1) (*i.e.*,

matters over which the agency can opt to reach an agreement).  *See U.S. Dep't of the*

*Navy, Naval Aviation Depot, Cherry Point, N.C.*, 952 F.2d at 1439 ("Inherent in both

the NLRA and the FSLMRS is a fundamental rule that the parties to a bargaining

relationship are [] *required* to negotiate over "mandatory" subjects of bargaining.");

*U.S. Dep't of the Treasury, Internal Revenue Serv., Office of Chief Counsel, Wash. D.C. v. Fed. Labor Relations Auth.*, 739 F.3d 13, 19 (D.C. Cir. 2014) ("[S]ection 7106(b)(1) expressly identifies certain matters that although interfering with section 7106(a) management rights, may nonetheless be negotiated at the election of the agency[.]" (internal quotation marks and citation omitted)).  With respect to these delineated matters, Congress has provided no choice: federal workers' right to collective bargaining requires agency management to either actually discuss certain topics or be open to discussing them.  But as the D.C. Circuit has recognized, in the overall scheme of things, the scope of protected bargaining rights that the FSLMRS mandates with respect to federal labor relations is relatively narrow.  *See Chertoff*, 452 F.3d at 861. That is, the FSLMRS "excludes from negotiations a host of subjects that employers would be obliged to bargain about in the private sector." *Id.* (internal quotation marks and citations omitted).  As explained above, Congress appears to have done this in deference to "the special requirements and needs of the government[.]" *Id.*; *see also id.* at 863 (explaining that Congress struck a delicate balance, by creating a collective bargaining system whose "parameters . . . under the FSLMRS are narrow and flexible").

### b.  *The Duty To Act In Good Faith*

The FSLMRS also expressly requires both labor unions and agencies to negotiate "in good faith" during collective bargaining negotiations.  *See, e.g.*, 5 U.S.C. §§ 7103(a)(12), 7114(b).  The duty to bargain in good faith plays a central role in the FSLMRS's scheme, because an agency's "unwillingness to discuss the issues with an open mind, and to engage in a 'give and take' relationship foreclose[s] any possibility of meaningful collective bargaining." *Fed. Aviation Admin. Nw. Mountain Region Seattle, WA*, 14 F.L.R.A. 644, 672 (1984); *see also* Archibald Cox, *The Duty to Bargain*

*in Good Faith*, 71 Harv. L. Rev. 1401, 1412–13 (1958) ("The bargaining status of a union can be destroyed by going through the motions of negotiating almost as easily as by bluntly withholding recognition.").

To satisfy this duty, agencies and unions have a clear statutory obligation: to "approach [] negotiations with a sincere resolve to reach a collective bargaining agreement"; to "be represented at the negotiations by duly authorized representatives prepared to discuss and negotiate on any condition of employment"; and to "meet at reasonable times and convenient places as frequently as may be necessary, and to avoid unnecessary delays[.]" 5 U.S.C. § 7114(b)(1)–(2).  In addition, the parties must "participate actively in the deliberations so as to indicate a present intention to find a basis for agreement"; maintain "an open mind"; and make "a sincere effort . . . to reach [] common ground." *Amalgamated Transit Union Int'l AFL–CIO v. Donovan*, 767 F.2d 939, 949 (D.C. Cir. 1985); *Turegon v. Fed. Labor Relations Auth.*, 677 F.2d 937, 939–40 (D.C. Cir. 1982) ("[I]t is appropriate . . . to consider precedent developed under the NLRA in interpreting the [FSLMRS].").  Hence, when appraising whether a union or agency has acted in bad faith, the FLRA and the courts pay particular attention to whether there has been an "attempt to evade or frustrate the bargaining responsibility[.]" *Division of Military & Naval Affairs, State of New York*, 7 F.L.R.A. 321, 338 (1981).

> c. *Takeaways Regarding Agency Conduct With Respect To Federal Labor Negotiations*

The FSLMRS's unequivocal duties to (a) "bargain" and (b) negotiate "in good faith" compel the conclusion that Congress intended to regulate agency conduct with respect to federal labor negotiations, and these statutory criteria clearly impact federal

agencies in at least two ways.  First, in order to preserve federal workers' statutory right to "bargain," an agency must be cautious about taking matters off the negotiating table in its collective bargaining discussions.  *See, e.g., U.S. Dep't of the Navy, Naval Aviation Depot, Cherry Point, N.C.*, 952 F.2d at 1439.  Second, in order to fulfill the obligation to bargain "in good faith," agency representatives must keep an open mind and exhibit flexibility in the give-and-take process that good-faith negotiation requires.  *See Amalgamated Transit Union Int'l AFL–CIO*, 767 F.2d at 949.  In other words, because Congress has specifically determined the scope of the right to collective bargaining in the federal civil service, (*i.e.*, what matters can, must, and need not be negotiated), as well as the required nature of any such negotiations (*i.e.*, a sincere attempt to reach agreement), in order to act consistently with that statute, agency management must not remove covered matters from the bargaining table indiscriminately, and must proceed to collective bargaining discussions ready to listen and consider what the workers are proposing, with an open mind and with every intention of coming to a mutually acceptable result.

In regard to what agencies can and cannot do, *National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), is instructive.  In that case, OPM and the Department of Homeland Security ("DHS") attempted to implement a provision of the Homeland Security Act that authorized them to create the DHS human resources system, but the final regulations that DHS issued drastically reduced the matters that were subject to collective bargaining such that, in essence, only those "that might be seen as personal employee grievances" remained.  *Id.* at 848.  The new policy also authorized DHS to take additional matters off the bargaining table in the future.  *Id.*

Several unions filed a lawsuit, complaining that, among other things, OPM and DHS's regulation "impermissibly restricted the scope of bargaining." *Id.* at 851. And, the D.C. Circuit held that, because the agencies had impermissibly diminished the already narrow "scope of bargaining" under the Homeland Security Act (which mimics the scope of bargaining under the FSLMRS, *see id.* at 858, 863), the agencies' actions had violated the right to bargain collectively, *see id.* at 861.

As far as agency management's obligation to respect employees' right to bargain goes, *Chertoff* provides at least three relevant lessons. First, it establishes that the linchpin of identifying agency conduct that impermissibly undermines the right to bargain is whether the agency's actions strike at the "core elements[s]" of collective bargaining as defined by statute. (*See* Part IV.D.1(a), (b), *supra*.) *Chertoff*, 452 F.3d at 861. Second, with respect to the scope of bargaining under the FSLMRS, an agency's reduction of the matters that would otherwise be subject to negotiation between agencies and federal employees (*i.e.*, taking matters off the table) can deprive the employees and their union representatives of the right to bargain collectively, and can thereby violate the statute. *Chertoff*, 452 F.3d at 844, 861–62. Even without imposing limitations that specifically and directly conflict with individual statutory prescriptions, there can come a point at which an agency (or in this case the President) diminishes the scope of bargaining such that the only acceptable conclusion is that the agency's conduct violates the FSLMRS's requirement that the parties "bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees[,]" 5 U.S.C. § 7103(a)(12). Third, an attempt to limit the negotiability of the areas of bargaining that the FSLMRS deems permissive (*i.e.*, those over which the

agency has discretion to bargain under section 7106(b)(1)) is not merely an innocuous exercise of management prerogatives; rather, it eviscerates the statutory right of employees to have an opportunity to discuss certain matters, and also seemingly sheds light on the agency's motivations for slashing otherwise potentially negotiable topics, and as such, is cause for great concern.  *See Chertoff*, 452 F.3d at 862 (calling the fact that the agency had removed the "permissive" areas of bargaining from the scope of bargaining "critical" with respect to a determination of whether the scope of bargaining was impermissibly reduced).

Not surprisingly, Defendants read *Chertoff* differently.  They argue, for example, that the hallmark of an impermissible reduction in the scope of bargaining under *Chertoff* is *not* whether the agency has acted to remove from the collective bargaining table topics that Congress has specifically identified as negotiable, but whether what is *left* on the table is sufficient to constitute collective bargaining within the meaning of statute.  (*See, e.g.*, Defs.' Mem. at 73 ("[T]he HR system struck down by the D.C. Circuit in *Chertoff* bears no resemblance to the collective bargaining regime that continues to exist under the President's Executive Orders."); *see also* Defs.' Reply at 24 (quoting *Chertoff* to suggest that an egregious near-total diminution of bargaining is necessary, based on the D.C. Circuit's observation that the challenged act before it had "reduced the scope of bargaining . . . to 'virtually nil'" (citation omitted)).)  But *Chertoff's* analysis does not demand this result.  To be sure, in that case the D.C. Circuit evaluated what appears to have been a near total abrogation of the collective bargaining right, but that says nothing about whether a less egregious affront can suffice to impair the right to bargain in violation of the FSLMRS.  With respect to that

key question, *Chertoff* established (and this Court concludes) that "the norms of 'collective bargaining'" matter, 452 F.3d at 861, and that agency efforts to remove from the bargaining table otherwise negotiable topics of discussion arbitrarily and in a manner that impacts a unions' ability to engage in effective collective bargaining negotiations moving forward impermissibly jeopardizes the right to bargain that the FSLMRS assiduously protects, *id.* at 487 (concluding "the scope of bargaining" rights under federal law "must be guided by the federal labor policy underlying the permissible scope of bargaining in the federal sector[,]" and that the "general framework" that Congress has laid out "to ensure collective bargaining" for federal employees "must be followed").

One final takeaway bears mentioning: we have learned from the FLRA that an executive branch official can be found to have "instruct[ed]" agency negotiators in a manner that "preclude[s] the existence of the prerequisite good faith necessary under the" FSLMRS.  *Fed. Aviation Admin. Nw. Mountain Region Seattle, WA*, 14 F.L.R.A. at 672.  This occurs most obviously when the instruction prevents the negotiator from "approach[ing] the Union with [an] open mind[.]"  *Id.*  In other words, commands that are likely to cause agency representatives to pursue a certain outcome with such dogged determination that the agency negotiator effectively "come[s] to the bargaining table with a closed mind[,]" impinge upon the duty to act in good faith.  *Sign & Pictorial Union Local 1175*, 419 F.2d at 731; *compare Teamsters Local Union No. 515 v. Nat'l Labor Relations Bd.*, 906 F.2d 719, 726 (D.C. Cir. 1990) (emphasizing that "rigid adherence to disadvantageous proposals may provide a basis for inferring bad faith" (internal citation and quotation marks omitted)) *with Fed. Aviation Admin. Nw.*

*Mountain Region Seattle, WA*, 14 F.L.R.A. at 672 (associating a flexible process of "give and take" with the obligation to proceed in "good faith").

> 2. <u>Certain Provisions Of The Challenged Executive Orders Dramatically Curtail The Scope Of Bargaining Because Agencies And Unions Will No Longer Negotiate Over A Host Of Significant Issues</u>

With the above framework in mind, it is clear to this Court that various aspects of the Orders that the Unions seek to challenge in this case violate the statutorily protected duty to bargain. This violation is most easily perceived as an illegitimate attempt to take four categories of otherwise negotiable matters off the bargaining table: (1) all of the permissive subjects of bargaining that Congress has listed in section 7106(b)(1) of Title 5 of the United States Code; (2) the ways in which union members can receive and use official time (which the FSLMRS addresses in section 7131(d)); (3) the agency's procedures for handling matters relating to inadequate employee performance, performance evaluations, and performance-based bonuses (which is covered in the statute, at sections 7103(a)(12) and 7121); and (4) the methods for conducting collective bargaining in the first place (which are designated by Congress as a topic for negotiation under section 7114(a)(4)).

> a. *The Orders Remove These Matters From The Scope Of The Right To Bargain Despite The Fact That Congress Has Made Them Negotiable*

To be more specific, with respect to each of these bargaining categories, the challenged executive orders dictate the following. Section 6 of the Collective Bargaining Procedures Order states that agencies "may not negotiate over the substance of the subjects set forth in section 7106(b)(1) of [T]itle 5"— *period*. Exec. Order No. 13,836 § 6. This means that unions and agencies will no longer engage in negotiations over such topics as "the numbers, types, and grades of employees or positions assigned

to any organizational subdivision, work project, or tour of duty" and "the technology, methods, and means of performing work"—matters that Congress specifically designated as subject to negotiation "at the election of the agency" in section 7106(b)(1).  5 U.S.C. § 7106(b)(1).

Even more dramatically, the Official Time Order completely reconceptualizes the terms and scope of bargaining regarding the right of employees to engage in union business during their paid working hours—a topic that the FSLMRS specifically covers. *See* Exec. Order No. 13,837.  Subsections (a) and (c) of section 7131 of the FSLMRS provide a list of certain activities for which a federal agency must grant "official time" to labor representatives, 5 U.S.C. § 7131(a) (negotiation of a collective bargaining agreement); *id.* § 7131(c) (participation of proceedings before the FLRA, if that agency authorizes it), while section 7131(b) provides Congress's directive that, with respect to activities "relat[ed] to the internal business of a labor organization[,]" official time cannot be used, *id.* § 7131(b).  For everything else, section 7131(d) states that federal employees "shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest." *Id.*; *see also BATF*, 464 U.S. at 99 (defining "official time" as the right of employees to receive their "usual pay" during union-related matters).  Yet certain challenged provisions in the Official Time Order expressly limit the negotiations over the matters for which official time can be utilized: *e.g.*, the Order flatly prohibits the use of official time to lobby government officials, or to prepare grievances on behalf of the union or other union members.  *See* Exec. Order No. 13,837 §§ 4(a)(i), 4(a)(v).  Similarly, the Official Time Order instructs agencies that they cannot provide union members with

federal resources or support relating to activities performed on official time, *see id.* §§ 4(a)(iii)–(iv)—effectively making *those* matters, too, non-negotiable—and it restricts bargaining over the conduct of union employees with respect to the use of official time as well, because whatever collective bargaining negotiators might have been able to agree to about the amount of official time labor representatives can utilize while engaged in union business, the order mandates that official time cannot comprise more than twenty-five percent of a union employee's working hours, *see id.* § 4(a)(ii), and management approval must be obtained before any official time can be used at all, *see id.* §§ 4(b).

By restricting negotiation over the procedures that an agency uses to evaluate employee performance, the Removal Procedures Order takes a similar tack. *See* Exec. Order No. 13,839. For example, section 4(a) explicitly prohibits agencies from subjecting disputes about assignment ratings (*i.e.*, performance evaluations) or performance-based monetary awards to any "grievance procedures or binding arbitration[,]" *id.* § 4(a), no matter what the agency and labor organization might have been able to agree to with respect to how such disputes should be handled. *Compare* 5 U.S.C. § 7121(a)(1) and (2) (providing that "any collective bargaining agreement shall provide procedures for the settlement of grievances[,]" and suggesting that all related grievance matters are negotiable, because "any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement"). Section 4(c) of Executive Order 13,839 removes from the bargaining process and commits to the sole discretion of agency management how long an employee should have to improve their performance before being terminated once

their employer has deemed their performance unacceptable within the meaning of

section 4302(c)(6) of Title 5 in the United States Code, *see* Exec. Order No. 13,839

§ 4(c), despite the fact that section 4302(c)(6) and the relevant regulations in this regard

do not set any definite limit on the length that employees have to improve their

performance, *see* 5 U.S.C. § 4302(c)(6).[13]

Courts and the FLRA have decided that each of the matters discussed above falls

within the scope of the right to bargain that Congress sought to protect when it enacted

the FSLMRS. *See BATF*, 464 U.S. at 107 n.17 (financial support to union members is

negotiable during collective bargaining); *Dep't of the Air Force Eglin Air Force Base,*

*Fla.*, 2016 WL 3548040, at *13 (May 31, 2016) (a party is free "to advocate for what it

believes to be the proper amount of official time"); *U.S. Dep't of the Treasury, Internal*

*Revenue Serv., Wash. D.C.*, 56 F.L.R.A. 393, 395 (2000) ("[M]atters covered under

section 7106(b)(1) are negotiable only at the election of the agency."); *Am. Fed'n of*

*Gov't Emps. Nat'l Council of Field Labor Locals*, 39 F.L.R.A. 546, 553 (1991) (how

official time may be used is open to negotiation); *Patent Office Prof'l Ass'n*, 29

F.L.R.A. 1389, 1403 (1987) (the amount of recovery time to be provided before

performance-based action is negotiable); *Vt. Air Nat'l Guard, Burlington, Vt.*, 9

F.L.R.A. 737, 740–41 (1982) (the scope of grievance procedures is negotiable); *see also*

5 U.S.C. § 7114(a)(4) (unions and agencies "may determine appropriate techniques,

---

[13] The Unions point to one other purported conflict between a provision of the Removal Procedures Order and the FSLMRS with regard to the scope of bargaining: section 4(b)(iii) of that Order prohibits an agency from "mak[ing] any agreement, including a collective bargaining agreement . . . that limits the agency's discretion to remove an employee from Federal Service without first engaging in progressive discipline[.]" Exec. Order No. 13839 § 4(b)(iii).  As explained in Part IV.E, this directive does not conflict with the scope of bargaining protected by the FSLMRS, because the FLRA has already determined that such matters are within the sole discretion of agency management under section 7106(a), and the opinion of this expert agency is entitled to *Chevron* deference.

consistent with the provisions of section 7119 of [the FSLRMS], to assist in any

negotiation").  However, as indicated above, the Orders that the Unions challenge here

selectively *remove* these nine matters from the array of topics that Congress has placed

on the bargaining table in the FSLMRS, ostensibly to promote an expansive conception

of what Congress intended when it recognized the public's interest in "the effective

functioning of the executive branch."  Exec. Order No. 13,837 (preamble); Exec. Order

No. 13,839 (preamble); *see also* Exec. Order No. 13,836 (preamble); *cf. Chertoff*, 452

F.3d at 861–62 (concluding that the removal of just six matters illegally diminished the

scope of bargaining anticipated in the statute).[14]  This Court has little doubt that this

shifting of discussion topics from the "must" or "may" negotiate buckets that Congress

created and into the non-negotiable bucket reduces the scope of the protected right to

bargain in an impermissible manner.  *See Chertoff*, 452 F.3d at 861.

> b.  *The Removed Topics Are Important To The Functioning Of Labor Organizations And The Fairness Of Collective Bargaining Negotiations*

Whether or not the right to bargain has been impermissibly reduced as a result of

---

[14] As an aside, each of these Orders puts way too much stock in the FSLMRS's statements about an "effective" and "efficient" government, as a general matter.  It is certainly true that that goal certainly reflects one key aspect of the careful balance that Congress was attempting to strike between management and labor.  *See, e.g.*, 5 U.S.C. § 7101(a)(2) (suggesting that "the public interest demands the highest standards of employee performance").  But the overall thrust of the FSLMRS is unquestionably Congress's stated belief that "labor organizations and collective bargaining in the civil service are in the public interest[,]" *id.*, rather than any concern that, by accommodating collective bargaining rights, government agencies were becoming ineffective or inefficient and thus not serving the public.  Moreover, far from being propelled by some abstract conviction that the scope of the right of collective bargaining needs to be reduced in order to achieve an effective and efficient federal workforce (as these Orders suggest), in the FSLMRS, Congress stated plainly what the statute *means* when it references "the requirement of an effective and efficient Government." *Id.* § 7101(b).  Section 7101(a)(1)(B) explains that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" *itself* "contributes to the *effective* conduct of public business," and section 7101(a)(2) indicates that "the continued development and implementation of modern and progressive work practices *through collective bargaining* "facilitate[s] and improve[s] employee performance and the efficient accomplishment of the operations of the Government." *Id.* § 7101(a)(1)(B), (2) (emphasis added).

the removal of these matters from the realm of negotiation turns on more than just the *number* of matters the Orders remove from the ambit of collective bargaining discussions; it also depends on the relative *importance* of the subjects that the orders target in this regard.  When viewed from this perspective, this Court's assessment of whether or not these provisions of the Orders conflict with the will of Congress becomes even more grave.

Consider, for example, the ban on agency and union negotiations about the potential of negotiating the permissive bargaining matters listed in section 7106(b)(1).  In *Chertoff*, the D.C. Circuit expressly disapproved of agency determinations that these matters are categorically "off limits[,]" and in doing so, the panel strongly suggested that the "distinction" between a right of bargaining that includes the potential to discuss these matters and a right of bargaining that does not "is critical."  452 F.3d at 862.

But that is not the only canary in the coal mine.  Indeed, one could argue that the executive order provisions that restrict and limit official time have an even bigger impact on the scope of bargaining that the FSLMRS protects.  By prohibiting union members from using official time for lobbying efforts or for the pursuit of other employees' grievances, the Official Time Order has eliminated what the Unions say are two indisputably central activities of labor organizations: attempting to preserve and expand (through lobbying) the statutory protections for workers and the right to collective bargaining (*see, e.g.*, NFFE's Stmt. of Facts ¶ 58; Decl. of Kenneth Moffett, Jr., Ex. 1 to Pl. NTEU's Mot. for Summ. J., ECF No. 29-4, ¶ 35), and seeking to enforce the results of collective bargaining negotiations by working with their members to file grievances under negotiated grievance procedures about the violation of agreed-to

conditions (*see, e.g.*, NTEU's Stmt. of Facts ¶¶ 30, 47; Decl. of Witold Skwierczynski, Ex. 3 to Pl. AFGE's Mot. for Summ. J., ECF No. 30-6, ¶ 27).  For a very long time in this country, unions have played a "major" role "in urging legislation and candidacies" with the goal of advancing policy agendas that are favorable to workers.  *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 813 (1961) (Frankfurter, J., dissenting); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 344–47 (2010) (providing examples).  Indeed, for public unions in particular, the right to "communicate with Congress is essential . . . because so many fundamental working conditions are directly determined by Congress through legislation."  *Gen. Servs. Admin.*, 9 F.L.R.A. 213, 223 (1982).  And it is also clear that gains workers achieve through a union's agreements with management would not be worth the paper they are written on if unions and their members cannot effectively enforce the terms of their agreements through the vigorous pursuit of any grievance that a member is authorized to file.  *See Sec'y of the Air Force*, 716 F.3d at 636–37.  By assisting individual members in the grievance process, unions have traditionally advanced this effort.  *See, e.g.*, *Vaca v. Sipes*, 386 U.S. 171, 194 (1967).  And Congress appears to have endorsed this practice, for it devoted an entire section of the FSLMRS to negotiated grievance procedures, *see* 5 U.S.C. § 7121, explicitly granting federal workers (through their representatives) an open-ended right to bargain with management about them.

Thus, it is entirely unsurprising that unions have sought to protect and defend the right to bargain over the use of official time for lobbying and grievance assistance, both before and after the enactment of the FSLMRS.  *See Patent Office Prof'l Ass'n v. Fed. Labor Relations Auth.*, 872 F.2d 451, 452–53 (D.C. Cir. 1989) (grievances); *Gen. Servs.*

*Admin.*, 9 F.L.R.A. at 223 (lobbying).  Collective bargaining over material support has also been viewed as a vital term in collective bargaining negotiations for many reasons, including the fact that the potential of securing support contributes to the parity between management and labor that the FSLMRS implicitly requires.  *See Dep't of the Navy Naval Constr. Battalion Ctr. Port Hueneme, Cal.*, 14 F.L.R.A. 360, 372 (1984); *see also BATF*, 464 U.S. at 104 (noting that several provisions of the act "aim[] at equalizing the positions of management and labor"); *id.* at 101–02 (recognizing that the justifications for permitting federal workers to do union work during paid time have historically centered on the need "to maintain a reasonable policy with respect to union self-support[,]" and on the principle that union members "should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities" (internal quotation marks and citations omitted)).  Under these challenged provisions of the Official Time Order, however, the Unions' right to bargain for the official time and financial support that contributes to parity in collective bargaining negotiations is significantly diminished, because union representatives cannot negotiate for the financial support that management receives, nor can they barter for arrangements that would permit union representatives to devote the necessary time to become specialists in labor-management issues.  *See* Exec. Order No. 13,837 §§ 4(a)(ii)–4(a)(iv).  This, in turn, exacerbates management's advantages over labor and hampers unions' ability to engage effectively in future collective bargaining, contrary to the clearly articulated goals of the FSLMRS.  *See* 5 U.S.C. § 7101(a).

Insofar as the Official Time Order also generally requires agency management to pre-approve union representatives' use of official time, *see* Exec. Order No. 13,837

§ 4(b), one could argue that this singular provision is the one that does the most damage to the statutory right to bargain that the FSLMRS establishes.  This is so because requiring preapproval effectively confers upon management the discretion to dictate when, if ever, union employees may use paid time to engage in union activities.  *See id.* § 5(b) (requiring any authorization procedure to allow management to "assess whether it is reasonable and necessary" to grant such official time).  (*See also* NFFE's Mem. at 41–42.)  No; the Order does not give management the power to prevent union members from engaging in any union activities on their *own* time.  (Defs.' Mem. at 77; Hr'g Tr. 146:3–11.)  Nor does the Order expressly divest labor representatives of their clear statutory right to use paid time to negotiate collective bargaining agreements under section 7131(a) of Title 5 of the United States Code, or to participate in authorized FLRA proceedings, *id.* § 7131(c).  But to the extent that the Order confers upon management control over when (and if) official time is used to do anything else union-related, it effectively shifts the determination of what is "reasonable, necessary, and in the public interest" *away from both parties*, where section 7131(d) of Title 5 of the United States Code places it, and hands that crucial decision over *to management alone*, in a manner that might well result in labor representatives being denied the use of paid time in all but the most narrow set of circumstances.[15]

---

[15] The parties to collective bargaining negotiations can still conceivably bargain over the circumstances under which official time might be appropriately granted (except for lobbying and grievances), and can include such circumstances in their agreements, under the Official Time Order's provision, but, as noted, the Order directs agencies to secure the power to grant or deny "authorization" for the requested use of official time for any reason, which will affect how official-time agreements are actually implemented.  Exec. Order No. 13,837 § 4(b).  Thus, agencies can turn any bargain regarding the scope of official time into a meaningless exercise, and according to the D.C. Circuit, *that* circumstance conflicts with the will of Congress, because "[n]one of the major statutory frameworks for collective bargaining allows a party to unilaterally abrogate a lawfully executed agreement." *Chertoff*, 452 F.3d at 860.  In other words, by giving management the unilateral power to determine whether or not this bargained-for term will be actually implemented, the government has effectively conferred upon itself

The Removal Procedures Order provisions that (a) pertain to agreements about the grievability of performance evaluations and incentive awards, and (b) place time limits on struggling employees' efforts to improve their performance, have similar outsized significance.  As indicated above, it is well established that grievance procedures exist to "safeguard the participation rights of individual employees and [] unions[,]" *Am. Fed'n of Gov't Emps., Locals 225, 1504, and 3723 AFL-CIO v. Fed. Labor Relations Auth.*, 712 F.2d 640, 641 (D.C. Cir. 1983), and the FSLMRS finds that such participation is "in the public interest[,]" 5 U.S.C. § 7101(a), so *any* reduction in the scope of negotiations regarding such procedures is potentially problematic from the standpoint of what matters to Congress as reflected in the FSLMRS.  Moreover, because federal employees' ability to file grievances regarding unsatisfactory performance evaluations and/or performance awards, in particular, is clearly instrumental in facilitating the protection of other statutory rights, *see, e.g.*, *Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003) (claiming that a "pay differential was a result of discrimination"); *Smith v. Sec'y of the Navy*, 659 F.2d 1113, 1120 (D.C. Cir. 1981) (acknowledging that "[a]n unfavorable employee assessment . . . could both prejudice the employee's superiors and materially diminish his chances for advancement"), the Order's elimination of the ability of labor representatives to negotiate over how grievances will be handled with respect to federal employees who claim they were improperly evaluated or undercompensated deprives unions of an opportunity to utilize the collective bargaining process to influence the mechanisms through which accurate and fair treatment of employees within the federal civil service occurs.  Accountability

_____

the power to nullify any bargained-for agreement to the use of official time.

of government officials with respect to their treatment of workers also hangs in the balance—all in clear contrast with Congress's stated conviction that collective bargaining has the potential to "*safeguard*[] the public interest" and to "*facilitate . . .* the *amicable* settlements of disputes[.]"  5 U.S.C. § 7101(a) (emphasis added).

Likewise, and finally, forbidding agencies from bargaining over the length of time available to an employee to "demonstrate acceptable performance" under section 4302(c)(6) of Title 5 of the United States Code effectively silences workers with respect to "one of the most important rights" relating to performance-based employment actions.  *Sandland*, 23 M.S.P.R. 583, 590 (1984).  Defendants have yet to explain how shutting down any such discussions comports with the FSLMRS's requirement that federal workers get a 'say' with respect to their conditions of employment.  *See* 5 U.S.C. § 7103(a)(14); *Dep't of the Treasury, Office of Chief Counsel v. Fed. Labor Relations Auth.*, 873 F.2d 1467, 1468 (D.C. Cir. 1989) ("Perhaps the most important protections enjoyed by the competitive service are those—set forth in chapters 43 and 75 of the Act—which buffer the prospect of discipline or discharge."); *see also Prof'l Airways Sys. Specialists, MEBA, AFL-CIO v. Fed. Labor Relations Auth.*, 809 F.2d 855, 858 (D.C. Cir. 1987) ("Legally mandated collective bargaining provides an orderly vehicle for the formal articulation of competing positions so, if successful, a more universally agreeable course of action may eventuate.").

This all demonstrates that even though the Orders touch upon only selected matters among the myriad topics that negotiators purportedly seek to address during the federal collective bargaining process (*see* Hr'g Tr. at 122:6–13 ( defense counsel contending that " I have a long, long list of things that would [still] be negotiable in

that respect")), these particular provisions have a *substantial* impact on the scope of the right to bargain under the FSLMRS.  As the D.C. Circuit recognized, the scope of bargaining under the FSLMRS is actually quite "narrow" to begin with, when compared to what labor and management negotiate over in the private sector, *Chertoff*, 452 F.3d at 860, so it stands to reason that almost *any* attempt to shrink the otherwise generally accepted and traditional scope of bargaining rights under the FSLMRS can quickly render such an effort suspect from the standpoint of the boundaries that Congress has constructed, *id.* at 858 (suggesting that the point in which management is "not even giv[ing] an illusion of collective bargaining" comes fast in the federal bargaining process).  Even with respect to *one* carveout in the *Chertoff* case—the permissive bargaining matters under section 7106(b)(1) of Title 5 of the United States Code—the Circuit has made no bones about the fact that the scope of the right to bargain can be "critical[ly]" restricted.  *See id.* at 862; *see also, e.g.*, *U.S. Dep't of the Navy, Naval Aviation Depot, Cherry Point, N.C.*, 952 F.2d at 1439 (finding that the removal of "mandatory subjects of bargaining," such as matters relating to official time, grievance procedures, employee performance, and the methods of collective bargaining, "impermissibly restricts collective bargaining at its core").  The Orders before this Court require the carveout of the FSLMRS's permissive bargaining topics, too, and—in terms of actual practical effect—so much more.[16]

---

[16] Because the above analysis invalidates section 4(a)(v) of the Official Time Order, which is the only Order provision to which the Unions' First Amendment claim related, it is unnecessary for this Court to consider the Unions' claims that section 4(a)(v) of the Official Time Order violates the Unions' First Amendment right to freely associate.  (*See* AFGE's Mem. at 15–19; AFGE's Reply at 31–34; AFSCME's Mem. at 31–36; AFSCME's Reply at 10–15.)

3.  <u>Certain Provisions Of The Executive Orders Impede The Prospect Of
Good Faith Negotiations</u>

Sections 5(a) and (e) of the Collective Bargaining Procedures Order, section 3(a)

of the Official Time Order, and section 3 of the Removal Procedures Order, create a

new series of norms and default bargaining positions, and in this Court's view, these

standards prevent federal agency representatives from bargaining with labor

organizations "in good faith," consistent with their duty to do so under the FSLMRS.

*See* 5 U.S.C. §§ 7103(a)(12), 7114(b).

First of all, several of these provisions tell the agencies—at the outset—what

should "ordinarily" happen with respect to certain negotiable terms and negotiation

processes during the course of collective bargaining.  Section 5(a) of the Collective

Bargaining Procedures Order, for example, provides that "ordinarily" agencies shall

only devote a certain amount of time to negotiating the ground rules for a collective

bargaining process (no more than six weeks) or to hammering out the terms of a final

collective bargaining agreement (between four to six months).  Exec. Order No. 13,836

§ 5(a).  Section 3(a) of the Official Time Order similarly prescribes that agencies

should "ordinarily" not agree to provide unions with more than one hour of official time

per union member employed with the bargaining agency, in the aggregate.  Exec. Order

No. 13,837 § 3(a).  And section 3 of the Removal Procedures Order instructs agencies

that they should, "[w]henever reasonable[,]" endeavor to exclude from the negotiated

grievance procedures any issues relating to an employee's removal for misconduct or

unacceptable performance.  Exec. Order No. 13,839 § 3.

Given the rights that the FSLMRS confers, such preconceived notions of the

'ordinary' length of negotiations or the standard amount of official time to be

authorized, are unwarranted, and ultimately unduly restrictive, because there is no such thing as a *typical* collective bargaining agreement with respect to each of these terms— *all* of these matters concern negotiable conditions of employment or negotiated procedures for collective bargaining, as the FLRA has recognized.  *See Dep't of the Air Force Base, Fla.*, 2016 WL 3548040 at *13 (amount of official time); *U.S. Dep't of the Treasury, Internal Revenue Serv., Wash, D.C.*, 64 F.L.R.A. 426, 432 (2010) (timelines); *Vt. Air Nat'l Guard, Burlington, Vt.*, 9 F.L.R.A. at 740–41 (scope of grievance procedures).

Furthermore, these norm-setting provisions of the executive orders at issue each contain an implicit enforcement mechanism that effectively transforms these norms from fashionable "aspirations," merely to be tried on and thoughtfully pondered during the course of negotiations (*cf.* Defs.' Mem. at 41), into an impermeable straightjacket. In this regard, each Order first announces the *endpoint* that the agency must strive to achieve in the "ordinar[y]" course of things, or whenever it is "reasonable" for the agency to do so.  Exec. Order No. 13,836 § 5(a); Exec. Order No. 13,837 § 3(a); Exec. Order No. 13,839 § 3.  Then, across the board, these provisions indicate that "[a]gencies shall commit the time and resources necessary" to achieve these objectives. Exec. Order No. 13,836 § 5(a); Exec. Order No. 13,837 § 3(a); Exec. Order No. 13,839 § 3.  And, in the unlikely event that the agency somehow fails to bring all of its resources to bear upon the assigned task of browbeating the union into accepting the stated term in the context of any negotiation, it must either bring the matter to mediation and then to the Federal Impasse Panel, *see* Exec. Order No. 13,836 § 5(a) (regarding ground-rule negotiations), or must explain to the "President [of the United

States] through the Director of the Office of Personnel Management" why the agency

relented, and thereby, shamefully, failed to achieve the goal, Exec. Order No. 13,837 §

3(b); Exec Order No. 13,839 § 3.

This Court has no doubt that the net effect of these provisions is to put an entire

hand on the scale with respect to certain negotiable provisions of a collective

bargaining agreement before negotiations even begin (never mind the thumb), and to

require agency negotiators to cut off any digits that union representatives might seek to

extend in the hopes of reaching an agreement on these particular issues.  In effect,

agency negotiators are told that they must enter into the negotiating arena wielding

predetermined goals, and must be prepared to fight to the death on these prescribed

issues, in a manner that, in this Court's view, is not meaningfully susceptible to the

open "give and take" negotiating process that the duty to bargain in good faith

anticipates.  *Fed. Aviation Admin. Nw. Mountain Region Seattle, WA*, 14 F.L.R.A. at

672.  Indeed, "[s]ection 7114(b) of the [FSLMRS] obligates" agencies and unions "to

send representatives to the bargaining table who are *fully* authorized to discuss and

negotiate over any condition of employment." *Am. Fed. of Gov't Emps., Local 1916*, 64

F.L.R.A. 1171, 1172 (2010) (emphasis added).  But the norm-setting sections of these

Orders effectively *remove* full negotiation authority from agency officials in the

covered circumstances, and rather than seeking to promote the "open mind" approach to

collective bargaining negotiations that the FSLMRS unquestionably promotes,

*Amalgamated Transit Union Int'l AFL–CIO*, 767 F.2d at 949 (internal quotation marks

and citation omitted), these challenged provisions of the Orders require the following of

agency negotiators: to commit to keeping the presumptive positions in the forefront of

their consciousness; to dedicate all the time and resources necessary to achieving these positions; and to answer to the Director of OPM and the President of the United States about their failed negotiating strategy, if, in some unlikely scenario, they cannot secure the desired result.

Under the FSLMRS, the collective bargaining process is not a cutthroat death match. *Cf. Nat'l Labor Relations Bd. v. Katz*, 369 U.S. 736, 747 (1962) (suggesting that behavior that "*in effect* . . . reflects a cast of mind against reaching agreement" is inconsistent with good-faith bargaining (emphasis added)). Quite to the contrary, Congress explicitly called for open-mindedness, civility, and sincere mutual effort when it directed agency and labor representatives to bargain "in good faith."

Section 5(e) of the Collective Bargaining Procedures Order conflicts with the duty of good faith bargaining for a similar reason. That executive order provision provides that, with respect to the manner of bargaining, agencies "shall request the exchange of written proposals" and "should, at the soonest opportunity, take steps" to remove any other approach to collective bargaining from current collective bargaining agreements or collective bargaining ground rules. Exec. Order No. 13,836 § 5(e). For even a "request" to conduct collective bargaining negotiations entirely on paper, and especially pursuant to changed agency rules requiring this result, risks altering the fundamental nature of the fair and flexible bargaining process that the FSLMRS guarantees, for collective bargaining negotiations are supposed to involve flexible exchanges between knowledgeable institutional actors who meet regularly to try to come to an agreement. 5 U.S.C. § 7114(a)(4). The requested robotic exchange of written proposals suggests that the kind of direct and personal contact that has to occur

when negotiators are seated around a metaphorical table, discussing workplace conditions, is not welcomed; moreover, it surely discourages the type of "give and take" among equals that the negotiating process of the FSLMRS demands.  *See Fed. Aviation Admin. Nw. Mountain Region Seattle, WA*, 14 F.L.R.A. at 672.[17]

What is more, a written-proposal request carries with it the implicit assertion that the requestor (the agency representative) himself does not have "full" authority to commit or to comment about union proposals, *see Am. Fed. of Gov't Emps., Local 1916*, 64 F.L.R.A. at 1172; instead, his task is to compile a record of union suggestions in a format that *other* agency officials (folks who are not otherwise engaged in the negotiations) can review.  *See, e.g.*, Exec. Order. 13,836 § 5(e) (stating that this provision will "facilitate resolution of negotiability issues and assess the likely effect of specific proposals").  While having a comprehensive listing of all that has ever been offered might well make the supervision of an individual agency negotiator's game-time strategy decisions easier, *see, e.g.*, Exec. Order No. 13,837 § 3(a), it is also unquestionably constraining (of a piece with the substantive negotiating restrictions described above) from the standpoint of the government official who is charged with the responsibility of negotiating in good faith.

Notably, section 5(e) of the Collective Bargaining Procedures Order not only introduces an element of inflexibility into the process of negotiating that is antithetical to the good faith negotiations that the FSLMRS guarantees, but it also expressly prevents *negotiation* over whether or not proposals must be made in writing—which is

---

[17] With respect to the same matter, "rigidity" and "fluidity" are opposing concepts.  *See, e.g.*, Paul J. Hagerman, *Flexibility of RNA*, 26 Ann. Rev. of Biophysics and Biomolecular Structure 139 (1997) (examining the helix and nonhelix components of RNA).

an otherwise negotiable term of a collective bargaining agreement. *See* 5 U.S.C.

§ 7114(a)(4). (*See also* AFSCME's Reply at 19.) Consequently, in terms of FSLMRS

transgressions, this provision of the Order comes up snake eyes, as it has the unenviable

distinction of patently conflicting with *both* the duty to bargain *and* the duty to bargain

in good faith. (*See* Part IV.D.2, *supra*.)

> 4. <u>Defendants' Best 'No-Conflict' Counterarguments Are Meritless</u>

In their briefs and during the hearing, Defendants made a host of compelling

counterarguments, but upon reflection, none of them effectively counters this Court's

conclusion that the challenged provisions of the Orders described above exceed the

President's statutory authority because they conflict with the letter and the spirit of the

FSLMRS. (*See* Part IV.D.2 and 3.) Only two of Defendants' contentions are worth

addressing here.[18]

> a. *The Specious Section 7117 Suggestion*

Defendants vigorously maintain that the President has the statutory authority to

issue the challenged executive order provisions notwithstanding any conflict with the

tenets of FSLMRS—and, in fact, the President has *explicit* authorization to contradict

Congress—because the Orders qualify as "Government-wide rule[s]" under section

7117(a)(1). To hear Defendants tell it, the following statutory statement provides the

window through which Congress has permitted the President to toss any of the other

labor relations mandates that Congress has made:

> [T]he duty to bargain in good faith shall, to the extent not
> inconsistent with any Federal law or any Government-wide rule

---

[18] To the extent that Defendants' briefs make the argument that what the President set out to do with these Orders was to regulate the *conduct* of federal employees and agencies (*see, e.g.*, Defs.' Mem. at 49), the Court notes that Defendants have also maintained that the Orders were "designed to promote more efficient and effective approaches to federal-sector collective bargaining and labor-management relations" (*id.* at 17). In this Court's view, Defendants cannot have it both ways.

> or regulation, extend to matters which are the subject of any rule
> or regulation only if the rule or regulation is not a Government-
> wide rule or regulation.

5 U.S.C. § 7117(a)(1).  (*See* Defs.' Reply at 21 (characterizing Collective Bargaining

Procedures Order section 6, Official Time Order sections 4(a) and (b), and Removal

Procedures Order section 4 as "a lawful exercise of the President's authority to issue

consistent rules across the federal workforce").)

      The strangeness of Defendants' contention that, in the context of a statute that

Congress has crafted to protect workers' rights to good-faith collective bargaining,

Congress intended to confer upon the President the power to issue executive orders that

nullify those protections, cannot be overstated.  A plain, compelling, and entirely

reasonable alternative explanation for the statute's language carving-out "Government-

wide rule[s] or regulations" is that government-wide standards sometimes relate to

various terms and conditions of employment in the civil service.  *See, e.g.*, *Nat'l Fed'n*

*of Fed. Emps., Local 2015*, 41 F.L.R.A. 1158, 1185–86 (1991) (concerning President

Ronald Reagan's Drug-Free Workplace Executive Order).  And section 7117 merely

clarifies that any such requirement naturally has to be applied to federal workers, so, as

a result, such government-wide rules must be excluded from the scope of collective

bargaining.  *See* 5 U.S.C. § 7117(a)(1).  *This* is the simplest, narrowest, and most

straightforward reading of the plain text of the section 7117(a)(1) exemption from

bargaining.  By contrast, Defendants employ an analysis that is akin to verbal jujitsu:

their first move is to contend that the President can certainly issue executive orders that

qualify as "government-wide rules" (Defs.' Reply at 20–21); then, they confidently

maintain that the President has the authority to opt to make such government-wide rules

apply to federal-sector labor relations "in a specific way" (*id*. at 23 (internal quotation marks, italics, and citation omitted).  For the grand finale, they reasons that *clearly* Congress *must* have intended for the President to employ this power to impact federal sector labor relations by taking select matters off the collective bargaining table nationwide per the language of section 7117, because that provision plainly states that "matters which are the subject of any rule of regulation" that qualifies as "a [g]overnment-wide rule or regulation" (read: any executive order the President wishes to craft) are necessarily exempted from good-faith bargaining (*id*. at 20–23).

In so arguing, Defendants have (*voila*!) made a distracting shiny object out of an otherwise entirely unremarkable statutory exemption.  But this Court has kept its focus on Congress's stated "findings and purposes," which provide clear context for the statute in which section 7117 is nestled.  As has by now been said repeatedly, Congress enacted the FSLMRS to protect and preserve collective bargaining rights, not to destroy them.  Thus, what Defendants' section 7117 analysis has not answered—and cannot answer—is *why* an exception to collective bargaining principles that allows the President (or any other agency official, for that matter) to pick off any of the mandatory or permissive topics of negotiation that Congress took care to delineate in the FSLMRS, and put it into the management rights (non-negotiable) bundle, would *ever* be inserted in this statute?  Defendants attempt to distract from this fundamental unanswered inquiry by providing a detailed discussion of the reason why the scope of its favored interpretation is actually less expansive than its implications might suggest.  (*See, e.g.*, *id.* at 22 (emphasizing the "narrowness" of a conclusion that the President is authorized to "direct the exercise of existing management prerogatives in a *specific* way, so that

*particular* subjects or appropriate arrangements are identified as inappropriate topics of

bargaining" (emphasis in original) (internal citation and quotation marks omitted)).)

But with respect to the actual question at issue, the silence is deafening; there is no

rational explanation for Defendants' suggestion that Congress would have intended for

the President to have the power to act in this fashion *at all* in regard to the matters that

the FSLMRS specifically characterizes as negotiable.  Quite frankly, it is hard to even

*imagine* a rational statutory exception that is *intentionally* designed to swallow the rule.

        Not surprisingly, the D.C. Circuit has confirmed that the government officials

are not permitted to issue government-wide regulations "that merely restate[] a

statutorily guaranteed prerogative of management" in order to "render a bargaining

proposal nonnegotiable when the underlying statutory prerogative does not do so[.]"

*Office of Pers. Mgmt. v. Fed. Labor Relations Auth.*, 864 F.2d 165, 166 (D.C. Cir.

1988).  Put another way, contrary to Defendants' assertions, the government cannot use

section 7117(a)(1) to "circumvent" other portions of the FSLMRS.  *Id.* at 168; *see also*

*Equal Emp't Opportunity Comm'n v. Fed. Labor Relations Auth.*, 744 F.2d 842, 853

(D.C. Cir. 1984).  Yet, that is precisely what Defendants say Congress has authorized

the President to do, when they press the section 7117 argument here.  That is, rather

than asking this Court "to give [the] statute the most harmonious, comprehensive

meaning possible, and not to impute to Congress a purpose to paralyze with one hand

what it sought to promote with the other[,]" *Office of Pers. Mgmt.*, 864 F.2d at 168

(internal quotation marks and citations omitted), Defendants insist that, pursuant to

section 7117, the President has the authority to "lawfully prescribe Government-wide

rules that have the effect of removing subjects from the scope of collective

bargaining[,] as he has done here" (Defs.' Reply at 20).  But in the words of the D.C.

Circuit, "[i]t strains plausibility to assert . . . that Congress could have made statements

in support of" collective bargaining and the various rights conferred throughout the

FSLMRS "while simultaneously fashioning an omnipotent veto mechanism in the form

of government-wide regulations[.]"  *Office of Pers. Mgmt.*, 864 F.2d at 170.

　　　*U.S. Department of the Treasury, IRS v. Federal Labor Relations Authority*, 996

F.2d 1246 (D.C. Cir. 1993), is not to the contrary.  (*See, e.g.*, Defs.' Mem. at 36–38;

Defs.' Reply at 22–23.)  In *IRS*, the D.C. Circuit concluded that an OMB circular

directing agencies in the exercise of their prerogatives under the management rights

section of the FSLMRS qualified as a government-wide rule under section 7117.  *See*

996 F.2d at 1250–51.  The circular at issue addressed the implementing "agency's own

internal appeal system," *id.* at 1248, and in characterizing the circular's tenets as a

"government-wide rule" that was exempted from bargaining under section 7117, the

Circuit observed that the union could not reasonably rely on the "general right to

grieve" under the FSLMRS to demand that the agency commence bargaining over

appeal processes, notwithstanding the circular, *id.* at 1251.  This holding made

imminent sense, and was entirely consistent with *Office of Personnel Management*,

because the circular was *directed at agency appeals*, and not the collective bargaining

process.  *See Office of Pers. Mgmt.*, 864 F.2d at 170 (explaining that section 7117(a)(1)

may be used to "direct[] the exercise of existing management prerogatives in a *specific*

way, so that *particular* subjects or appropriate arrangements are identified as

inappropriate topics of bargaining").  In other words, the circular's policy

pronouncement was not designed to thwart collective bargaining rights; at most, it had a

merely *incidental* effect on workers' collective bargaining rights. Nothing in the *IRS* case, or in any other case involving section 7117 that Defendants have cited, authorizes *direct* regulation of the scope of bargaining through the adoption of government-wide rules. *See, e.g.*, *U.S. Dep't of the Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (appropriations law preventing bargaining over the provision of free bottled water); *Overseas Educ. Ass'n*, 827 F.2d at 816–17 (State Department regulations regarding overseas employees prohibited negotiating over employment benefits).

Even if section 7117(a)(1) could be used to regulate collective bargaining directly in the way that Defendants suggest, it cannot seriously be maintained that Congress has authorized the President to abrogate the right to "bargain collectively" as the challenged provisions of the Orders do here. *See IRS*, 996 F.2d at 1251 (observing that "some important limitations on the government's ability to diminish the scope of collective bargaining through government-wide regulations" exist). To read section 7117 to permit the President to trump the statutory right to "bargain" would elevate 7117(a)(1) far above sections 7101(a), 7102(2), and 7103(a)(12), in a manner that dwarfs Congress's clear efforts to guarantee this right. *Cf. Chertoff*, 452 F.3d at 861 ("The problem with . . . the Government's arguments . . . is that they elevate one provision of the [statute] over another[.]"). Defendants appear to admit that the President does not have *that* power. (*See* Defs.' Reply at 31 (admitting that there exist "statutory limitations on the President's authority to act in this area").) But the irony of their section 7117 argument—*i.e.*, that in the context of a statute that was motivated in large part by Congress's belief that it was necessary to protect federal collective

bargaining processes from the vagaries of rogue presidential action (*see* Part IV.C., *supra*), Congress intended to insert an exception that authorized the President to target and eliminate workers' statutory bargaining rights—seems to be lost on them.

### b.  *The Mistaken 'Mere Guidance' Characterization*

The other 'no conflict' argument that merits discussion is Defendants' repeated suggestion that many provisions in these Orders merely provide goals for agencies to strive towards, and therefore cannot conflict with the FSLMRS by nature.  (*See* Defs.' Mem. at 46 (suggesting that orders that do not constitute "hard-and-fast rules" cannot conflict with the substantive rights conferred by statute).)  This counterargument also fails to carry the day.  Even if such provisions are "deliberately flexible[,]" and even if nothing "precludes [agencies] from" deviating from the "objectives" within these provisions (*id.*), such directives can violate the duty to bargain in good faith that the FSLMRS prescribes nevertheless, and for the reasons laid out in Part IV.D.3, *supra*, they do so.

Defendants' argument fails to appreciate that the conflict at issue with respect to these provisions is *not* in identifiable tension with a *particular* substantive requirement over which agencies and unions must bargain (as is the case with the right to bargain transgressions (*see* Part IV.D.2, *supra*)).  Rather, for the purpose of this Court's analysis, the relevant conflict is the distinct (and admittedly general) statutory obligation that the parties must undertake to negotiate in "good faith[.]"  5 U.S.C. § 7114(b).  In other words, with respect to these types of provisions, the *nature* of the President's order (*i.e.*, whether he seeks to give guidance as opposed to laying down a hard-and-fast rule) makes no difference; instead, the key question is whether these suggestions impair the ability of agency officials to keep an open mind, and to

participate fully in give-and-take discussions, during collective bargaining negotiations. *See id.*; *see also United Steelworkers of Am.*, 983 F.2d at 245 (defining the duty of good faith). This Court has concluded that the guidance the President has provided to federal agency negotiators in the context of the Orders does just that. (*See* Part IV.D.3, *supra*.)

Finally, it makes no difference that the President's guidance in the context of these challenged Order provisions is packaged with "repeated directives that agencies must continue to meet their statutory duty to bargain in good faith." (Defs.' Mem. at 73; *see also id.* at 45–46; 50–52.) *See* Exec. Order No. 13,836 §§ 5(a), 5(b); Exec. Order No. 13,837 § 3(a); Exec. Order No. 13,839 § 3. That command does not abate the conflict, for, as Part IV.D.3, *supra*, explains, prescribing specified goals and suggesting fixed outcomes while simultaneously flashing the coercive implement of mandatory reporting requirements, wreaks a kind of damage with respect to the negotiating mindset of agency officials that a subsequent, generalized 'follow the law' directive simply can't undo.

As the D.C. Circuit has recognized, "it takes more than mere surface bargaining" for a party to act in good faith "for purpose[s] of collective bargaining." *Cap Santa Vue, Inc. v. Nat'l Labor Relations Bd.*, 424 F.2d 883, 889 (D.C. Cir. 1970) (internal quotation marks and citation omitted). And this Court has already found that, with respect to the matters at issue, the suggested policies in the challenged executive order provisions pay only lip service to the statutory duty to bargain in good faith. (*See* Part IV.D.3, *supra*.) Having essentially demanded that agency representatives seek specific ends, and use specific means, in a manner that prevents full and open collective bargaining negotiation, the Orders cannot be saved due to their clever (albeit internally

inconsistent) directive that, notwithstanding these suggestions, an agency negotiator should nevertheless act in the manner that the FSLMRS requires.  *Cf. Cap Santa Vue*, 424 F.2d at 889 ("[B]ad faith is prohibited though done with sophistication and finesse." (internal quotation marks and citation omitted)).

### E.  The Remaining Challenged Provisions Of These Executive Orders Are Legitimate Exercises Of The President's Authority

This Court now arrives at the final stop in the epic journey that the parties' various claims and arguments have required it to consider.  Here, the Court reaches a clear conclusion—not each and every provision that the Unions challenge within the Orders runs afoul of a right protected within the FSLMRS or within the CSRA.

For example, with respect to the Unions' claim that section 5(c) of the Collective Bargaining Procedures Order is an unauthorized exercise of presidential power (*see* AFSCME's Mem. at 28–29), the Court discerns no conflict with the FSLMRS.  This is because Section 5(c) merely provides that, if union representatives delay or impede negotiations in bad faith, federal agency representatives shall only "consider" filing an unfair labor practice or unilaterally implementing a proposal.  Exec. Order No. 13,836 § 5(c).  The FSLMRS plainly authorizes such filings in appropriate situations, and nothing in the Order requires agencies to take steps incompatible with that statutory authorization.  *See* 5 U.S.C. § 7116(b)(5); *U.S. Dep't of the Justice, Immigration & Naturalization Serv.*, 55 F.L.R.A. 892, 904 (1999) (explaining that an agency may implement changes unilaterally if "implementation is necessary for the functioning of the agency").  Thus, contrary to the Unions' suggestion (*see* AFSCME's Mem. at 28–29), this Order provision does not contradict the statute.

Nor do section 2(j) of the Official Time Order or section 2(c) of the Removal

Procedures Order (*see* NTEU's Mem. at 31–34; AFGE's Mem. at 20–21), present statutory conflicts. These provisions are little more than general statements that define other terms in the Orders, or they espouse abstract policy principles that are too generalized to dictate particular outcomes. *See, e.g.*, Exec. Order No. 13,837 § 2(j) (defining the phrase "union time rate"); Exec. Order No. 13,839 § 2(c) (remarking, *inter alia*, that "[e]ach employee's work performance and disciplinary history is unique, and disciplinary action should be calibrated to the specific facts and circumstances of each individual employee's situation"); *see also id.* § 7 (referring to the items under section 2 as "policies" as compared to the "requirements" in other sections). Such statements do not have any independent operative legal effect. *Cf. Sierra Club v. Envt'l Prot. Agency*, 873 F.3d 946, 951 (D.C. Cir. 2017) ("Policy statements are binding on neither the public nor the agency, and the agency retains the discretion and the authority to change its position[.]" (internal quotation marks and citation omitted)). Therefore, it is unclear whether the Unions have Article III standing to challenge these types of provisions, standing alone. *See Lujan*, 504 U.S. at 560 (standing requires "an invasion of a legally protected interest"); *id.* at 561 (stating that plaintiffs must set forth "evidence" demonstrating, via "specific facts[,]" the elements of Article III standing). Regardless, any challenge to the President's expression of such abstract policy views about 'progressive discipline'—a topic that the FSLMRS commits entirely to the discretion of management (*see infra*)—would necessarily fail on the merits.

The Unions have challenged section 4(b)(iii) of the Removal Procedures Order, which specifically informs federal agencies that they must refuse to bargain over any proposal "that limits the agency's discretion to remove an employee from Federal

service without first engaging in progressive discipline[,]" Exec. Order No. 13,839 § 4(b)(iii), but this Court agrees with Defendants that this particular provision lines up with the FSLMRS. Section 7106(a)(2) of Title 5 of the United States Code specifically exempts from the duty to bargain in good faith issues regarding the power of management "to suspend, remove, reduce in grade or pay, or take other disciplinary action against [agency] employees[.]" 5 U.S.C. § 7106(a)(2)(A). In addition, the FLRA has considered such a policy prescription, and has determined that a proposal that requires an agency "to administer discipline in, among other things, a progressive and consistent manner" need not be bargained over, because "[r]estrictions on an agency's ability to choose the specific penalty to impose in disciplinary actions directly interfere with management's right to discipline employees under section 7106(a)(2)(A) of the [FSLMRS]." *Am. Fed. of Gov't Emps., AFL-CIO, Local 3732*, 39 F.L.R.A. 187, 198 (1991); *see also Patent Office Prof'l Ass'n*, 47 F.L.R.A. 10, 53–54 (1993) (concluding that a system of "progressive discipline" was nonnegotiable under section 7106(a) of Title 5 of the United States Code). As a result, and due to the *Chevron* deference the FLRA receives, the Unions' challenges to this provision (*see* AFSCME's Mem. at 19; NFFE's Mem. at 36), have no merit.

The Unions' challenges to section 4(c) of the Official Time Order and section 7 of the Removal Procedures Order are similarly deficient. (*See* NFFE's Mem. at 34–35, 40; AFSCME's Mem. at 37.) Congress has clearly vested OPM with the authority to "execut[e], administer[], and enforc[e] the civil service rules and regulations of the President and the Office and the laws governing the civil service[,]" 5 U.S.C. § 1103(a)(5)(A), and with the authority to "aid[] the President, as the President may

request, in preparing such civil service rules as the President prescribes," *id.* § 1103(a)(7). This Court has already explained that the President himself has the authority to issue executive orders within the sphere of federal labor-management relations (*see* Part IV.C., *supra*), and he also has the undisputed authority to "empower the head of any department or agency[,]" including OPM, to perform "any function which is vested in the President by law," 3 U.S.C. § 301. Thus, given the multiple wellsprings of authority that OPM enjoys in this area, OPM can surely receive directions from the President to promulgate regulations that are consistent with the rights and duties that the FSLMRS or CSRA prescribe, and setting aside the invalidity of some of the underlying substantive mandates, OPM's implementation of the Orders themselves appears to be all that section 4(c) of the Official Time Order and section 7 of the Removal Procedures Order require.

Finally, one of the Unions has raised a constitutional Take Care Clause claim against Defendants; at this point, the contention seems to be that, even if the Court finds that the remaining executive order provisions do not create statutory conflicts with FSLMRS, these provisions, too, must be enjoined as a violation of the President's duty to "take care that the laws be faithfully executed." (AFSCME's Mem. at 10 ("This clause commands that the President shall execute this duty with 'care' and 'faithfully'; this duty is therefore one of *good faith* towards Congressional statutes[.]").) At bottom, this argument suggests that the manner in which the President has interpreted and enforced the FSLMRS and the CSRA has not been in good faith, and thus, his act of issuing these Orders violates the Constitution's Take Care Clause. (*See id.* at 10–11.)

As an initial matter, it is not at all clear that a claim under the Take Care Clause

presents a justiciable claim for this Court's resolution.  *See Citizens for Responsibility and Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 138–40 (D.D.C. 2018) (debating the justiciability of such claims).  But even "assuming [that] some universe of viable" and justiciable "Take Care Clause claims exists," *id.* at 140, the claim that AFSCME raises here has not been plausibly asserted, much less established, and thus cannot be sustained.  AFSCME merely alleges that the President cannot "dispense with the requirement of good faith negotiations" and must "act in good faith in executing the statute himself[.]"  (*See* AFSCME's Mem. at 16 – 17.)  But the instant record contains no *evidence* of intentional bad-faith decisionmaking on the part of the President.  And absent such evidence (or at least some indication that the Orders issued here exceed the statutory authority of the President in a manner that clearly implicates his constitutional duties and prerogatives that AFSCME says apply)—this Court will decline to hold that there has been a Take Care Clause violation.  *See Dalton*, 511 U.S. at 472 ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.  On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.").

* * *

The end is nigh.  As explained in Part IV.D of this Memorandum Opinion, many of the challenged provisions of the President's Orders constitute an improper exercise of his statutory authority to regulate federal employees' labor relations, because they conflict with the right to good-faith collective bargaining that the FSLMRS seeks to

protect.  The Orders that the President issued on May 25, 2018, and that have been

evaluated extensively in this Opinion, will not be invalidated *in toto*, however, given

the President's clear intent that any invalid provisions within these orders should be

severable from the rest.  *See, e.g.*, Exec. Order No. 13,837 § 9(f); Exec. Order No.

13,839 § 8(e); *cf. Ass'n of Am. R.R. v. U.S. Dep't of the Transp., et al.*, 896 F.3d 539,

544 (D.C. Cir. 2018) ("[T]he remedy should be no more severe than necessary to cure

the disease.").  Furthermore, the Court has concluded that the challenged provisions of

the Orders that are addressed herein in Part IV.E are not invalid.  Thus, along with the

unchallenged parts of the Orders, these provisions remain.

## V.   CONCLUSION

In their cross-motion for summary judgment, Defendants assert that the fact "that

the President's policy choices about how best to guide the conduct of employees in the

Executive Branch do not align with Plaintiffs' own policy preferences is not a proper

basis for seeking judicial review."  (Defs.' Mem. at 71.)  This is undoubtedly true.  But

the core claim that the Unions make in the context of the instant case is that the

President's policy choices as reflected in the challenged executive orders do not align

*with the policy preferences of Congress*, and in this Court's view, *that* contention is

undoubtedly true as well.

In short, there is no dispute that the principle mission of the FSLMRS is to

protect the collective bargaining rights of federal workers, based on Congress's clear

and unequivocal finding that "labor organizations and collective bargaining in the civil

service are in the public interest."  5 U.S.C. § 7101(a).  Congress did not intend for

union challenges to the validity of executive orders that threaten such collective

bargaining rights to be funneled to the FLRA.  Upon exercising its subject-matter jurisdiction over the ripe claims that the Unions bring here, this Court has concluded that many of the challenged provisions of the Orders at issue here effectively reduce the scope of the right to bargain collectively as Congress has crafted it, or impair the ability of agency officials to bargain in good faith as Congress has directed, and therefore cannot be sustained.

As a result, and as set forth in the accompanying Order, this Court will declare the following provisions invalid, and will enjoin the President's subordinates from implementing or giving effect to: Executive Order 13,836 §§ 5(a), 5(e), 6; Executive Order 13,837 §§ 3(a), 4(a), 4(b); and Executive Order 13,839 §§ 3, 4(a), 4(c).  What remains— Executive Order 13,836 § 5(c); Executive Order 13,837 §§ 2(j), 4(c); and Executive Order 13,839 §§ 2(b), 2(c), 4(b)(iii), 7—are the few challenged directives that have neither reduced the scope of protected collective bargaining rights nor hampered good faith bargaining, and, thus, cannot be said to conflict with the FSLMRS. Furthermore, given these conclusions, the parties' various cross-motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**.

DATE:  August 25, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

119